# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| PANINI AMERICA, INC. <br><br> *Plaintiff*, <br><br> v. <br><br> FANATICS, INC.,  FANATICS LLC,  FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC., FANATICS SPV, LLC, and FANATICS HOLDINGS, INC. <br><br> *Defendants.* | **Case No. 8:23-CV-1721-KKM-AEP** |

## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AND MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

THE COMPLAINT'S ALLEGATIONS .............................................. 3

ARGUMENT ...................................................................................... 6

I.  PANINI FAILS TO ALLEGE THAT IT HAS SUFFERED AN
    "ANTITRUST INJURY," WHICH IS A REQUIRED ELEMENT OF
    ITS ANTITRUST CLAIMS ...................................................... 7

    A.  Panini's "Injuries"—Its Failure To Win Licenses To IP Rights—
        Did Not Result From Alleged Anticompetitive Conduct .................... 8

    B.  The Length Of The IP Licenses Does Not Change The Analysis ......... 9

    C.  Panini's Other "Input" Foreclosure Arguments Are
        Impermissible Complaints About Increased Competition ................. 11

        1.  Panini Does Not Allege How Fanatics' GCP Investment
            Or Topps Acquisition Caused Panini An Antitrust Injury........ 11

        2.  The Remaining Allegations Do Not Plead Antitrust Injury...... 14

II.  PANINI'S ANTITRUST CLAIMS FAIL UNDER ALL OF THE
     VARIOUS RELEVANT PRODUCT MARKETS IT ALLEGES............... 15

    A.  Panini Fails To Allege That Fanatics Has Harmed Or Will Harm
        Competition In Any Of The Purported Single-League Markets.......... 16

    B.  Panini Does Not Allege *Facts* To Establish That Any Of The
        Purported Broader Markets Is Legally Cognizable ........................... 17

III.  PANINI FAILS TO ALLEGE A VIOLATION OF SECTION 1 OF
      THE SHERMAN ACT ............................................................ 20

IV.  PANINI FAILS TO ALLEGE THAT FANATICS' ACQUISITION
     OF TOPPS OR ITS GCP INVESTMENT VIOLATED SECTION 7
     OF THE CLAYTON ACT.......................................................... 23

    A.  Panini Fails To Allege That Fanatics' Acquisition Of Topps
        Increased Concentration In Any Alleged Market .............................. 24

    B.  Panini's Section 7 Challenge To Fanatics' GCP Investment Also
        Fails ............................................................................... 25

V.     ADDITIONAL PLEADING DEFICIENCIES REQUIRE
       DISMISSAL OF THE REMAINING STATE LAW CLAIMS ................. 27

       A.     Count VII Fails Because Panini Does Not Allege That Fanatics
              Caused Panini's Counterparties To Breach Their Contracts .............. 27

       B.     Count VIII Fails Because Panini Does Not Plead That Fanatics
              Acted With A "Purely Malicious Motive" ......................................... 29

       C.     Count IX's Defamation Claim Fails Because It Is Too Vague
              And Attacks Opinions ...................................................................... 30

CONCLUSION ................................................................................................. 31

## INTRODUCTION

Panini alleges that obtaining exclusive intellectual property ("IP") licenses from sports leagues and players associations ("PAs")—a practice that Panini itself engaged in for more than a decade—violates the antitrust laws. That is both hypocritical and wrong. Panini is not an antitrust victim. It is an entrenched incumbent, the self-proclaimed "world's largest sports and entertainment collectibles company,"[1] and an alleged "market leader." Compl. ¶ 1. Panini achieved a prominent position by entering into exclusive, multi-year IP licenses and, in turn, displaced previously well-established trading card companies—precisely what Fanatics did here. If Panini is a victim of anything, it is a victim of competition: the leagues and PAs preferred Panini until Fanatics offered them innovative new ways to deliver the best collectibles to consumers. They chose Fanatics—the dynamic new entrant—because it was the better partner for the future. As a result, Panini will lose its licenses when they expire.

Unhappy with this outcome, Panini asks this Court to use the antitrust laws to prevent the leagues and PAs from freely contracting to maximize the value of their IP. The antitrust laws do not allow this outcome and, in any event, alleged "market leader" Panini does not need protecting. Panini had a decade-plus long advantage that it squandered—it is anything but the struggling dynamic entrant foreclosed by an incumbent behemoth that one normally sees as an antitrust plaintiff. It is exactly the

---

[1] Buterman Decl. Ex. 2, Official Panini America TikTok, ECF No. 25-2 ("The world's largest sports and entertainment collectibles company."); *id.* Ex. 3, Panini America Instagram, ECF No. 25-3 ("Panini America: The world's largest sports and entertainment collectibles company (FIFA, NBA, NFL, NFLPA, NASCAR, UFC, WWE, and College).").

opposite.  Nothing about the leagues' and PAs' unilateral decisions to license their IP to new-entrant Fanatics *instead of* market-leader Panini provides a viable cause of action.  This baseless case should be dismissed.

Panini's antitrust claims (Counts I-VI) fail because they are not based on "antitrust injuries"—i.e., harm resulting from a reduction in competition.  Courts routinely reject efforts by disgruntled competitors (especially incumbent-competitors like Panini) to claim an antitrust violation where the crux of the harm is a lost business transaction.  That is because injuries like the ones Panini alleges arise from *increased competition*.  As a new entrant that has taken over the licenses, Fanatics must prepare to perform on those licenses, including by ensuring (1) it has qualified employees (through direct hiring and its acquisition of Topps), Compl. ¶¶ 98, 100-06, and (2) that a quality card manufacturer, GC Packaging ("GCP"), has capacity to make its cards, *id.* ¶¶ 77-78.  These are all legitimate actions taken to support Fanatics' entry— something the antitrust laws encourage.  Panini fails to allege otherwise.

The Court must also dismiss Counts I-VI because Panini fails to carry its pleading burden with regard to its *eight* alleged product markets:  six markets in which each of National Football League ("NFL") cards, National Basketball Association ("NBA") cards, and Major League Baseball ("MLB") cards are alleged to be distinct from one another, *id.* ¶¶ 32, 35, and two broader markets in which cards for these leagues are combined (but all other sports leagues and collectibles are excluded), *id.* ¶¶ 34-35; *see generally id.* ¶¶ 28-42.  These so-called markets fail for two distinct reasons. First, the individual markets, *see id.* ¶¶ 32, 35, fail because Panini does not—and

cannot—plausibly allege any anticompetitive effect in those markets: substituting one exclusive licensee for another does not change the competitive dynamics for the trading cards covered by those exclusive licenses. There is one licensee supplying the trading cards today, and there will be one tomorrow. There is no viable allegation of harm as to these markets. Second, Panini's broader markets, *see id.* ¶¶ 34-35, fail because Panini does not allege facts to support its claim that trading cards for the NFL, MLB, and NBA are the only substitutes for one another, and that no other sports trading cards or other sports memorabilia compete with those products.

