**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

PANINI AMERICA, INC.

*Plaintiff,*

v.

FANATICS, INC.,
FANATICS, LLC,
FANATICS COLLECTIBLES
INTERMEDIATE HOLDCO, INC.,
FANATICS SPV, LLC, and
FANATICS HOLDINGS, INC.

*Defendants.*
__________________________________/

**Case No. 8:23-cv-1721-KKM-AEP**

**Permanent Injunctive Relief Requested**

**Declaratory Relief Requested**

**Demand for a Jury Trial**

# AMENDED COMPLAINT FOR PERMANENT INJUNCTIVE, DECLARATORY, AND MONETARY RELIEF

## Table of Contents

**Page**


I. Nature of the Case ....... 1

II. Jurisdiction and Venue ....... 6

III. The Parties ....... 8

A. Plaintiff ....... 8

B. Defendants ....... 8

IV. Market Definition ....... 10

A. The Products ....... 10

B. The Relevant Product Markets ....... 13

C. The Relevant Geographic Markets ....... 23

V. Panini, Fanatics, and Historical Competition in and for the Relevant Markets ....... 23

A. Panini's Success Growing the Relevant Markets ....... 23

B. Panini's Production and Sale Processes ....... 24

C. Fanatics's Poor Quality ....... 26

D. Historical Competition in and for the Relevant Markets ....... 32

VI. Fanatics Executes Exclusive Deals of Unprecedented Length and Scope and Then Uses the Monopoly Power from Those Deals to Harm Panini, Distributors, Local Card Shops, Case Breakers, and Consumers Before Those Deals Even Begin. ....... 34

A. Fanatics gains a long-term monopoly by securing exclusive deals of unprecedented length that unprecedently combine all major sports leagues. ....... 34

B. Fanatics leverages its long-term monopoly gained by exclusive deals of unprecedented length and combination to obtain a monopoly in the short term through coercive, unfair, and anticompetitive conduct ....... 39

1. Fanatics buys Topps. ........................................................ 40

2. Fanatics acquires control over GCP, Panini's critical special manufacturer, and uses that control to undermine Panini's existing business. .............................. 41

3. Fanatics raids Panini for employees to undermine Panini's ability to compete. ......................... 48

4. Fanatics pays star, rookie players not to deal with Panini. ..................................................... 51

5. Fanatics disparages Panini to third parties. ..................... 54

6. Fanatics threatens to never stop coercing Panini and cuts off Panini's supply of jerseys. .............................. 55

7. Fanatics induces the NFL Players Association to terminate its license agreement with Panini. ............... 56

8. Fanatics induces WWE to terminate its contract. ............ 59

9. Fanatics coerces distributors and big-box retailers. .......... 60

10. Fanatics coerces local card shops. ...................................... 61

11. Fanatics coerces case breakers. ........................................ 63

VII. Fanatics's Market Power and Monopoly Power ................................... 66

VIII. Harm to Competition and Consumers .................................................. 69

Count One – Attempted Monopolization, Sherman Act Section 2 ................. 73

Count Two – Monopolization, Sherman Act Section 2 .................................. 75

Count Three – Unreasonable Restraint of Trade, Sherman Act Section 1 .... 76

Count Four – Clayton Act, Section 7 .............................................................. 79

Count Five – Clayton Act, Section 7 ................................................................ 80

Count Six – Tortious Interference with Contract .......................................... 82

Count Seven – Tortious Interference with Prospective Business .................. 83

Count Eight – Business Defamation and Disparagement .............................. 85

Jury Demand........................................................................................ 87

Prayer for Relief.................................................................................. 87

Panini America, Inc. ("Panini") sues Fanatics, Inc.; Fanatics, LLC; Fanatics Collectibles Intermediate Holdco., Inc.; Fanatics SPV, LLC; and Fanatics Holdings, Inc. (collectively, "Fanatics"); and alleges:

## I. Nature of the Case

1. The professional sports trading card business in the United States has become a multi-billion-dollar enterprise. It provides trading cards for everyone from kids beginning to collect cards of their sports heroes, to adults who remember the past excitement of collecting and following their favorite teams, to hobbyists who seek to make profits by acquiring and reselling rare cards.

2. Panini has for years led the way in facilitating this growth through high-quality production values and innovation. Panini, and other market participants that seek to compete, require many inputs to do so effectively. These include: (a) licenses for the right to use the names, images, and likenesses of professional sports players; (b) licenses from sports leagues for the right to use the names, logos, and uniforms of the team for which the player plays; (c) contracts with individual players to provide autographs, name, image, likeness, and clothing to embed in certain cards; (d) specialized manufacturing for production of the cards; and (e) employees skilled in the successful design and marketing of professional sports trading cards.

3. For some years now, United States professional sports leagues have controlled the licensing of the intellectual property of their members and professional players associations have controlled the licensing of important aspects of the intellectual property of their members. Consequently, Panini and other market participants who compete in the production and sale of sports trading cards enter into agreements with sports leagues and related players associations for licenses.

4. This case arises from the conduct of Fanatics in monopolizing and attempting to monopolize the market for the production and sale of new professional sports trading cards, and related alternative markets for separate sports, including by controlling and restricting access to key inputs that Panini and any other competitors require to compete successfully either in the long term or in the short term (Fanatics's "Anticompetitive Conduct").

5. Panini has enjoyed less extensive exclusive license agreements with certain sports leagues and players associations, and it competed for those agreements openly and proved itself in the market over many years. Panini expanded the business of producing and selling new sports trading cards for all involved, as reflected in its increasing revenues, and thus royalties paid to licensors, year-over-year—at times spectacularly so.

6. Panini currently holds an exclusive license with the National Basketball Association (NBA) through September 2025, a license with the NBA

Players Association through September 2025, and exclusive licenses with the National Football League (NFL) and the NFL Players Association through March and February 2026, respectively.

7. The industry has historically had separate, staggered (*i.e.*, expiring at different times), short-term exclusives of around five years, sport by sport, with several firms vying for rights when a contract was near expiration. But Fanatics has now obtained exclusive ten- or twenty-year deals to produce and sell new trading cards for players of teams in each of Major League Baseball (MLB), the NBA, and the NFL (collectively, "the Major U.S. Professional Sports Leagues" or "the Leagues"). Both before and after completing this coup, Fanatics also engaged in numerous acts to eliminate competitors, including Panini, which still has some years of remaining rights on existing contracts.

8. Although the exact terms have not been made public, Fanatics's new agreements with the NFL, NFL Players Association, MLB, and MLB Players Association are for twenty years, and the NBA and NBA Players Association deals are for at least ten years. Through these contracts of extremely long duration and by combining licenses from all these bodies, Fanatics has locked up all three major sports for the next decade and two of them for the next two decades. Fanatics accomplished this without open bidding. Fanatics also provided equity shares in Fanatics to induce the

Leagues and players associations to acquiesce in Fanatics's monopolization scheme, effectively precluding them from dealing with Panini and other competitors in any way that might disadvantage Fanatics.

9. When Fanatics acquired its long-term exclusive license agreements, licenses that were already in existence had some years left to run. Not content with waiting for several years to commence its licenses when the terms of the existing exclusive licenses expire, Fanatics then sought to monopolize the business and to tortiously interfere with Panini even in the short term. It has done so in many ways. It bought out a competitor (who had a license for baseball cards). It also undertook a concerted effort to limit or destroy Panini's business, including by buying control of the highly specialized manufacturer Panini depended upon to produce its cards and then using that control to undermine Panini's ability to supply cards. It raided Panini for employees. And it damaged Panini's relationships with players, leagues, business partners, and consumers, by telling agents representing athletes and others that Panini was now "dead," among other anticompetitive and tortious acts.

10. For example, as a direct result of Fanatics's employee raiding, one major players association (the NFL Players Association) has sought to terminate Panini's existing license before its expiration date.

11. The loss of competition from Fanatics's monopoly control over the Relevant Markets will substantially reduce consumer welfare. For example, Fanatics is already using its economic power to restrict consumer choice by moving to exclude or limit distributors and local card shops, thereby limiting the outlets where cards may be bought, and by insisting that card-breakers, who divide and resell packs, only use Fanatics's platform. If Fanatics is permitted to succeed in its effort to monopolize, consumers can expect a decline in the quality of sports trading cards—as happened when Fanatics took control over the official sports apparel business—as well as fewer choices and less innovation. And prices will rise because Fanatics—having driven out competition—will have significant market power and no restraint on its pricing.

12. Fanatics's anticompetitive, monopolistic acts, in undermining Panini's (and others) presence in the marketplace, have the purpose and effect of destroying competition in and for the market for the production and sale of Major U.S. Professional Sports Leagues trading cards, both immediately and for the long term. Competition "for" the market through bidding on licenses with the Leagues and players associations would normally take place every handful of years. Fanatics has ended that form of competition. By entering into licensing agreements of unprecedented length and scope, including with all major sports leagues, combined with its other Anticompetitive Conduct,

Fanatics has created insurmountable barriers to entry to competition "for the market."

13. As a victim of Fanatics's anticompetitive and otherwise illegal activities, Panini seeks relief from this Court.

## II. Jurisdiction and Venue

14. This action arises under Sections 1 and 2 of the Sherman Antitrust Act, which is codified at 15 U.S.C. §§ 1–2, as well as § 7 of the Clayton Act, which is codified at 15 U.S.C. § 18. Panini seeks damages under § 4 of the Clayton Act, which is codified at 15 U.S.C. § 15, and injunctive relief under § 16 of the Clayton Act, codified at 15 U.S.C. § 26.

15. This Court has subject matter jurisdiction under 15 U.S.C. §§ 15 and 26; 28 U.S.C. § 1331; and 28 U.S.C. § 1337(a).

16. This Court has supplemental jurisdiction over Panini's State-law claims under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Amended Complaint and are so related to Panini's federal-law claims that they form part of the same case or controversy.

17. This Court has personal jurisdiction over each Defendant named here under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because, among other things, each (a) resides in this District, (b) transacts business in this District, (c) directly or indirectly sells and delivers commerce in this District, and (d) has substantial aggregate contacts with this District.

18. This Court also has personal jurisdiction over each Defendant named here under Florida Statute § 48.193, as each operated, conducted, engaged in, and carried on a business venture in this State; committed tortious acts within this State; caused harm in this State; and is engaged in substantial and not isolated activity within this State.

19. Venue lies in this District pursuant to 15 U.S.C. §§ 15(a) and 22 along with 28 U.S.C. § 1391 because each Defendant has its principal place of business in this District and thus resides in this District, resides in the State in which this District is located, and is subject to personal jurisdiction in this District. Venue is also proper in this District because each Defendant transacted business, was found, or had agents in this District, and a substantial part of the events giving rise to Panini's claims occurred and a substantial portion of the affected interstate trade and commerce has been carried out in this District. Fanatics's website indicates that it has corporate offices in Tampa, Lake Mary, and Jacksonville in this District, and identifies Tampa both as its brand headquarters and a location for manufacturing and distribution.

20. Fanatics's Anticompetitive Conduct, as described herein, involved interstate trade or commerce and/or was within the flow of, was intended to, and did have a direct, substantial, and reasonably foreseeable effect on United

States interstate commerce, as well as on commerce and consumers in States including Florida.

21. If Fanatics's Anticompetitive Conduct is allowed to continue, Fanatics will obtain unlawful, monopolistic control over the markets for new Major U.S. Professional Sports Leagues trading cards, as detailed below, affecting the prices in those markets, harming competition, and injuring consumers throughout the United States.

22. Fanatics also uses instrumentalities of interstate commerce to produce, sell, market, and ship its trading cards.

## III. The Parties

### A. Plaintiff

23. Panini America, Inc., ("Panini") is a subsidiary of Panini S.p.A. (which does business as the Panini Group), a global trading card company with its principal place of business in Modena, Italy.

24. Panini produces and sells sports trading cards. It is a Delaware corporation with its principal place of business in Irving, Texas. Panini conducts business throughout the United States, including the State of Florida.

### B. Defendants

25. Fanatics, Inc., is a Delaware corporation with its principal place of business in this District.

26. Fanatics, LLC, is a sole-member LLC organized in Delaware with its principal place of business in this District.

27. Fanatics Holdings, Inc., is a Delaware corporation with its principal place of business in this District.

28. Fanatics Collectibles Intermediate Holdco, Inc., d/b/a Fanatics Trading Cards, is a subsidiary of Fanatics Holdings, Inc., and a Delaware corporation with its principal place of business in this District.

