UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PANINI AMERICA, INC.,

Plaintiff,

v. Case No. 8:23-cv-1721-KKM-AEP

FANATICS, INC., et al.,

Defendants.

---

# ORDER

To succeed in the professional sports trading-card industry, one must obtain (and keep) licensing agreements with the sports leagues and their players associations. For years, Panini led the industry. But Fanatics recently emerged as a fierce competitor. With billions of dollars at stake, Panini America, Inc., sues Fanatics, Inc., and four other Fanatics entities (collectively, Fanatics) for anti-competitive conduct related to exclusive licensing agreements for professional sports trading cards and other state law claims related to allegedly tortious and defamatory conduct. *See* Am. Comp. (Doc. 69).

Fanatics moves to transfer the case to the United States District Court for the Southern District of New York. *See* Defs.' Mot. to Transfer (Doc. 24). Fanatics argues that the parties agreed to bring this lawsuit there and that, regardless, this case properly

belongs in the Southern District of New York. Panini opposes transfer. (Doc. 49). Although the contract argument is meritless, Fanatics has shown that transfer is appropriate. The motion is granted.

## I. BACKGROUND

The professional sports trading-card business in the United States is a multi-billion-dollar industry. Am. Compl. ¶ 1. The United States professional sports leagues control "the licensing of the intellectual property of their members and professional players associations . . . [control] the licensing of important aspects of the intellectual property of their members." *Id.* at ¶ 3. Accordingly, market participants, like Panini, "enter into agreements with sports leagues and related players associations for licenses" to produce and sell trading cards. *Id.*

For over a decade, Panini has held many of these licenses. Currently, Panini "holds an exclusive license with the National Basketball Association (NBA) through September 2025, a license with the NBA Players Association through September 2025, and exclusive licenses with the National Football League (NFL) and the NFL Players Association through March and February 2026, respectively." *Id.* at ¶ 6. Upon expiration of these licenses with Panini, Fanatics is set to take over the licenses with the leagues and players associations. For example, Fanatics has "exclusive ten- or twenty-year deals to produce and sell new trading cards for players of teams in each of Major League Baseball (MLB), the

NBA, and the NHL." *Id.* at ¶ 7. Further, Fanatics also obtained licensing agreements with the players associations for the NFL, MLB, and NBA, each spanning at least ten years. *Id.* at ¶ 8.

Panini alleges that Fanatics acquired the licenses in an unfair manner, then "raided Panini for employees," and "damaged Panini's relationships with players, leagues, business partners, and consumers, by telling agents representing athletes and others that Panini was now 'dead.' " *Id.* at ¶ 9. Additionally, after announcing its newly secured licenses, Fanatics bought a competitor, Topps, which has a license with the MLB until 2025 and had a semi-exclusive license with the MLB Players Association that expired in 2022. *Id.* at ¶¶ 9, 118. Fanatics also acquired a controlling stake in GC Packing, LLC, which is a custom manufacturer of trading cards that is central in the industry and "manufactures over ninety percent of Panini's trading card requirements." *See id.* at ¶¶ 121–23, 131–32. Panini alleges that these actions give Fanatics monopoly power over the professional sports trading-card industry and foreclose any competition in the market.

Panini commenced this action in the Middle District of Florida, alleging that Fanatics is violating the Sherman Act and the Clayton Act. *See* Am. Compl. ¶¶ 236–74. Panini also brought state law claims for tortious interference and business defamation and disparagement. *See* Am. Compl. ¶¶ 275–96. Fanatics moves to transfer, arguing that a forum-selection clause within a non-disclosure agreement between the parties mandates

transfer to the Southern District of New York and that 28 U.S.C. § 1404(a) also cuts in favor of transfer.

## II. LEGAL STANDARDS

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.' " *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). In essence, a district court may transfer an action to another district if certain criteria are satisfied.

First, the transferee venue must be a "district or division where [the case] might have been brought," meaning the transferee forum must have personal and subject matter jurisdiction and offer a proper venue. 28 U.S.C. § 1404(a); *see Hoffman v. Blaski*, 363 U.S. 335, 342–44 (1960) (determining that transfer under § 1404(a) is only appropriate to a jurisdiction where it could be transferred without requiring defendant's consent to personal jurisdiction or venue).

Second, the Eleventh Circuit requires a district court to determine whether transfer is appropriate by weighing, at least, the following factors:

> (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005).

A party may also seek to enforce a forum-selection clause by filing a motion to transfer under § 1404(a). *See Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 59 (2013). If the parties' forum-selection clause is valid and enforceable, "a district court should transfer the case unless extraordinary circumstances unrelated to the convenience of the parties clearly disfavor a transfer." *Id.* at 52.

