**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PANINI AMERICA, INC.

       *Plaintiff,*

v.

FANATICS, INC., FANATICS, LLC,
FANATICS COLLECTIBLES
INTERMEDIATE HOLDCO, INC.,
FANATICS SPV, LLC, and
FANATICS HOLDINGS, INC.

       *Defendants.*

Case No. 1:23-cv-09714-JHR
[Related to Case No. 1:23-cv-06895-JHR]

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

THE AMENDED COMPLAINT'S ALLEGATIONS ....................................................4

ARGUMENT ..........................................................................................................................8

I.      THE COURT LACKS SUBJECT MATTER JURISDICTION OVER
        COUNTS I, II, III, AND V BECAUSE PANINI'S ALLEGED PROCEDURAL
        INJURY DOES NOT ESTABLISH ARTICLE III STANDING.........................................9

II.     PANINI CANNOT ESTABLISH THAT IT HAS "ANTITRUST STANDING" ...........16

        A.      Panini Has Not Alleged That It Suffered An "Antitrust Injury" ..........................17

                1.      Panini's "Injuries"—Its Failure To Win Licenses To IP Rights—
                        Did Not Result From Alleged Anticompetitive Conduct .........................18

                2.      The Length Of The IP Licenses Does Not Change The Analysis ............20

                3.      Panini's Other "Input" Foreclosure Arguments Are Impermissible
                        Complaints About Increased Competition.................................................22

                        a.      Panini Does Not Allege How Fanatics' GCP Investment Or
                                Topps Acquisition Caused Panini An Antitrust Injury.................22

                        b.      The Remaining Allegations Do Not Plead Antitrust Injury..........24

        B.      Panini Is Not An "Efficient Enforcer" Of These Antitrust Claims......................26

III.    PANINI FAILS TO ALLEGE A SHERMAN ACT SECTION 1 VIOLATION..............28

IV.     PANINI FAILS TO ALLEGE SHERMAN ACT SECTION 2 VIOLATIONS ..............30

V.      PANINI FAILS TO ALLEGE THAT FANATICS' ACQUISITION OF TOPPS
        OR ITS GCP INVESTMENT VIOLATED SECTION 7 OF THE
        CLAYTON ACT ..................................................................................................................32

        A.      Panini Fails To Allege That Fanatics' Acquisition Of Topps Increased
                Concentration In Any Alleged Market (Count V) ................................................33

        B.      Panini's Challenge To Fanatics' GCP Investment Also Fails (Count IV)............34

VI.     THE REMAINING STATE LAW CLAIMS ALL FAIL................................................36

        A.      Panini Failed To Allege The Elements Necessary For Its Tortious
                Interference Claim (Count VI)..............................................................................36

B.      Count VII Fails Because Panini Does Not Plead That Fanatics Acted "For The Sole Purpose Of Inflicting Intentional Harm," Or That Anyone Would Have Contracted With Panini "But For" Fanatics ...................................................38

C.      Count VIII's Defamation Claim Fails Because It Is Too Vague And Does Not Allege Fault By Fanatics.................................................................................39

CONCLUSION.......................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*16 Casa Duse, LLC v. Merkin*,
  791 F.3d 247 (2d Cir. 2015) ................................................................. 39

*AD/SAT v. Associated Press*,
  181 F.3d 216 (2d Cir. 1999) (per curiam) ........................................ 31, 32

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
  948 F.2d 536 (9th Cir. 1991) ............................................................. 31

*In re Aluminum Warehousing Antitrust Litig.*,
  2023 WL 7180648 (2d Cir. Nov. 1, 2023) .......................................... 27

*Am. Cricket Premier League, LLC v. USA Cricket*,
  445 F. Supp. 3d 1167 (D. Colo. 2020) ...................................... *passim*

*In re AMR Corp.*,
  2023 WL 2563897 (2d Cir. Mar. 20, 2023) ........................................ 33

*Apotex Corp. v. Hospira Healthcare India Private Ltd.*,
  2020 WL 58247 (S.D.N.Y. Jan. 6, 2020) ........................................ 26, 32

*Arcesium, LLC v. Advent Software, Inc.*,
  2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) ................................. *passim*

*ASARCO Inc. v. Kadish*,
  490 U.S. 605 (1989) ........................................................................... 16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................. 9

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ........................................................... 17, 22, 23, 36

*Balaklaw v. Lovell*,
  14 F.3d 793 (2d Cir. 1994) .......................................................... 17, 18, 20

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
  2011 WL 4482840 (S.D.N.Y. Sept. 28, 2011) ................................... 31

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ........................................................................... 17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)..............................................................................8, 17, 34

*Brunswick Corp. v. Riegel Textile Corp.*,
    752 F.2d 261 (7th Cir. 1984) ...............................................................29

*Camaisa v. Pharm. Rsch. Assocs., Inc.*,
    2022 WL 843653 (D. Del. Mar. 22, 2022) ...........................................34

*Carvel Corp. v. Noonan*,
    3 N.Y.3d 182 (2004)........................................................................38, 39

*Coal, of Watershed Towns v. U.S. E.P.A.*,
    552 F.3d 216 (2d Cir. 2008)..................................................................15

*Daimler Chrysler Corp. v. Cuno*,
    547 U.S. 332 (2006).................................................................................9

*Daniel v. Am. Bd. of Emergency Med.*,
    269 F. Supp. 2d 159 (W.D.N.Y 2003) ..................................................28

*Daniel v. Am. Bd. of Emergency Med.*,
    428 F.3d 408 (2d Cir. 2005)............................................................27, 28

*Doe v. Va. Dep't of State Police*,
    713 F.3d 745 (4th Cir. 2013) ................................................................13

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
    472 F.3d 23 (2d Cir. 2006)...............................................................21, 29

*Elcan Indus., Inc. v. Cuccolini, S.R.L.*,
    2014 WL 1173343 (S.D.N.Y. Mar. 21, 2014) ......................................39

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*,
    129 F.3d 240 (2d Cir. 1997)..................................................................30

*Fam. Equal. v. Becerra*,
    2022 WL 956256 (S.D.N.Y. Mar. 30, 2022), *appeal filed sub nom.*
    *Fam. Equal. v. Azar*, No. 22-1174 (2d Cir. May 27, 2022) .....................8

*Fineman v. Armstrong World Indus.*,
    980 F.2d 171 (3d Cir. 1992)..................................................................31

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
    658 F.2d 139 (3d Cir. 1981)............................................................13, 30

*Friedman v. Self Help Cmty. Servs., Inc.*,
    647 F. App'x 44 (2d. Cir. 2016) ............................................................40

iv

*FTC v. Microsoft Corp.*,
  2023 WL 4443412 (N.D. Cal. July 10, 2023), *appeal filed*, No. 23-15992
  (9th Cir. July 13, 2023) ................................................................................................35

*Ganske v. Mensch*,
  480 F. Supp. 3d 542 (S.D.N.Y. 2020) ...........................................................................38

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
  711 F.3d 68 (2d Cir. 2013) ...................................................................................... *passim*

*Gelb v. Fed. Rsrv. Bank of New York*,
  2016 WL 4532193 (S.D.N.Y. Aug. 29, 2016) .........................................................14, 15, 16

*Giordano v. Saks Inc.*,
  654 F. Supp. 3d 174 (S.D.N.Y. 2023), *appeal filed*, No. 23-600
  (2d Cir. Apr. 17, 2023) ..................................................................................................28

*In re Indep. Serv. Orgs. Antitrust Litig.*,
  203 F.3d 1322 (Fed. Cir. 2000) ......................................................................................31

*Kirch v. Liberty Media Corp.*,
  449 F.3d 388 (2d Cir. 2006) ...........................................................................................37

*Lama Holding Co. v. Smith Barney Inc.*,
  88 N.Y.2d 413 (1996) ...............................................................................................36, 37

*Lee v. City of Rochester*,
  663 N.Y.S.2d 738 (1997), *aff'd*, 677 N.Y.S.2d 848 (N.Y. App. Div. 1998) .........................40

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ......................................................................................................26

*Lerman v. Bd. of Elections in N.Y.C.*,
  232 F.3d 135 (2d Cir. 2000) ...........................................................................................14

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ..............................................................................................8, 13, 16

*M'Baye v. World Boxing Ass'n*,
  2009 WL 2245105 (S.D.N.Y. July 28, 2009) ....................................................................37

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
  833 F.3d 172 (2d Cir. 2016) ...........................................................................................30

*Marion HealthCare, LLC v. S. Ill. Hosp. Servs.*,
  2022 WL 2317303 (S.D. Ill. June 28, 2022) .....................................................................36

*Medidata Sols. Inc. v. Veeva Sys. Inc.*,
    2018 WL 6173349 (S.D.N.Y. Nov. 26, 2018)........................................................38

*Mount Evans Co. v. Madigan*,
    14 F.3d 1444 (10th Cir. 1994) ...........................................................................10

*N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*,
    2013 WL 1500333 (S.D.N.Y. Apr. 12, 2013)................................................37, 38

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)...............................................................................7, 28, 29

*Orion Pictures Distrib. Corp. v. Syufy Enters.*,
    829 F.2d 946 (9th Cir. 1987) .............................................................................23

*Oxford Glob. Res., Inc. v. Weekley-Cessnun*,
    2004 WL 2599898 (N.D. Tex. Nov. 12, 2004)....................................................29

*Parker Madison Partners v. Airbnb, Inc.*,
    283 F. Supp. 3d 174 (S.D.N.Y. 2017)..................................................................8

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007)..................................................................... *passim*

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010)...........................................................12, 18, 19, 20

*Redcell Corp. v. A.J. Trucco, Inc.*,
    2022 WL 683007 (S.D.N.Y. Mar. 8, 2022) ........................................................38

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock*,
    993 F.2d 800 (11th Cir. 1993) ...........................................................11, 12, 16

*S.W.B. New England, Inc. v. R.A.B. Food Grp. LLC*,
    2008 WL 540091 (S.D.N.Y. Feb. 27, 2008)..................................................23, 26

*SAS of P.R., Inc. v. P.R. Tel. Co.*,
    48 F.3d 39 (1st Cir. 1995)..................................................................................23

*Schor v. Abbott Labs.*,
    457 F.3d 608 (7th Cir. 2006) .............................................................................31

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
    22 F.4th 103 (2d Cir. 2021)................................................................................27

*Servicetrends, Inc. v. Siemens Med. Sys., Inc.*,
    870 F. Supp. 1042 (N.D. Ga. 1994), *amended on other grounds upon*
    *reconsideration*, 1994 WL 7766878 (N.D. Ga. June 24, 1994)............................21

*Somosky v. Consumer Data Indus. Ass'n,*
  2022 WL 596480 (S.D.N.Y. Feb. 28, 2022)..............................................................8, 10, 13, 14

*Spectrum Sports, Inc. v. McQuillan,*
  506 U.S. 447 (1993)...............................................................................................................32

*Spinelli v. Nat'l Football League,*
  96 F. Supp. 3d 81 (S.D.N.Y. 2015)............................................................................... *passim*

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016).............................................................................................................9, 16

*United States v. AT&T Inc.,*
  310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).........................35

*United States v. AT&T, Inc.,*
  916 F.3d 1029 (D.C. Cir. 2019) ............................................................................................33