There are additional reasons to dismiss these counts. The Court must dismiss Count III because Panini does not allege facts sufficient to support its claim that Fanatics' individual IP licenses with the leagues and PAs violate Section 1 of the Sherman Act. The Court must dismiss Counts IV and V because Panini does not allege facts sufficient to support its claims that Fanatics' acquisition of Topps and investment in GCP violated Section 7 of the Clayton Act. In addition, the Court must dismiss Panini's remaining, non-antitrust claims (Counts VII-IX) because Panini (1) improperly attempts to repackage ordinary business conduct into common law violations and (2) fails to plead the necessary elements of those claims. The Court should dismiss the complaint in its entirety.

## THE COMPLAINT'S ALLEGATIONS

For decades, companies have competed for the licenses needed to sell sports trading cards. Compl. ¶ 1. PAs generally control IP rights to athletes' identifying information, including their names, images, and likenesses ("NIL"). *Id.* ¶ 29. And

3

sports leagues control IP rights, such as trademarked team logos and color combinations. *Id.* To produce and sell sports trading cards with both players' likenesses and team or league marks, companies must acquire licenses to both sets of rights. *Id.*[2] Because of the "brand investment" and "financial stability" required to succeed in selling sports trading cards, *id.* ¶ 125, companies—including Panini—often enter into long-term license agreements with leagues and PAs, *see id.* ¶¶ 54, 126, and "most licenses have been exclusive," at least in the "recent past," *id.* ¶ 48.

Panini has been a dominant player in global trading card sales for decades. *See id.* ¶ 53. Based in Italy, Panini describes itself as "a global, trading-card company" and a "market leader" in the sale of sports trading cards. *Id.* ¶¶ 1, 18. Panini achieved this position through, among other things, long-term exclusive licenses with IP holders (leagues and PAs) and acquisitions of existing licensees. *See id.* ¶ 126. In 2009, Panini entered into an exclusive licensing agreement with the NBA and began selling NBA trading cards in the United States. *Id.* ¶ 54. That same year, Panini acquired another trading card company (Donruss Playoff) and assumed that company's licenses from the NFL and the National Football League Players Association ("NFLPA"). *Id.* And in 2011, Panini secured a multi-year license with the Major League Baseball Players Association ("MLBPA"). *Id.* Through this series of licensing agreements and acquisitions, Panini won competitions for rights and displaced "established firms like Topps and Upper Deck." *Id.* ¶ 1. Today, Panini still holds multi-year licenses with

---

[2] Notably, however, companies can and do produce and sell trading cards for individual athletes, such as rookies, without obtaining a license from the league or including the league's IP. *See id.* ¶ 110.

many sports leagues, including: an exclusive license with the NBA, a license with the National Basketball Players Association ("NBPA"), and exclusive licenses with the NFL and the NFLPA. *Id.* ¶¶ 1, 64.

Fanatics is a digital sports platform that manufactures and sells licensed sports merchandise and collectibles. *Id.* ¶ 26. Fanatics recognized that the sports trading card industry had become stagnant and so, in 2021, it used its expertise to bring innovation to this industry. *See id.* ¶¶ 67-68. With Panini's exclusive licenses with the NBA and NFL set to expire in 2025 and 2026, respectively, *id.* ¶ 1, and Topps' licenses with MLB also set to expire, Fanatics competed for the rights that would allow it to sell trading cards after Panini's and Topps' existing licenses expired, *id.* ¶ 3. It succeeded, and in 2021 and 2022, Fanatics entered into licensing agreements with the NBA, NFL, MLB, and their respective PAs. *Id.* ¶¶ 3, 68. These exclusive agreements have terms between ten and twenty years, but do not begin for several years. *Id.* ¶¶ 3, 69. Panini claims these agreements are how Fanatics "began" its allegedly anticompetitive scheme and are the core mechanism by which Fanatics "foreclose[s] competition entirely" and "eliminate[s]" competition from Panini. *Id.* ¶¶ 3, 71.

To deliver on its promise to innovate and to meet its new licensors' expectations, Fanatics turned to building out its own trading card operations. In late 2021, Fanatics acquired Topps, a long-standing producer of trading cards that held exclusive licenses with MLB (and a non-exclusive license with the MLBPA) and Major League Soccer. *Id.* ¶¶ 4, 68. In February 2022, Fanatics invested in GCP, a manufacturer of quality trading cards. *Id.* ¶¶ 5, 77. (Panini continues to print cards

with GCP even after that investment.  *Id.* ¶ 94.)  And in April 2023, Fanatics sought to hire various "experts at producing NFL player trading cards, NBA player trading cards, and MLB player trading cards," some of whom worked for Panini.  *Id.* ¶¶ 5, 100, 104; *see also id.* ¶ 47 (alleging "the need for skilled workers" to make trading cards).  To expand its trading card offerings and to create new categories of trading cards, Fanatics also entered into exclusive autograph deals with "star, rookie players" in the NBA and NFL so that it could use those autographs on its cards.  *Id.* ¶¶ 5, 107.

Defining a relevant market that reflects commercial realities is the first step in any antitrust case.  Panini does not identify a single market, but instead alleges that Fanatics' conduct harmed competition in eight gerrymandered markets artificially defined so as to include only "the production and sale," *id.* ¶ 28, of "newly issued," *id.* ¶ 45, "fully licensed," *id.* ¶ 30, "mass market," *id.* ¶ 35, trading cards for (1) "Major U.S. Professional Sports Leagues" (defined to include only): (a) MLB player cards; (b) NBA player cards; and (c) NFL player cards, as well as separate relevant markets for *each* of (2) NBA, (3) MLB, and (4) NFL trading cards, *id.* ¶¶ 34, 41.  Panini also alleges each of these four markets has a "premium" equivalent.  *Id.* ¶ 41.  These eight markets were reverse engineered to line up exactly with six licenses that Fanatics acquired.

## ARGUMENT

To survive a motion to dismiss, "[a] plaintiff must plausibly allege all the elements of the claim for relief."  *Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1339-40 (11th Cir. 2017).  "Conclusory allegations and legal conclusions are not sufficient; the plaintiff[] must 'state a claim to relief that is plausible on its face.'"  *Id.* (citation

omitted). At their core, Panini's six antitrust claims all fail because they rest on conclusory and factually implausible allegations as to two indispensable elements. Specifically, to state plausible antitrust claims, Panini had to allege (1) **antitrust injuries**, meaning that its purported injuries result from a *decrease* rather than an increase in competition, and (2) **plausible relevant markets** that support a coherent theory of harm and which include all the products that consumers find to be reasonable substitutes. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448-49 (11th Cir. 1991); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010).[3] Panini fails to allege either. Panini's antitrust and state law claims fail for several other pleading deficiencies detailed below.

## I. PANINI FAILS TO ALLEGE THAT IT HAS SUFFERED AN "ANTITRUST INJURY," WHICH IS A REQUIRED ELEMENT OF ITS ANTITRUST CLAIMS

Panini's antitrust claims (Counts I-VI) all fail because Panini does not allege the required "antitrust injury." Antitrust injury is an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977); *Todorov*, 921 F.2d at 1448-49. An antitrust injury is one that results from a "competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). Critically, "injuries . . . due to an

---

[3] Count VI alleges that the same antitrust conduct underlying Counts I through V also violates the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). It is well settled that when, as here, the underlying federal antitrust claims fail, the FDUTPA claim should be dismissed as well. *See QSGI, Inc. v. IBM Glob. Fin.*, 2012 WL 1150402, at *4 (S.D. Fla. Mar. 14, 2012).

increase in competition" are not antitrust injuries.  *Todorov*, 921 F.2d at 1449-50; *see also Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994).  Panini's thesis—that it, an incumbent, suffered harm because it lost the competition for the IP licenses, Compl. ¶ 71—cannot supply the basis for pleading "antitrust injury."  Instead, Panini had to allege that *Fanatics engaged in anticompetitive conduct* to win the licenses.  But it can't, because Fanatics didn't:  Panini's antitrust claims fail on this basis alone.