29. Fanatics SPV, LLC, is a Delaware limited liability company with its principal place of business in this District.

30. Panini refers to Defendants collectively as "Fanatics" because they all operate under the name "Fanatics" and hold themselves out as one unified entity: Fanatics. The Amended Complaint's allegations are to be construed against all Defendants individually and collectively.

31. Fanatics promotes itself as an online manufacturer and retailer of licensed sportswear, sports collectibles, sports merchandise, and—now—sports trading cards. Fanatics conducts business throughout the United States, including in the State of Florida, where it operates at least four offices.

32. Fanatics is an actual and/or potential competitor of Panini.

## IV. Market Definition

### A. The Products

33. The products at issue here are described as sports trading cards, and the business involved here concerns the design, production, marketing, and sale of these cards. Consumers most desire fully licensed sports trading cards—meaning those that display the League logo, League players association logo, the team uniform, the color combinations of the team, and the player's name, image, and likeness (and sometimes more).

34. Each League today controls not only its own marks and logos, but the names, marks, and logos of all the League's teams. But no League controls the intellectual property in player names, images, signatures, and the like. So no League can produce and sell any product in-house that includes the use of player names, images, signatures, and the like and no League has a preexisting monopoly over such products.

35. Similarly, today, each players association for each League—through a group-licensing agreement with its own member-athletes—generally controls the group licensing of the intellectual property of its members and each of the players association's members agree to significantly restrict their ability to enter into individual licenses.

36. The players association for each League does not hold intellectual property that includes League marks, League logo, team names, team

uniforms, and color combinations. So each players association cannot produce or sell any product in-house that includes the use of League logo, team names, team uniforms, and color combinations and no players association has a preexisting monopoly over such products.

37. Accordingly, producing fully licensed sports trading cards of players in a given league complete with league logo, league players association logo, team uniform, color combinations, and player image today at least requires a license from both the player's League ***and*** a license from the player's player association (each referred to here as a "Major League License"). These two ingredients are critical. No other option exists for producing and selling fully licensed trading cards, and no individual League or individual players association could produce and sell fully licensed trading cards on its own.

38. Thus, unlike other holders of intellectual property, the Leagues and players associations cannot effectively use their intellectual property independently to produce sports trading cards. For such cards to be fully licensed and meet consumer demand, there must be a combination of the right to use the player's name, image, and likeness; the right to use the name, logo, and uniform of the player's team and League; and the intellectual property and expertise of the third-party card supplier. Panini has developed its renowned brands, intellectual property, trade secrets, skill, and creativity to produce and

sell fully licensed sports trading cards that meet—and exceed—consumer expectations.

39. If a third-party licensee secures licenses from both a League and that League's players association such that it can produce and sell fully licensed trading cards of players in that League, that licensee can also seek out other licenses to further enhance their production and sale of fully licensed sports trading cards. One of these further licenses is a license with an individual player.

40. The group player rights licensed by the players associations typically include *facsimile* signatures of the players—rather than original, handwritten autographs that can be provided by players on an individual basis. This means a licensee also can add features to a trading card by contracting with an individual player for the right to use that individual player's original, handwritten autograph, pieces of that player's uniforms or shoes, and that player's name, image, and likeness on an individual rather than group basis.

41. To recap, a League can license its intellectual property of League marks, team names, color combinations and the like. But doing so is not enough to produce and sell a fully licensed trading card of players in that League. A players association can license its intellectual property (received from its players) of the right to use player names, images, signatures, and the

like on a group basis along with other players. But doing so is not enough to produce and sell a fully licensed trading card of players in that League. Thus, neither a League nor a players association can effectively use its intellectual property independently. Instead, both Leagues and players associations require a third-party licensee (like Panini) to produce and sell fully licensed sports trading cards. A third-party licensee can execute other deals to enhance the fully licensed trading cards it seeks to produce and sell, such as deals with individual players for original, handwritten autographs.

**B. The Relevant Product Markets**

42. The relevant market here is the overall market for all **Major U.S. Professional Sports Leagues trading cards:** a combined market including NBA player trading cards, NFL player trading cards, and MLB player trading cards.

43. The relevant product market or markets are limited to newly issued trading cards created by card producers and sellers like Panini. In industry terms, this is the "primary" market, and it is distinct from the re-sale—or "secondary"—market.

44. The size and importance of the markets for other U.S. league sports—such as the National Hockey League (NHL) and Major League Soccer (MLS)—are marginal in comparison to the "big three" Major U.S. Professional Sports Leagues. Even if NHL and MLS trading cards are included within the

market for Major U.S. Professional Sports Leagues trading cards, the market-definition, market-power, and competitive-effects allegations here would remain unchanged. So, too, for college sports. Moreover, by acquiring Topps in January 2022, Fanatics also has an exclusive license with MLS.

45. Major U.S. Professional Sports Leagues trading cards are distinct from and do not compete with other trading cards, including trading cards for other professional sports or collegiate sports.

46. The popularity, familiarity, and viewership of the "big three" Major U.S. Professional Sports significantly exceeds all other sports. And the interests, preferences, and loyalties of professional sports enthusiasts of Major U.S. Professional Sports Leagues dictate that only a Major League License will suffice to compete in the Relevant Markets. There is no close substitute for a Major League License in the associated professional sport to reach consumers devoted to that sport, a team in the associated League, and favorite players on that team or in that sport.

47. Due to their popularity and long history, Major U.S. Professional Sports Leagues trading cards enjoy greater visibility and are more readily accessible for purchase by consumers than other sports trading cards. Among sports trading cards displayed at retailers, Major U.S. Professional Sports Leagues trading cards typically receive the most shelf space and are displayed more prominently than trading cards for other sports. At some retailers, Major

U.S. Professional Sports Leagues trading cards are the only sports cards available. Similarly, at online retailers, Major U.S. Professional Sports Leagues trading cards are displayed more prominently on webpages and generally come up first in search results for sports trading cards.

48. The trading cards of other sports teams—such as those for NHL, MLS, collegiate sports, and the WNBA—do not have significant cross-elasticity with Major U.S. Professional Sports Leagues trading cards. For the same reasons, sports trading cards for other non-team sports, such as NASCAR, PGA, and UFC, are even less reasonable substitutes for Major U.S. Professional Sports Leagues trading cards.

49. Other types of trading cards, such as Pokémon cards, are even more removed from the relevant market. These cards are distinguished from Major U.S. Professional Sports Leagues trading cards in obvious ways, including price, appearance, quality, and content. They are not produced to the same high level of specification, nor do they include signatures or memorabilia. For these reasons, consumers do not view Pokémon and other entertainment trading cards as interchangeable with Major U.S. Professional Sports Leagues trading cards.

50. A small but significant non-transitory increase in the price of Major U.S. Professional Sports Leagues trading cards would not substantially raise demand for other sports trading cards or other types of trading cards.

51. The production and sale of sports trading cards requires—along with the licenses from sports leagues and players associations described above—access to specialized manufacturing techniques and specifications and employees skilled in the successful creation, design, and marketing of professional sports trading cards. There are substantial entry barriers to the business, including significant investments associated with development and manufacturing. To overcome these barriers, a licensee (like Panini) must be able to produce and sell trading cards for players of at least one Major U.S. Professional Sports League. NBA player trading cards, NFL player trading cards, and MLB player trading cards are the only three types of sports trading cards with sufficient consumer demand—and thus revenues—to allow a firm to secure and maintain a competitively substantial market presence.

52. As a result of consumer preferences and a degree of product differentiation, the **Major U.S. Professional Sports Leagues trading cards** market is further divided by producers, distributors, and consumers into markets for **Mass Market** trading cards and for **Premium** trading cards.

53. Significant differences in price, distribution channels, quality of output, and product design distinguish Mass Market from Premium cards. Mass Market cards are sold at a low price—such as $5–15 per "packet" of eight-to-ten cards—through mainstream channels such as Walmart, Target, pharmacy chains, and other retailers at which casual sports fans (or their

parents) often shop. Premium cards sell for hundreds or even thousands of dollars per packet or case at specialist retailers known as local card shops (or hobby shops), online retailers, and through case breaking.

54. Premium cards include such features as hand-signed autographs or pieces of jerseys integrated into the cards—or both. Examples of Premium cards include:







55. Some Mass Market card lines include cards with signatures or other special features, but the frequency is far lower than for Premium cards.

56. Mass Market cards are targeted to casual collectors, such as youngsters and enthusiasts. These cards are the modern successor to the wax-paper-wrapped, bubble-gum packets of decades past. Mass Market cards are likely to be found trading and circulating in the schoolyard or neighborhood.

57. Among consumers, the product interchangeability between Mass Market cards and Premium cards is limited. Large price differences, for example, distinguish the two different types of cards, and transparent quality differences make the two types of cards suitable for different collectors with very different aims.

58. There is also limited interchangeability between either Mass Market cards or Premium cards and sports collectibles such as jerseys, hats, and other league, team, or athlete-specific apparel. The sports trading card market is distinguished from these other sports products by all the traditional indicia of market delineation: Defendants and the Leagues recognize that trading cards form a distinct market because they license trading cards separately from other memorabilia. Trading cards and other memorabilia are produced by different firms using different facilities. There are obvious differences in the construction, appearance, and use of trading cards (which are often traded or collected) and, for example, apparel (which may be worn). Very few consumers, if any, collect apparel related to more than one team. Retail outlets, appraisers, and other businesses specialize in trading cards.

There are significant price differences between trading cards and other memorabilia. Put starkly, consumers do not view a Fanatics-produced hat as interchangeable with a pack of trading cards.

59. There is minimal, if any, cross elasticity of demand between trading cards and other memorabilia. Indeed, Fanatics's conduct—its plan to monopolize trading cards and illegally destroy Panini's trading card business—makes sense only because trading cards are a distinct product that consumers value independently of other types of memorabilia.

60. Investing in art and non-card collectibles such as pens or watches is even less a substitute for collecting or trading Mass Market or Premium trading cards for the Major U.S. Professional Sports Leagues.

61. Within the larger market for **Major U.S. Professional Sports Leagues trading cards** exist smaller submarkets, which include **NBA player trading cards**, **NFL player trading cards**, and **MLB player trading cards**. These submarkets are alleged in the alternative to be relevant markets for purposes of Panini's claims.

62. The NBA, NFL, and MLB consist of thirty, thirty-two, and thirty teams, respectively. In each League, each of the teams has agreed to give exclusive control over the licensing of their names, logos, and uniforms to their League for licensing the production and sale of the trading cards at issue here.

63. For many fans of the "big three" Leagues, given the similarities in popularity, history, and consumer access to trading cards for players of these sports, there is significant cross elasticity of demand among NBA player trading cards, NFL player trading cards, and MLB player trading cards.

64. However, many consumers do not view trading cards for players from one League as interchangeable with cards for players from another League. They prefer to collect cards from one of the Major U.S. Professional Sports Leagues over the cards from other Leagues. For example, some consumers do not view MLB player trading cards as interchangeable with NFL player trading cards. Even some fans of both sports do not regard their cards for one sport as interchangeable with cards for the other sport. Each of the Major U.S. Professional Sports Leagues is well-established, unique, and has its own devoted followers. For these customers, the interchangeability of cards is constrained in satisfying consumer demand.

65. Accordingly, an entity that is able to monopolize and control the new professional trading card business for players in the NFL, NBA and MLB has a distinct ability to increase prices and engage in other anticompetitive activity.

66. As with the Major U.S. Professional Sports Leagues trading cards market, the submarkets for NBA player trading cards, NFL player trading cards, and MLB player trading cards are further divided by producers,

distributors, and consumers into markets for Mass Market trading cards and for Premium trading cards for the reasons discussed above.

67. To recap, the products at issue here—sports trading cards—implicate two relevant markets: Mass Market and Premium cards for Major U.S. Professional Sports Leagues trading cards. In the alternative, sports trading cards implicate six relevant submarkets: Mass Market and Premium cards for each of **(1)** MLB player trading cards; **(2)** NBA player trading cards; and **(3)** NFL player trading cards. Collectively, these eight markets are referred to as the "Relevant Markets."

68. In addition, for distributors and producers of cards, there is no substitutability for critical supply-side inputs. All the inputs described herein—including (a) licenses from sports leagues that control the use of team colors, logos, and names; (b) licenses from players associations for the use of player names, images, and likenesses; (c) contracts with individual players to provide their name, image, and likeness along with original autographs and clothing to embed in certain cards; (d) specialized manufacturing for production of the cards; and (e) employees skilled in the successful creation, design, and marketing of professional sports trading cards—are necessary to produce and sell trading cards in these markets.