## III. ANALYSIS

Fanatics contends that a forum-selection clause in a non-disclosure agreement requires transfer and that the § 1404 factors favor transfer. Mot. to Transfer at 3–4. Panini responds that the forum-selection clause does not apply to this case and that the § 1404(a) factors—importantly its preferred venue—require the case remain here. Resp. (Doc. 49) at 3. For the reasons below, I transfer the case to the Southern District of New York.

### A. The Forum-Selection Clause Does Not Govern This Case

Before filing this lawsuit, the parties exchanged confidential information as part of

a potential negotiated transaction. As is customary in many industries, the parties signed a non-disclosure agreement, which included this forum-selection clause:

> Any court action or proceeding *arising out of or relating to the subject-matter of this Agreement* shall be brought only in the federal or state courts located in the borough of Manhattan, New York. Each Party agrees and submits to the exclusive jurisdiction of these courts for any such action or proceeding and each Party agrees not to commence any such action or proceeding in any other court or forum.

Mut. Non-Disclosure Agreement (Doc. 50-68) at 6 (emphasis added).

Although the non-disclosure agreement does not define its "subject-matter," the document as a whole indicates that the subject matter is the confidentiality of certain information exchanged by the parties. The non-disclosure agreement states that "[e]ach party has requested certain information regarding the other Party and its direct and indirect parent affiliated companies and subsidiaries in connection with a possible negotiated transaction between the Parties or their affiliates." Mut. Non-Disclosure Agreement at 2. Further, as "consideration" for each party disclosing such information, "the Parties . . . entered into [the] agreement." *Id.* The section immediately following then defines "certain information" that the parties agree to keep confidential; provides a definition for "[c]onfidential [i]nformation" and lists qualifying documents; and sets forth the parties' obligations to keep that information confidential and protected. *Id.* at 2–4. Thus, the subject-matter of the agreement is the confidential information exchanged by the parties

and the obligation to keep such information confidential. *See Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330 (11th Cir. 2011) ("[T]he plain meaning of a contract's language governs its interpretation." (citing *Belize Telecom, Ltd. v. Belize*, 528 F.3d 1298, 1307 & n.11 (11th Cir. 2008))).

Fanatics' argument that the forum-selection clause found in the non-disclosure agreement governs this case falters at its start: this antitrust and state-tort lawsuit does not arise out of or relate to the subject matter of the non-disclosure agreement. The antitrust claims do not, as alleged, relate to the improper disclosure or use of confidential information and even the state torts do not allege a breach of the non-disclosure agreement. That the potential negotiated transaction between the parties might relate to the state claims, *see* Reply (Doc. 59) at 5, does not suffice to bring the lawsuit within the forum-selection clause's purview because the negotiations are not the subject matter of the agreement. And the operative complaint never alleges that Fanatics breached the agreement, misused the confidential documents, or otherwise disclosed confidential information obtained during the negotiations. Thus, whatever venue that clause prescribes is irrelevant, other than perhaps to emphasize that Panini does not find the Southern District of New York unpalatable in all instances.

### B. Transfer under 28 U.S.C. § 1404 Traditional Factors

The Southern District of New York would have subject matter jurisdiction over the action, personal jurisdiction over Fanatics, and venue would be proper. *See* Am. Compl. ¶¶ 14–16; 28 U.S.C. §§ 1331, 1367. Because many of the factual allegations occurred in the Southern District of New York where Fanatics negotiated the licenses with the leagues and players associations, *see, e.g.*, Am. Compl. ¶¶ 4, 7–8, 102–149, and because many of the key witnesses reside there, Fanatics tips the balance in its favor.

#### 1. Factors One, Three, Four, Five, and Nine Favor Transfer

For this case between well-heeled entities that centers on negotiations and statements made to third parties, the most important factor is where those with knowledge of the relevant discussions reside. The Southern District of New York wins that contest for several reasons. First, Fanatics asserts that five of the six professional sports leagues and their players associations at issue are headquartered in New York (the other is in Washington, D.C.). Mot. to Transfer at 14–17. None are in Florida. And presumably the relevant witnesses from those entities reside in New York or could be compelled to testify in the Southern District of New York. Second, even setting the leagues and associations aside, Panini does not identify a single third-party witness who resides in Florida, including any of the "rookie players" or their representatives who also signed exclusive contracts with Fanatics. Third, the primary Fanatics entity involved in the licensing contracts—Fanatics

Collectibles—is and always was headquartered in New York. *See* Mot. to Transfer at 3–5; Reply at 2; Winiarski Aff. (Doc. 24-1) ¶ 2. None of Fanatics Collectibles' officers in the management of its trading-card business or the challenged licenses reside in Florida. Winiarski Aff. ¶ 2. For these reasons, the Southern District of New York is not only more convenient for these witnesses and the primary defendant, but that court is much more likely to have the power to compel the non-party witnesses' testimony at trial.