*United States v. Baker Hughes, Inc.,*
  908 F.2d 981 (D.C. Cir. 1990) ........................................................................................33, 34

*United States v. UnitedHealth Grp. Inc.,*
  630 F. Supp. 3d 118 (D.D.C. 2022) ......................................................................................35

*United States v. Waste Mgmt. Inc.,*
  743 F.2d 976 (2d Cir. 1984)..................................................................................................34

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004).............................................................................................12, 19, 25, 32

*Vigoda v. DCA Prods. Plus,*
  741 N.Y.S.2d 20 (N.Y. App. Div. 2002) ..............................................................................39

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC,*
  257 F.3d 256 (2d Cir. 2001)..................................................................................................31

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens,*
  529 U.S. 765 (2000)..........................................................................................................12, 13

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.,*
  8 N.Y.3d 422 (2007)..............................................................................................................37

*Wrath v. Seldin,*
  422 U.S. 490 (1975)..................................................................................................................9

*Wyo. Sawmills Inc. v. U.S. Forest Serv.,*
  383 F.3d 1241 (10th Cir. 2004) ............................................................................................11

## STATUTES

15 U.S.C. § 18 ..........................................................................................................34, 36

Cal. Educ. Code § 67456 ...................................................................................................25

Clayton Act § 7 ............................................................................................... *passim*

Fla. Stat. § 1006.74 ...........................................................................................................25

Sherman Act
    § 1............................................................................................................ *passim*
    § 2............................................................................................................ *passim*

## RULES

Fed. R. Civ. P.
    12(b)(1) ..................................................................................................8, 9, 12
    12(b)(6) .............................................................................................9, 18, 28

## TREATISES

Phillip Areeda & Herbert Hovenkamp, Antitrust Law (2022) ................................................13, 21

## OTHER AUTHORITIES

Comment of the Antitrust Division of the U.S. Department of Justice,
    *Non-Compete Clause Rule*, No. 2023-0007 (F.T.C. Apr. 19, 2023),
    https://www.justice.gov/media/1288391/dl?inline ................................................25

## <u>INTRODUCTION</u>

Panini's amended complaint tries to turn procompetitive conduct—the choice by sports leagues and players' associations to move their intellectual property licenses from entrenched incumbent Panini to innovative new entrant Fanatics—into an antitrust violation.  If that doesn't sound like a viable antitrust case, that is because it isn't.  Panini's case is not only legally baseless, but also hypocritical.  Panini, the self-proclaimed "market leader,"[1] achieved a prominent position by first entering into exclusive, multi-year intellectual property ("IP") licenses and, in turn, displacing established trading card companies—precisely what Fanatics is doing.  When Fanatics competed by offering the leagues and players' associations ("PAs") new ways to deliver the best collectible products to consumers, those licensors decided to part ways with Panini and do business with Fanatics instead.  Panini has no right to the licenses at the heart of this case—nor, quite tellingly, does it even plead as much:  neither Major League Baseball ("MLB"), the National Football League ("NFL"), the National Basketball Association ("NBA"), nor any of their respective PAs are under any obligation to license their IP in the first place—and they certainly are not required to license their IP to Panini.  The leagues and PAs picked Fanatics because it offered them innovative ideas.  That is a portrait of competition working.  The fact that it is not the outcome Panini wanted does not mean Panini can recast its commercial failings as an antitrust violation.  Panini's case must be dismissed.

To start, Panini's antitrust claims fail because Panini has not alleged an actual injury sufficient for Article III standing for Counts I, II, III, and V.  Panini asserts it was injured because (1) the IP owners supposedly denied Panini the opportunity to compete "for" the licenses that

---

[1] Initial Compl. ¶ 1, ECF No. 1.  Panini removed this reference to it being the "market leader" in its amended complaint after seeing Fanatics' original motion to dismiss.

Fanatics won, and (2) due to the length of the licenses, Panini will have to wait too long before it will have the chance to compete again.  Am. Compl. ¶¶ 107-10, ECF No. 69 ("Compl.").  But those claims turn on a purely "procedural injury"—*i.e.*, an injury resulting from an alleged lost opportunity to participate in a competitive bidding process—which does not constitute a basis for Article III standing.  *Am. Cricket Premier League, LLC v. USA Cricket*, 445 F. Supp. 3d 1167, 1174-75 (D. Colo. 2020) (dismissing antitrust case on Article III grounds where plaintiff's alleged injury was that it was denied opportunity to compete for sole source contract).  Panini's alleged procedural injury fails all three required elements of Article III standing:  (1) it does not qualify as an injury-in-fact because the antitrust laws do not give Panini any legally protected right to compete for these IP licenses *at all*; (2) it is not fairly traceable to Fanatics because *the leagues and PAs*—as the owners of the IP rights—have exclusive control over whether and for how long they want to license their rights—and whether they want to do so on an exclusive or non-exclusive basis; and (3) none of the relief Panini seeks would redress its alleged procedural injury.

All of Panini's antitrust claims (Counts I-V) also fail because Panini has not alleged either of the required elements for "antitrust standing":  (a) that it has suffered an "antitrust injury" (*i.e.*, a harm resulting from a reduction in competition); or (b) that it is an "efficient enforcer" of the antitrust laws.  As to antitrust injury, courts routinely reject efforts by disgruntled competitors (especially incumbents like Panini) to claim an antitrust violation where the crux of the harm is losing out to another competitor.  That is because injuries like the ones Panini alleges arise from *increased competition*.  The same holds true for Panini's attempts to base antitrust violations on the actions Fanatics took to be a successful partner to the leagues and PAs that trusted Fanatics with their IP.  As a new entrant, Fanatics had to prepare to perform on those licenses before they begin in 2025 and 2026, including by ensuring it had, among other things, (1) qualified employees

(through direct hiring and its acquisition of Topps), and (2) a quality card manufacturer, GC Packaging ("GCP"), with capacity to make its cards. Not only are these all legitimate actions taken to support Fanatics' *entry*—something the antitrust laws encourage—but Panini expressly alleges these things are "necessary" steps for *any* new entrant to be able to compete "effectively" in this space. Compl. ¶¶ 2, 68. These actions, therefore, cannot possibly have caused Panini an antitrust injury.

Panini fares no better in pleading that it is an "efficient enforcer." This element asks whether Panini is best suited to vindicate the public interest in antitrust enforcement. It is not. Panini's alleged injuries are not just "indirect"; they are totally unconnected to the competitive harms it alleges that Fanatics may someday cause—which, in any event, are entirely speculative. Panini's suggestion that maybe someday Fanatics will cause trading card prices to increase, will reduce the outlets where consumers can buy cards, and will reduce card quality may be Panini's most provocative spin, but it is irrelevant here because *Panini does not allege that any of that has actually happened.*

There are additional reasons to dismiss each of the counts. The Court should dismiss Counts I and II because Panini does not come close to pleading a so-called "monopoly leveraging" violation of Section 2 of the Sherman Act, if such a theory even exists today. The Court should dismiss Count III because Panini does not allege facts sufficient to support its claim that Fanatics' IP licenses with the leagues and PAs violate Section 1 of the Sherman Act. The Court should dismiss Counts IV and V because Panini does not allege facts sufficient to support its claims that Fanatics' acquisition of Topps and investment in GCP violated Section 7 of the Clayton Act. In addition, the Court should dismiss Panini's remaining, non-antitrust claims (Counts VI-VIII) because Panini (1) improperly attempts to repackage ordinary business conduct into common law

violations and (2) fails to plead the necessary elements of those claims. The Court should dismiss the complaint in its entirety—and, because Panini has already amended its complaint in response to Fanatics' arguments and cannot remedy these deficiencies, should do so with prejudice.

## THE AMENDED COMPLAINT'S ALLEGATIONS

For decades, companies have competed for the IP licenses needed to sell fully licensed sports trading cards. Compl. ¶¶ 3, 96. PAs generally control IP rights to athletes' identifying information, including their names, images, and likenesses ("NIL"). *Id.* ¶ 41. And sports leagues control IP rights to trademarked team logos, color combinations, and the like. *Id.* To produce and sell sports trading cards with both players' likenesses and team or league marks, companies must acquire licenses to both sets of rights. *Id.* ¶ 37.[2] As the owners of the IP, the leagues and PAs decide whether to license their IP to third parties at all, for how long to license their IP, and whether to do so on an exclusive or non-exclusive basis. *Id.* ¶¶ 95-101. Because of the "brand investment" and "financial wherewithal" required to succeed in selling sports trading cards, *id.* ¶ 220, the IP owners often choose to enter into long-term license agreements with third-party licensees, such as Panini. *See id.* ¶¶ 6, 77, 96-98. Many of these licenses have "historically" been "exclusives." *Id.* ¶ 7. Although these licenses are always subject to competition, the IP owners choose the form of that competition, with some licenses put out for "a public-bidding process" and others not. *Id.* ¶¶ 95-101.

Panini's parent, Panini S.p.A, has been a dominant player in global collectibles, including trading cards, for decades. *See id.* ¶ 76. Based in Italy, Panini S.p.A describes itself as "a global trading card company" that "has for years led the way" in the sale of sports trading cards. *Id.* ¶¶ 2,

---

[2] Notably, however, companies can and do produce and sell trading cards for individual athletes, such as rookies, without obtaining a license from the league or including the league's IP. *See id.* ¶ 168.

23.    Panini achieved its leading position in the U.S. through, among other things, long-term exclusive licenses with IP holders (leagues and PAs) and the acquisition of an existing licensee (Donruss Playoff, L.P. ("Donruss")).    *See id.* ¶ 77.    In 2009, Panini entered into an exclusive licensing agreement with the NBA and began selling NBA trading cards in the United States.    *Id.* ¶¶ 76-77.    This was a nine-year exclusive deal, with an original four-year term of exclusivity and a five-year extension.    *Id.* ¶ 96.    The same year, Panini acquired another trading card company (Donruss) and assumed that company's existing licenses with the NFL and the National Football League Players Association ("NFLPA").    *Id.* ¶ 77.    And in 2011, Panini secured a multi-year license with the Major League Baseball Players Association ("MLBPA").    *Id.*    Through this series of licensing agreements and acquisitions, Panini won competitions for IP rights.    *See id.* ¶¶ 96-98. Today, Panini still holds multi-year licenses with many sports leagues, including:  an exclusive eight-year license with the NBA, an exclusive six-year license with the National Basketball Players Association ("NBPA"), an exclusive five-year license (plus a potential five-year extension) with the NFL, an exclusive ten-year license with the NFLPA, and others.    *Id.*[3]

Fanatics is a digital sports platform that manufactures and sells licensed sports merchandise and collectibles.    Compl. ¶ 31.    Fanatics recognized that the sports trading card industry had become stagnant and so, in 2021, it used its expertise to bring innovation to this industry.    *See id.* ¶ 102.    With Panini's exclusive licenses with the NBA and NFL set to expire in 2025 and 2026,

---

[3] In August 2023, the NFLPA "attempted to terminate its agreement with Panini" on the ground of a "material change in executive management" at Panini. *Id.* ¶¶ 182-83.  Later, World Wrestling Entertainment, Inc. ("WWE") also attempted to terminate its agreement with Panini.  *Id.* ¶ 190. Panini is challenging those terminations and, as of now, still produces both NFL and WWE trading cards.  *Id.* ¶¶ 185, 191-92.  Panini speculates—with *zero* supporting facts—that Fanatics "induce[d]" those two entities to terminate their agreements with Panini. *Id.* ¶¶ 181, 193.  And Panini and WWE subsequently resolved their differences. *See* Settlement & Dismissal Papers, *Panini S.p.A. v. World Wrestling Ent'mt, Inc.*, No. 23-cv-08324 (S.D.N.Y. Nov. 14-21, 2023), ECF Nos. 41-43 ("*Panini v. WWE*").

respectively, *id.* ¶ 98, and the licenses of another long-standing producer of trading cards (Topps) with MLB also set to expire, Fanatics competed for the rights that would allow it to sell fully licensed baseball, basketball, and football trading cards after Panini's and Topps' existing licenses expired, *id.* ¶ 102.  It succeeded.  In 2021 and 2022, Fanatics entered into licensing agreements with the NBA, the NFL, the MLB, and their respective PAs.  *Id.*  These exclusive agreements have terms between ten and twenty years, although they do not begin for several years.  *Id.* ¶¶ 9, 104. Panini claims these agreements are "critical" to the allegedly anticompetitive scheme and are the core mechanism by which Fanatics "foreclose[s] competition entirely" and "eliminate[s]" competition from Panini.  *Id.* ¶¶ 108, 115.