### A.    Panini's "Injuries"—Its Failure To Win Licenses To IP Rights—Did Not Result From Alleged Anticompetitive Conduct

Panini alleges that it was injured when it failed to win new licenses to exclusively use the IP of the sports leagues and PAs, but it does not allege that its harm resulted from anticompetitive conduct.  For IP licenses like those at issue here, it is "well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract."  *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015).

Panini points to *nothing that Fanatics did* to preclude Panini from competing for those future contracts.  Panini does not allege that Fanatics coerced the leagues or PAs not to solicit bids from Panini.  Nor does it allege that Fanatics leveraged power from some other product market to strong-arm the leagues or PAs.  That is because neither took place.  Instead, the complaint confirms that Panini was the long-term incumbent and thus better positioned than anyone to show the leagues and PAs what it was capable of and to persuade them to extend or renew their licenses before they expired.  Panini has been in this industry since at least 2009.  Compl. ¶ 53.  It knew when the

licenses would expire because it held five of the six licenses in question, *id.* ¶ 64, and it knew how to secure new licenses, *id.* ¶ 48.  Panini had relationships with the leagues and PAs and claims that it had "achieved great results" for them in the past.  *Id.* ¶ 55.

As the incumbent, Panini should have been "competing" every day to maintain these relationships, and it had every advantage to win.  *Balaklaw*, 14 F.3d at 799 (incumbent has "strong incentive" to continue competing "in order to secure the exclusive positions").  The truth for Panini, though painful, is simple:  it became complacent and simply wasn't good enough.  The leagues and PAs wanted a better partner and moved their business elsewhere.  That was a lawful exercise of the "freedom to switch suppliers" that "lies close to the heart of the competitive process that the antitrust laws seek to encourage."  *Spinelli*, 96 F. Supp. 3d at 116 n.16 (citation omitted).  It was *increased* competition that caused the IP licensors here to switch from Panini to Fanatics.  That is not an antitrust violation.  *Atl. Richfield*, 495 U.S. at 344.

### B.    The Length Of The IP Licenses Does Not Change The Analysis

Unable to allege antitrust injury based on competing for—but failing to win—these future IP licenses, Panini complains that the IP licenses themselves are unduly restrictive because Panini will not have a chance to compete for them for ten to twenty years after they begin.  Compl. ¶ 69.  But that, too, is not a basis for alleging antitrust injury:  the licensors in this case—the leagues and PAs—have the right to independently choose with whom they want to deal (and with whom they don't), and for how long.  That right is inherent in the IP they are licensing.

It is well settled that "exclusive-licensing agreements covering intellectual property rights stand on a different footing than other exclusive arrangements" under the antitrust laws.  Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1803e (2023) ("Areeda"); *Spinelli*, 96 F. Supp. 3d at 118 ("An exclusive license, which merely confers upon the licensee the ability to exploit the licensor's exclusive intellectual property rights, does not violate the antitrust laws.").  That is because IP law gives the owners *exclusive* control over their rights, including the ability to assign them or to not license them at all.  Areeda ¶ 1803e; *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 153 (3d Cir. 1981) ("[A]s a licensor, the MLBPA is free to grant licenses to any competitor, or none at all.").  Indeed, the right to exploit exclusivity is fundamental to the concept of an IP right and serves as the incentive for creation and innovation.  Areeda ¶ 1803e.  For this reason, courts recognize that an exclusive license merely confers upon the licensee the licensor's existing ability to exploit the *licensor's* exclusive IP rights.  *Spinelli*, 96 F. Supp. 3d at 116.  That kind of license does not harm competition.

The length of Fanatics' IP licenses with the leagues and PAs does not change the outcome.  Intellectual property owners can choose to exclusively exploit their rights for as long as they hold them without the aid of an exclusive licensee.  It therefore is irrelevant how long the leagues and PAs choose to empower someone else to do what they could do themselves.  *Id*; *see also E& L Consulting, Ltd. v. Doman Indus.*, 472 F.3d 23, 29-30 (2d Cir. 2006) (lawful monopolist does not harm competition when it uses an exclusive distributor because that "vertical arrangement provides no

monopolistic benefit to [the manufacturer] that it does not already enjoy and would not continue to enjoy if the exclusive distributorship were enjoined"); *cf. Servicetrends, Inc. v. Siemens Med. Sys., Inc.*, 870 F. Supp. 1042, 1056 (N.D. Ga. 1994) (defendant would be "entitled" to the "monopoly power that is inherent in its right to sell or refuse to sell" its IP), amended on other grounds upon reconsideration, 1994 WL 7766878 (N.D. Ga. June 24, 1994). To accept Panini's position would restrict the freedom of sports leagues (NFL, NBA, MLB, and others) and PAs to decide whether and how to utilize their own IP. Neither antitrust nor IP law supports that result.

## C. Panini's Other "Input" Foreclosure Arguments Are Impermissible Complaints About Increased Competition

Once Fanatics rightfully won the future licenses to manufacture cards for the MLB, NBA, and NFL, and in order to support its efforts to improve the collectibles industry/collector experience, Fanatics began competing for other trading card inputs, including employees, printing services, and player autographs. *See* Compl. ¶ 121. While Panini complains about the struggles it allegedly experienced in those fields, its complaints are again about *increased* competition from a new entrant—which cannot give rise to antitrust injury. *See Todorov*, 921 F.2d at 1449-50.[4]

### 1. Panini Does Not Allege How Fanatics' GCP Investment Or Topps Acquisition Caused Panini An Antitrust Injury

Panini takes issue with two aspects of Fanatics' investment in trading card

---

[4] Because all of Panini's alleged injuries arise from an increase in competition for the IP licenses, this case is different from *Gulf States Reorg. Group, Inc. v. Nucor Corp.*, 466 F.3d 961 (11th Cir. 2006), which did not involve IP licenses and where the plaintiff's harm arose from a reduction in competition.

inputs:  its investment in manufacturer GCP, and its acquisition of long-standing

trading cards company Topps.  Neither is a plausible basis for pleading antitrust injury.

With respect to GCP, Panini fails to allege how this vertical integration harms

competition at all, much less causes Panini antitrust injury.  Panini acknowledges that

it will need to compete with Fanatics for the use of GCP's services, but it does *not*

allege, for example, that Fanatics' investment increased its costs, reduced the output

of trading cards, or caused prices to increase for consumers.  *See Port Dock & Stone Corp.*

*v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124-25 (2d Cir. 2007) (vertical expansion plus refusal

to deal, even when done by an alleged monopolist, does not alone establish an antitrust

violation).   Nor could it consistent with Rule 11 of the Federal Rules of Civil

Procedure, since Fanatics' investment *benefited* Panini by increasing the volume of

cards delivered to Panini and improving the quality of the product manufactured.