69. Each Relevant Market also may contain further submarkets with competitive significance for the actions here.

70. In addition to the barriers to entry resulting from Fanatics's Anticompetitive Conduct, the Relevant Markets have barriers to entry, including (because of the need for licenses) the limits on individual teams granting their own licenses, limits on individual players granting their own licenses, the existence of exclusive licenses, specialized high-tech manufacturing requirements, and the need for skilled workers such as card designers, program designers, product developers, athlete-acquisition managers, and specialist-print managers.

71. Where licenses are exclusive, a new prospective entrant typically would need to wait for one of the League or players association contracts to be approaching termination, then bid for the exclusive or nonexclusive license from that League or players association. By having the ability to produce and sell trading cards for players of at least one Major U.S. Professional Sports League, a firm could maintain a market presence that allowed it to compete in the future for the production and sale of trading cards for players of other Major U.S. Professional Sports Leagues. But any firm that fails to win the rights to produce and sell trading cards for players of at least one of the Leagues is eliminated as a competitor.

72. These barriers inhibit new entry from firms outside the markets for Major U.S. Professional Sports Leagues trading cards.

### C. The Relevant Geographic Markets

73. The appropriate geographic market is the United States.

74. Consumers generally purchase Major U.S. Professional Sports Leagues trading cards within their own country. Moreover, the interest in sports is generally country-specific, with the U.S. market focused on the Major U.S. Professional Sports Leagues, while foreign markets may favor other sports, such as cricket, rugby, or soccer. Thus, as to the market for Major U.S. Professional Sports Leagues trading cards and the individual League submarkets, the relevant geographical area is the United States.

75. Consumer preferences and demand for trading cards of particular Leagues also vary by country. In the United States, cards for NFL players, NBA players, and MLB players constitute the vast majority of trading card sales.

## V. Panini, Fanatics, and Historical Competition in and for the Relevant Markets

### A. Panini's Success Growing the Relevant Markets

76. For over sixty years, Panini S.p.A. has produced and sold trading cards outside the United States. Panini Group established its United States subsidiary, Panini America, Inc. ("Panini"), in 2009, and Panini quickly entered the United States trading card business.

77. In January 2009, the NBA announced a four-year exclusive deal with Panini to produce and sell NBA player trading cards. At the time, the

NBA acted on behalf of both the League and the NBA Players Association concerning the licensing rights of each, so that deal covered the NBA League itself and its players association. Later that year, after securing the NBA deal, Panini bought the assets of Donruss Playoff, L.P., an American trading card company that at the time held nonexclusive licenses with the NFL and NFL Players Association. So by the end of 2009, Panini was producing and selling NBA player trading cards (exclusively) and NFL player trading cards (nonexclusively). In 2011, Panini secured a three-year, nonexclusive license with the MLB Players Association.

78. Through competitive prowess and product innovation—and backed by substantial financial investments from Panini S.p.A.—Panini generated win-win results for the Leagues, players associations, and consumers in producing and selling NBA player, NFL player, and MLB player trading cards in the years that followed. Panini reliably increased revenues year-over-year through innovative designs, a high order of quality control, effective marketing, and wide distribution.

**B. Panini's Production and Sale Processes**

79. Panini's success is due in part to innovations it brought to the trading card industry that have benefited consumers along with the Leagues and players associations that Panini has served.

80. Each year, Panini releases up to 100 or more unique card collections featuring Major U.S. Professional Sports Leagues players. Each collection, in turn, includes many individual brands, sets, and sub-sets that have become popular among consumers.

81. Panini produces trading cards in boxes and packs of trading cards and then sells the cards to authorized distributors. These include big-box retailers and specialist-retailer shops (also called local card shops or hobby shops). Panini also sells directly to consumers on its website—which forms the primary trading card market. Panini does so at various prices determined by its pricing models consistent with the product's specifications.

82. Some collections will include "Insert Cards," which are specialty cards that are rarer than common "base" cards. Insert Cards make up a small percentage of Panini's manufactured trading cards, but this scarcity gives them significant consumer appeal and value. Some Insert Cards are elaborate and include the featured player's autograph or memorabilia (or both), such as a piece of clothing or other gear used by that player.

83. Panini's trading card collections are typically issued annually, to coincide with a particular season for a sport. Significant effort and ingenuity go into designing a card collection before its release date.

84. Panini has invested heavily in the establishment of brands and has developed a wide range of strategies, software, and formulas for the production

and sale of its sports trading cards in the Relevant Markets. Panini also has trained and developed employees with distinctive, highly specialized skills and knowledge of Panini's methods. As a result, the popularity of trading cards has grown significantly.

### C. Fanatics's Poor Quality

85. Unlike Panini's success in bringing innovations and high-quality products to trading cards and growing the Relevant Markets for all the participants, Fanatics has a record of reducing product quality for consumers wherever it goes.

86. Fanatics has struggled with producing products of quality for consumers of its sports merchandise and its early run of trading cards. In fact, the quality of Fanatics's products that Fanatics produces for consumers is so poor, entire Twitter (or X) accounts are devoted to Fanatics's failings:



[1]

[1] Fanatics Sucks! (@FanaticsSucks), X, https://twitter.com/FanaticsSucks.

87. When the NHL announced a deal with Fanatics for jerseys, hockey fans were "outraged" because "[s]ports fans from all corners have had a bone to pick with Fanatics for years. Complaints about fabric quality, printing errors and questionable designs are nothing new."[2]

88. Poor product quality is not a reputational characteristic of Fanatics only in years past. The reputation continues:


The Philadelphia Inquirer

SIGN IN / SIGN UP

EAGLES

**Eagles fans are dunking on Fanatics for crooked kelly green merch**

After dozens of Eagles fans received lopsided kelly green gear from Fanatics, the merchandise juggernaut and official NFL supplier told The Inquirer it paused future shipments.

[3]

---

[2] Richard Morin, *Hockey fans are outraged by the NHL's jersey deal with Fanatics. Here's why.*, USA TODAY (March 21, 2023), https://www.usatoday.com/story/sports/nhl/2023/03/21/fanatics-nhl-jersey-deal-fan-reaction-new-uniform-supplier/11516767002/.

[3] Beatrice Forman, *Eagles fans are dunking on Fanatics for crooked kelly green merch*, THE PHILADELPHIA INQUIRER (Sept. 18, 2023, 2:57 PM), https://www.inquirer.com/eagles/eagles-merch-kelly-green-fanatics-crooked-20230918.html.





[4]

89. Given these failures to produce quality products, Fanatics's attempts at producing and selling trading cards promise to be plagued by similar shortcomings. Indeed, that already appears to be the case.

90. One issue in the trading card industry concerns what are known as redemption cards. Redemption cards usually occur when a player who has a contractual obligation to provide his autograph to the trading card company has failed to provide his autograph on a timely basis. The trading card company includes what is essentially an "I.O.U." for that player's autograph

[4] MLFootball (@_MLFootball), X (Sept 15, 2023, 4:14 PM), https://twitter.com/_MLFootball/status/1702777929330044940; Reid Gillis (@DannyGarcia126), X (Aug. 24, 2023, 2:14 PM), https://twitter.com/DannyGarcia126/status/1694775284363395327.

card in the trading card pack. Like anyone who receives an I.O.U. rather than cash, consumers prefer not to receive a redemption card.

91. The trading cards Fanatics has produced for MLB and the MLB Players Association are plagued by redemption cards:



[5]

[5] Mario Alejandro (@BeisbolCardBlog), X (Sept. 4, 2023, 9:46 PM), https://twitter.com/BeisbolCardBlog/status/1698875318159683598.

92. Fanatics's trading cards are also plagued by poor quality, just like Fanatics merchandise. For example, as recently as late September 2023, Fanatics made a massive error in what is supposed to be one of its flagship products, "Bowman Chrome," by producing and selling duplicates of cards that were supposed to be "1/1" (meaning ***no*** duplicates):



[6]

[6] JB (@OldTownCards), X (Sept. 18, 2023, 1:49 PM), https://twitter.com/OldTownCards/status/1703828577479688389.

93. Fanatics also recently pre-sold boxes of MLB trading cards that it represented and advertised would contain twenty-four packs of cards. But in October 2023, when consumers received those boxes that they pre-purchased from Fanatics, the boxes contained only twenty packs of cards:


Chris Doetsch
@LLSportsCards
Follow
Topps has reduced 2023 topps update hobby boxes to 20 packs from 24 despite all sell sheet info and even topps.com presells saying 24 packs. Absolutely despicable . @CardPurchaser

12:41 PM · Oct 9, 2023 · 64.1K Views
14 Reposts 10 Quotes 76 Likes


Card Purchaser
@CardPurchaser
Follow
2023 Topps Update hobby boxes have 20 packs.... pre-sale information says 24 packs...... will there be refunds or free "silver packs" for the screw up?

Description

2023 Topps Baseball Update Series - Hobby Box - PRE-ORDER

The excitment of the 2023 Major League Baseball season continues in Topps Baseball Update Series. Collectors will find cards of familiar faces in new uniforms, brand new rookies celebrating their recent MLB debuts and cards capturing the festivities of the MLB All Star Game and Home Run Derby from Seattle, Washington.

Fans can also find autograph and relic cards from the stars of today, young embering rookies, and legendary players.

Every 24-pack Hobby Box contains one autograph or relic card!

1:48 PM · Oct 9, 2023 · 14K Views


Bobby
@BobbySTL1936
Follow
Hi @MikeMahan Quick ? How does @Topps advertise pre orders on 202 Topps Update as 24 packs. Boxes now only have 20. Last year's update 14 cards per pack. Now only 12. You are shorting collectors 96 cards at the same price. How is this growing the hobby. @CardPurchaser

6:38 PM · Oct 9, 2023 · 2,774 Views
[7]

[7] Chris Doetsch (@LLSportsCards), X (Oct. 9, 2023, 12:41 PM), https://x.com/llsportscards/status/1711421629350236496?s=46&t=x05Ym-

94. All in all, Fanatics is a company known for producing poor-quality products for consumers. That has been evident for its sports apparel business and is now evident for its sports trading card business. Consumers thus suffer at least from decreased product quality whenever Fanatics becomes involved. That is true here.

### D. Historical Competition in and for the Relevant Markets

95. Before Fanatics's Anticompetitive Conduct, there was competition in and for the Relevant Markets.

96. Panini started with a four-year exclusive deal with the NBA, which it obtained after a public-bidding process. Panini then secured a five-year extension on that deal with the NBA. After a public-bidding process, Panini secured its current eight-year exclusive deal with the NBA. After the NBA and NBA Players Association split, Panini secured its current six-year exclusive deal with the NBA Players Association lasting for the same term as its original deal with the NBA.

97. As for the NFL, after the nonexclusive deals inherited through Donruss, Panini started with a two-year, nonexclusive deal, which it obtained after a public-bidding process. After another public-bidding process, Panini

BfuaxL1pxEEEgDuQ; Card Purchaser (@CardPurchaser), X (Oct. 9, 2023, 1:48 PM), https://x.com/cardpurchaser/status/1711438509410570646?s=46&t=x05Ym-BfuaxL1pxEEEgDuQ; @BobbySTL1936, X (Oct. 9, 2023, 6:38 PM), https://x.com/bobbystl1936/status/1711511514778153009?s=46&t=x05Ym-BfuaxL1pxEEEgDuQ.

then secured a four-year, nonexclusive deal. After another public-bidding process, Panini then secured a five-year deal that gave the NFL (not Panini) the option to renew for another five years. And similarly for the NFL Players Association, Panini started with a two-year, nonexclusive deal, then a four-year, nonexclusive deal, and then its current ten-year, exclusive deal. Panini never held any license—exclusive or otherwise—with MLB and has always held only a nonexclusive license with the MLB Players Association.

98. Panini now holds exclusive licenses with the NFL (through March 2026), the NFL Players Association (through February 2026), and the NBA (through September 2025). Panini also holds a license with the NBA Players Association through September 2025 that the NBA Players Association recently interpreted as nonexclusive rather than exclusive. Panini previously held a nonexclusive license with the MLB Players Association that expired in December 2022.

99. So at most, at any given point in time and accepting the NBA Players Association's interpretation of its license with Panini, Panini held, on an exclusive basis, only three of the possible six Major League Licenses at issue here: NFL, NFL Players Association, and the NBA. In other words, accepting the NBA Players Association's interpretation, Panini has never had more exclusive Major League Licenses than three and never held a single Major League License for any period approaching or reaching twenty years.