Many of the operative facts also likely occurred in New York. Almost all the licensing agreements—which form the heart of the antitrust claims—were negotiated by parties with their headquarters in the Southern District of New York. Additionally, the allegations concerning the stealing of thirty-six employees imply that those actions occurred in Texas. *See* Am. Compl. ¶¶ 155–56. At a minimum, Fanatics asserts that none of the former-Panini, now-Fanatics employees reside in Florida. Mot. to Transfer at 5. Panini does not dispute that assertion. As for the allegations related to Panini's acquisition of G.C. Packaging and Topps, neither event seems to have occurred in Florida. *See* Am. Compl. ¶¶ 118–21.

Panini does not argue that any activity in particular transpired in Florida. Or that a particular witness resides here. Instead, Panini relies on the historical presence of Fanatics in Florida to assert that "a substantial part of the events giving rise to Panini's claims occurred in this District." Am. Compl. ¶ 19. But where the parent company Fanatics—

whether Fanatics, Inc., or Fanatics, LLC—was headquartered is not the relevant inquiry. The transfer inquiry focuses on where the entity currently operates and where the witnesses with pertinent testimony reside. Panini offers no meaningful rebuttal as to why the Southern District of New York is not the better venue as to Fanatics Collectibles (the defendant most closely involved in the trading-card business at the heart of this lawsuit) and its officers or for the leagues and players associations. Simply put, that the public associates Fanatics as a Florida-based company cannot carry the weight Panini places on it. Nor has Panini showed that this venue is more convenient to itself, especially because it is headquartered in Texas.

I also conclude that trial efficiency and the interests of justice cut slightly in favor of transfer. True, civil cases in the Southern District of New York, as a general matter, proceed to trial slower. *See* Resp. at 13. But efficiencies might also be gained there because of the related litigation pending in that court. *See Panini S.P.A. v. World Wrestling Ent., Inc.*, No. 1:23-cv-08324 (S.D.N.Y. Sept. 20, 2023); *Fanatics Collectibles Topco, Inc. v. Panini S.P.A.*, No. 1:23-cv-06895 (S.D.N.Y. Aug. 7, 2023). And this District also has less interest in a dispute between foreign corporations. Mot. to Transfer at 14. The relevant Fanatics entity is New York-based—even if Fanatics generally is perceived as a Florida company—and Panini is Texas-based. Thus, this factor weighs slightly in favor of transfer.

Additionally, the case remains at its infancy so transfer at this juncture will not significantly delay its progression.

### 2. Factors Two, Six, and Seven are Mostly Neutral

The parties agree that the relative means of the parties is neutral here. Mot. to Transfer at 20; Resp. at 17. And the parties also do not seriously dispute that the location of relevant documents, if any, is neutral because much of the discovery can be transmitted electronically. Mot. to Transfer at 18–19; Resp. at 17. As for the forum's familiarity with governing law, the Southern District of New York is equally familiar with federal law, which constitutes the majority of Panini's claims. Therefore, I find that the forum's familiarity with governing law is neutral.

### 3. Although Factor Eight Favors Denying Transfer, the Other Factors Clearly Outweigh Panini's Preference

A plaintiff's choice of forum is entitled to weight and "should not be disturbed unless it is clearly outweighed by other considerations." *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996) (quoting *Howell v. Tanner*, 650 F.2d 610, 616 (5th Cir. 1981)). Panini prefers the Middle District of Florida. Although I give that preference deference, the other factors clearly outweigh it here. Five of the nine factors cut towards transfer, especially the most important ones of where the entities and witnesses reside. The other three are neutral. That leaves Panini with only its preference. And I need not decide whether such preference would be entitled to greater deference if Panini were

headquartered here. At bottom, Panini prefers I keep a case with no clear connection to this District. That alone is not enough in the light of the other factors favoring transfer.

## IV. CONCLUSION

Weighing the totality of the § 1404 factors, I determine that a transfer to the Southern District of New York is in the interests of justice. Accordingly, the following is

**ORDERED:**

1. Fanatics's Motion to Transfer Venue to the Southern District of New York (Doc. 24) is **GRANTED**.
2. Fanatics's Request for Oral Argument (Doc. 26) is **DENIED AS MOOT.**
3. The Clerk is directed to **TRANSFER** this case to the United States District Court for the Southern District of New York for all further proceedings. Following transfer, the Clerk is directed to terminate any pending motions and deadlines and **CLOSE** the case.

**ORDERED** in Tampa, Florida, on October 31, 2023.

Kathryn Kimball Mizelle

Kathryn Kimball Mizelle
United States District Judge