To deliver on its promise to innovate and to meet its new licensors' expectations, Fanatics began building out its own trading card operations.  Fanatics did so in the same way that Panini had done over a decade earlier:  by initially acquiring another company.  In late 2021, Fanatics acquired Topps and assumed Topps' existing exclusive licenses with MLB (and a non-exclusive license with the MLBPA) and Major League Soccer ("MLS").  *Id.* ¶ 118.  In February 2022, Fanatics invested in GCP, a manufacturer of trading cards.  *Id.* ¶ 121.  (Panini continues to print cards with GCP even after that investment.  *Id.* ¶¶ 144-45.)  And in April 2023, Fanatics sought to hire various "employees with distinctive, highly specialized skills" for "the successful design and marketing of professional sports trading cards," some of whom worked for Panini.  *Id.* ¶¶ 2, 84, 151.  To expand its trading card offerings and create new categories of trading cards, Fanatics also entered into exclusive autograph deals with "star, rookie players" in the NBA and NFL so that it could use their autographs on its cards.  *Id.* ¶¶ 164-65.

Although Panini alleges that Fanatics' recent entry has harmed Panini in the "short term," *id.* ¶¶ 115-16, Panini has proclaimed the opposite elsewhere.  For example, Panini recently told

Judge Schofield that the departure of its employees to Fanatics had **no impact** on Panini's ability to continue to operate as normal because Panini "moved swiftly to replace the departed employees." Decl. of Mark Warsop ¶ 31, *Panini v. WWE*, ECF No. 28.  Similarly, despite claiming that Fanatics induced WWE to *breach* its contract with Panini without any factual or legal basis, Panini and WWE resolved their differences and Panini is still producing WWE cards today.  *See* Settlement & Dismissal Papers, *Panini v. WWE*, ECF Nos. 41-43.

Defining a relevant market that reflects commercial realities is the first step in any antitrust case because Panini has to allege that Fanatics harmed competition in a legally cognizable relevant market.[4]  Panini does not identify a single market, but instead alleges that Fanatics' conduct harmed competition in eight gerrymandered markets artificially defined to include only "the production and sale," Compl. ¶ 12, of "newly issued," *id*. ¶ 43, "fully licensed," *id*. ¶ 33, "mass market," *id*. ¶ 52, trading cards for (1) "Major U.S. Professional Sports Leagues" (defined to include only): (a) MLB player cards; (b) NBA player cards; and (c) NFL player cards, as well as separate relevant markets for each of (2) NBA, (3) MLB, and (4) NFL trading cards, *id*. ¶¶ 42, 61. Panini also alleges each of these four markets has a "premium" equivalent.  *Id*. ¶ 52.  These eight markets were reverse engineered to line up exactly with the six future IP licenses that Fanatics acquired.[5]

---

[4] *E.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018).

[5] Although none of these markets constitutes a legally cognizable relevant market for antitrust purposes, at this time Fanatics is not moving to dismiss on the basis that Panini failed to allege proper relevant markets.  Panini's claims fail at this pleading stage for many additional independent reasons as set forth below.  Fanatics reserves its right to challenge Panini's alleged markets at a later time.

## **ARGUMENT**

In an antitrust case, a private plaintiff must have both (i) standing to sue under Article III of the U.S. Constitution, and (ii) the more exacting "antitrust standing," which includes the essential requirements that the plaintiff have suffered an "antitrust injury" and be an "efficient enforcer" of the antitrust laws.  *Gatt Commc'ns, Inc. v. PMC Assocs.*, *LLC*, 711 F.3d 68, 76 (2d Cir. 2013).  Article III standing and "antitrust standing" are legally separate inquiries.  *Somosky v. Consumer Data Indus. Ass'n*, 2022 WL 596480, at *3 (S.D.N.Y. Feb. 28, 2022) (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007)).  Article III standing focuses on whether the suit is an actual "case" or "controversy" that federal courts are constitutionally empowered to resolve.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  The more exacting antitrust standing requires more than an injury causally related to unlawful anticompetitive conduct.  *Port Dock*, 507 F.3d at 122.  Antitrust standing requires a plaintiff to plausibly allege both that (1) it suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977), and (2) it is an "efficient enforcer" for the specific antitrust claims at issue, *Gatt*, 711 F.3d at 76.

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss based on lack of Article III standing.  *Fam. Equal. v. Becerra*, 2022 WL 956256, at *2 (S.D.N.Y. Mar. 30, 2022), *appeal filed sub nom. Fam. Equal. v. Azar*, No. 22-1174 (2d Cir. May 27, 2022).  Although courts can consider evidence outside the complaint to resolve Rule 12(b)(1) motions, they also can resolve such motions based solely on the complaint where, as here, the plaintiff's lack of Article III standing is evident from the face of the complaint.  *Parker Madison Partners v. Airbnb, Inc.*, 283 F. Supp. 3d 174, 178-80 (S.D.N.Y. 2017).

Federal Rule of Civil Procedure 12(b)(6) governs whether a plaintiff has plausibly alleged all of the essential elements of its claims.  Here, Rule 12(b)(6) controls whether Panini has sufficiently alleged (1) antitrust standing for its antitrust claims, and (2) the other elements of each of its claims.  *Gatt*, 711 F.3d at 74-75.  Under Rule 12(b)(6), the complaint must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  *Arcesium, LLC v. Advent Software, Inc.*, 2021 WL 1225446, at *5 (S.D.N.Y. Mar. 31, 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Court "is 'not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions.'"  *Id.* (quoting *In re Facebook Initial Pub. Offering Derivative Litig.*, 797 F.3d 148, 159 (2d Cir. 2015)).

## I. THE COURT LACKS SUBJECT MATTER JURISDICTION OVER COUNTS I, II, III, AND V BECAUSE PANINI'S ALLEGED PROCEDURAL INJURY DOES NOT ESTABLISH ARTICLE III STANDING

The Court should dismiss Counts I, II, III, and V pursuant to Rule 12(b)(1) because Panini fails to allege facts sufficient to establish Article III standing for each of these federal antitrust claims.[6]  Article III standing requires a plaintiff to "clearly . . . allege facts demonstrating each element" of standing:  that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting in part *Wrath v. Seldin*, 422 U.S. 490, 518 (1975)).  A failure to allege any of the three elements means the plaintiff lacks Article III standing.  *Id.*[7]

---

[6] Fanatics is not moving to dismiss Count IV (the Section 7 claim related to GCP) for lack of Article III standing.  However, as detailed below, Count IV fails for multiple other reasons.  *See infra* Sections II, V.

[7] Moreover, a plaintiff must demonstrate standing for each claim it asserts and cannot rely on standing for one count to suffice for all counts.  *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  Standing thus turns on the specific harm the plaintiff claims to *personally* have

Panini's complaint offers a variety of conclusory assertions about harm to "consumers" and "competition" generally.  *See, e.g.*, Compl. ¶¶ 223-35.  When it comes to Panini itself, however, its allegations of personal harm are sparse at best.

**Counts I, II, and III:**  As to these three counts, Panini's personal injury argument hinges on its repeated assertions that Fanatics caused Panini a "competitive injury" because the IP owners did not allow Panini to compete "for" the IP licenses Fanatics won, and Panini will not have another opportunity to compete for them again as soon as it would prefer.  *Id.* ¶¶ 107-110, 240, 248, 258.  Specifically, Panini alleges (1) it was not "given an opportunity to bid or otherwise compete for the licenses Fanatics acquired," *id.* ¶ 110, and (2) Panini will not have "a single opportunity to compete for a decade or more" now that the leagues and PAs have chosen Fanatics to make trading cards with their IP, *id.* ¶ 108; *see also, e.g.*, *id.* ¶ 12 ("Competition 'for' the market through bidding on licenses with the Leagues and [PAs] would normally take place every handful of years.").  But Panini does not allege that Fanatics did anything wrongful to prevent Panini from competing for the licenses Fanatics won.  Nor does Panini allege that it had any reasonable likelihood of being awarded any of these IP licenses.  To the contrary, Panini pleads that the leagues and PAs each decide their own licensing procedures, including whether they want to put their licenses out for public bid (which they do not have to do), how long they want to license their IP rights, and whether they want to do so on an exclusive or non-exclusive basis.  *Id.* ¶¶ 95-101.

Panini's allegations are a textbook example of the type of "procedural injury"—*i.e.*, injury a plaintiff supposedly suffered because it lost the opportunity to compete for a license or a contract—which courts hold do not confer Article III standing.  *See, e.g.*, *Mount Evans Co. v.*

---

suffered in the context of *each* count.  *Somosky*, 2022 WL 596480, at *3 (dismissing antitrust claim for lack of Article III standing).

*Madigan*, 14 F.3d 1444, 1451 (10th Cir. 1994) (finding no Article III standing for claim that sought opportunity to compete for contract because there was no guarantee plaintiff would win contract and court could not order that it be awarded contract); *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 808 (11th Cir. 1993) (no Article III standing for alleged injury from reduction in timber available for future contract because plaintiffs had no right to harvest any set amount of timber); *Wyo. Sawmills Inc. v. U.S. Forest Serv.*, 383 F.3d 1241, 1248  (10th Cir. 2004) ("denial of the opportunity to bid competitively for federal contracts" does not establish Article III standing).

*American Cricket* is instructive.  There, two entities competed for a contract to be the sole firm to develop a professional U.S. cricket league.  *Am. Cricket Premier League, LLC v. USA Cricket*, 445 F. Supp. 3d 1167, 1171-72 (D. Colo. 2020).  The plaintiff brought antitrust claims alleging it was denied a fair opportunity to compete for the contract.  *Id.* at 1173-74.  Applying settled Article III principles, the court held that the plaintiff had alleged a type of "procedural" injury that is not sufficient for standing because the defendants had no obligation to allow the plaintiff to compete for the contract in the first place.  *Id.* at 1175-77.  As the court explained, the only relief that might remedy the alleged harm—ordering the defendants to re-bid the contract or to accept the plaintiff's bid—was not something courts have the power to award, so the plaintiff's alleged injury was not redressable.  *Id.* at 1178.