Panini's unsupported claim that GCP is "essential" because of its high quality

(Compl. ¶ 78) does not move the needle.  Panini does not allege that it has been cut

off from GCP and, in any event, concedes that other "quality" manufacturers exist.

*Id.* ¶¶ 78-79, 94.[5]  Instead, Panini alleges that GCP "shifted" some of the dates for

Panini's card releases at the end of 2022.  *Id.* ¶ 95.  That is another complaint about *an*

*increase in competition*.  But Fanatics (Topps) would have had the right to compete for

space at GCP even if it never invested in GCP.  Any alleged injury resulting from

---

[5]  Panini seems to be trying to invoke the "essential facilities doctrine."  But the "indispensable requirement for invoking [that] doctrine is the unavailability of access to the 'essential facilities'; where access exists, the doctrine serves no purpose."  *Verizon Comm'cns, Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004).  Panini admittedly has access to GCP.  *See* Compl. ¶ 94.

GCP's supposed "shift" in customer priorities "stem[s] from competition" and is not an antitrust injury. *Atl. Richfield*, 495 U.S. at 342-43 & n.13.[6]

Panini also complains about Fanatics' acquisition of Topps, Compl. ¶ 4, which occurred shortly *after* Fanatics secured future licenses with several of the sports leagues and PAs, *id.* ¶ 74.[7] Panini does not explain how this acquisition harmed competition or injured Panini. Again, the choice of IP owners to license their IP to Fanatics after years of dealing with Topps is the essence of competition. Panini's assertion that Topps had "no choice but to sell" itself to Fanatics because Fanatics secured a future long-term license with MLB and its PA, which were "Topps['] primary business partners," *id.* ¶¶ 74-75, is of no import. It is well established that an acquisition that rescues a failing firm does not cause antitrust injury to other market participants. *Brunswick Corp.*, 429 U.S. at 487-88 (injuries resulting from a company continuing rather than going out of business are not antitrust injuries); *see also infra* Section IV.A (explaining that the Topps acquisition could not increase concentration in any market because Fanatics did not make trading cards prior to the acquisition).

---

[6] Even accepting the cursory allegation that Fanatics "acquired control of GCP," Compl. ¶ 92, that would not make Panini's claim viable. A company "has no general duty to cooperate with its business rivals and may refuse to deal with them if valid business reasons exist for such refusal." *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294-95 (11th Cir. 2004). Here, Fanatics' need to produce its own quantities of high-quality trading cards would be a "valid business reason" to allegedly not cooperate with Panini on printing (which, to be clear, has not happened).

[7] It is ironic that Panini complains about Fanatics trying to develop its newly emerging trading card business by acquiring Topps when Panini did essentially the same thing a little over a decade prior. Shortly after Panini secured its first exclusive deal with the NBA in 2009, Panini "bought the assets of Donruss" and gained control of that company's licenses with certain leagues and PAs. *Id.* ¶ 54.

### 2.    The Remaining Allegations Do Not Plead Antitrust Injury

Panini also alleges a grab-bag of other things Fanatics has supposedly done after winning the IP licenses, including hiring Panini employees, signing rookie players to exclusive deals, "threaten[ing]" to stop selling jerseys to Panini, and using a different distribution model to sell trading cards.  Compl. ¶¶ 120-21, 131.  Even accepting the truth of those allegations, Panini cannot allege that any of them caused antitrust injury.

As a new entrant to the trading card space—its initial entry was barely two years ago, *id.* ¶¶ 67-68—Fanatics has to do the things emerging companies need to do to grow, such as hiring qualified employees and signing new licenses with college players who, because of changes in law, are now permitted to receive payments from third parties who compete for their NIL rights.[8]  This conduct is all *procompetitive*, as it increases worker mobility and labor market competition, something antitrust regulators expressly seek to encourage.  *See, e.g.*, Comment of the Antitrust Division of the U.S. Department of Justice, *Non-Compete Clause Rule*, No. 2023-0007 (F.T.C. Apr. 19, 2023).  And no business (nascent or otherwise) has a duty to deal with any particular customer, so there is nothing problematic about Fanatics allegedly threatening to no longer supply jerseys to Panini, particularly where, as here, Panini can acquire jerseys elsewhere.[9]  *See United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (antitrust law preserves "the long recognized right" of businesses to

---

[8]  Beginning in 2020, various states enacted laws that allow college athletes to receive payments from third parties for their NIL rights.  *See, e.g.*, Cal. Educ. Code § 67456; Fla. Stat. § 1006.74.

[9]  In fact, invoices Panini injected into the case show Panini continued to receive jerseys from Fanatics *after* this supposed May 2023 "threat."  *See* Hilborn Decl. ¶ 46 & Ex. 45, ECF Nos. 50, 50-45.

"freely . . . exercise [their] own independent discretion as to parties with whom [they] will deal"). Nor does utilizing a different distribution model and the alleged firing of one distributor reflect any injury to Panini or the competitive process.

At bottom, Panini simply does not like the fact that it faced increased competition from a new entrant, and that Panini lost because it was a complacent incumbent. Fanatics is doing the things it needs to do to perform its license agreements with the leagues and PAs, and is bringing much-needed innovation to the trading card space. Whatever harm that supposedly causes Panini, it is not antitrust injury.

## II.  PANINI'S ANTITRUST CLAIMS FAIL UNDER ALL OF THE VARIOUS RELEVANT PRODUCT MARKETS IT ALLEGES

Panini attempts to disguise other major legal defects in its antitrust claims by alleging an array of different relevant product markets—*eight* to be exact—but none is sufficient to sustain any of its claims. Panini's eight alleged markets[10] fall into two categories: (1) the narrower "Single Professional Sports League Trading Card Markets," which treat NFL, MLB, and NBA trading cards as each being in distinct markets, *see* Compl. ¶ 32; and (2) the broader "Major U.S. Professional Sports Leagues Trading Card Markets," which artificially combine MLB, NBA, and NFL trading

---

[10]  The supposed markets are: (1) the production and sale of newly issued mass market trading cards "for Major U.S. Professional Sports Leagues," and (2) their premium equivalents; (3) the production and sale of newly issued mass market MLB player trading cards and (4) their premium equivalents; (5) the production and sale of newly issued mass market NBA player trading cards, and (6) their premium equivalents; (7) the production and sale of newly issued mass market NFL player trading cards, and (8) their premium equivalents. Compl. ¶¶ 32, 34-35, 41. Panini labels the six narrower markets as "submarkets," but that is a distinction without a difference. *See* Areeda ¶ 533 (noting that "[s]peaking of 'submarkets' merely confuses the issue" and that "[a] typical result of the confusion is an overly narrow market designation that exaggerates the defendant's power"). Regardless of labels, Panini must plead a "relevant antitrust market."

cards into one market, *see id.* ¶ 34. Counts I-VI all fail under either category, but for different legal reasons. First, Panini's claims fail under the narrower "Single Professional Sports League Trading Card Markets" because Panini has not alleged that Fanatics has harmed or will harm competition in any of those single-league markets. Second, Panini's claims fail under the broader "Major U.S. Professional Sports Leagues Trading Card Markets" because Panini has not alleged any *facts* necessary to plausibly plead that those markets are legally cognizable.