100. All of Panini's deals with the Major U.S. Professional Sports Leagues were consummated after Panini proved it could perform for licensors and consumers. None approached twenty years. The single, ten-year deal Panini did secure happened after multiple, short-term, non-exclusive deals always subject to open, public bidding.

101. This historical competitive landscape in the trading card industry has been completely altered by Fanatics's Anticompetitive Conduct.

## VI. Fanatics Executes Exclusive Deals of Unprecedented Length and Scope and Then Uses the Monopoly Power from Those Deals to Harm Panini, Distributors, Local Card Shops, Case Breakers, and Consumers Before Those Deals Even Begin.

### A. Fanatics gains a long-term monopoly by securing exclusive deals of unprecedented length that unprecedently combine all major sports leagues.

102. In August 2021, Fanatics simultaneously announced the acquisition of the leading professional sports licenses in North America: MLB, the MLB Players Association, the NBA, the NBA Players Association, and the NFL Players Association. Later, Fanatics acquired the NFL exclusive license, thus exclusively securing all six of the Major League Licenses for Major U.S. Professional Sports Leagues trading cards. When it acquired Topps, it also obtained an exclusive license with MLS.

103. Fanatics's exclusive deals with the Major U.S. Professionals Sports Leagues and their players associations were of unprecedented length and

scope. The extreme duration and combination of these key inputs is something the trading card industry has never seen before.

104. Four of the licenses (the licenses that Fanatics acquired from the NFL, NFL Players Association, MLB, and MLB Players Association) are for twenty years. Fanatics's licenses with the NBA and NBA Players Association, the exact terms of which have not been made public, are for at least ten years.

105. The durations of Fanatics's exclusive dealing arrangements are beyond anything that is necessary for any legitimate economic or other purpose. Twenty years, by a wide margin, is an unprecedented exclusive dealing duration in the trading card business. There have ***never*** been exclusive deals close to that duration in the trading card industry.

106. The durations of Fanatics's exclusive deals are made even more problematic by their scope. It is not just that Fanatics has a twenty-year deal with the NFL or a twenty-year deal with the MLB. Rather, Fanatics has engaged in such an extreme combination of Major League Licenses that, for the first time ever, a single firm will hold all six Major League Licenses for the Major U.S. Professional Sports Leagues.

107. By combining long-term exclusive licenses of unprecedented duration covering ***every*** Major U.S. Professional Sports League and their players associations, Fanatics positioned itself to drive Panini and other actual

or potential competitors out of the market and erected barriers to entry blocking their return.

108. Fanatics's exclusive agreements foreclose competition entirely in the markets for MLB player trading cards, NBA player trading cards, and NFL player trading cards. Fanatics's exclusive agreements thereby foreclose one hundred percent of the market for Major U.S. Professional Sports Leagues trading cards. Thus, Fanatics sought and is now poised to eliminate Panini and others from competing in the production and sale of trading cards by completely blocking an essential input for a long time—without a single opportunity to compete for a decade or more—and not by competition on the merits.

109. The unprecedented duration and scope of Fanatics's exclusive dealing agreements causes substantial harm to consumers and competition in the market for Major U.S. Professional Sports Leagues trading cards in part because competition cannot occur until the end of the exclusive contract approaches. Only at that point can there be competition "for the market"; that is, competition to replace the prior holder of the exclusive contract. Before Fanatics's Anticompetitive Conduct, competition for Major League Licenses typically occurred regularly, because the agreements between the Leagues and players associations and the companies that produce and sell sports trading cards—to the extent they were even exclusive—had shorter terms and

staggered expiration dates. Now, because of the unprecedented length and combination of Fanatics's exclusive-dealing arrangements, any competition "for the market" cannot take place for decades, placing consumers at the mercy of only one provider with a record of inferior performance.

110. The new, untested Fanatics was not given its long-term exclusives after proving it could perform through a short-term trial contract consistent with past industry practice. Nor was Panini given an opportunity to bid or otherwise compete for the licenses Fanatics acquired. Panini only learned about Fanatics's exclusive agreements after they were consummated, through reading about them in the media.

111. To induce the Leagues and players associations to deal with them, Fanatics gave them equity ownership interest in Fanatics. In acquiring all six U.S. Major Sports League licenses from existing Relevant Market licensors, Fanatics leveraged its relationships with leaders of the players associations and certain League personnel, the equity stakes that relevant Leagues and players associations were provided, and other considerations premised on the monopoly profits Fanatics expected to earn. The collective equity stake of the Leagues and players associations (plus NHL and MLS) is today worth between $5 and $10 billion.[8]

[8] Jabari Young, *Fanatics wants to be a $100 billion company – here's how it plans to get there*, CNBC (Apr. 11, 2022, 4:55 PM), https://www.cnbc.com/2022/04/11/fanatics-aims-to-be-100-billion-company.html.

112. The MLB Players Association and NFL Players Association created a joint venture called OneTeam, which "specializes in the collective licensing rights of athletes."[9] In other words, OneTeam is a joint venture that combines the intellectual property of the MLB Players Association and NFL Players Association—which the individual players associations had themselves acquired by combining the intellectual property of their respective members—and others. It then serves as a seller of that combined intellectual property. Indeed, when the exclusive deals were announced, the Executive Directors of the MLB Players Association and the NFL Players Association "said that the deal 'never would have happened' if their organizations had not 'joined forces to create OneTeam.'"[10] OneTeam was central to at least the NFL Players Association and MLB Players Association's exclusive deals with Fanatics.

113. OneTeam also reveals that the decision of at least the NFL Players Association and MLB Players Association to go with Fanatics was not one made independently. Rather, both the NFL Players Association and the MLB Players Association worked together to agree jointly on deals with Fanatics through OneTeam. The deals "never would have happened" otherwise.

---

[9] ONETEAM, https://www.joinoneteam.com/.

[10] *OneTeam demonstrates power of combining players' group NIL rights*, SPORTS BUS. J. (Oct. 7, 2021), https://www.sportsbusinessjournal.com/Daily/Issues/2021/10/07/Marketing-and-Sponsorship/OneTeam.aspx.

114. Fanatics's exclusive deals gave it a long-term monopoly of unprecedented length and combination in the trading card industry. Once announced in August 2021, the entire industry knew that Fanatics would, for many years, have complete control of the marketplace for MLB, NFL, and NBA player trading cards along with the broader market for player trading cards for the Major U.S. Professional Sports Leagues. That reality, assured by a web of anticompetitive contracts, gave Fanatics unprecedented power to secure for itself a monopoly in the near term, too.

### B. Fanatics leverages its long-term monopoly gained by exclusive deals of unprecedented length and combination to obtain a monopoly in the short term through coercive, unfair, and anticompetitive conduct.

115. Securing its exclusive deals of extreme length and in an extreme combination was critical to Fanatics's overall plan. In the first instance, these deals gave Fanatics a monopoly of the Relevant Markets for the long term. But then Fanatics leveraged that long-term monopoly to monopolize those same markets in the short term through coercive, unfair, and anticompetitive conduct.

116. As intended by Fanatics, the practical, combined effect of Fanatics's exclusive deals was to facilitate Fanatics's subsequent anticompetitive attacks on Panini and other market participants and ensure that Fanatics could maintain the monopolistic fruits of its Anticompetitive

Conduct for decades—and even beyond that, given the barriers to entry that Fanatics has erected and is erecting.

117. Fanatics then undertook numerous actions, which were themselves facilitated by Fanatics's long-term, exclusive-dealing arrangements—with the purpose and dangerous probability of success of monopolizing those same markets in the short term—with the purpose and effect of reinforcing its long-term monopoly. These actions included anticompetitive, exclusionary deals with Panini's employees, with a critical manufacturing supplier of trading cards to Panini, with star professional basketball and football players, and with other industry participants—all well before Panini's existing licenses are due to expire.

***1. Fanatics buys Topps.***

118. After announcing its exclusive deals in August 2021, on January 4, 2022, Fanatics announced that it had persuaded Topps to sell itself to Fanatics for a price reported to be in the range of $500 million. Topps's primary business at the time was supplying MLB trading cards with an exclusive license with MLB that ran until 2025 and a semi-exclusive license with the MLB Players Association that ran until the end of 2022.

119. By acquiring Topps, Fanatics also acquired an immediate, exclusive license with MLS and eliminated any marginal current competition, and any greater potential competition, that MLS cards might provide. So that

means Fanatics used the monopoly power and effective market control created by its exclusive deals with the Major U.S. Professional Sports Leagues and their players associations to acquire *further* exclusive privileges.

120. Fanatics's acquisition of Topps solidified and increased Fanatics's market power, which in turn it leveraged as described herein to disadvantage Panini.

### *2. Fanatics acquires control over GCP, Panini's critical special manufacturer, and uses that control to undermine Panini's existing business.*

121. To undermine Panini's ability to perform even in the short run under its existing licenses, in March 2022, Fanatics acquired through two transactions a controlling stake in GC Packaging, LLC (GCP). GCP is the critical, high-tech, custom manufacturer of trading cards for Panini and a key input for competition in and for the Relevant Markets.

122. Of quality manufacturers in the United States, GCP is one of the only manufacturers able to meet Panini's technological quality and capacity requirements, and the only one that was positioned to supply cards in the short term. GCP is therefore an essential input for Panini's entire business.

123. The group of viable card manufacturers consists of only a few high-tech, specialty firms offering the unique set of technological services necessary to produce cards that are demanded by consumers in these markets. A conventional or even a specialty print shop is not a supply-side possibility. This

is because manufacturing trading cards requires print and finishing technologies that are unique to the production of many types of trading cards that are important to Panini's business and valued by consumers.

124. The trading card manufacturing process is elaborate. It requires more exacting standards than is typical of the printing industry for things like print registration, color variance, foil stamping, guillotine cutting, slitting borders, lamination, wrapping, sorting, and packaging—all while navigating a variety of underlaying substrates of varying degrees of thickness (such as plastic, paper, aluminum, and even gold) that must be paired perfectly with the correct, custom-mixed, spot color. Adding materials such as jerseys, sneakers, and other memorabilia to the cards themselves (like Panini does) increases the technological complexity of the production process dramatically.

125. To satisfy consumer preferences, a competitive manufacturing provider must be able to perform all the above with minimal mistakes—because one error can require restarting from scratch, imposing sizable costs on the provider.

126. A competitive manufacturing provider must also have a proven record of tight security because the number and ratio of special and rare Insert Cards must be carefully controlled to ensure appropriate distribution.

127. A competitive manufacturer also must produce cards of the highest quality according to exacting standards. This is because certain high-end card

collectors demand pristine cards. "Mint" condition cards are highly valued, and a manufacturing provider that cannot produce and package cards so that they reach their ultimate consumer in perfect condition will undermine the product and brand.

128. A competitive manufacturer also must have a flexible array of systems because some special cards use unique materials—such as unique or uniquely finished card stock, acetate or acrylic cards, or cards that incorporate pieces of jerseys or other memorabilia.

129. These special cards must be produced according to precise standards lest the product's value be destroyed. In addition, they must be produced on time because the seasonality of each sport brings new designs, players, logos, rosters, and other changes.

130. Panini's trading card releases are precisely scheduled to accord for a cadence that allows for the most sales. Release delays cause the window of time between product releases to decrease, creating less time for consumers to accumulate cash to buy trading cards again between releases, resulting in decreased sales.

131. Because of the specialized complexity involved with manufacturing trading cards, there are only a few manufacturers of high-quality cards in the United States. GCP is one of the only manufacturers that has the necessary equipment, technology, and capacity to manufacture trading

cards according to the exacting standards Panini requires, and the only manufacturer in position to meet Panini's requirements in the short term.

132. GCP has a contract with Panini S.p.A. under which GCP produces most of Panini's cards. In fact, GCP manufactures over ninety percent of Panini's trading card requirements, and the overwhelming amount of GCP's production has been for Panini cards.

133. Because of GCP's essential role in Panini's operations and the centrality of Panini's business to GCP, Panini S.p.A.'s contract with GCP prohibits GCP from undergoing a change in control without Panini S.p.A.'s consent. Fanatics's acquisition of control of GCP—without notice to, or consent by, Panini S.p.A.—is a direct violation of this contractual provision.

134. Fanatics was clearly aware of the Panini S.p.A.-GCP relationship and of GCP's contractual obligations to produce cards for Panini.

135. Panini was by far GCP's most important purchaser of trading card manufacturing services, with many of its machine lines being devoted to Panini's business at the time Fanatics acquired control. Over the last fourteen years, Panini has collaborated with GCP on research and development to allow GCP to develop substantial know-how in meeting Panini's requirements—from the most basic cards to those most sophisticated in their design, including implanting within the trading card bits of uniform, shoes, and other memorabilia.