The same principles govern here.  Panini's sole alleged injury for Counts I, II, and III is a *procedural* one:  it complains that it was denied the opportunity to compete for the licenses Fanatics won, and that it will not have another opportunity to compete for those licenses again as soon as it would prefer.  A straightforward application of Article III standing requirements compels

the conclusion that Panini's alleged harm is exactly the type of procedural injury that courts deem insufficient under Federal Rule of Civil Procedure 12(b)(1).

*First*, Panini's claim that it was deprived of opportunities to compete for IP licenses does not qualify as an ***"injury in fact."*** For one, Panini was not actually deprived of any such opportunities; the complaint does not allege anything that prevented Panini from competing for the IP licenses that Fanatics won. An opportunity to "compete" does not require a public bidding process, or a direct invitation from the IP owners. *Cf. Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83-84 (3d Cir. 2010) (plaintiff was not denied the ability to compete merely because it did not receive an invitation to bid). As the long-term incumbent for five of the six licenses at issue, Panini was better positioned than anyone on the planet to compete for those licenses, whether the IP owners held an open bidding process or not.

Regardless, to satisfy the injury-in-fact element, Panini must plead that its harm arises from a "violation of a legally protected right." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 772 (2000); *see also Alcock*, 993 F.2d at 808 (alleged injury from reduction in timber available for future contract was not injury-in-fact because plaintiffs had no right to harvest any set amount of timber). Panini cannot make such a claim here because the antitrust laws do not give Panini a legally protected right to compete for these IP licenses at all, much less to compete in its preferred form (*i.e.*, being invited to bid) or at its preferred intervals. And Panini certainly has no "right" to win any of the licenses. "[T]he antitrust laws do not displace the discretion of a private business to decide on its own with whom it will deal." *Arcesium*, 2021 WL 1225446, at *6 (citing *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)).

That is particularly true here, where the licenses at issue are for IP rights. IP law gives IP owners *exclusive* control over their rights, including the ability to decide whether, how often, and

to whom to license them.  *Id.* (IP owner's refusal to do business with plaintiff does not violate antitrust law); *see* Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1803e (2022) ("Areeda"); *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 153 (3d Cir. 1981) ("[A]s a licensor, the MLBPA is free to grant licenses to any competitor, or none at all.").  In short, the antitrust laws do not obligate the leagues or PAs to give Panini—or anyone else—an opportunity to compete for, or to otherwise acquire, licenses to their IP **ever**, so the purported denial of an *opportunity* to compete is not a "violation of a legally protected right" or a cognizable injury-in-fact.  *Vt. Agency of Nat. Res.*, 529 U.S. at 772.[8]

**Second,** even if Panini's alleged injury did qualify as an injury-in-fact, it is not **"fairly traceable" to Fanatics** because the leagues and PAs control the procedures for licensing their rights.  An injury is not "fairly traceable" to the defendant if it is "the result of the independent action of some third party not before the court."  *Somosky*, 2022 WL 596480, at *3 (quoting *Lujan*, 504 U.S. at 560); *see also Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755-56 (4th Cir. 2013) (plaintiff could not demonstrate traceability where her alleged harm arose from the decision of third parties not before the court).

Here, the leagues and PAs decide whether to put the licenses out for bid at all and whether to license their rights exclusively.  Panini does not allege that Fanatics did anything to coerce the IP owners into denying Panini the opportunity to compete; nor does Panini allege Fanatics

---

[8] As to Counts I and II (the Section 2 counts), Panini alleges that Fanatics first "[s]ecur[ed] its exclusive licenses" to gain a "monopoly of the Relevant Markets for the long term" and then "leveraged that long-term monopoly to monopolize those same markets in the short term," *i.e.*, before Panini's existing licenses expire, through a hodgepodge of supposedly unfair conduct.  *See* Compl. ¶¶ 114-15, 207.  Because the monopoly leveraging counts are premised on Fanatics' acquisition of the future licenses, Panini's standing to pursue the "short-term monopoly" theory rises and falls with Panini's standing to challenge the future IP licenses on the ground that it was supposedly denied the opportunity to compete for them.

wrongfully forced the IP owners to award their licenses on an exclusive basis.  Panini would be in the exact same position if each of the leagues and PAs had decided to award their exclusive licenses to someone other than Fanatics.  Panini's alleged injury did not occur because the IP owners chose Fanatics; it occurred because none of the IP owners chose to award or renew their licenses with Panini.  "The Supreme Court, and countless lower courts have held that plaintiffs fail to show traceability where their alleged injuries are caused by third parties' intervening conduct." *Somosky*, 2022 WL 596480, at *3.

**Third**, there is no relief this Court legally could order that would *redress* Panini's loss of the exclusive IP rights it has held for more than a decade, or the supposed deprivation of an opportunity to compete for future IP licenses as often as Panini would like.  *Gelb v. Fed. Rsrv. Bank of New York*, 2016 WL 4532193, at *4 (S.D.N.Y. Aug. 29, 2016) (it must be "likely, rather than 'merely speculative,' that the injury will be redressed by a favorable decision" (quoting *Lerman v. Bd. of Elections in N.Y.C.*, 232 F.3d 135, 142 (2d Cir. 2000))).  To redress Panini's alleged injuries, the Court would have to order the non-party IP owners to change how they award their licenses.  Specifically, the Court would have to decree that:  (a) the IP owners must license out their IP for trading cards; (b) the IP owners must hold public bidding processes at certain intervals; and (c) the IP owners must allow Panini to participate in those bidding processes every time.  But the Court is not empowered to grant any such order against non-parties, and Panini has not asked for that relief.  *See* Compl. ¶ 298.   In any event, such a ruling would not actually address the crux of Panini's complaint or make it "likely" that Panini would win any license, much less the specific combination of **two licenses**—from a league and its associated PA—that Panini claims

is necessary to sell fully licensed trading cards for any league.[9]  And, such an outcome is not merely "unlikely"; it is fantasy.  If the IP owners had wanted to continue working with their long-term incumbent, they would have done so.  Their decision to instead partner with the innovator, Fanatics, speaks volumes.

The specific relief Panini *requests* would not redress its alleged harm either.  Panini asks the Court to order a variety of injunctive relief, including ordering Fanatics "to divest itself of the licenses it has acquired from the Leagues and players associations."  *Id.* ¶ 298(c).  But such injunctive relief would not redress Panini's alleged harm of being excluded from competing for the licenses or from selling fully licensed cards in the future.  *See Am. Cricket*, 445 F. Supp. 3d at 1178 (vacating contract award would not redress alleged harm because court cannot award contract to plaintiff so plaintiff "would be left just as empty-handed as before").  Forcing Fanatics to divest its IP licenses would not give Panini those licenses nor require the IP owners to solicit bids from Panini.  *See id.*  The leagues and PAs have no obligation to work with Panini, and Panini does not claim the leagues and PAs would work with Panini were the licenses bid.  "Relief that does not remedy the injury [allegedly] suffered cannot bootstrap a plaintiff into federal court."  *Gelb*, 2016 WL 4532193, at *4-5 (quoting *Coal, of Watershed Towns v. U.S. E.P.A.*, 552 F.3d 216, 218 (2d Cir. 2008)) (no Article III standing because alleged injuries not redressable by relief sought).

Nor can monetary damages redress Panini's alleged harm because Panini has not alleged that it has suffered any monetary harm.  Panini does not and cannot allege that merely losing the *opportunity* to compete caused it to suffer any monetary harm.  For all its bluster, Panini never

---

[9] Panini alleges that "no individual League or individual players association could produce and sell fully licensed trading cards on its own" and that the only way any entity can sell fully licensed trading cards for MLB, NBA, or NFL is to have licenses from **both** the league and its associated PA.  Compl. ¶¶ 36-38.  Thus, according to Panini, it needs a very specific combination of licenses from at least two separate entities to sell fully licensed cards for any league.  *Id.*

alleges that *any* league or PA—much less the necessary combination of *both* a league *and* its associated PA (*supra* n.9)—would have awarded Panini its desired licenses.  So, Panini has not alleged that it was deprived of any revenues it otherwise would have received.[10]  In short, Panini's alleged injury—exclusion from the market(s) because it did not have the opportunity to compete for the necessary IP licenses—is not "likely" to be redressed by any of the specific relief it seeks, or any relief the Court could legally order.  *See Am. Cricket*, 445 F. Supp. 3d at 1178; *Gelb*, 2016 WL 4532193, at *4; *Alcock*, 993 F.2d at 808 (no Article III standing where redressability "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict" (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 614 (1989))).

**Count V**:  As to Count V, Panini alleges no specific injury that it has personally suffered because of Fanatics' acquisition of Topps at all.  The Court should dismiss Count V on that basis alone.  *See Spokeo*, 578 U.S. at 339 (injury sufficient for standing "must affect the plaintiff in a personal and individual way" (quoting *Lujan*, 504 U.S. at 560)).

For these reasons, the Court should dismiss Counts I, II, III, and V for lack of Article III standing.

## II.   PANINI CANNOT ESTABLISH THAT IT HAS "ANTITRUST STANDING"

Even if Panini's allegations established Article III standing, the Court still should dismiss all of the antitrust claims (Counts I-V) because Panini has not plausibly alleged the more exacting "antitrust standing."   Antitrust standing requires Panini to plausibly allege **both** that it (1) has suffered an "antitrust injury," **and** (2) "that it is a suitable plaintiff to pursue the alleged antitrust

---

[10] This means that, unlike in most antitrust cases, Panini does not allege that Fanatics' purportedly anticompetitive conduct in Counts I, II, III, and V has caused Panini to suffer an *economic* injury to its business, such as lost sales that Panini otherwise would have made.

violations and thus is an 'efficient enforcer' of the antitrust laws." *Gatt*, 711 F.3d at 76 (quoting *Port Dock*, 507 F.3d at 121-22). Panini cannot meet either requirement.

**A.    Panini Has Not Alleged That It Suffered An "Antitrust Injury"**

Antitrust injury is an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489. The antitrust laws were enacted for "the protection of competition, not competitors," *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962), so an antitrust injury must be one that results from a "competition-*reducing* aspect or effect of the defendant's behavior," *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 343-44 (1990). Critically, "injuries resulting from competition alone are not sufficient to constitute antitrust injuries." *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994).

This Circuit employs a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury. *Gatt*, 711 F.3d at 76. **Step one**, "the party asserting that it has been injured by an illegal anticompetitive practice must 'identify the practice complained of and the reasons such a practice is or might be anticompetitive.'" *Id.* (quoting *Port Dock*, 507 F.3d at 122). **Step two**, the court must "identify the 'actual injury the plaintiff alleges.'" *Id.* (quoting *Port Dock*, 507 F.3d at 122). This requires the court to determine "the ways in which the plaintiff claims it is in a 'worse position' as a consequence of the defendant's conduct." *Id.* (quoting *Brunswick*, 429 U.S. at 486). **Step three**, the court must "'compare' the 'anticompetitive effect of the specific practice at issue' to 'the actual injury the plaintiff alleges.'" *Id.* (quoting *Port Dock*, 507 F.3d at 122). Applying these three steps, it is clear that Panini has not pled antitrust injury.