### A. Panini Fails To Allege That Fanatics Has Harmed Or Will Harm Competition In Any Of The Purported Single-League Markets

Panini's allegations regarding **Single Professional Sports League Trading Card Markets for each of the NFL, MLB, and NBA** require dismissal because Panini fails to allege that any of Fanatics' conduct has harmed or will harm competition in these markets. In these single-league markets, Panini merely alleges that Fanatics has replaced or will replace the existing single seller. It is well established that substituting one seller for another in a market does not harm competition. *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 267 (7th Cir. 1984); *Balaklaw*, 14 F.3d at 799.

As to its proposed single-league markets, Panini alleges that "consumers do not view trading cards for players from one League as interchangeable with cards for players from another League." Compl. ¶ 33. Panini also alleges that there is a single company producing and supplying the trading cards in each of these alleged markets today (Panini for NFL and NBA, and Topps for MLB). *See id.* ¶¶ 1, 4. It further alleges that only one company will produce and supply trading cards in each alleged

market after Fanatics' future licenses take effect.  *See id.* ¶ 6.  The lateral transfer of a single NFL, NFLPA, NBA, NBPA, MLB, or MLBPA license to Fanatics cannot harm competition for the simple reason that ***nothing about competition changes for the sale of each of those single-league products:  there is one seller before, and one seller after***.  As such, Panini fails to allege harm to competition in its single-league markets.

Courts routinely reject "single-seller" substitution theories because, "[f]rom the standpoint of antitrust law, concerned as it is with consumer welfare, it is a matter of indifference whether [one seller or another] exploits a monopoly."  *Brunswick Corp.*, 752 F.2d at 266-67 (affirming dismissal of antitrust claims because "merely shift[ing] a lawful monopoly into different hands . . . has no antitrust significance"); *see also Oxford Glob. Res., Inc. v. Weekly-Cessnun*, 2004 WL 2599898, at *3 (N.D. Tex. Nov. 12, 2004) (dismissing antitrust claims "[b]ecause an attempted takeover of existing monopoly power can have no negative effect on competition," and noting that antitrust law is "completely indifferent to the transfer of existing monopoly power"); *Am. Cricket Premier League, LLC v. USA Cricket*, 445 F. Supp. 3d 1167, 1178 (D. Colo. 2020) ("Plaintiff's ultimate goal is to hold the monopoly that USA Cricket granted to ACE.  Being deprived of that monopoly is not something the antitrust laws were designed to remedy.").  Crediting Panini's single-league markets therefore compels dismissal of all six antitrust counts for failure to allege harm to competition.

## B.    Panini Does Not Allege *Facts* To Establish That Any Of The Purported Broader Markets Is Legally Cognizable

Panini's broader **Major U.S. Professional Sports Leagues Trading Card**

**Markets** fail for a different reason: Panini fails to allege the facts necessary to plead that these are relevant markets. Not only were these markets reverse engineered and drafted to capture only licenses Fanatics will hold, but they cannot be squared with commercial realties, including the myriad of broad ways Panini itself has described the market in other litigations.[11] Not surprisingly, Panini's markets flunk the basic legal test for how to define a product market.

To allege a legally cognizable product market, Panini "must present enough information in [its] complaint to plausibly suggest the contours of the relevant . . . product market[]." *Jacobs*, 626 F.3d at 1336. This inquiry turns on whether Panini alleges facts plausibly showing that *all of the relevant substitutable products are included* in each of its proposed markets. *See id*. at 1337. Panini must therefore *plead facts* that explain why its market definition reflects "the area of effective competition," *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (citation omitted), and must identify the products that are "reasonabl[y] interchangeab[le] for the

---

[11] *See, e.g.*, Am. Pet. ¶ 18, *Panini Am., Inc. v. Matijevich*, No. 23-04798 (Dallas Cty. Dist. Ct. Aug. 3, 2023) (referencing a "highly competitive **sports trading cards** market" in which Panini competes (emphasis added)); *id.* ¶ 20 ("Panini and Fanatics are actual or potential competitors in the **trading card** industry." (emphasis added)); Mot. to Dismiss at 2, *Wheeler v. Panini Am., Inc.*, No. 22-00763 (D.D.C. June 10, 2022), ECF No. 8 ("Panini is a world leader in the **sports trading card** industry." (emphasis added)); Compl. ¶ 1, *Panini Am. Inc. v. Carter*, No. 23-03628 (C.D. Cal. May 11, 2023), ECF No. 1 ("Panini is a leading retailer of **collectible trading cards and memorabilia** in the United States and internationally." (emphasis added)). The Court may judicially notice these prior inconsistent statements for the fact that Panini made them. *See Rasha v. BellSouth Telecomm., Inc.*, 2009 WL 10697350, at *3 n.5 (N.D. Ga. Apr. 17, 2009) ("[A] court may take judicial notice of the plaintiff's written statements/pleadings in a prior action. A court may assume that plaintiff is estopped from denying the truth of the information contained in his/her prior pleadings/arguments, and, thus, is estopped from taking positions contrary to the ones he took in a previous proceeding."); *see also Walther v. McIntosh*, 2013 WL 4028189, at *2 (M.D. Fla. Aug. 7, 2013) (taking judicial notice of plaintiff's prior statements "for the fact that they were uttered").

purposes for which they are produced—price, use and qualities considered," *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956); *see also Am. Express Co.*, 138 S. Ct. at 2285 (relevant market "is the 'arena within which significant substitution in consumption or production occurs'" (citation omitted)). The Eleventh Circuit has affirmed dismissal of antitrust claims for failure to adequately plead a relevant market, *Jacobs*, 626 F.3d at 1339, and district courts in this Circuit routinely do the same. *See, e.g.*, *Park 80 Hotels, LLC v. Holiday Hosp. Franchising, LLC*, 2023 WL 2445437, at *21 (N.D. Ga. Feb. 16, 2023); *Wound Care Concepts, Inc. v. Vohra Health Servs.*, 2021 WL 4990957, at *7 (S.D. Fla. Mar. 26, 2021).