136. Panini's close collaboration with GCP is what caused GCP to develop its technological and capacity capabilities.

137. Because of its contractual role as Panini's specialty manufacturer and the two firms' close working relationship over many years, GCP also has access to a substantial amount of Panini trade secrets, such as information about its production runs, product mixes, and form breaks (detailed product specifications that are the "secret recipe" for producing a run of cards).

138. Fanatics has no need for owning or controlling GCP's manufacturing services to meet its current obligations under its licenses with MLB and the MLB Players Association. Fanatics targeted and acquired control of GCP to weaken Panini and to hasten Panini's exit from the Relevant Markets.

139. Fanatics's acquisition of control over GCP has given Fanatics control of Panini's lifeblood—the production of nearly all its trading cards. For example, when Panini recently wished to discuss business with GCP, it was informed that GCP would need to obtain direction and feedback directly or indirectly from Fanatics first.

140. Fanatics's control over Panini's lifeblood was the purpose of its acquiring control of GCP. After acquiring this control, Fanatics's CEO, Michael Rubin, told Panini's CEO, Mark Warsop, that Fanatics could now turn

off the GCP machines devoted to Panini whenever it wanted, and from time-to-time Fanatics has done just that.

141. Manufacturing capacity is reserved in advance to ensure adequate, specially trained staffing, resources, and quality control. Panini thus communicates production-volume requirements ahead of time, and GCP commits to substantially meeting those requirements—at least until Fanatics got involved.

142. Between 2019 and 2021, GCP consistently delivered well over ninety percent of Panini's requested production volume requirement: ninety-one percent in 2019, ninety-nine percent in 2020, and ninety-seven percent in 2021.

143. In November 2021, before Fanatics acquired control of GCP, GCP told Panini that it would have capacity to produce 297 million packs in 2022 and 336 million packs in 2023 for Panini. But when Fanatics acquired control over GCP, everything changed.

144. In 2022, making all too real Rubin's threat to turn off the GCP machines devoted to Panini, GCP delivered only fifty-eight percent of Panini's requested production, totaling 181 million packs for the year, contrary to GCP's November 2021 confirmation of capacity for 297 million packs in 2022. In 2023, GCP has delivered around sixty-one percent of Panini's requested production.

145. This failure to produce promised output has occurred in various ways. One way is through an abrupt change in releases. For example, Panini had scheduled with GCP in advance to produce at least twenty-one releases for November 2022 and seventeen releases for December 2022. Despite this, and with barely over ten days' notice before the release date, on October 18, 2022, Panini was told that GCP would only produce six to eight projects per month for each of November and December 2022. GCP gave no reason for the reduction. GCP ultimately produced four programs in November and twelve in December rather than the nearly forty originally scheduled.

146. This sort of last-minute cancellation by GCP to this extreme degree had never occurred before Fanatics acquired control of it. GCP would have had to begin implementing any such release reduction (if it were indeed real rather than pretextual) well before it provided the ten-day notice to Panini due to a standard thirty-four-week production planning timeline.

147. Ultimately, in 2022, GCP's reduced manufacturing caused an output shortfall of over 100 million packs of Panini trading cards and delayed programs (or releases) into 2023, resulting in canceled orders and lost or reduced sales. Panini had no alternative source of manufacturing supply during this time. Fanatics's purposeful disruption—indeed, appropriation—of this critical supply chain for high-quality trading cards has denied consumers

the many benefits of having the opportunity to buy superior product from Panini when and how they prefer.

148. This conduct of delaying releases last-minute has continued in 2023, with GCP weekly delaying Panini's product releases with little to no notice. This pattern of intermeddling delays is new; before Fanatics acquired control, Panini experienced nothing on this scale or this systematic. These delays result in less weeks on the market for Panini and licensors and disrupts the normal cadence of releases scheduled, ultimately resulting in a decrease in Panini's revenue and profit margin and a reduction of consumer choice.

149. At bottom, through acquiring control of GCP, Fanatics now controls the critical means of manufacturing Panini's trading cards and has been exercising that control to harm Panini, competition, and consumers.

#### *3. Fanatics raids Panini for employees to undermine Panini's ability to compete.*

150. Employees skilled in the successful creation, design, and marketing of professional sports trading cards are another key input for competing in the Relevant Markets.

151. As part of its Anticompetitive Conduct to monopolize the Relevant Markets, Fanatics launched a raid of Panini for such a key input: its employees. In doing so, Fanatics also tortiously interfered with those employees' contracts with Panini.

152. Fanatics knew of Panini's contracts with its employees.

153. Panini's contracts with its employees include a nondisclosure agreement that prohibits employees from sharing Panini's proprietary information and contains a non-solicitation provision preventing employees from recruiting other employees to leave Panini.

154. Fanatics knew of Panini's contracts with its employees. For example, Panini's nondisclosure agreement requires Panini's employees to notify prospective employers like Fanatics of the terms and conditions of the nondisclosure agreement before accepting employment.

155. Before the raid, Fanatics rented out a new office in Dallas, Texas, for its trading card business—choosing to locate it approximately one thousand miles from its Florida headquarters but mere miles away from Panini's headquarters. On or about April 4, 2023, Fanatics began trying to hire, and succeeded in hiring, significant numbers of Panini employees. In fact, even before April 2023, Fanatics had tried to hire away Panini America's Chief Executive Officer, Mark Warsop.

156. Fanatics has managed to use unlawful means to lure, as of the date of this Amended Complaint, thirty-six employees to leave Panini and join Fanatics. Fanatics raided Panini's employee base to harm Panini and did so with a combination of threats and improper inducements.

157. For example, Fanatics used the monopoly power and effective market control from its future exclusive deals to induce some employees to come to Fanatics by threatening them with not working in the industry ever again once Panini's licenses expired unless those employees committed immediately to join Fanatics. That Fanatics, in a few years, would hold long-term exclusive licenses to ***all*** Major U.S. Professional Sports Leagues (and their players associations) provided credibility to these threats.

158. At times, Fanatics went even further, telling Panini's employees that Fanatics would soon take over Panini's business *before* Panini's licenses expired and thus Panini—and with it these employees' jobs—would no longer exist. So if these employees wished to continue in the industry, Fanatics's story went, they needed to join Fanatics immediately.

159. Fanatics also induced some employees to quit their jobs at Panini and join Fanatics by offering compensation packages at levels that make economic sense only as part of a plan to force Panini out of the business of producing and selling NFL player trading cards and NBA player trading cards during the remaining term of Panini's licenses.

160. With the aid and encouragement of Fanatics, these employees stole Panini's trade secrets and helped Fanatics recruit other employees away from Panini, each in violation of their employment contracts with Panini, specifically the proprietary-information and non-solicitation provisions.

161. The raided employees are mostly surplus to Fanatics's staffing needs at least until 2025 or 2026—unless Fanatics planned to—or manages to—shut down Panini's NFL and NBA operations before then.

162. By raiding these employees years before a legitimate need, Fanatics sought to harm Panini's current ability to perform under its existing licenses and to bolster Fanatics's monopoly power by trying to put Panini out of business, all to the detriment of consumers who heretofore have benefited from market competition and, in particular, Panini's striving to meet and exceed consumer expectations in the Relevant Markets.

#### ***4. Fanatics pays star, rookie players not to deal with Panini.***

163. Another key input to competing in the Relevant Markets is contracts with individual players for the right to use their original, handwritten autograph on their trading card.

164. In April 2023, in a similar demonstration of exclusionary intent and to further remove Panini as its only competitor in the Relevant Markets, Fanatics began a targeted effort to execute exclusive deals with star, rookie players to deprive Panini of the ability to include those players' original, handwritten autographs with its trading cards during the remaining years of Panini's existing licenses. Fanatics is effectively paying these players to

prevent them from dealing with Panini since Fanatics cannot effectively use these rights in the interim.

165. Fanatics has signed several NFL and NBA rookie players to lucrative deals for their original, handwritten autographs that, importantly, include exclusivity provisions. In essence, Fanatics offered these players large sums to keep their original, handwritten autographs ***off*** the most important trading cards for the critical, early years of their careers during which they otherwise are trying to enhance their reputations and when their cards generally are most desired by consumers. That, indeed, is why Fanatics had to pay so much.

166. And as with Panini's employees, Fanatics also used threats to persuade these athletes to sign with Fanatics. For example, if the large sums weren't enough, Fanatics also threatened players that if they did not immediately sign with Fanatics, they would never get an autograph deal in the future when Fanatics's long-term, exclusive deals began.

167. Panini's agreements with the NFL and NBA and their players associations do not foreclose players from individually signing exclusive deals for the use of their original, handwritten autographs. But Fanatics's doing so deprives consumers for years of the full range of trading cards that they would otherwise be able to enjoy from Panini and furthers Fanatics's Anticompetitive Conduct.

168. Panini holds exclusive licenses with the NBA and NFL until 2025 and 2026, respectively, to use those Leagues' marks, such as team uniforms, logos, and color combinations. Fanatics cannot sell star, rookie players' original, handwritten autographs on its own trading cards with NBA and NFL marks until 2025 and 2026. The most it can do is create what the trading card industry, and Michael Rubin,[11] pejoratively call "pajama cards" that brush out all League marks, generally resulting in low-quality cards depicting players seemingly in pajamas. Another option is to offer cards showing players in street clothing. Either way, consumers do not desire these types of cards nearly as much as those with League marks like team uniforms and color combinations.

169. By signing these players to exclusives over the remaining terms of Panini's licenses with the NBA and NFL, Fanatics harmed Panini and reduced consumer welfare by depriving Panini of the ability to provide consumers with superior products—trading cards with original, handwritten autographs—that they otherwise could buy. Rookie cards are especially sought out by consumers, but because of Fanatics's conduct these rookie cards simply won't exist for consumers to buy for the next two-to-three years during the remaining terms of Panini's licenses.

---

[11] Santiago Sports LLC (@santiago_sports_), INSTAGRAM (Sept. 24, 2023), https://www.instagram.com/reel/CxmOszAMIJ-/?igshid=MzRlODBiNWFlZA%3D%3D.

### *5. Fanatics disparages Panini to third parties.*

170. Also in or around April 2023, Fanatics began disseminating false and derogatory statements about Panini to three sets of third parties that are central to Panini's operations under its existing licenses: (1) players, player agents, and player representatives; (2) players associations; and (3) Panini's current and now-former employees. To harm Panini's business and exclude Panini as a competitor in the Relevant Markets, Fanatics informed these third parties that Panini ***is*** incapable of performing for them, will be out of business soon, and lacks the money to pay them.

171. These statements of asserted facts are false. Panini is well-capitalized with an experienced executive-management team, and it remains the only exclusive, fully licensed, trading card partner of the NBA and NFL.

172. Fanatics disseminated false, derogatory statements about Panini to players, player agents, and player representatives to induce players not to do business with Panini and, instead, to sign exclusive licensing agreements with Fanatics, even to the extent of forfeiting their ability to deal with Panini while its existing licenses remain in force. For example, in or around April 2023, Michael Rubin, Mike Mahan, Omar Wilkes, and other Fanatics employees told some of the biggest and most important sports agencies representing current and prospective NFL and NBA players, including CAA Sports and WME Sports (William Morris Endeavor), that Panini would be

unable to fulfill its contractual obligations to athletes, that Panini was going to go bankrupt, and that Panini would lose its licenses with the NFL, NFL Players Association, NBA, and NBA Players Association by June 2023.

173. Fanatics also disseminated false, derogatory statements about Panini to players associations to induce the associations to breach their contracts with Panini.

174. In addition, Fanatics disseminated false, derogatory statements about Panini to entice employees to leave Panini and join Fanatics. For example, as detailed above, Fanatics told employees that Panini ***is*** incapable of securing their jobs, will be out of business soon, and lacks the money to pay them. Fanatics made these statements to harm Panini's business reputation and raid its employees. Fanatics managed to lure thirty-six employees away from Panini in substantial part by leveraging these false and disparaging statements.

175. These statements have harmed Panini's business reputation, disparaged Panini's business, and diminished Panini's ability to compete in the Relevant Markets.

### *6. Fanatics threatens to never stop coercing Panini and cuts off Panini's supply of jerseys.*

176. One of many innovative elements that Panini offers to trading card consumers is the inclusion in important lines of Premium (and some Mass

Market) cards of a piece of a player's jersey integrated into that player's trading card. Critical to that offering is obtaining the jerseys themselves. For years, Panini obtained most of its supply of official player jerseys from Fanatics.