At **step one**, Panini contends that Fanatics' conduct is anticompetitive under Sherman Act Sections 1 and 2 and Clayton Act Section 7 because someday Fanatics *might* (a) cause consumers to pay higher prices, (b) reduce the outlets where consumers can buy trading cards, or (c) reduce

card quality.  Compl. ¶¶ 223-35.  Of course, Panini does not allege that any of these things have actually happened; nor can it.  Instead, Panini relies on purely "*speculative* and *conclusory* allegations" which "do not suffice to defeat a Rule 12(b)(6) motion" on antitrust injury.  *Arcesium*, 2021 WL 1225446, at *7.  In any event, none of Fanatics' purported anticompetitive conduct is the source of Panini's alleged injury.  Instead, focusing on **step two,** Panini's alleged injury is that it, an incumbent, suffered harm because it lost the competition for this particular set of IP licenses and thus cannot legally sell fully licensed MLB, NBA, and NFL trading cards after its current licenses expire.  Compl. ¶¶ 12, 225.  But Panini does not allege that *Fanatics engaged in anticompetitive conduct* to win the licenses.  It cannot because Fanatics did not.  It is thus clear at **step three** that Panini's alleged injuries arise from competition itself, and not from a supposed reduction in competition in the form of higher prices, reduced outlets, or reduced quality.  *Id.* ¶¶ 223-35.

The discussion that follows elaborates on **step three** to demonstrate that if Panini is a victim of anything, it is a victim of competition.  It is "axiomatic that the antitrust laws do not protect a competitor against competition."  *Port Dock*, 507 F.3d at 122.  Counts I-V all fail.

### 1.    Panini's "Injuries"—Its Failure To Win Licenses To IP Rights—Did Not Result From Alleged Anticompetitive Conduct

For IP licenses like those at issue here, it is "well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract."  *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015); *Race Tires*, 614 F.3d at 83 ("It is well established that competition among businesses to serve as an exclusive supplier should actually be *encouraged*.").  "[I]t is the nature of competition that at some point there are winners and losers, and the losers are excluded."  *Balaklaw*, 14 F.3d at 799 (alteration in original).  Panini itself currently holds long-term exclusive licenses for NFL and NBA cards.  Compl. ¶¶ 96-97.  To try to

differentiate its own conduct, Panini alleges the IP owners did not give Panini "an opportunity to bid or otherwise compete for the licenses Fanatics acquired." *Id.* ¶ 110. That is not sufficient to establish antitrust injury.

As an initial matter, as noted above, Panini has no right to compete for these licenses at all, much less in a particular way. The IP owners decide the process for awarding their licenses. *Arcesium*, 2021 WL 1225446, at \*6 (citing *Trinko*, 540 U.S. at 408). The IP owners do not have to license to anyone; they do not have to hold a public bidding process; and they do not have to solicit multiple bids. *Id.*; *Race Tires*, 614 F.3d at 79. The IP owners' failure to affirmatively solicit a bid from Panini is legally irrelevant because Panini points to *nothing wrongful that Fanatics did* to preclude the IP owners from soliciting a bid from Panini if they had wanted to do so. Instead, Panini merely alleges the leagues and PAs awarded the IP licenses to Fanatics because they received "equity ownership interest in Fanatics." Compl. ¶ 111. But offering better terms is not wrongful conduct—it is competition. In any event, how Fanatics chose to structure its financial proposals is irrelevant to the question of antitrust injury. The IP owners decide the value of their rights and the compensation they will accept for that value. Offering a better value package— however structured—to win an exclusive contract is not coercion; it is the essence of competition because each IP rights owner "remains free to pick the supplier that it believes will provide the best deal." *Race Tires*, 614 F.3d at 79.

More importantly, the fact that the IP owners may not have affirmatively solicited a bid from Panini does not mean Panini was denied the opportunity to compete for these licenses. Panini was the long-term incumbent and thus was better positioned than anyone to persuade the leagues and PAs to extend or renew their licenses before they expired. Panini has been in this industry in the U.S. since at least 2009. Compl. ¶ 76. It knew when the licenses would expire because it held

five of the six licenses in question, *id.* ¶ 98, and it knew how to secure new licenses, *id.* ¶¶ 96-98. Panini had relationships with the leagues and PAs and claims that it had "generated win-win results" for them in the past.  *Id.* ¶ 78.  As the incumbent, Panini should have been "competing" every day to maintain these relationships, and it had every advantage to win.  *Balaklaw*, 14 F.3d at 799 (incumbent has "strong incentive" to continue competing "in order to secure the exclusive positions"); *Race Tires*, 614 F.3d at 83 (no antitrust injury from lack of invitation to bid because plaintiff was "well aware of what [was] going on in the marketplace" and knew how to compete for exclusive contracts).

The truth for Panini, though painful, is simple:  it was a complacent incumbent that squandered the opportunity to obtain future IP rights.  The leagues and PAs decided to move their business to an innovative new partner.  That was a lawful exercise of their "freedom to switch suppliers" that "lies close to the heart of the competitive process that the antitrust laws seek to encourage."  *Spinelli*, 96 F. Supp. 3d at 116 n.16 (citation omitted).  It was *increased* competition that caused the IP licensors here to switch from Panini to Fanatics, and "the antitrust laws do not protect a competitor against competition."  *Port Dock*, 507 F.3d at 122.

## 2.    The Length Of The IP Licenses Does Not Change The Analysis

Unable to allege antitrust injury based on competing "for"—but failing to win—these future IP licenses, Panini complains that the IP licenses themselves are unduly restrictive because Panini will not have a chance to compete for them again for 10 to 20 years after they begin.  Compl. ¶ 109.  Panini characterizes this delay as causing harm to competition "for" the market, *i.e.*, Panini will have to wait too long until it can compete again.  *Id.*  Panini's complaint that 10 years is too long to wait rings particularly hollow when its own current exclusive licenses with the NFLPA and NBA are for 10 and 8 years, respectively.  *Id.* ¶¶ 96-97.  Regardless, the length of Fanatics' licenses is not a basis for alleging antitrust injury:  the leagues and PAs have the right to

independently choose whether they want to deal with anyone at all, with whom they want to deal (and with whom they don't), for how long, and whether to do so on an exclusive or non-exclusive basis. *Arcesium*, 2021 WL 1225446, at *6 (IP owners' refusal to deal was not an antitrust violation); *Gatt*, 711 F.3d at 77 (plaintiff did not suffer antitrust industry from being excluded from the network when it "had no right *ab initio* to participate"). That right is inherent in the IP they are licensing.

It is well-settled that "exclusive-licensing agreements covering intellectual property rights stand on a different footing than other exclusive arrangements" under the antitrust laws. Areeda ¶ 1803e. IP owners can choose to exclusively exploit their rights for as long as they hold them without the aid of an exclusive licensee. *Id.*; *Spinelli*, 96 F. Supp. 3d at 118 ("An exclusive license, which merely confers upon the licensee the ability to exploit the licensor's exclusive intellectual property rights, does not violate the antitrust laws."). An exclusive license confers upon the licensee the licensor's existing ability to exploit the *licensor's* own exclusive IP rights, and thus does not harm competition. *Spinelli*, 96 F. Supp. 3d at 116. It is irrelevant how long the leagues and PAs choose to empower someone else to exclusively exploit the same rights they could exclusively (and indefinitely) exploit themselves. *See id*; *see also E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29-30 (2d Cir. 2006) (lawful monopolist does not harm competition when it uses an exclusive distributor because that "vertical arrangement provides no monopolistic benefit to [the manufacturer] that it does not already enjoy and would not continue to enjoy if the exclusive distributorship were enjoined"); *cf. Servicetrends, Inc. v. Siemens Med. Sys., Inc.*, 870 F. Supp. 1042, 1056 (N.D. Ga. 1994) (defendant would be "entitled" to the "monopoly power that is inherent in its right to sell or refuse to sell" its IP), *amended on other grounds upon reconsideration*, 1994 WL 7766878 (N.D. Ga. June 24, 1994). To accept Panini's position would

restrict the freedom of sports leagues (NFL, NBA, MLB, and others) and PAs to decide whether

and how to utilize and value their own IP.  Neither antitrust nor IP law supports that result.

### 3.     Panini's Other "Input" Foreclosure Arguments Are Impermissible Complaints About Increased Competition

When Fanatics rightfully won the future licenses to manufacture cards for the MLB, NBA,

and NFL, and in furtherance of its efforts to improve the collectibles industry/collector experience,

Fanatics began competing for other trading card inputs, including skilled employees, quality

printing services, and player autographs.  Panini tries to paint this procompetitive conduct as

unlawful by arguing that Fanatics "leveraged [its] long-term monopoly to monopolize those same

markets in the short term through coercive, unfair, and anticompetitive conduct."  Compl. ¶ 115.

But none of this conduct can be anticompetitive when these are *exactly* the things Panini alleges

any new entrant must do to compete "effectively" in this industry.  *See id.* ¶¶ 2, 68.  In fact, Panini

alleges that there are no reasonable substitutes for these "critical supply-side inputs" and that they

are "necessary" for anyone to produce and sell NFL, MLB, and NBA trading cards "effectively."

*Id.*  It is thus clear that, once again, Panini is complaining about *increased* competition from a new

entrant—which cannot give rise to antitrust injury.  *See Atl. Richfield*, 495 U.S. at 344; *Port Dock*,

507 F.3d at 122.

### a.     Panini Does Not Allege How Fanatics' GCP Investment Or Topps Acquisition Caused Panini An Antitrust Injury

Panini takes issue with two aspects of Fanatics' investment in trading card inputs:  its

investment in manufacturer GCP, and its acquisition of long-standing trading card company

Topps.  Neither is a plausible basis for pleading antitrust injury.

With respect to GCP, Panini does not allege that Fanatics' vertical integration harmed

competition at all.  Specifically, Panini does *not* allege (as it was required to do) that Fanatics'

*investment* in GCP caused the competitive harms that antitrust law condemns, *i.e.*, reducing the

overall output of trading cards and increasing prices, much less that Panini's alleged injuries flow from those specific harms.  *See Port Dock*, 507 F.3d at 123 (excluded distributor's harm was not antitrust injury because it did not arise from increased prices or reduced output).  Instead, Panini merely alleges that GCP breached its contract with Panini (Compl. ¶ 132) when GCP supposedly "delayed" the release of "100 million" packs of Panini cards from November/December 2022 "into 2023."  *Id.* ¶¶ 145-47.  But whatever harm Panini may have suffered from GCP supposedly breaching its production contract with Panini is not an *antitrust* injury because it does not flow from any allegedly anticompetitive aspect of Fanatics' vertical integration with GCP.  *See, e.g.*, *SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39, 44-45 (1st Cir. 1995) (no antitrust injury where alleged wrong was from a breach of contract, not harm to competition); *Orion Pictures Distrib. Corp. v. Syufy Enters.*, 829 F.2d 946, 949 (9th Cir. 1987) (same).  Moreover, allegations that GCP caused a temporary delay in the release of some *Panini* cards cannot qualify as harm to *competition* because Panini does not allege that GCP reduced its *overall* output in the allegedly relevant market in 2022 or 2023 as compared to 2021 (before Fanatics invested in GCP).  Merely alleging temporary harm to *Panini* does not plead harm to *competition.  See Atl. Richfield*, 495 U.S. at 344. Other companies, including Topps, have the right to compete for capacity at GCP, whether Fanatics supposedly "acquired control" of GCP or not.  Compl. ¶ 148.  Any injury resulting from GCP supposedly delaying the release of some Panini cards in order to produce more Topps cards is not antitrust injury because such delay is "something [GCP] could have just as well done without having monopoly power."  *Port Dock*, 507 F.3d at 123-24; *S.W.B. New England, Inc. v. R.A.B. Food Grp. LLC*, 2008 WL 540091, at *5-6 (S.D.N.Y. Feb. 27, 2008) (no antitrust injury where plaintiff could have suffered same injury without any monopoly power).  In any event, Panini concedes that "high-quality" manufacturers other than GCP exist.  Compl. ¶ 131.