To survive a motion to dismiss, Panini must plead facts sufficient to support its claim that no other sports trading cards (professional or otherwise) or other sports memorabilia compete with products from the NFL, MLB, and NBA—***yet the complaint remarkably says nothing on this point***. It merely alleges that these three are the biggest leagues. Compl. ¶ 34. "This conclusory statement merely begs the question of what, exactly, makes [the NFL, MLB, and NBA] comprise this []market." *Jacobs*, 626 F.3d at 1338. It says zero about consumer preferences, including the potential substitutability of cards from college football, college basketball, NASCAR, PGA golf, UFC, and wrestling, for example. *See id.* (dismissing complaint for failure to address consumer preferences). The complaint is likewise silent as to why other *entertainment trading cards or entertainment collectibles* are not part of the market, which is especially glaring given Panini's references to a broader sports and entertainment

collectibles marketplace in other litigation. Consumer preferences and market realities "are crucial to understanding whether [Panini's] separate market[s] exist[]," yet these obvious questions about Panini's markets "go unanswered in the complaint." *Id.* at 1338-39. Panini's "skimpy allegations" of the Major U.S. Professional Sports Leagues Trading Card Markets render its antitrust claims "legally insufficient," and compel dismissal of all six of them. *See id.*

## III.    PANINI FAILS TO ALLEGE A VIOLATION OF SECTION 1 OF THE SHERMAN ACT

In Count III, Panini alleges that *each of Fanatics' agreements with the sports leagues and PAs* individually violates Section 1 of the Sherman Act. In short, Panini claims that the very conduct that it engaged in for more than a decade—obtaining exclusive IP licenses from sports leagues and PAs—now violates the Sherman Act. This Court should be skeptical of Panini's allegations of harm to competition given its history of entering into the precise types of exclusive licensing agreements it now claims are unlawful. *Cf. Spanish Broad. Sys., Inc. v. Clear Channel Commc'ns, Inc.*, 242 F. Supp. 2d 1350, 1361 (S.D. Fla. 2003) (finding it "puzzling" and "curious" that plaintiff "saw no federal anticompetitive problem [with its own prior conduct], yet it complains the actions of HBC and CC would injure the advertiser in the relevant market"), *aff'd*, 376 F.3d 1065 (11th Cir. 2004). But hypocrisy aside, the fact that the sports leagues and PAs decided to support a new entrant in Fanatics—after Panini had a decade-long opportunity to show the leagues and PAs what it could do for them—confirms these agreements do not harm competition.

20

Section 1 of the Sherman Act "prohibits only those agreements that unreasonably restrain competition." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996) (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 58-64 (1911)).[12]  Pleading that an agreement unreasonably restrains competition requires "specific factual allegations" concerning the agreement's individual effects, such as "reduction of output, increase in price, or deterioration in quality." *Jacobs*, 626 F.3d at 1339-40 (citation omitted) (noting that bare allegations that an agreement will "eliminat[e] price competition" are not enough because they "provide[] no basis on which a court could determine *how* harm to competition results from" that agreement).

Despite a 190-paragraph complaint, Panini provides no specificity as to *how each of Fanatics' individual IP licenses with the sports leagues and PAs will reduce output, increase price, or result in a decrease in quality when they eventually begin.*  Rather, Panini asserts—in the most conclusory fashion—that Fanatics' IP licenses mean that "the kid on the playground will have less options to buy trading cards after school in retail stores," Compl. ¶ 129, and that "[c]onsumers will also suffer antitrust injury from decreased choice, increased prices, and loss of quality due to the absence of competition," *id.* ¶ 153.  Neither conclusory allegation meets Panini's burden to plausibly allege how the individual agreements alter the competitive landscape—because they don't.  *See Spanish Broad. Sys.*, 242 F. Supp. 2d at 1360 (substituting "one

---

[12]  The license agreements at issue here are vertical agreements to license IP; as Panini concedes (Compl. ¶ 151), they are therefore subject to the "rule of reason," which assesses whether each individual agreement "unreasonabl[y] restrain[s]" competition.  *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1216 (11th Cir. 2002) (citation omitted); *see also Spinelli*, 96 F. Supp. 3d at 118.

competitor for another without more does not violate the antitrust laws" (quoting *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 421 (11th Cir. 1984))).

The exclusive licenses at issue are licenses to use the *intellectual property* of individual sports leagues and PAs.  Compl. ¶ 29.  That key factual allegation dooms Panini's Section 1 claims:  exclusive IP licenses are presumptively legal for the simple reason that IP holders do not have to license their IP in the first place.[13]  Thus, for example, in *Spinelli v. NFL,* the court dismissed a Section 1 claim based on an exclusive license the NFL granted to Getty and AP for NFL images, finding that "[a]n exclusive license, which merely confers upon the licensee the ability to exploit the licensor's exclusive intellectual property rights, does not violate the antitrust laws."  96 F. Supp. 3d at 118 (collecting cases).  Similarly, in *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 149-50 (3d Cir. 1981), the Third Circuit rejected allegations that Topps' "assiduous program of obtaining exclusive license agreements with every major and minor league baseball player" violated Section 1 and Section 2 of the Sherman Act.  The court explained that, "as a licensor, the MLBPA is free to grant licenses to any competitor, or none at all."  *Id.* at 153.  Notably, the *Fleer* court specifically rejected claims that Topps' licensing program was anticompetitive because its multiple licenses were of a long duration, as Panini alleges in this case.

Here, the MLB, NFL, NBA, and their respective PAs could have chosen to

---

[13]  The allegations here stand in stark contrast to *McWane v. FTC*, 783 F.3d 814 (11th Cir. 2015).  Here, the leagues and PAs that are the licensors already have natural and exclusive ownership over their own IP and hence the exclusive arrangements are not used to protect their monopolies or foreclose any competition that would exist absent them licensing their IP.

produce and sell their own trading cards.  Instead, they chose to license their IP—first to Panini or Topps and then to Fanatics.  Pleading the fact of those IP licenses says nothing about their impact on competition, and Panini does not offer any non-conclusory allegations tending to show that the individual agreements caused "harm[] to competition in general, rather than the plaintiff, or any other competitor." *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1265-66 (S.D. Fla. 2021) (citing *Spanish Broad. Sys.*, 376 F.3d at 1069).  Where, as here, the "complaint lacks sufficient factual matter regarding the harm to competition" and instead "only describes the impact that Defendant's conduct has had on" the plaintiff "and its economic loss," dismissal is warranted.  *Lavender Health Care, LLC v. Redstone LLC*, 2021 WL 4169796, at *8 (M.D. Fla. Sept. 14, 2021); *see also Spanish Broad. Sys.*, 242 F. Supp. 2d at 1360 (the "requirement [of harm to competition] ensures that otherwise routine business disputes between business competitors do not escalate to … an antitrust action").

## IV. PANINI FAILS TO ALLEGE THAT FANATICS' ACQUISITION OF TOPPS OR ITS GCP INVESTMENT VIOLATED SECTION 7 OF THE CLAYTON ACT

Panini challenges two different acquisitions by Fanatics:  its acquisition of Topps and its acquisition of control of GCP.  To state Section 7 claims based on these acquisitions, Panini must allege facts showing that the transactions substantially reduced competition in a relevant market.  The framework for conducting that analysis varies depending on whether the transaction is horizontal or vertical in nature—i.e., whether the transaction combines competitors, or is instead between entities at different levels of the supply chain.  *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1032

(D.C. Cir. 2019) (discussing varied application of Section 7 in the horizontal and vertical settings).  As to Topps (Count V), Panini's failure to allege increased concentration in any market requires dismissal, whether the transaction is deemed horizontal or vertical.  As to GCP (Count IV), Panini does not plead facts sufficient to allege an anticompetitive vertical transaction under Section 7 law.

### A.   Panini Fails To Allege That Fanatics' Acquisition Of Topps Increased Concentration In Any Alleged Market

The complaint's minimal allegations regarding Fanatics' acquisition of Topps do not come close to pleading the Section 7 violation that Panini asserts in Count V. Compl. ¶¶ 74-76, 160-64.  As then-Judge Thomas explained in *United States v. Baker Hughes, Inc.*, Section 7 requires Panini to demonstrate that the "transaction will lead to undue concentration in the market for a particular product in a particular geographic area."  908 F.2d 981, 982-83 (D.C. Cir. 1990) (noting plaintiff proved defendants "would significantly increase concentration in the already highly concentrated" market, but not finding a violation in the absence of anticompetitive effects).