177. But in May 2023, Fanatics's CEO, Michael Rubin, approached Panini to threaten that Fanatics would no longer supply Panini with any jerseys for Panini to offer to consumers as elements of its trading cards. Panini has since been unable to submit new orders to buy jerseys from Fanatics through its official Panini account. The account representative at Fanatics who previously dealt with Panini has been unresponsive. While Panini has received and paid for orders submitted before May 2023, Fanatics has now cut off Panini's ability to place new orders to buy jerseys.

178. Rubin added at this same time that Fanatics would not stop its pressure campaign against Panini and would continue to sign exclusive deals with players that Panini would have otherwise partnered with to offer fully licensed, original, handwritten autographed trading cards to consumers.

#### ***7. Fanatics induces the NFL Players Association to terminate its license agreement with Panini.***

179. Fanatics knew Panini had an exclusive deal with the NFL Players Association. After all, its own exclusive deal was set to begin when Panini's expired—or at least that's what was publicly reported.

180. The NFL Players Association agreement with Fanatics provides that if the NFL Players Association were to terminate its agreement with Panini early, then the effective date of Fanatics's deal with the NFL Players Association is automatically accelerated, making Fanatics's agreement immediately effective.

181. Fanatics induced the NFL Players Association (and likely others) to find a way to claim it can terminate its agreement with Panini before its term expires to go with the entity in which it holds equity.

182. Fanatic's raiding Panini for its employees in April 2023 was a central step in its plan. That raid provided the predicate for the NFL Players Association to point (wrongly) to language in its Panini agreement providing for termination if Panini suffers a material change in executive management.

183. In August 2023, the NFL Players Association did just that. It attempted to terminate its agreement with Panini based on the Fanatics raid—exactly as Fanatics planned. The NFL Players Association's doing so lacks any factual or legal basis under its agreement with Panini and represents a breach of that agreement.

184. If the NFL Players Association manages to terminate its agreement with Panini, one consequence would be the immediate acceleration of Fanatics's exclusive deal with the NFL Players Association.

185. Panini is challenging in arbitration the NFL Players Association's attempted termination. In addition, Panini has successfully thwarted the NFL Players Association's attempt to obtain a preliminary injunction preventing Panini from operating under its license agreement with the NFL Players Association pending arbitration. But should the NFL Players Association's purported termination be upheld because of Fanatics's raids on Panini, it would be one more part of Fanatics's plan to monopolize the Relevant Markets by excluding Panini as a source of competition.

186. This would be devastating to consumers. Because Panini retains the exclusive NFL license for the use of NFL marks, any trading cards produced by Fanatics could not include NFL marks. Consumers would thus be prohibited from accessing fully licensed trading cards with NFL and NFL Players Association marks that they expect and that they would otherwise be offered for the rest of the 2023, 2024, and 2025 NFL seasons. In short, consumers would have no ability to buy fully licensed NFL player trading cards for three seasons.

187. Of course, Fanatics's goal is that the NFL would terminate its agreement with Panini early, too, thus allowing Fanatics to produce fully licensed NFL player trading cards for those seasons. Should that occur, this would be yet another contract of Panini's in which Fanatics has tortiously interfered and which constitutes another act of Anticompetitive Conduct.

### *8. Fanatics induces WWE to terminate its contract.*

188. Panini is the beneficiary of an exclusive deal to produce and sell trading cards between Panini S.p.A. and World Wrestling Entertainment (WWE) that lasts through 2025. Panini substantially operationalizes the contract and produces and sells the WWE trading cards.

189. Fanatics knows about this contract. In March 2022, it announced its own exclusive deal with WWE—to begin after Panini S.p.A.'s exclusive deal with WWE expired.

190. In lockstep fashion—almost as if it were planned—within days of the NFL Players Association's attempt to terminate its contract with Panini and announcing Fanatics was its new exclusive partner, WWE did the same. It, too, attempted to terminate its contract with Panini S.p.A. and it has been reported that WWE has also now partnered exclusively with Fanatics—purportedly effective immediately.

191. WWE's attempting to terminate its contract with Panini S.p.A. lacks any factual or legal basis under that contract and represents a breach of it.

192. Panini S.p.A. successfully defended an attempt by WWE to obtain a temporary restraining order against Panini based on WWE's purported termination.[12]

193. Although WWE is not part of the Relevant Markets, Fanatics's inducing WWE to try to terminate its exclusive deal with Panini S.p.A. is evidence of Fanatics's overall intent, reflects Fanatics seeking to leverage its market and monopoly power in the Relevant Markets to harm competition in another market, and represents yet another contract affiliated with Panini with which Fanatics has tortiously interfered.

#### *9. Fanatics coerces distributors and big-box retailers.*

194. Fanatics's Anticompetitive Conduct, and evidence of the harm to consumers and competition generally caused by Fanatics's Anticompetitive Conduct, includes Fanatics's use of its monopoly power and effective market control to threaten distributors, who supply trading cards to big-box retail stores, with cutting them off if they do not provide Fanatics with higher margins, likely pressuring them to compromise quality of service, to the detriment of retail customers and their consumers.

195. Fanatics also has renegotiated terms directly with those same big-box retailers that require the retailers to carry a more limited line of trading

[12] *Panini S.P.A. v. World Wrestling Entertainment, Inc.*, No. 23-cv-08324 (S.D.N.Y Sept. 25, 2023), ECF No. 16.

card options—the ones belonging only to Fanatics (through Topps), further compromising consumer choice.

196. In doing so, Fanatics intentionally signaled both the distributors to the big-box retailers and the big-box retailers themselves that, because of its total control over player trading cards for the Major U.S. Professional Sports Leagues, Fanatics will soon be the only way for them to receive necessary trading card product.

197. Making clear Fanatics would follow through on its threats against distributors, it eliminated from its roster of United States distributors the largest distributor of sports-trading cards, GTS Distribution.

198. Fanatics's actions relating to GTS, the other distributors to big-box retailers, and the big-box retailers themselves harm consumers by, among other things, reducing consumer choice, reducing competition, and ultimately raising prices.

#### *10. Fanatics coerces local card shops.*

199. After obtaining its exclusive deals and after acquiring Topps, Fanatics used the monopoly power and effective market control from those deals and its other Anticompetitive Conduct to impose terms on local card shops that are anticompetitive and harm competition and consumers.

200. Fanatics sent contracts to local card shops requiring them to acknowledge that whenever Fanatics wished, it could unilaterally issue

minimum prices available to consumers to pay for Fanatics trading cards. Although Fanatics labeled these unilaterally controlled, minimum price requirements as "suggestions," Fanatics made clear that local card shops' ignoring these price floors would be grounds for Fanatics's suspending their accounts.

201. Because Fanatics will soon control the market for player trading cards for the Major U.S. Professional Sports Leagues—and with that control the ability to decide which local card shops (if any) receive NFL, NBA, and MLB player trading cards—local card shops must comply with minimum-price requirements as decreed by Fanatics.

202. This will ultimately result in higher prices for consumers, with lower output.

203. Fanatics also reduced consumer choice by pressuring local card shops not to sell trading cards on business-to-business trading card websites by threatening to never again supply those shops with player trading cards for the Major U.S. Professional Sports Leagues if they do so.

204. These threats have grown so severe that the owner of a local-card-shop website was forced to place a banner at the top of the site, warning users of Fanatics's threats and offering to let users operate on the website anonymously to avoid Fanatics's anticompetitive retaliation.

#### *11. Fanatics coerces case breakers.*

205. Fanatics also has coerced a key participant in the trading card industry: "case breakers." Case breakers help bring new trading card product to market, "breaking"—or opening—new trading card cases and packets by livestreaming over the internet. Case breakers, by necessity, need cases of product to break. Fanatics has made clear to them that their ability to secure those cases will be thwarted unless they immediately migrate to Fanatics's new case-breaking platform—Fanatics Live—on terms so draconian as to run their case-breaking business into the ground.

206. This serves two purposes for Fanatics that square with its anticompetitive plan. For one, it forces case breakers who would rather operate on other case-breaking platforms to migrate to Fanatics Live. For another, once those case-breakers have migrated, it slowly forces them out of business so that only Fanatics's own case breakers, or Fanatics's preferred case breakers, will remain—all of whom will operate only on Fanatics's platform. This will result at a minimum in reduced consumer choice and reduced output of case-breaking services. And Econ 101 teaches that reduced output means higher prices.

* * *

207. Fanatics's unfair, tortious, and Anticompetitive Conduct has consisted of at least twelve elements that harm competition, each of which

involved clear, anticompetitive intent. First, Fanatics simultaneously locked up, for unprecedented durations, ***all*** of the key sources of an input necessary in the production and sale of Major U.S. Professional Sports Leagues trading cards—the League and players association licenses to produce such cards—giving Fanatics a long-term monopoly of the Relevant Markets guaranteed by contract. Fanatics then leveraged that long-term monopoly to secure for itself a short-term monopoly of the Relevant Markets before its long-term monopoly began, including by **(1)** extinguishing competition by acquiring Topps; **(2)** restricting Panini's access to the specialized manufacturer for over ninety percent of Panini's trading cards and decreasing output for consumers by acquiring control of GCP, causing breach of GCP's contract, and engaging in other conduct aimed at harming Panini's ability to produce Major U.S. Professional Sports Leagues trading cards; **(3)** raiding Panini's employees, not to provide short-term benefits to Fanatics, but in aid of Fanatics's goal to deprive Panini of those employees' services, thereby seeking to destroy Panini and help Fanatics monopolize the Relevant Markets; **(4)** signing star, rookie players to exclusive deals, not to produce high-quality cards using these rights, but to deprive Panini of using their original, handwritten autographs to create a complete, fully licensed trading card; **(5)** disseminating derogatory statements about Panini to central third parties; **(6)** cutting off Panini's supply of jerseys and threatening further, coercive, anticompetitive conduct; **(7)**

inducing the NFL Players Association to purport to terminate its agreement with Panini; **(8)** inducing WWE to purport to terminate its contract with Panini S.p.A.; **(9)** threatening to cut out distributors if they do not give Fanatics higher margins and pressuring big-box retailers to feature its cards over others; **(10)** requiring local card shops to accept "suggested" minimum price requirements; **(11)** coercing case breakers to join its own card-breaking platform and imposing on them draconian contractual terms.

208. At bottom, Fanatics's name fits its anticompetitive strategy. Its Anticompetitive Conduct has left no stone unturned in monopolizing the markets for decades to come and then in monopolizing the markets in the near term as well. Fanatics has anticompetitively attacked Panini on every front, cut off all its key inputs, and more broadly undermined Panini's every act in competing in and for the Relevant Markets. And it has similarly targeted other industry participants, including distributors, local card shops, and case breakers—all to the detriment of consumers at least in the form of reduced choice, reduced product quality, decreased output, and inevitably increased prices.

209. Each of these acts represents unfair, tortious, anticompetitive, exclusionary conduct that harms competition and consumers and for which no procompetitive justification exists.

## VII. Fanatics's Market Power and Monopoly Power

210. Fanatics's Anticompetitive Conduct has completely altered the competitive landscape of the Relevant Markets.

211. Through its Anticompetitive Conduct, Fanatics has specifically intended to monopolize and has monopolized the overall market for Major U.S. Professional Sports Leagues trading cards (both Mass Market and Premium), which includes the production and sale of trading cards, and the individual submarkets for MLB player trading cards, NBA player trading cards, and NFL player trading cards (both Mass Market and Premium).

212. It has done so for the long term and at least attempted to do so, if it has not already done so or at least come dangerously close to doing so, for the short term. And in doing so, it has erected insurmountable barriers to new entry.

213. Fanatics has monopolized the long term through its unprecedently long exclusive agreements with the Leagues and players associations, which foreclose competitors' access to the critical inputs for each of the three MLB player trading card, NBA player trading card, and NFL player trading card markets (and markets for Mass Market and Premium cards) for an unprecedented period.

214. Fanatics's unprecedently long agreements with respect to each League accomplish an extreme combination of those unprecedently long

agreements by consolidating the Major U.S. Professional Sports Leagues trading cards market into the hands of a single firm for the first time ever, thereby covering the entire Major U.S. Professional Sports Leagues trading cards market (and markets for Mass Market and Premium cards).

215. The Major U.S. Professional Sports Leagues trading cards market will be completely controlled by a single firm for decades, one whose dominance does not result from superior products, business acumen, or even historic accident. Or put differently, Fanatics has foreclosed—for decades—all competition for player trading cards for the ninety-two teams that compose the NBA, NFL, and MLB.