Panini also complains about Fanatics' acquisition of Topps, Compl. ¶¶ 118-20, which occurred shortly *after* Fanatics secured future licenses with several of the leagues and PAs, *id.* ¶ 118.[11]   Panini does not explain how this acquisition harmed competition in the purportedly relevant markets or injured Panini.   Panini alleges that, by acquiring Topps, Fanatics acquired Topps' then-existing MLB/MLBPA licenses (ones that would expire before Fanatics' own licenses later came into effect), and that "Fanatics also acquired an immediate, exclusive license with MLS and eliminated any marginal current competition, and any greater potential competition, that MLS cards might provide." *Id.* ¶¶ 118-19.   But Topps held the current MLB and MLS licenses *before* Fanatics acquired Topps, so nothing about the acquisition changed the *current* competitive landscape or harmed Panini; Fanatics was just substituted for Topps.   *See also infra* Section V.A (explaining that the Topps acquisition could not increase concentration in any market because Fanatics did not make trading cards prior to the acquisition).   And in any event, Panini alleges that MLS cards are not part of the relevant market(s) because consumers do not view them as reasonable substitutes for NFL, NBA, or MLB cards.   Compl. ¶¶ 45-48.   Focusing on the narrow relevant market Panini alleges (limited to NFL, NBA, and MLB cards), Fanatics acquired its future MLB, NFL, and NBA licenses *before* acquiring Topps, so the acquisition of Topps did not change the future competitive landscape in the purportedly relevant market either, and it cannot cause Panini any antitrust injury.

### b.   The Remaining Allegations Do Not Plead Antitrust Injury

Panini also alleges a grab-bag of other things Fanatics has supposedly done after winning

---

[11] It is ironic that Panini complains about Fanatics trying to develop its newly emerging trading card business by acquiring Topps when Panini did essentially the same thing a little over a decade prior.   Shortly after Panini secured its first exclusive deal with the NBA in 2009, Panini "bought the assets of Donruss" and gained control of that company's licenses with certain leagues and PAs, including the NFL and NFLPA.   Compl. ¶ 77.

the future IP licenses, including hiring Panini employees, signing rookie players to exclusive deals, no longer selling jerseys to Panini "through its official Panini account," *id.* ¶ 177, using a different distribution model to sell trading cards, and supposedly inducing the NFLPA and WWE to terminate their licenses early. *Id.* ¶¶ 150-207. Even accepting the truth of those allegations, Panini cannot allege that any of the supposed conduct caused antitrust injury.

As a new entrant to the trading card space, Fanatics must take steps to develop its business, such as hiring qualified employees and signing new licenses with college players who are newly empowered to receive payments from third parties who compete for their NIL rights.[12] Panini admits these "critical" activities are "necessary" for Fanatics to "effectively" sell trading cards at all. Compl. ¶¶ 2, 68.

This conduct is all *procompetitive*. Hiring talented employees increases worker mobility and labor market competition, something antitrust regulators expressly encourage. *See, e.g.*, Comment of the Antitrust Division of the U.S. Department of Justice, *Non-Compete Clause Rule*, No. 2023-0007 (F.T.C. Apr. 19, 2023), https://www.justice.gov/media/1288391/dl?inline. Indeed, Panini "moved swiftly to replace the departed employees" and continued to operate as normal. Decl. of Mark Warsop ¶ 31, *Panini v. WWE*, ECF No. 28.

Similarly, no business (nascent or otherwise) has a duty to deal with any particular customer, so there is nothing problematic about Fanatics allegedly no longer supplying jerseys to Panini "through its official Panini account," Compl. ¶ 177, particularly when Panini can (and does) acquire jerseys through other means. *Arcesium*, 2021 WL 1225446, at *6 (citing *Trinko*, 540 U.S.

---

[12] Beginning in 2020, various states enacted laws that allow college athletes to receive payments from third parties for their NIL rights. *See, e.g.*, Cal. Educ. Code § 67456; Fla. Stat. § 1006.74.

at 408).  Nor does utilizing a different distribution model, suggesting minimum resale prices[13] or the alleged firing of a single distributor injure Panini or the competitive process.  "[C]hanges in distribution strategy are not anticompetitive." *S.W.B.*, 2008 WL 540091, at *4 (dismissing antitrust claims based on manufacturer's decision to change distribution strategies).  Finally, as to the NFLPA and WWE, Panini fails to allege facts demonstrating that Fanatics had a hand in those licensors' unilateral decisions to terminate their licenses with Panini's parent company (Panini S.p.A).  In any event, Panini alleges that it is still doing business under both licenses today, so nothing about the current competitive landscape has changed.  Compl. ¶¶ 184-85, 191-92.

At bottom, Panini was a stagnant incumbent that could not weather increased innovation and competition (for licenses, printing resources, skilled employees, athlete autographs, etc.).  But engaging in "aggressive conduct against a rival" while expanding into a new market cannot be the basis for an antitrust claim, no matter how "unfair" Panini alleges that conduct to be.  *Apotex Corp. v. Hospira Healthcare India Private Ltd.*, 2020 WL 58247, at *4-5 (S.D.N.Y. Jan. 6, 2020) (courts must maintain "distinction between [allegedly] unfair conduct and anticompetitive conduct . . . because the antitrust laws 'do not create a federal law of unfair competition'" (citations omitted)).  Counts I-V fail for lack of antitrust injury.

## B.  Panini Is Not An "Efficient Enforcer" Of These Antitrust Claims

Even if Panini had pled antitrust injury, all of its antitrust claims would still fail because Panini is not an "efficient enforcer" of the antitrust laws.  *Gatt*, 711 F.3d at 78.  "At its core, the efficient enforcer analysis requires a court to decide if the plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust

---

[13] Even retail price maintenance agreements—as opposed to unilateral policies suggesting retail prices—can have many pro-competitive benefits. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 889-90 (2007).

enforcement." *In re Aluminum Warehousing Antitrust Litig.*, 2023 WL 7180648, at *2 (2d Cir. Nov. 1, 2023) (quoting *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 115 (2d Cir. 2021)).  Courts consider four factors to determine whether a particular plaintiff is an efficient enforcer, but the relative importance of each factor "will necessarily vary with the circumstances of particular cases," and not all factors are necessary to find that a plaintiff is not an efficient enforcer.  *Id.* at *2-3 (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005)) (finding just two efficient enforcer factors dispositive).  The four factors are: (1) "the directness or indirectness of the asserted injury"; (2) "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"; (3) "the speculativeness of the alleged injury"; and (4) "the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries."  *Daniel*, 428 F.3d at 443 (citation omitted) (affirming dismissal where plaintiff was not efficient enforcer).

Panini's alleged injury is not merely indirect and speculative—it is wholly unconnected to the competitive harms that Panini alleges may someday occur, which are themselves entirely speculative.  Panini speculates that Fanatics might someday (a) raise prices for trading cards, (b) reduce outlets to buy trading cards, and (c) lower card quality.  Compl. ¶¶ 223-35.  But Panini does not contend that any of these events have actually occurred; nor does Panini's alleged injury flow—directly or indirectly—from that alleged competitive harm.  Moreover, *if* someday these purely speculative harms come to pass, at that point there will be better plaintiffs than Panini to bring antitrust claims, *i.e.*, the persons or entities that directly suffer any such harms.  The Second Circuit has held that competitors like Panini are not efficient enforcers when they sue to maintain an exclusive arrangement because they have "no natural economic self-interest" in reducing prices

for the product. *Daniel*, 428 F.3d at 444 (quoting *Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp. 2d 159, 182 (W.D.N.Y 2003)). Counts I–V thus fail for the independent reason that Panini is not an efficient enforcer.

## III. PANINI FAILS TO ALLEGE A SHERMAN ACT SECTION 1 VIOLATION

Even assuming Panini has plausibly alleged Article III and antitrust standing, each of its claims fails on the merits under Rule 12(b)(6).

In Count III, Panini alleges that *each of Fanatics' agreements with the sports leagues and PAs* individually violates Section 1 of the Sherman Act. In short, Panini claims that the very conduct that it engaged in for more than a decade—obtaining exclusive IP licenses from sports leagues and PAs—now violates the Sherman Act. The leagues' and PAs' independent decisions to support a new entrant (Fanatics) after Panini had a decade-long opportunity to prove itself confirms these agreements do not harm competition.

Section 1 of the Sherman Act prohibits only those agreements "that *unreasonably* restrain[]" competition. *Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 195 (S.D.N.Y. 2023), *appeal filed*, No. 23-600 (2d Cir. Apr. 17, 2023).[14] Pleading that an agreement unreasonably restrains competition requires specific, non-conclusory factual allegations that the agreement has had "actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality." *Id.* at 208 (quoting *Am. Express Co.*, 138 S. Ct. at 2284) (dismissing antitrust claim where plaintiff failed to plead harm to competition actually occurred).[15]

---

[14] The license agreements at issue here are vertical agreements to license IP, as Panini concedes, Compl. ¶ 238; they are therefore subject to the rule of reason, which assesses whether each individual agreement unreasonably restrains competition. *Spinelli*, 96 F. Supp. 3d at 118.

[15] A plaintiff, in theory, can plead adverse effects on competition indirectly by alleging "market power plus some evidence that the challenged restraint harms competition"; however, no plaintiff in the Second Circuit has succeeded using an indirect theory. *Saks Inc.*, 654 F. Supp. 3d at 208

Panini does not and cannot satisfy that obligation here because the exclusive licenses at issue are licenses to use the *IP* of individual sports leagues and PAs.  Compl. ¶ 37.  That key fact dooms Panini's Section 1 claims:  exclusive IP licenses are presumptively legal for the simple reason that IP holders have a natural monopoly over their rights and do not have to license their IP in the first place.  Courts routinely find that when a monopolist substitutes one supplier for another, there is no harm to competition because the monopolist could exert the same monopoly power "without the aid of a distributor."  *E & L Consulting*, 472 F.3d at 30.  "From the standpoint of antitrust law, concerned as it is with consumer welfare, it is a matter of indifference whether [one seller or another] exploits a monopoly."  *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266-67 (7th Cir. 1984) (affirming dismissal of antitrust claims because "merely shift[ing] a lawful monopoly into different hands . . . has no antitrust significance"); *see also Oxford Glob. Res., Inc. v. Weekley-Cessnun*, 2004 WL 2599898, at *3 (N.D. Tex. Nov. 12, 2004) (dismissing antitrust claims "[b]ecause an attempted takeover of existing monopoly power can have no negative effect on competition," and noting that antitrust law is "completely indifferent to the transfer of existing monopoly power"); *Am. Cricket*, 445 F. Supp. 3d at 1178 ("Plaintiff's ultimate goal is to hold the monopoly that USA Cricket granted to ACE.  Being deprived of that monopoly is not something the antitrust laws were designed to remedy.").