Panini *says nothing about how Fanatics' acquisition of Topps increased concentration in any alleged market—because it did not*.  When Fanatics acquired Topps in 2021, Fanatics was not producing any new trading cards at all.  Compl. ¶ 67 (alleging that Fanatics had "no experience in the trading-card industry as of 2021"). Indeed, Panini's own long-term exclusive licenses bar Fanatics from manufacturing any cards utilizing NBA or NFL IP until 2025 or 2026.  *Id.* ¶¶ 104, 110.  Because Fanatics had zero percent of sales in any of the alleged trading cards markets when it

acquired Topps, that deal could not as a matter of law increase concentration in any of those markets by any amount—and certainly not by an "undue" amount. *Baker Hughes*, 908 F.2d at 982-83; *see also Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1563 (11th Cir. 1987) ("Since the two merged companies do not control a significant portion of the relevant product market, no anticompetitive effects arise from the merger."); *Camaisa v. Pharm. Rsch. Assocs., Inc.*, 2022 WL 843653, at *7 (D. Del. Mar. 22, 2022) (dismissing Section 7 claim for failure to plausibly allege anticompetitive effects where plaintiff did not allege change in market shares).

Panini's Section 7 challenge also fails because the foreclosure about which Panini complains does not "flow[] from" the Topps acquisition. *See Ekbatani v. Cmty. Care Health Network, LLC*, 2021 WL 2806185, at *3 (M.D. Fla. June 14, 2021), *aff'd*, 2022 WL 31793 (11th Cir. 2022) (per curiam). Panini's core complaint is about Fanatics' future licenses with the MLB, NFL, NBA, and their respective PAs. *See, e.g.*, Compl. ¶ 3. Fanatics did not acquire any of those licenses by acquiring Topps; the MLB licenses that Topps held would have expired before Fanatics' own MLB licenses took effect in 2026. *See id.* ¶¶ 4, 74. Thus, the Topps acquisition merely gave Fanatics access to Topps' expiring agreements—licenses Panini does not allege were unlawful. *See id.* ¶ 72. Panini fails to allege any "substantial lessening of competition" that flows from this acquisition. *Ekbatani*, 2021 WL 2806185, at *3.

**B.     Panini's Section 7 Challenge To Fanatics' GCP Investment Also Fails**

The Court should likewise dismiss Panini's Section 7 challenge to Fanatics' investment in the manufacturing company GCP. Compl. ¶¶ 154-59. Panini concedes

that GCP "is not a competitor" of Fanatics, *id.* ¶ 156, which means that Fanatics' investment is a vertical transaction. To state a Section 7 claim based on a vertical transaction, Panini has a heavy burden[14]: it must allege a "reasonable *probability* of anticompetitive effect" by showing that Fanatics' investment in GCP results in the ability and incentive to harm competition, and that "competition would probably be substantially lessened." *FTC v. Microsoft Corp.*, 2023 WL 4443412, at *12-13 (N.D. Cal. July 10, 2023) (citation omitted), *appeal filed*, No. 23-15992 (9th Cir. July 13, 2023). Panini does none of that.

Panini's theory of harm to competition is entirely speculative and contrary to its own allegations. Panini hypothesizes that, at some point in the future, Fanatics' investment in GCP *might* harm Panini *if* Fanatics caused GCP to "restrict Panini's supply of trading cards." Compl. ¶¶ 94-96. To be very clear, that has not happened— and nothing in the complaint tends to show a "reasonable probability" that it will. *Microsoft Corp.*, 2023 WL 4443412, at *12 (citation omitted). Further, speculation about potential future harm *to Panini itself* does not establish that Fanatics' investment is likely to harm *competition*. *Atl. Richfield*, 495 U.S. at 338 ("The antitrust laws were enacted for 'the protection of *competition*, not *competitors*'" (citation omitted)); *Marion HealthCare, LLC v. S. Ill. Hosp. Servs.*, 2022 WL 2317303, at *5 (S.D. Ill. June 28, 2022)

---

[14] The difficulty of proving a Section 7 challenge to a vertical merger is clear from the fact that, as of 2018, the Antitrust Division of the Department of Justice had "not tried a vertical merger case to decision in *four* decades!" *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 193-94 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). In that vertical-merger challenge, and in every other such challenge the government has tried in federal court since, the government has failed to show an anticompetitive effect. *See id.* at 254; *see also United States v. UnitedHealth Grp.*, 630 F. Supp. 3d 118, 155 (D.D.C. 2022).

(dismissing Section 7 claim because "[i]t is unclear what actual financial injury has occurred [to consumers], and, if that injury does occur to the public . . . then one of those members would be a more suitable plaintiff here").  In any event, Panini admits it has a supply agreement with GCP that protects Panini, and fails to allege how Fanatics could cause GCP to harm Panini without violating that agreement.  *See, e.g.*, Compl. ¶¶ 87-88.  Panini's failure to account for these contractual protections compels dismissal of its Section 7 claim based on Fanatics' vertical investment in GCP.  *See United Health Grp.*, 630 F. Supp. 3d at 147-49; *see also AT&T*, 310 F. Supp. 3d at 225-26 (considering that existing agreements "serve to significantly constrain" the defendants' post-merger conduct).

## V.    ADDITIONAL PLEADING DEFICIENCIES REQUIRE DISMISSAL OF THE REMAINING STATE LAW CLAIMS

### A.    Count VII Fails Because Panini Does Not Allege That Fanatics Caused Panini's Counterparties To Breach Their Contracts

Panini alleges that Fanatics tortiously interfered with its existing contracts with the leagues and PAs, GCP, and Panini's own employees, Compl. ¶¶ 170-74, but fails to allege the necessary elements of a tortious interference claim.[15]

As to the leagues and PAs, Panini does not allege the breach of any agreements—an essential element under Florida law.  *See AMG Trade & Distrib., LLC*

---

[15]  To the extent there is a conflict between possible sources of substantive law, New York law would govern Panini's tort law claims under Florida choice-of-law principles.  *See Garcia v. Pub. Health Tr. of Dade Cnty.*, 841 F.2d 1062, 1064 (11th Cir. 1988) (citing *Bishop v. Fla. Specialty Paint Co.*, 389 So.2d 999 (Fla. 1980)); *see also* Mot. to Transfer at 15-16, ECF No. 24.  However, Panini's claims fail under either Florida or New York law, so any distinction is not material for the instant motion.

*v. Nissan N. Am., Inc.*, 2019 WL 11583368, at *3 (S.D. Fla. May 17, 2019) ("[I]n an action for tortious interference with a contract, a plaintiff must demonstrate there was a breach of contract." (citation omitted)), *aff'd*, 813 F. App'x 403 (11th Cir. 2020). Instead, Panini alleges that it still sells trading cards pursuant to its agreements with these entities today, *see* Compl. ¶¶ 64, 105, and merely complains that Fanatics has entered into agreements that will begin *after* Panini's current agreements expire, *see id.* ¶¶ 104-05. That is not sufficient under Florida law.