216. No firm has ever done this before, even for a few years. In the past, competition among different firms to produce trading cards of players for Major U.S. Professional Sports imposed price and quality discipline on the market. Neither Panini nor any other firm held exclusive licenses for trading cards of players for ***all*** Major U.S. Professional Sports Leagues.

217. Fanatics, however, has created a new monopoly spanning all the Major U.S. Professional Sports Leagues and their players associations that no other entity in the trading card industry has ever held. Never has a single firm combined the licenses required to produce fully licensed trading cards of players for ***all*** Major U.S. Professional Sports Leagues. Fanatics's doing so has erected a potential barrier to entry for decades. As a result, Fanatics can

raise prices in the Major U.S. Professional Sports trading card market to supra-competitive levels or compromise choice or quality without constraint by competitors.

218. Fanatics has also leveraged the long-term monopoly power created by its exclusive deals of unprecedented duration and scope to extend that monopoly by seeking to secure for itself a short-term monopoly over the same Relevant Markets through the rest of its Anticompetitive Conduct described above by seeking to choke off other key inputs from Panini.

219. In so doing and together with the rest of its unfair, tortious, and Anticompetitive Conduct, Fanatics has restrained competition in and has monopolized, or is attempting to monopolize, competition for the Major U.S. Professional Sports Leagues trading cards market for decades.

220. The Relevant Markets are characterized by barriers to entry as discussed above. It requires considerable brand investment, financial wherewithal, and expertise to enter the market for Major U.S. Professional Sports Leagues trading cards or any of the other Relevant Markets. Only the Major U.S. Professional Sports Leagues offer the volume, financial stability, and industry focus necessary to enable a firm engaged in the production and sale of such trading cards to be a significant competitor.

221. Panini managed to gain a foothold in the market by securing a League license and acquiring one of the Major U.S. Professional Sports

Leagues trading card brands in 2009. Fanatics's soon-to-be total control of the market will render a similar foothold strategy impossible for years, if not decades, to come.

222. If not enjoined, Fanatics's Anticompetitive Conduct will give Fanatics a complete, total, and long-lasting monopoly of the individual submarkets for MLB player trading cards, NBA player trading cards, and NFL player trading cards (both Mass Market and Premium) and the market for Major U.S. Professional Sports Leagues trading cards (both Mass Market and Premium). That long-term monopolistic outcome is not just probable absent an antitrust remedy; it is locked down and assured by contract.

## VIII. Harm to Competition and Consumers

223. Fanatics's Anticompetitive Conduct harms competition in the short run and the long run and establishes Fanatics's ability to exclude competition for decades.

224. Its unfair, tortious, and Anticompetitive Conduct will eliminate its only remaining significant competitor in the United States—Panini—having already eliminated its other competitor, Topps, by acquisition.

225. By executing deals of unprecedented length and combination, Fanatics has destroyed competition "for" the Relevant Markets that would normally occur after each license agreement expires. It has thus created insurmountable barriers to entry for competition "for" the Relevant Markets.

226. Fanatics is also obtaining its monopoly position in the Relevant Markets through anticompetitive acts. In this respect as well, Fanatics has not competed "for" the Relevant Markets. In this way, among others, Fanatics has deprived counterparties of the benefits of the competitive process to which they are entitled.

227. The monopolistic outcome of Fanatics's Anticompetitive Conduct will harm the public, consumers, and competition by allowing Fanatics complete control to set and raise prices and to dictate choice and quality for the overall market for Major U.S. Professional Sports Leagues trading cards (both Mass Market and Premium) and the markets for MLB player trading cards, NBA player trading cards, and NFL player trading cards (both Mass Market and Premium), reduce incentives for the development of higher-quality cards, and reduce consumer choice.

228. Higher pricing and diminished choice and product quality for consumers will result from Fanatics's Anticompetitive Conduct given that no other firm will be able to compete for the production of trading cards for the Relevant Markets so no restraints on Fanatics's raising prices will exist. Fanatics has already revealed this to be the case—reserving for itself the right to raise the prices that local card shops must set for consumers.

229. Panini's output of trading cards already has been substantially reduced, which shows that Fanatics's first concern is not about customers, but

rather its own motivation to monopolize the Relevant Markets and its own long-term profits. At any moment, Panini's production could be even further reduced if Fanatics follows through on its threat to further "turn off the machines" devoted to Panini at GCP.

230. Product quality for trading cards in the Relevant Markets is another casualty as a result of Fanatics's Anticompetitive Conduct. Once consumers no longer had an option to buy League apparel other than Fanatics, League apparel product quality nosedived. The same will be true once consumers have no option other than Fanatics for trading cards for Major U.S. Professional Sports Leagues. Indeed, Fanatics—through Topps—already is producing and selling MLB trading cards of inferior quality and confronting consumers with massive quality-control issues.

231. The consumer experience will also suffer through a reduction in consumer choice. Already Fanatics is leveraging its long-term monopoly power to fire a distributor, pressure other distributors to give it higher margins, force big-box retailers to feature its own product over others, and force case breakers onto its own platform. These actions limit the outlets at which cards may be bought and deprive consumers of the choice in where to buy their cards, from whom to buy their cards, and the mix of cards from which to choose.

232. Moreover, Fanatics's Anticompetitive Conduct has already deprived consumers of the ability to buy fully licensed NFL and NBA trading

cards with original, handwritten autographs of the leading players from this year's Rookie class: No Victor Wembanyama (NBA Draft #1 overall), Brandon Miller (NBA Draft #2 overall), Sterling "Scoot" Henderson (NBA Draft #3 overall), Bryce Young (NFL Draft #1 overall), or C.J. Stroud (NFL Draft #3 overall). Because of Fanatics's Anticompetitive Conduct, consumers can only find non-fully licensed autographed cards of these players in their street clothes or what in the trade is called "pajamas."

233. Competitive harm like this will grow even worse as the effective dates for Fanatics's exclusive deals approach and as Fanatics continues to leverage its long-term monopoly over the Relevant Markets into creating an immediate monopoly for itself over those same markets in the short term.

234. These harms to competition will befall both Mass Market and Premium trading card consumers. For example, on the Mass Market side, one of the likely outcomes of Fanatics's Anticompetitive Conduct is a reduction in retail distribution channels—meaning the kid on the playground will have fewer options to buy trading cards after school in retail stores. And on the Premium side, there is nothing to suggest that an unproven entity like Fanatics will be able to replicate Panini's innovative use of proprietary methods of maintaining the value of Premium cards—particularly given Fanatics's terrible record on product quality.

235. All in all, Fanatics's unprecedented market control and monopoly power over the Relevant Markets knows no bounds. Although Fanatics is just getting started, it has already shown a willingness to wield that power in a way that harms the entire trading card industry, including Panini, distributors, big-box retailers, local card shops, case breakers, and consumers—well before its long-term exclusive deals of unprecedented duration and combination even begin. It is time to bring Fanatics's Anticompetitive Conduct to an end.

**Count One**

**Attempted Monopolization**

**Sherman Act Section 2**

**15 U.S.C. § 2**

**(Against All Defendants)**

236. Panini realleges paragraphs 1 through 235.

237. For both the short term (before Panini's licenses expire and Fanatics's long-term exclusive deals begin) and the long term (after Fanatics's long-term exclusive deals begin), Fanatics, through its Anticompetitive Conduct and each of that Conduct's constituent acts, willfully has attempted, continues to attempt, and specifically intends to monopolize the market for Major U.S. Professional Sports Leagues trading cards and each of the three MLB player, NBA player, and NFL player trading card markets—for both the

Mass Market and Premium card markets. Fanatics has a dangerous probability of success in monopolizing each of these markets, each of which constitutes a substantial part of interstate commerce. This probability is not due to superior products, business acumen, or historic accident, and instead results from its Anticompetitive Conduct and each of that Conduct's constituent acts, none of which constitute competition on the merits.

238. Fanatics's Anticompetitive Conduct and each of that Conduct's constituent acts unreasonably restrain competition and erect insurmountable barriers to entry. There are no procompetitive justifications to redeem them.

239. Fanatics's Anticompetitive Conduct has affected a substantial portion of interstate commerce.

240. Panini has suffered competitive injury and an injury of the type the antitrust laws were intended to prevent in the Relevant Markets and is an efficient and appropriate enforcer of the antitrust laws here. Consumers will also suffer antitrust injury from decreased choice, increased prices, and loss of quality due to the absence of competition.

241. Panini is entitled to declaratory and injunctive relief and monetary relief including in the form of damages, treble damages, and interest.

## Count Two

**Monopolization**

**Sherman Act Section 2**

**15 U.S.C. § 2**

**(Against All Defendants)**

242. Panini realleges paragraphs 1 through 235.

243. For both the short term (before Panini's licenses expire and Fanatics's long-term exclusive deals begin) and the long term (after Fanatics's long-term exclusive deals begin), Fanatics's Anticompetitive Conduct and each of that Conduct's constituent acts has willfully caused Fanatics to acquire and maintain monopolies of the overall market for Major U.S. Professional Sports Leagues trading cards, and each of the three MLB player, NBA player, and NFL player trading card markets (for both the Mass Market and Premium markets), each of which constitutes a substantial part of interstate commerce.

244. Fanatics has the power to control prices in and/or to exclude competition from the Relevant Markets, resulting in monopoly power in each of the markets.

245. These monopolies and their maintenance are not due to superior products, business acumen, or historic accident, and instead result from Fanatics's Anticompetitive Conduct and each of that Conduct's constituent acts.

246. Fanatics's Anticompetitive Conduct and each of that Conduct's constituent acts unreasonably restrain competition and create insurmountable barriers to entry. There are no procompetitive justifications to redeem them.

247. Fanatics's Anticompetitive Conduct affects a substantial portion of interstate commerce.

248. Panini has suffered, or will imminently suffer, competitive injury in the Relevant Markets and an injury of the type that the antitrust laws were intended to prevent and is an efficient and appropriate enforcer of the antitrust laws here. Consumers will also suffer antitrust injury from decreased choice, increased prices, and loss of quality due to the absence of competition.

249. Panini is entitled to declaratory and injunctive relief and monetary relief including in the form of damages, treble damages, and interest.

## Count Three

## Unreasonable Restraint of Trade

## Sherman Act Section 1

## 15 U.S.C. § 1

## (Against All Defendants)

250. Panini realleges paragraphs 1 through 235.

251. Fanatics executed at least ten-year exclusive deals with the NBA and NBA Players Association and twenty-year exclusive deals with the NFL, NFL Players Association, MLB, and MLB Players Association.

252. Major League Licenses are critical inputs for the market for Major U.S. Professional Sports Leagues trading cards. Thus, Fanatics's exclusive deals for Major League Licenses with the NFL, NBA, and MLB as well as their players associations, along with the rest of its Anticompetitive Conduct and each of that Conduct's constituent acts, has foreclosed all or a substantial portion of the market for Major U.S. Professional Sports Leagues trading cards (including both the Mass Market and Premium markets).

253. Major League Licenses are also critical inputs for the alternative submarkets for NBA player trading cards, NFL player trading cards, and MLB player trading cards. Thus, Fanatics's exclusive deals for Major League Licenses with the NFL, NBA, and MLB, as well as their players associations, along with the rest of its Anticompetitive Conduct and each of that Conduct's constituent acts, has foreclosed all or a substantial portion of the market for each Relevant Market (including both the Mass Market and Premium markets).

254. Fanatics's exclusive deals for Major League Licenses with the NFL, NBA, and MLB as well as their players associations, along with the rest of its Anticompetitive Conduct and each of that Conduct's constituent acts, has foreclosed all or a substantial portion of the Relevant Markets.

255. And at a minimum, Fanatics's exclusive deals for Major League Licenses with the NFL, NBA, and MLB as well as their players associations,

along with the rest of its Anticompetitive Conduct and each of that Conduct's constituent acts, foreclose the entirety—that is, one-hundred percent—of each of the three alternative submarkets for MLB player, NBA player, and NFL player trading cards for decades—both the Mass Market and Premium markets.

256. Fanatics's exclusive deals for Major League Licenses with the NFL, NBA, and MLB as well as their players associations, along with the rest of its Anticompetitive Conduct and each of that Conduct's constituent acts, unreasonably restrain competition and create insurmountable barriers to entry. There are no procompetitive justifications to redeem Fanatics's course of Anticompetitive Conduct.

257. Fanatics's Anticompetitive Conduct has affected a substantial portion of interstate commerce.

258. Panini has suffered competitive injury and an injury of the type the antitrust laws were intended to prevent in the Relevant Markets and is an efficient and appropriate enforcer of the antitrust laws here. Consumers will also suffer antitrust injury from decreased choice, increased prices, and loss of quality due to the absence of competition.

259. Panini is entitled to declaratory and injunctive relief and monetary relief including in the form of damages, treble damages, and interest.

## Count Four

**Clayton Act, Section 7**

**15 U.S.C. § 18**

**(Against All Defendants)**

260. Panini realleges paragraphs 1 through 235.

261. The effect of Fanatics's acquisition of a controlling stake of GCP, as part of the Anticompetitive Conduct alleged herein, has been, and will continue to be, to substantially lessen competition or to tend to create a monopoly in the Relevant Markets in the United States in violation of Section 7 of the Clayton Act.

262. Panini's Section 7 claim arises from Fanatics's acquisition of a controlling stake in GCP. Fanatics is not a competitor of GCP; GCP is a manufacturer of inputs critical for producing player trading cards for the Relevant Markets.

263. Fanatics's acquiring control over GCP directly threatens, and has already been used to undermine, both Panini's competitive viability and competition more generally in the Relevant Markets, and there are no procompetitive justifications to redeem it.

264. Panini has suffered losses reflecting the anticompetitive effect of Fanatics's acquisition of control over GCP, including reduced capacity for manufacturing Panini's trading card products and reduced and delayed

trading card releases, both of which result and have resulted in less trading cards on the market for consumers.

265. Fanatics's Anticompetitive Conduct has affected a substantial portion of interstate commerce.

266. Panini has suffered competitive injury in the Relevant Markets and an injury of the type that the antitrust laws were intended to prevent and is an efficient and appropriate enforcer of the antitrust laws here. Consumers will also suffer antitrust injury from decreased choice, increased prices, and loss of quality due to the absence of competition.

267. Panini is entitled to relief at least in the form of divestiture and damages, including treble damages.

**Count Five**

**Clayton Act, Section 7**

**15 U.S.C. § 18**

**(Against All Defendants)**

268. Panini realleges paragraphs 1 through 235.

269. The effect of Fanatics's acquisition of Topps, as part of the Anticompetitive Conduct alleged herein, has been, and will continue to be, to substantially lessen competition or to tend to create a monopoly in the Relevant Markets in the United States in violation of Section 7 of the Clayton Act.

270. Fanatics's acquisition of Topps was vital to Fanatics's anticompetitive plan. Together with other Fanatics's Anticompetitive Conduct, it raised barriers to entry, eliminating forever one critical way that a new entrant might license as a foothold into the Relevant Markets.

271. Panini has suffered losses reflecting the anticompetitive effect of Fanatics's acquisition of Topps, including increased barriers to entry in the Relevant Markets and foreclosed competition in and for the Relevant Markets for decades, harming Panini and consumers.

272. Fanatics's Anticompetitive Conduct has affected a substantial portion of interstate commerce.

273. In the Relevant Markets, Panini has suffered competitive injury and an injury of the type that the antitrust laws were intended to prevent, and Panini is an efficient and appropriate enforcer of the antitrust laws here. Consumers will also suffer antitrust injury from decreased choice, increased prices, and loss of quality due to the absence of competition.

274. Panini is entitled to relief in the form of divestiture and damages, including treble damages.

## Count Six

### Tortious Interference with Contract

### (Against All Defendants)

275. Panini realleges paragraphs 1 through 235.

276. Panini has existing contracts with the NBA, NBA Players Association, NFL, NFL Players Association, and its own Panini employees and former Panini employees. Panini S.p.A. has an existing contract with GCP under which GCP produces most of Panini's cards and an existing contract with WWE under which Panini produces and sells WWE trading cards. Each of these contracts affords Panini existing or prospective legal rights.

277. Fanatics wrongfully, recklessly, maliciously, offensively, and without justification or privilege, knowingly and intentionally interfered with Panini's aforementioned existing contracts through anticompetitive, wrongful, and unjustifiable means of interference through its Anticompetitive Conduct, including by using its control over GCP to disrupt Panini's production and sale of Major U.S. Professional Sports Leagues trading cards (both the Mass Market and Premium markets), inducing GCP to breach the change-of-control provision in its contract with Panini S.p.A., inducing Panini employees and former Panini employees to breach their nondisclosure and non-solicitation contractual agreements with Panini and leave Panini for Fanatics, inducing the NFL Players Association to purport to terminate its agreement with

Panini, inducing WWE to purport to terminate its agreement with Panini S.p.A., and engaging in the other Anticompetitive Conduct described herein that interfered with Panini's existing or prospective legal rights given it under contracts with the NBA, NBA Players Association, NFL, NFL Players Association, GCP, WWE, and Panini employees and former Panini employees.

278. At the time of its actions, Fanatics had actual knowledge of the relevant contracts and acted intentionally, willfully, maliciously, recklessly, and offensively.

279. Fanatics cannot justify its actions as legitimate competition.

280. Fanatics's conduct has caused, and will cause, actual damage to Panini in the State of Florida and throughout the United States.

281. Panini is entitled to relief in the form of a permanent injunction against Fanatics along with full monetary damages and punitive damages under Florida Statute § 768.72.

## Count Seven

## Tortious Interference with Prospective Business

## (Against All Defendants)

282. Panini realleges paragraphs 1 through 235.

283. Panini has existing or prospective business relations with the NBA, NBA Players Association, NFL, NFL Players Association, MLB, MLB

Players Association, GCP, WWE, its own Panini employees and former Panini employees, and star, rookie players.

284. Fanatics wrongfully, recklessly, maliciously, offensively, and without justification or privilege, knowingly and intentionally interfered with Panini's existing or prospective business relations through anticompetitive, wrongful, and unjustifiable means of interference through its Anticompetitive Conduct, including by raiding Panini's employees and using its control over GCP to disrupt Panini's production and sale of Major U.S. Professional Sports Leagues trading cards, inducing GCP to breach the change-of-control provision in its contract with Panini S.p.A., inducing Panini employees and former Panini employees to breach their nondisclosure and non-solicitation contractual agreements with Panini and leave Panini for Fanatics, inducing star, rookie players to not deal with Panini, inducing the NFL Players Association to purport to terminate its agreement with Panini, inducing WWE to purport to terminate its agreement with Panini S.p.A., and engaging in the other Anticompetitive Conduct described herein that interfered with Panini's existing or prospective business relations with the NBA, NBA Players Association, NFL, NFL Players Association, MLB, MLB Players Association, GCP, WWE, its own Panini employees and former Panini employees, and star, rookie players.

285. At the time of its actions, Fanatics had actual knowledge of the relevant existing or prospective business relationships and acted intentionally, willfully, maliciously, recklessly, and offensively.

286. Fanatics cannot justify its actions as legitimate competition.

287. Fanatics conduct has caused, and will cause, actual damage to Panini in the State of Florida and throughout the United States.

288. Panini is entitled to relief at least in the form of a permanent injunction against Fanatics along with full monetary damages and punitive damages under Florida Statute § 768.72.

**<u>Count Eight</u>**

**Business Defamation and Disparagement**

**(Against All Defendants)**

289. Panini realleges paragraphs 1 through 235.

290. Fanatics has defamed and disparaged Panini's business reputation by falsely disseminating defamatory, derogatory statements to third parties such as players, player agents, player representatives, players associations, and Panini employees and former Panini employees.

291. These statements included asserted factual statements that Panini ***is*** incapable of performing for them, will be out of business soon, lacks the money to pay them, would be unable to fulfill its contractual obligations, was going to go bankrupt, and would lose its licenses with the NFL, NFL

Players Association, NBA, and NBA Players Association early—attempting to persuade those third parties that they should not do business with Panini now.

292. Each of these statements disseminated to those third parties was false, malicious, defamatory, and not privileged.

293. Fanatics knew the statements were false or acted in reckless disregard for the fact that the statements were false. As a result, Fanatics's statements were defamatory or were made negligently and without regard to the truth of the statements.

294. Fanatics's false and defamatory statements prejudiced Panini's business in the State of Florida and throughout the United States. They also deterred third parties from dealing with Panini, including players, player agents, player representatives, players associations, and Panini and former Panini employees.

295. Panini has suffered and continues to suffer damages in the State of Florida and throughout the United States because of Fanatics's unlawful conduct, including in the form of reputational damage, lost revenue, lost customers, and loss of goodwill, for which it is entitled to recover actual and punitive damages.

296. In addition, or in the alternative, each of these statements is false, not privileged, and malicious. Fanatics knew the statements were false or acted in reckless disregard for the fact that the statements were false. As such,

these statements constitute business disparagement. Panini has suffered pecuniary damages because of this conduct, including loss of profits and loss of goodwill, entitling Panini to recover actual and punitive damages. Panini also is entitled to permanent injunctive relief protecting it from Fanatics's conduct.

## Jury Demand

297. Under Rule 38(b) of the Federal Rules of Civil Procedure, Panini demands a trial by jury of all claims asserted in this Amended Complaint and any associated issue of fact so triable.

## Prayer for Relief

298. WHEREFORE, Panini requests entry of judgment:

a. declaring, ordering, and adjudging that the conduct challenged here unreasonably restrained trade, monopolized or has attempted to monopolize one or more markets, or otherwise violated the Sherman or Clayton Antitrust Acts—or both—and, further, that it was illegal and tortious under State law;

b. permanently enjoining Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns) from engaging in, enforcing, carrying out, renewing, or attempting to engage in, the conduct challenged here;

c. ordering Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns) to divest

itself of the licenses it has acquired from the Leagues and players associations to restore competition to the Relevant Markets or in the alternative permanently enjoining Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns) from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, or carry out any action to use its licenses to harm, or threaten to harm, Panini;

d. ordering Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns) to divest itself of its control over GCP to restore competition to the Relevant Markets or in the alternative permanently enjoining Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns) from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, or carry out any action to use its control over GCP to harm, or threaten to harm, Panini;

e. ordering Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns) to divest itself of the assets associated with Topps to restore competition in the Relevant Markets or in the alternative permanently enjoining Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns) from engaging in, enforcing, carrying out, renewing,

or attempting to engage in, enforce, or carry out any action to use the Topps assets to harm, or threaten to harm, Panini.

f. permanently enjoining Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns) from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, or carry out, threats against Panini employees or to use such statements or other unlawful means in seeking to hire Panini employees;

g. permanently enjoining Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns) from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, or carry out, the dissemination of false, derogatory, and defamatory statements about Panini to third parties such as players, player agents, player representatives, players associations, and Panini employees,

h. Awarding Panini its full monetary damages to be proven at trial;

i. Awarding Panini treble its monetary damages, pursuant to 15 U.S.C. § 15;

j. Awarding Panini punitive damages;

k. Awarding Panini pre- and post-judgment interest on its damages;

l. Awarding Panini the costs of this action and reasonable attorneys' fees pursuant to 15 U.S.C. § 15; and

m. Awarding Panini any other relief that the Court deems just and proper.

October 10, 2023

Respectfully submitted,


/s/ Stuart H. Singer
Stuart H. Singer (FBN 377325)
Jesse Panuccio (FBN 31401)
Sabria A. McElroy (FBN 95657)
Jason Hilborn (FBN 1008829)
**Boies Schiller Flexner LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
(954) 356-0011
ssinger@bsfllp.com
jpanuccio@bsfllp.com
smcelroy@bsfllp.com
jhilborn@bsfllp.com

Gary L. Sasso (FBN 622575)
D. Matthew Allen (FBN 866326)
John E. Clabby (FBN 113664)
Sarah J. Barney (FBN 1041254)
**Carlton Fields, P.A.**
4221 W. Boy Scout Blvd., Suite 1000
Tampa, FL 33607
(813) 223-7000
gsasso@carltonfields.com
mallen@carltonfields.com
jclabby@carltonfields.com
sbarney@carltonfields.com

David Boies,* *Lead Counsel*
**Boies Schiller Flexner LLP**
333 Main Street
Armonk, NY 10504
(914) 749-8200
dboies@bsfllp.com

Sean Phillips Rodriguez*
**Boies Schiller Flexner LLP**
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
(415) 293-6800
srodriguez@bsfllp.com

James P. Denvir*
Richard A. Feinstein*
**Boies Schiller Flexner LLP**
1401 New York Ave, NW
Washington, DC 20005
(202) 237-2727
jdenvir@bsfllp.com
rfeinstein@bsfllp.com


**Admitted pro hac vice*

*Counsel for Panini America, Inc.*