Thus, for example, in *Spinelli v. National Football League*, the court dismissed a Section 1 claim based on an exclusive license the NFL granted to Getty and AP for NFL images, finding that "[a]n exclusive license, which merely confers upon the licensee the ability to exploit the licensor's exclusive intellectual property rights, does not violate the antitrust laws."  96 F. Supp.

(citing *Am. Express Co.*, 138 S. Ct. at 2284).  Regardless, Panini has not even attempted to state an indirect theory.

3d at 118 (collecting cases).  Similarly, in *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 149-50 (3d Cir. 1981), the Third Circuit rejected allegations that Topps' "assiduous program of obtaining exclusive license agreements with every major and minor league baseball player" violated Section 1 and Section 2 of the Sherman Act.  The court explained that, "as a licensor, the MLBPA is free to grant licenses to any competitor, or none at all."  *Id.* at 153.  Notably, the *Fleer* court specifically rejected claims that Topps' licensing program was anticompetitive because its multiple licenses were of a long duration, as Panini alleges in this case.

 Here, each of MLB, NFL, and NBA could have joined together with its respective PA and chosen to produce and sell their own trading cards.  Instead, they chose to license their IP—first to Panini or Topps and then to Fanatics.  Pleading the fact of those IP licenses says nothing about their impact on competition, and Panini does not offer any non-conclusory allegations tending to show that the individual agreements caused "harm to competition in the market as a whole," even if "its own business suffered."  *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 187 (2d Cir. 2016).  Where, as here, a plaintiff alleges only injury to the individual competitors in the market instead of to competition as a whole, dismissal is warranted.  *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997) (affirming dismissal).

## IV.    PANINI FAILS TO ALLEGE SHERMAN ACT SECTION 2 VIOLATIONS

Counts I and II allege that Fanatics violated Section 2 by first "[s]ecuring its exclusive deals" to gain a "monopoly of the Relevant Markets for the long term" and then "leverag[ing] that long-term monopoly to monopolize those same markets in the short term," *i.e.*, before Panini's existing licenses expire.  *See* Compl. ¶ 115; *id.* ¶¶ 207, 218, 233.  These "monopoly leveraging" allegations do not state a Section 2 violation and should be dismissed.

As an initial matter, it is at best unclear whether monopoly leveraging is even a viable

theory of Section 2 liability today.  Multiple Circuits have held that it is not,[16] and the Second

Circuit has recognized that "uncertainty exists" as to the continued viability of such a theory.  *See*

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 272-73 (2d Cir. 2001).  But even if

the theory were viable, Panini has not come close to pleading it.

At a minimum, such a theory requires Panini to plead that Fanatics possesses monopoly

power in one market and is using that power to attempt to monopolize a "different distinct market."

*Id.* at 273; *AD/SAT v. Associated Press*, 181 F.3d 216, 228, 230 (2d Cir. 1999) (per curiam)

("[w]hatever the continued scope of monopoly leveraging claims as independent causes of action"

might be, it at least would require conduct in two "distinct market[s]").  But Panini's leveraging

theory does not allege conduct in two distinct product or geographic markets.[17]  Instead, Panini

alleges Fanatics is trying to monopolize the "same" product and geographic markets over two time

periods:  "short term" and "long term."  Compl. ¶ 115.  No court has ever recognized a monopoly

leveraging theory of the same markets at different time periods, for good reason:  there is zero

precedent for slicing up one market into two different markets based on temporal distinctions.

Doing so flies in the face of the fundamental principle that for monopoly power to exist, it must

be durable over the long run.  *See, e.g.*, *AD/SAT*, 181 F.3d at 229 ("[T]ransitory power may safely

---

[16] *See, e.g.*, *Schor v. Abbott Labs.*, 457 F.3d 608, 613 (7th Cir. 2006); *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 205 (3d Cir. 1992); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547 (9th Cir. 1991); *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1327 (Fed. Cir. 2000).

[17] The only types of markets that are relevant for a Section 2 claim are (i) product markets (*i.e.*, the set of products that consumers consider reasonably interchangeable for the same purpose) and (ii) geographic markets (*i.e.*, the geographic boundaries where consumers reasonably look to buy the relevant product).  *Bayer Schering Pharma AG v. Sandoz, Inc.*, 2011 WL 4482840, at *2-3 (S.D.N.Y. Sept. 28, 2011).

be ignored by antitrust law." (citation omitted)); *Apotex*, 2020 WL 58247, at *6 (dismissing Section 2 claims where plaintiff failed to plead defendant had "durable" monopoly power).

In any event, even if the "short term" somehow qualified as the required second market for a leveraging claim (it does not), Panini has not come close to alleging that Fanatics is monopolizing or attempting to monopolize the purportedly relevant market in the "short term," *i.e.*, before Panini's current licenses expire.  Whatever remains of a leveraging theory today at least requires Panini to allege that Fanatics has "a dangerous probability of success in monopolizing [the] second market." *Trinko*, 540 U.S. at 415 n.4 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993)) (rejecting leveraging theory that "dispensed" with this requirement).  That is something Panini has not pled and could never plead because, in the "short term," ***Panini*** is selling ***two*** of three types of cards it alleges make up the purportedly relevant market:  Panini is selling fully licensed NFL and NBA cards today, whereas Fanatics/Topps is selling only MLB cards. Compl. ¶ 98.  Moreover, Panini fails to explain how Fanatics' future licenses—which will not begin for several years—are supposedly giving Fanatics improper leverage over the "short term." Instead, Panini simply complains that Fanatics is doing certain things now to prepare to perform those licenses in the future.  But that conduct is not sufficient for a monopoly leveraging violation because it is "normal business development which is to be expected by any competitor entering a new business." *AD/SAT*, 181 F.3d at 231 (citation omitted).  Conduct undertaken for the purposes of "expanding into a new market to compete" simply "cannot, as a matter of law, be the basis for an antitrust claim." *Apotex*, 2020 WL 58247, at *3-4.  The Court should dismiss Counts I and II.

## V.     PANINI FAILS TO ALLEGE THAT FANATICS' ACQUISITION OF TOPPS OR ITS GCP INVESTMENT VIOLATED SECTION 7 OF THE CLAYTON ACT

In Counts IV and V, Panini challenges two different acquisitions by Fanatics:  its acquisition of Topps and its acquisition of control of GCP.  To state Section 7 claims based on

these acquisitions, Panini must allege facts showing that the transactions substantially reduced competition in a relevant market. *In re AMR Corp.*, 2023 WL 2563897, at *2 (2d Cir. Mar. 20, 2023). The framework for conducting that analysis varies depending on whether the transaction is horizontal or vertical in nature—*i.e.*, whether the transaction combines competitors, or is instead between entities at different levels of the supply chain. *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019). As to Topps (Count V), Panini's failure to allege increased concentration in any market requires dismissal, whether the transaction is deemed horizontal or vertical. As to GCP (Count IV), Panini does not plead facts sufficient to allege an anticompetitive vertical transaction under Section 7 law.

### A. Panini Fails To Allege That Fanatics' Acquisition Of Topps Increased Concentration In Any Alleged Market (Count V)

The complaint's minimal allegations regarding Fanatics' acquisition of Topps do not come close to pleading the Section 7 violation that Panini asserts in Count V. Compl. ¶¶ 118-20, 268-74. Section 7 requires Panini to allege that the "transaction will lead to undue concentration in the market for a particular product in a particular geographic area." *In re AMR Corp.*, 2023 WL 2563897, at *2 (quoting *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990)).

Panini says nothing about how Fanatics' acquisition of Topps increased concentration in any alleged market—because it did not. When Fanatics acquired Topps in 2021, Fanatics was not producing any new trading cards at all. Compl. ¶ 110. Indeed, Panini's own long-term exclusive licenses bar Fanatics from manufacturing any cards utilizing NBA or NFL IP until 2025 or 2026. *Id.* ¶ 98. Because Fanatics had zero percent of sales in any of the alleged trading card markets when it acquired Topps, that deal could not as a matter of law increase concentration in any of those markets by any amount—and certainly not by an "undue" amount. *In re AMR Corp.*, 2023

WL 2563897, at *2 (quoting *Baker Hughes*, 908 F.2d at 982-83); *see also United States v. Waste Mgmt. Inc.*, 743 F.2d 976, 983-84 (2d Cir. 1984) (no Section 7 violation despite large post-merger share because of absence of anticompetitive effects); *Camaisa v. Pharm. Rsch. Assocs., Inc.*, 2022 WL 843653, at *7 (D. Del. Mar. 22, 2022) (dismissing Section 7 claim for failure to plausibly allege anticompetitive effects where plaintiff did not allege change in market shares).

Panini's Section 7 challenge also fails because its alleged injury does not "flow[] from" the Topps acquisition. *See Brunswick*, 429 U.S. at 489; *Port Dock*, 507 F.3d at 123 (no Section 7 violation where alleged injury was not caused by acquisition itself). Panini's core complaint is about Fanatics' future licenses with the MLB, NFL, NBA, and their respective PAs. *See, e.g.*, Compl. ¶ 8. Fanatics did not acquire any of those future licenses by acquiring Topps; the MLB licenses that Topps held at the time of the acquisition would have expired before Fanatics' own MLB licenses took effect in 2026. *See id.* ¶ 118. Thus, the Topps acquisition merely gave Fanatics access to Topps' expiring agreements—licenses Panini does not allege were unlawful. *See id.* ¶¶ 118-19; *see supra* Section III.A.3.a (discussing irrelevance of MLS license allegations). Panini fails to allege any "substantial[] . . . lessen[ing] [of] competition" that flows from the Topps acquisition at all, much less one that has caused injury to Panini. *See Port Dock*, 507 F.3d at 120 n.3 (quoting 15 U.S.C. § 18); *see also id.* at 123.

## B.  Panini's Challenge To Fanatics' GCP Investment Also Fails (Count IV)

The Court should likewise dismiss Panini's Section 7 challenge to Fanatics' investment in the manufacturing company GCP. Compl. ¶¶ 260-67. Panini concedes that GCP "is not a competitor" of Fanatics, *id*. ¶ 262, which means that Fanatics' investment is a vertical transaction. Courts recognize that where, as here, a vertical transaction is done to increase efficiency, such deals are pro-competitive and do not violate Section 7. *Port Dock*, 507 F.3d at 124-25. Panini's

burden to plead that Fanatics' vertical investment in GCP violates Section 7 is thus a heavy one.[18]

Panini must allege a "reasonable *probability* of anticompetitive effect" by showing that Fanatics'

*investment* in GCP results in the ability and incentive to harm competition, and that "competition

would probably be substantially lessened." *FTC v. Microsoft Corp.*, 2023 WL 4443412, at *12-13

(N.D. Cal. July 10, 2023) (citation omitted), *appeal filed*, No. 23-15992 (9th Cir. July 13, 2023).

Panini does none of that.

Panini fails to allege any reduction in competition resulting from Fanatics' investment in

GCP.  Instead, Panini merely alleges that, in 2022, GCP "caused an output shortfall of over 100

million packs of Panini trading cards and delayed programs (or releases) in 2023," Compl. ¶ 147,

which resulted in fewer Panini trading cards "on the market for consumers," *id.* ¶ 264.  But those

are just complaints about a temporary shortage of Panini's own cards, not trading cards in general.

Thus, those allegations are not sufficient to plead a likely *substantial* reduction in *competition*

generally (and certainly not one resulting from Fanatics' investment).  Panini does not allege, for

example, that GCP reduced its overall output of trading cards for the allegedly relevant market for

2022 or 2023.  Moreover, Panini admits that there are other quality manufacturers that companies

(including Panini) can use in lieu of GCP.  *Id.* ¶ 131.  Because Panini concedes that GCP's

customers have other options, Panini has not alleged that GCP has the ability or incentive to harm

competition generally.  *See Microsoft Corp.*, 2023 WL 4443412, at *12-13.  That Panini

supposedly experienced a temporary reduction of its own cards while GCP made more cards for

---

[18] The difficulty of proving a Section 7 challenge to a vertical merger is clear from the fact that, as of 2018, the Antitrust Division of the Department of Justice had "not tried a vertical merger case to decision in *four* decades!"  *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 193-94 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).  In that vertical-merger challenge, and in every other such challenge the government has tried in federal court since, the government has failed to show an anticompetitive effect.  *See id.* at 253-54; *see also United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 155 (D.D.C. 2022).

Panini's competitors does not come close to establishing that Fanatics' *investment* in GCP is likely "substantially to lessen competition." 15 U.S.C. § 18. Section 7 is concerned with the likelihood of harm to competition, not harm to Panini. *See Atl. Richfield*, 495 U.S. at 338 ("The antitrust laws were enacted for 'the protection of *competition*, not *competitors*'" (citation omitted)); *Marion HealthCare, LLC v. S. Ill. Hosp. Servs.*, 2022 WL 2317303, at \*5 (S.D. Ill. June 28, 2022) (dismissing Section 7 claim because "[i]t is unclear what actual financial injury has occurred [to consumers], and, if that injury does occur to the public . . . then one of those members would be a more suitable plaintiff here").

## VI.    THE REMAINING STATE LAW CLAIMS ALL FAIL

### A.    Panini Failed To Allege The Elements Necessary For Its Tortious Interference Claim (Count VI)

Panini alleges that Fanatics tortiously interfered with its existing contracts with the leagues and PAs, WWE, GCP, and Panini's own employees, Compl. ¶¶ 170-74, but fails to allege the necessary elements of a tortious interference claim.

As to all of the leagues and PAs (other than NFLPA), Panini does not allege the breach of any agreement—an essential element under New York law. *See Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996) ("Tortious interference with contract requires . . . actual breach of the contract."). Instead, Panini alleges that it still sells trading cards pursuant to its agreements with these entities today, Compl. ¶ 171, and merely complains that Fanatics has entered into agreements that will begin *after* Panini's current agreements expire.

As to NFLPA and WWE, Panini's assertion that Fanatics may have had something to do with those entities' decisions to lawfully terminate their agreements with its parent, Panini S.p.A, is pure speculation; Panini does not allege a single concrete fact to support its suspicions. In any event, even assuming for purposes of this motion that Fanatics *did* suggest that NFLPA and WWE

should "find a way to claim [they] can terminate [their] agreement[s] with Panini," *id.* ¶ 181, that conduct is not "improper" as a matter of law.  *See M'Baye v. World Boxing Ass'n*, 2009 WL 2245105, at *8-9 (S.D.N.Y. July 28, 2009) (quoting *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 8 N.Y.3d 422, 426-27 (2007)).  Suggesting that a business consider whether there is any legitimate, legal basis to terminate a contract does not fall below a "minimum level of ethical behavior in the marketplace," and is not improper or unlawful.  *Id.*  In any event, Panini alleges it is challenging those terminations and is still selling WWE and NFL cards today.  Compl. ¶¶ 185, 192.  Moreover, Panini nowhere explains how it has standing to sue for alleged interference with contracts to which it is not even a party.  *See id.* ¶ 188 ("Panini is the beneficiary of an exclusive deal to produce and sell trading cards between *Panini S.p.A.* and World Wrestling Entertainment (WWE) that lasts through 2025." (emphasis added)); *id.* ¶ 132 ("GCP has a contract with *Panini S.p.A.* under which GCP produces most of Panini's cards." (emphasis added)); *see also Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (under NY law, tortious interference with contract requires "the existence of a valid contract between *the plaintiff* and a third party" (emphasis added) (quoting *Lama Holdings*, 88 N.Y.2d at 424)).

As to GCP, Panini fails to plead Fanatics' specific intent to procure a breach.  Panini asserts that GCP "breach[ed] the change-of-control provision" that "prohibits GCP from undergoing a change in control without Panini's S.p.A.'s consent."  Compl. ¶¶ 133, 277, 284.  But New York law requires Panini to plead that Fanatics had the specific intent to procure that particular breach, which means that Panini was required to plead that Fanatics knew about the particular change of control provision it allegedly induced GCP to breach.  *See, e.g.*, *N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*, 2013 WL 1500333, at *3-5 (S.D.N.Y. Apr. 12, 2013) (tortious interference claim requires "knowledge of [] specific covenants [allegedly breached], not just knowledge of the . . .

[a]greement in general"). Panini has not pled that. *See* Compl. ¶ 133. Nor does Panini offer

anything but conclusory allegations as to why any alleged interference was improper.

Finally, as to Panini's employees, Panini does not allege (as it was required to do) that

Fanatics knew about the specific non-solicitation provision that some unidentified employees

supposedly breached. *N. Shipping Funds I*, 2013 WL 1500333, at *4. As to the non-disclosure

agreement, Panini fails to allege what "trade secrets" these employees supposedly "stole" in breach

of that agreement, nor any facts to conclude that Fanatics induced them to do so. *See id.*; *cf.*

*Redcell Corp. v. A.J. Trucco, Inc.*, 2022 WL 683007, at *7 (S.D.N.Y. Mar. 8, 2022) (dismissing

claim because "plaintiffs must plead their trade secrets with sufficient specificity to inform the

defendants of what they are alleged to have misappropriated" (quoting *Medidata Sols. Inc. v. Veeva*

*Sys. Inc.*, 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018))). None of Panini's conclusory

allegations comes close to stating that Fanatics induced a breach of any agreement by "improper"

means. *See, e.g.*, *Ganske v. Mensch*, 480 F. Supp. 3d 542, 557 (S.D.N.Y. 2020) (dismissing

tortious interference claim where plaintiff alleged only "knowledge of [the] contract and

employment" but not an intent to induce a breach).

**B.**     **Count VII Fails Because Panini Does Not Plead That Fanatics Acted "For The Sole Purpose Of Inflicting Intentional Harm," Or That Anyone Would Have Contracted With Panini "But For" Fanatics**

Panini contends that Fanatics tortiously interfered with Panini's prospective relations with

the leagues and PAs, WWE, GCP, Panini's own employees, and star "rookie" players. Compl.

¶¶ 282-88. This claim fails too. Under New York law, "where a suit is based on interference with

a nonbinding relationship, . . . the defendant's conduct must amount to a crime or an independent

tort [to be unlawful, unless it is] for the sole purpose of inflicting intentional harm on plaintiffs."

*Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004) (cleaned up).

Here, Panini's allegations do not remotely suggest that Fanatics' "sole purpose" was to "inflict[] intentional harm." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015) (quoting *Carvel*, 3 N.Y.3d at 182). Rather, Panini's allegations are consistent with Fanatics acting in its "normal economic self-interest." *Id.* (quoting *Carvel*, 3 N.Y.3d at 182); *see supra* Sections II.A.1, II.A.3. Panini itself expressly alleges that it is "critical" for any new trading card entrant (like Fanatics) to do precisely these things; they are "necessary" for anyone to compete "effectively" in this space. Compl. ¶¶ 2, 68.

Panini's claim also fails because it has not alleged that any person or organization would have contracted with it "but for" Fanatics' conduct. *Vigoda v. DCA Prods. Plus*, 741 N.Y.S.2d 20, 23 (N.Y. App. Div. 2002) ("Tortious interference with prospective economic relations requires an allegation that plaintiff would have entered into an economic relationship but for" the defendant's conduct).

### C.     Count VIII's Defamation Claim Fails Because It Is Too Vague And Does Not Allege Fault By Fanatics

Panini alleges that Fanatics defamed its business by telling unidentified "players, player agents, player representatives, players associations, and Panini employees" in or around April 2023 that "Panini is incapable of performing for them, will be out of business soon, lacks the money to pay them, would be unable to fulfill its contractual obligations, was going to go bankrupt, and would lose its licenses." Compl. ¶¶ 170, 290-96. This claim fails for at least two reasons.

*First*, Panini fails to allege the most basic details to support its defamation claim. For instance, except for one supposed statement in April 2023, Panini does not identify the specific statements alleged to be defamatory, how the statements were conveyed, or (with respect to the PAs and Panini employees) who was involved in the communications. The lack of this basic information dooms the claim. *See, e.g., Elcan Indus., Inc. v. Cuccolini, S.R.L.*, 2014 WL 1173343,

at *9 (S.D.N.Y. Mar. 21, 2014) ("Failure to specifically plead 'when, where, or in what manner the statements were made,' necessitates dismissal of defamation claim." (citation omitted)).

*Second*, as to all the supposed statements, Panini fails to allege any plausible factual basis to support its claim that Fanatics acted with the requisite fault when it supposedly offered these opinions. *See, e.g.*, *Friedman v. Self Help Cmty. Servs., Inc.*, 647 F. App'x 44, 47-48 (2d. Cir. 2016) (dismissing defamation claim for failing to plausibly allege that the "defamatory statement . . . was made with the applicable level of fault"). Panini makes only the bare allegation that "Fanatics knew the [alleged] statements were false or acted in reckless disregard for the fact that the statements were false." Compl. ¶¶ 293, 296. But Panini's own words and actions confirm that it would have been reasonable for anyone to believe Panini's business was in serious trouble in the Spring of 2023 when these statements were supposedly made. *See Lee v. City of Rochester*, 663 N.Y.S.2d 738, 754 (1997) (holding that "actual or constructive notice of the falsity of the statement should be required as part of the negligence inquiry"), *aff'd*, 677 N.Y.S.2d 848 (N.Y. App. Div. 1998). Just a few months later, in August 2023, Panini filed its initial complaint in this case claiming that its short-term business was being "cripple[d]," Initial Compl. ¶ 8, ECF No. 1, and that its loss of the future IP licenses "eliminated" it as a competitor "in the production and sale of trading cards." *Id.* ¶¶ 48, 71, 129.

## **CONCLUSION**

The Court should dismiss Panini's amended complaint in its entirety, with prejudice.

*[Signature on following page]*

Dated:  December 8, 2023

Respectfully submitted,

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1264
lawrence.buterman@lw.com

Amanda P. Reeves (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004

Christopher S. Yates (*pro hac vice*)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

Michael B. Carlinsky
Christopher D. Kercher
Sami H. Rashid
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
51 Madison Ave, 22nd Floor
New York, NY 10010

Derek L. Shaffer
Christopher G. Michel (*pro hac vice* to be filed)
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
1300 I Street NW, 9th Floor
Washington, DC 20005

*Counsel for Defendants*