As to GCP, Panini fails to plead Fanatics' specific intent to procure a breach. Panini asserts that GCP "breach[ed] the change-of-control provision" that "prohibits GCP from undergoing a change in control without Panini's consent." *Id.* ¶¶ 171, 88. Florida law requires Panini to plead Fanatics' specific intent to procure the breach of a contract, which means that Panini must plead Fanatics' knowledge of the particular contractual provision Fanatics allegedly induced GCP to breach. *See, e.g., McGriff Ins. Servs., Inc. v. Littlestone*, 2021 WL 4750646, at *2 (M.D. Fla. Oct. 12, 2021). Panini does not allege that Fanatics knew of *any* term, let alone the specific change-in-control provision, in Panini's alleged agreement with GCP.[16]

Finally, as to Panini's employees, Panini again fails to plead a breach of any agreement. Panini does not allege that any employee breached a specific term in any employment contract, but only that some employees decided to accept higher-paying

---

[16]    Nor does Panini offer anything but wholly conclusory allegations as to why any alleged "interference" was unjustified. *See Duty Free Ams., Inc. v. Estée Lauder Cos.*, 797 F.3d 1248, 1279 (11th Cir. 2015).

jobs with Fanatics. *See* Compl. ¶¶ 103-04. That is insufficient as a matter of law. *See, e.g.*, *Centennial Bank v. ServisFirst Bank Inc.*, 2022 WL 10219893, at *18 (M.D. Fla. Oct. 10, 2022) (dismissing tortious interference with contract claims where plaintiff failed to allege breach of relevant employment contracts); *Ganske v. Mensch*, 480 F. Supp. 3d 542, 557 n.6 (S.D.N.Y. 2020) (similar).

### B.     Count VIII Fails Because Panini Does Not Plead That Fanatics Acted With A "Purely Malicious Motive"

Panini contends that Fanatics tortiously interfered with Panini's prospective relations with the leagues and PAs, GCP, Panini's own employees, and star "rookie" players. Compl. ¶¶ 176-80. This claim fails because, under Florida law, "the defendant's interference to protect its economic interests" bars a claim for tortious interference with prospective relations unless the plaintiff plausibly alleges a "purely malicious motive." *Duty Free Ams., Inc.*, 797 F.3d at 1280 (citation omitted). Here, all of Panini's allegations are consistent with Fanatics acting in its "legitimate competitive economic interest," and do not remotely suggest pure malice. *Id.* (citation omitted); *see supra* Sections I.A, III, IV.B, V.A (explaining why Panini fails to state claims for antitrust, FDUTPA, or tortious interference with contract claims). It is not unlawful or malicious that Fanatics competed vigorously for the exclusive licensing agreements that Panini currently holds and wanted to keep for itself—that is the essence of competition. *See Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 186 (S.D.N.Y. 2006). Nor is it unlawful or malicious for Fanatics to acquire an interest in a manufacturing facility (GCP) that it intends to use to produce the trading cards it has

licensing agreements to produce.  *See Port Dock*, 507 F.3d at 124.  It is also not unlawful or malicious for Fanatics to pursue qualified employees (whom it needs to build out its operations to be ready to fulfill its obligations to its licensing partners) and to pay them better—that is simply fair competition in the labor market.  Likewise, it is not unlawful or malicious for Fanatics to enter exclusive autograph agreements with college players expected to be star "rookies" in the professional leagues; those types of agreements are valuable to Fanatics and its ability to serve its licensing partners and create new categories of trading cards, and therefore could not be for the sole purpose of harming Panini.

### C.    Count IX's Defamation Claim Fails Because It Is Too Vague And Attacks Opinions

Panini alleges Fanatics defamed its business by telling unidentified "players, player agents, player representatives, players associations, and Panini employees" that "Panini is incapable of performing for them, will be out of business soon, and lacks the money to pay them."  Compl. ¶¶ 112, 182-88.  This claim fails for two reasons.

First, Panini fails to allege the most basic details to support its defamation claim. For instance, Panini does not identify the specific statements alleged to be defamatory or the identity of any speaker.  The lack of this basic information dooms the claim. *See, e.g.*, *Am. Airlines, Inc. v. Geddes*, 960 So. 2d 830, 834 (Fla. Dist. Ct. App. 2007) (per curiam) (rejecting defamation claim where "[n]either the complaint nor the evidence presented at trial identifies the precise statements alleged to have been defamatory or the [] employee making such statements").

Second, Panini's defamation claim is predicated on alleged statements of opinion rather than fact.  "[S]tatements that are not readily capable of being proven false" and "statements of pure opinion" are "protected from defamation actions by the First Amendment." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018).  Whether a statement constitutes fact or opinion "is a question of law for the courts," *id.* at 1262-63, to be made by "examin[ing] the statement in its totality and the context in which it was uttered or published," *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1379, 1385 (S.D. Fla. 2006) (citation omitted).  The alleged statements here pertain to *predictions* about Panini's current and future capabilities and the viability of its business.  These statements could not be proven true or false at the time they were made, and could only represent a Fanatics employee's opinion about Panini's future business prospects.  Such predictions cannot provide the basis for a defamation claim.  *See Advisors Excel, L.L.C. v. Scranton*, 2014 WL 12543802, at *4, 8 (S.D. Fla. Sept. 16, 2014) (dismissing defamation claim predicated on "predictions as to the outcome of future events"); *Finkelstein v. Wachtel*, 2003 WL 1918309, at *7 (S.D.N.Y. Apr. 21, 2003) (same).

## CONCLUSION

The Court should dismiss Panini's complaint in its entirety.

Dated:  September 11, 2023

Respectfully submitted,

William J. Schifino, Jr., Esq.
Florida Bar Number 564338
**GUNSTER, YOAKLEY**
**& STEWART, P.A.**
401 E. Jackson Street, Suite 1500
Tampa, Florida 33602

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1264
lawrence.buterman@lw.com

Michael G. Tanner, Esq.
Florida Bar Number 261300
**GUNSTER, YOAKLEY**
**& STEWART, P.A.**
1 Independent Drive, Suite 2300
Jacksonville, Florida 32202

Derek L. Shaffer (*pro hac vice*)
Christopher G. Michel (*pro hac vice*)
**QUINN EMANUEL URQUHART &**
**SULLIVAN**
1300 I Street NW, 9th Floor
Washington, DC 20005

Amanda P. Reeves (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004

Christopher S. Yates  (*pro hac vice*)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

Michael B. Carlinsky (*pro hac vice*)
**QUINN EMANUEL URQUHART &**
**SULLIVAN**
51 Madison Ave, 22nd Floor
New York, NY 10010

*Counsel for Defendants*

## LOCAL RULE 3.01(g) CERTIFICATION

I hereby certify that counsel for Defendants has conferred over teleconference with Plaintiff's counsel, Stuart H. Singer, of Boies Schiller Flexner LLP, on September 8, 2023, who advised that Plaintiff opposes the relief requested herein.

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman

## CERTIFICATE OF SERVICE

I certify that on September 11, 2023, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will notify counsel.

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman