**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PANINI AMERICA, INC.

     *Plaintiff,*

     v.

FANATICS, INC.,
FANATICS, LLC,
FANATICS COLLECTIBLES
INTERMEDIATE HOLDCO, INC.,
FANATICS SPV, LLC, and
FANATICS HOLDINGS, INC.

     *Defendants.*

_____/

**Case No. 1:23-cv-09714-JHR**
**[rel: Case No. 1:23-cv-06895-JHR]**

## PANINI AMERICA'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 4

I.      The Relevant Market ...................................................................................................... 4

II.     Panini brings success to the Relevant Market ................................................................ 5

III.    Fanatics forecloses 100% of the Relevant Market for
an unprecedented length of time. ................................................................................... 5

IV.   Fanatics unleashes additional abusive behavior to further harm Panini,
other industry participants, and consumers in the near term. ......................................... 6

LEGAL STANDARD ............................................................................................................ 7

ARGUMENT ....................................................................................................................... 7

I.      Panini has standing. ....................................................................................................... 7

      A.     Fanatics' arguments on Article III standing ignore
well-settled antitrust law. ................................................................................... 12

      B.     Panini has sustained antitrust injury. ................................................................... 15

      C.     Panini is an efficient enforcer of the antitrust laws .............................................. 16

II.     Fanatics' unprecedented exclusive licenses and its other
anticompetitive conduct violate Sherman Act Sections 1 and 2 ..................................... 18

      A.     Panini adequately pleads Fanatics' conduct violates Sections 1 and 2 ................. 18

      B.     Intellectual-property agreements can violate the antitrust laws ............................ 20

      C.     Panini sufficiently pleads that Fanatics' exclusive deals are anticompetitive. ..... 24

      D.     Panini sufficiently pleads that Fanatics' other conduct was anticompetitive—
involving attempted and actual monopolization in the near term ......................... 25

      E.     Panini's Section 2 claims are not monopoly-leveraging claims. ......................... 28

III.    Panini's allegations establish that Fanatics violated Clayton Act Section 7 and, in
doing so, caused Panini an antitrust injury. ................................................................... 29

A.      Fanatics' buying GCP violated Section 7 and caused Panini antitrust injury....... 29

B.      Fanatics' acquisition of Topps violated Section 7 and Panini sustained
        antitrust injury as a result. ........................................................................................ 32

IV.     Panini adequately pleads that Fanatics has violated State tort law. .................................. 35

A.      Fanatics tortiously interfered with Panini's contracts. ........................................... 35

B.      Fanatics tortiously interfered with Panini's prospective business
        relationships. ........................................................................................................... 38

C.      Fanatics has defamed Panini. .................................................................................. 39

CONCLUSION .......................................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*1-800 Contacts, Inc. v. F.T.C.*,
   1 F.4th 102 (2d Cir. 2021) ..................................................................................................... 2, 20

*Am. Cricket Premier League, LLC v. USA Cricket*,
   445 F. Supp. 3d 1167 (D. Colo. 2020) ...................................................................................... 14

*Am. Needle, Inc., v. Nat'l Football League*,
   560 U.S. 183 (2010) .................................................................................................................... 20

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
   256 F.3d 799 (D.C. Cir. 2001) ................................................................................................... 14

*Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*,
   2020 WL 58247 (S.D.N.Y. Jan. 6, 2020) ................................................................................... 29

*Arcesium, LLC v. Advent Software, Inc.*,
   2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) ............................................................................ 23

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985) ............................................................................................................... 26, 27

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) ................................................................................................................. 9, 17

*Balaklaw v. Lovell*,
   14 F.3d 793 (2d Cir. 1994) ......................................................................................................... 25

*Biro v. Conde Nast*,
   883 F. Supp. 2d 441 (S.D.N.Y. 2012) ........................................................................................ 40

*Blue Shield of Va. v. McCready*,
   457 U.S. 465 (1982) .................................................................................................................... 10

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
   441 U.S. 1 (1979) ........................................................................................................................ 20

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ...................................................................................................................... 9

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ............................................................................................................... 29, 32

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) ............................................................................................................... 15, 34

*Burger King Corp. v. Ashland Equities, Inc.*,
    161 F. Supp. 2d 1331 (S.D. Fla. 2001) .................................................................... 35

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ................................................................................... 14

*Camaisa v. Pharm. Rsch. Assocs., Inc.*,
    2022 WL 843653 (D. Del. Mar. 22, 2022) .............................................................. 33

*Carter v. HealthPort Techs., LLC*,
    822 F.3d 47 (2d Cir. 2016)....................................................................................... 15

*Carvel Corp. v. Noonan*,
    3 N.Y.3d 182 (N.Y. 2004) ....................................................................................... 39

*Coinmach Corp. v. Aspenwood Apartment Corp.*,
    417 S.W.3d 909 (Tex. 2013)..................................................................................... 35

*Consol. Gold Fields PLC v. Minorco, S.A.*,
    871 F.2d 252 (2d Cir. 1989).............................................................................. 16, 34

*Daniel v. Am. Bd. of Emergency Med.*,
    428 F.3d 408 (2d Cir. 2005)..................................................................................... 17

*Don King Prods., Inc. v. Douglas*,
    742 F. Supp. 741 (S.D.N.Y. 1990) .......................................................................... 37

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
    472 F.3d 23 (2d Cir. 2006)................................................................................. 23, 24

*El Paso Healthcare Sys., Ltd. v. Murphy*,
    518 S.W.3d 412 (Tex. 2017)..................................................................................... 35

*Ethan Allen, Inc. v. Georgetown Manor, Inc.*,
    647 So. 2d 812 (Fla. 1994)....................................................................................... 35

*F.T.C. v. Actavis Inc.*,
    570 U.S. 136 (2013).............................................................................................. 2, 20

*F.T.C. v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ........................................................................... 32, 33

*F.T.C. v. Procter & Gamble Co.*,
    386 U.S. 568 (1967)...................................................................................... 29, 34, 35

*Fed. Election Comm'n v. Cruz*,
    596 U.S. 289 (2022)................................................................................................... 7

*Fido's Fences, Inc. v. Radio Sys. Corp.*,
    999 F. Supp. 2d 442 (E.D.N.Y. 2014) ............................................................. 10, 13

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
    658 F.2d 139 (3d Cir. 1981) ............................................................................. 21, 22

*Full Draw Prods. v. Easton Sports, Inc.*,
    182 F.3d 745 (10th Cir. 1999) ...................................................................... 10, 13, 16

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
    711 F.3d 68 (2d Cir. 2013) ......................................................................... 2, 8, 15, 23

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016) ..................................................................................... 8

*Geneva Ph arms. Tech. Corp. v. Barr Labs. Inc.*,
    386 F.3d 485 (2d Cir. 2004) ................................................................. 10, 12, 18, 19, 21

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
    406 N.E.2d 445 (N.Y. 1980) ................................................................................... 37

*Higgins v. N.Y. Stock Exch.*,
    755 F. Supp. 113 (S.D.N.Y. 1991) ............................................................................ 2

*Illumina, Inc. v. F.T.C.*,
    44 F.4th 1036 (5th Cir. 2023) ................................................................................. 30

*In re Allergan PLC Sec. Litig.*,
    2021 WL 4077942 n.1 (S.D.N.Y. Sept. 8, 2021) ........................................................ 33

*In re AMR Corp.*,
    2023 WL 2563897 (2d Cir. Mar. 20, 2023) ............................................................... 33

*In re Joe's Friendly Serv. & Son, Inc.*,
    2019 WL 1313519 (Bankr. E.D.N.Y Mar. 21, 2019) .................................................... 38

*In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) ......................... 7, 8, 10, 15, 16, 18, 19, 20, 25, 27, 28

*In re Lipsky*,
    460 S.W.3d 579 (Tex. 2015) ................................................................................... 35

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
    924 F.3d 57 (2d Cir. 2019) ................................................................................ 15, 34

*Ithaca Capital Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*,
    450 F. Supp. 3d 358 (S.D.N.Y. 2020) ....................................................................... 39

v

*Jews For Jesus, Inc. v. Rapp*,
  997 So. 2d 1098 (Fla. 2008) ............................................................. 35

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
  359 U.S. 207 (1959) .................................................................... 9, 13

*Kobe, Inc. v. Dempsey Pump Co.*,
  198 F.2d 416 (10th Cir. 1952) ........................................................ 24

*Laumann v. Nat'l Hockey League*,
  907 F. Supp. 2d 465 (S.D.N.Y. 2012) ............................................. 28

*LePage's Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2001) ................................................ 9, 18, 19, 25

*Lorain J. Co. v. United States*,
  342 U.S. 143 (1951) ....................................................................... 26

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ....................................................................... 14

*McGahee v. N. Propane Gas Co.*,
  858 F.2d 1487 (11th Cir. 1988) .................................................. 10, 13

*McWane, Inc. v. F.T.C.*,
  783 F.3d 814 (11th Cir. 2015) ................................................ 18, 19, 21, 24

*Medidata Sols., Inc., v. Veeva Sys. Inc.*,
  2018 WL 6173349 (S.D.N.Y. Nov. 26, 2018) ................................ 38

*Michael Grecco Prods., Inc. v. Alamy, Inc.*,
  372 F. Supp. 3d 131 (E.D.N.Y. 2019) ............................................ 37

*Moraes v. White*,
  571 F. Supp. 3d 77 (S.D.N.Y. 2021) .............................................. 40

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015) .......................................................... 23

*N. Shipping Funds I, LLC v. Icon Cap. Corp.*,
  2013 WL 1500333 (S.D.N.Y. Apr. 12, 2013) ............................ 36, 37

*Nostalgic Partners, LLC v. Off. of Comm'r of Baseball*,
  637 F. Supp. 3d 45 (S.D.N.Y. 2022) .............................................. 34

*Oddo Asset Mgt. v. Barclays Bank PLC*,
  973 N.E.2d 735 (N.Y. 2012) .......................................................... 37

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) .................................................................................. 25

*Orion Pictures Distrib. Corp. v. Syufy Enters.*,
    829 F.2d 946 (9th Cir. 1987) ....................................................................... 32

*Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*,
    604 F.3d 1291 (11th Cir. 2010) ......................................................... 9, 16, 17

*Pecover v. Elecs. Arts Inc.*,
    633 F. Supp. 2d 976 (N.D. Cal. 2009) .................................................. 19, 21, 22

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
    392 U.S. 134 (1968) ...................................................................................... 34

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007) .......................................................................... 31

*Pulse Network, LLC v. Visa, Inc.*,
    30 F.4th 480 (5th Cir. 2022) ...................................................................... 9, 13

*R.C. Bigelow, Inc. v. Unilever N.V.*,
    867 F.2d 102 (2d Cir. 1989) .......................................................................... 31

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010) ........................................................................... 25

*Redcell Corp. v. A.J. Trucco, Inc.*,
    2022 WL 683007 (S.D.N.Y. Mar. 8, 2022) ...................................................... 38

*Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc.*,
    349 F. Supp. 2d 389 (N.D.N.Y. 2004) ............................................................ 10

*S.W.B. New England, Inc. v. R.A.B. Food Grp., LLC.*,
    2008 WL 540091 (S.D.N.Y. Feb. 27, 2008) .............................................. 28, 31

*SAS of P.R., Inc. v. P.R. Tel. Co.*,
    48 F.3d 39 (1st Cir. 1995) ............................................................................ 32

*Sidney Frank Importing Co. v. Beam Inc.*,
    998 F. Supp. 2d 193 (S.D.N.Y. 2014) ............................................................ 39

*Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
    2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) ............................................... 31, 32

*Spinelli v. Nat'l Football League*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) ................................................................ 22

*Standard Oil Co. of Cal. v. United States*,
    337 U.S. 293 (1949) ................................................................................ 12, 21

*Steginsky v. Xcelera Inc.*,
    741 F.3d 365 (2d Cir. 2014) ............................................................................ 7

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    988 F.3d 690 (4th Cir. 2021) ......................................................... 30, 31, 33, 34

*Tampa Electric v. Nashville Coal*,
    365 U.S. 320 (1961) ...................................................................................... 19

*Thole v. U.S. Bank N.A.*,
    140 S. Ct. 1615 (2020) ................................................................................... 12

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ........................................................................... 33

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
    142 F.3d 90 (2d Cir. 1998) ............................................................................. 27

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    676 F.2d 1291 (9th Cir. 1982) ........................................................................ 19

*Union Carbide Corp. v. Montell N.V.*,
    944 F. Supp. 1119 (S.D.N.Y. 1996) ............................................................... 36

*United States v. AT & T Inc.*,
    310 F. Supp. 3d 161 (D.D.C. 2018) ................................................................ 29

*United States v. Bertelsmann SE & Co. KGaA*,
    646 F. Supp. 3d 1 (D.D.C. 2022) .................................................................... 32

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ........................................................................... 21

*United States v. Griffith*,
    334 U.S. 100 (1948) ...................................................................................... 20

*United States v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001) (en banc) .............................................. 2, 19, 20, 24

*United States v. Northrop Grumman Corp.*,
    2003 WL 21659404 (D.D.C. June 10, 2003) .................................................... 30

*United States v. UnitedHealth Grp. Inc.*,
    630 F. Supp. 3d 118 (D.D.C. 2022) ................................................................ 29

*United States v. Waste Mgmt., Inc.*,
    743 F.2d 976 (2d Cir. 1984)......................................................................... 33

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
    914 F.2d 1256 (9th Cir. 1990) .................................................................... 26

*Utah Pie Co. v. Cont'l Baking Co.*,
    386 U.S. 685 (1967)...................................................................................... 13

*Valassis Comm'ns, Inc. v. News Corp.*,
    2019 WL 802093 (S.D.N.Y. Feb. 21, 2019)........................ 2, 11, 12, 16, 18

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ...................................................................... 26

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC*,
    257 F.3d 256 (2d Cir. 2001)......................................................................... 28

*Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*,
    857 F.2d 55 (2d Cir. 1988)........................................................................... 13

*Vázquez-Ramos v. Triple-S Salud, Inc.*,
    55 F.4th 286 (1st Cir. 2022)................................................. 11, 12, 21, 24

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010).......................................................................... 26

*Wacker v. JP Morgan Chase & Co*,
    678 F. App'x 27 (2d Cir. 2017) ................................................................... 7

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
    549 U.S. 312 (2007)........................................................................................ 9

*Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*,
    224 F. Supp. 2d 657 (S.D.N.Y. 2002).......................................................... 31

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012).................................... 11, 12, 18, 19, 21, 25

## **Statutes**

15 U.S.C. § 26..................................................................................................... 16

## **Other Authorities**

Areeda & Hovenkamp, Antitrust Law (2022) .............................. 1, 9, 22, 23

# INTRODUCTION[1]

The Fanatics defendants lead with a new argument—lack of Article III standing—that Fanatics had not even thought to raise in its earlier motion to dismiss the original complaint. Panini's injury is not ethereal or "procedural" but the very real injury of being foreclosed from the relevant market for twenty years into the future, as well as harm experienced now from Fanatics' anticompetitive and tortious efforts to push it out of business today. Under Fanatics' view, countless antitrust plaintiffs, at all levels of federal courts, lacked Article III standing to pursue claims for exclusive dealing, predatory pricing, group boycotts, and other antitrust violations, and nobody noticed! In all these cases, there was no certainty that, but for the anticompetitive conduct, the plaintiff would have succeeded in its business objectives. In all of them, however, the courts have allowed competitors like Panini to proceed, recognizing, either explicitly or implicitly, that the foreclosure from competing for business opportunities gives rise to Article III standing for the foreclosed firm. Here, Fanatics relies mainly on a sole, easily distinguishable district court case in Colorado, ignoring the decades of cases, including Supreme Court cases, where these types of claims have been found cognizable in federal court.

So, too, with antitrust injury. Fanatics' brief omits the overwhelming point that, throughout the history of the antitrust laws, a "rival clearly has standing to challenge the conduct of rival(s) that is illegal precisely because it tends to exclude rivals from the market." Areeda & Hovenkamp, Antitrust Law ¶ 348a (2022). Put differently, "standing is clear and seldom challenged when the plaintiff alleges that its rival engaged in an exclusionary practice designed to rid the market of the plaintiff, to preclude its entry or raise its costs, so that the defendant could maintain or create a monopoly." *Id*. ¶ 348d1. Foreclosure from the relevant market by exclusive dealing agreements is

---

[1] All citations to "¶ _" are to the Amended Complaint filed October 10, 2023.

a "conventional form of antitrust injury" and "exactly the type" of injury "that antitrust laws were designed to prevent," *Valassis Comm'ns, Inc. v. News Corp.*, 2019 WL 802093, at *11–*12 (S.D.N.Y. Feb. 21, 2019), "that gives rise to a claim for damages as soon as the exclusion occurs ..., even though, in the nature of things, the victim's losses lie mostly in the future," *Higgins v. N.Y. Stock Exch.*, 755 F. Supp. 113, 116 (S.D.N.Y. 1991). Fanatics' arguments on antitrust injury also fail because Fanatics asks the Court to assume that Panini's antitrust claims are not viable, when alleged violations must be taken as valid when considering whether there is standing to assert them. *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 76 n.9 (2d Cir. 2013).

Many of Fanatics' related arguments, including its claim that intellectual-property licenses are essentially exempt from antitrust challenges, also have been explicitly or implicitly rejected by a century of caselaw, including pertinent Supreme Court decisions. For example, following Supreme Court cases since the early twentieth century and, more recently, *F.T.C. v. Actavis Inc.*, 570 U.S. 136 (2013), the Second Circuit has held that the "mere fact that an agreement implicates intellectual property rights does not 'immunize [the] agreement from antitrust attack.'" *1-800 Contacts, Inc. v. F.T.C.*, 1 F.4th 102, 113–14 (2d Cir. 2021). Unsurprisingly, other federal-appellate courts agree. Even though certain exclusive licenses involving intellectual property may on the merits be upheld as not anticompetitive, there is no "get out of jail free" card for antitrust violations simply because the defendant has licensed intellectual property. In the *Microsoft* case, the D.C. Circuit labelled Microsoft's contention that the exercise of "lawfully acquired" intellectual-property rights cannot give rise to antitrust liability as "frivolous." *United States v. Microsoft*, 253 F.3d 34, 63 (D.C. Cir. 2001) (en banc).

Beyond attacking standing, the motion to dismiss does little to question the substantive validity of Panini's claims. It gives scant attention to the core exclusive-dealing claims, mentioning

none of the elements (all of which are easily met) and omitting almost all the relevant caselaw, including many circuit cases upholding liability for exclusives of much shorter duration and scope than those present here. None of the cases *affirming* liability involve anything like the harm to competition that results from the 100% foreclosure of a market for twenty years. Instead, Fanatics relies entirely upon its supposed intellectual-property exemption and misplaced criticism of the so-called "monopoly leveraging" theory in lieu of any discussion of the relevant elements.

Fanatics also glosses over critical allegations that, taken as true, show that Fanatics has set out deliberately to force Panini from the relevant market even before Panini's current agreements terminate and Fanatics' long-term exclusives begin. In buying control of GCP—Panini's specialized card manufacturer—it is not simply that Fanatics sought a supplier for its future card business, but that Fanatics immediately used that acquisition—made in violation of GCP contracts with Panini—to reduce Panini's output by 100 million units in 2022. ¶ 147. It is not just that Fanatics sought to hire Panini's employees to prepare to compete, but that it did so in violation of non-solicitation and nondisclosure covenants and at a time well before these employees had useful work to perform for Fanatics. ¶ 161. And while it is one thing for a new entrant to entice business from athletes and their agents, it is wholly another to tie up such athletes during the time when Panini's contracts remain in place and when Fanatics had no legitimate basis for disallowing those athletes from working with a competitor. ¶ 168. As part of its plan, Fanatics also made false statements to athletes, Panini's employees, and others that Panini *is* "dead," will be unable to pay royalties, and will have its existing contracts cancelled. ¶ 172. Fanatics' suggestion that such conduct is without remedy is wrong. The motion to dismiss should be denied.

## <u>BACKGROUND</u>

### I.    The Relevant Market

This case is about sports trading cards for players in the Major U.S. Professional Sports Leagues: the National Football League ("NFL"), the National Basketball Association ("NBA"), and Major League Baseball ("MLB") ("Relevant Market"). That market, which Fanatics does not challenge, is the key relevant market here and consists of NBA player trading cards, NFL player trading cards, and MLB player trading cards. ¶¶ 42–56.[2]

Consumers in the Relevant Market mostly desire fully licensed sports trading cards. They want player cards that display the league logo, league players association logo, team uniform, team color combinations, and player name, image, and likeness (and sometimes more). ¶ 33. But the teams, players, Leagues, and players associations hold only limited intellectual-property rights. Each team and player controls only its own name, marks, and logos. Each League today at most controls its own marks and logos, and the names, marks, and logos of the League's teams.

Similarly, each players association for each League generally at most controls only its own names and marks and logos, and generally at most controls the group licensing of the intellectual property of its members, with those members agreeing to significantly restrict their ability to execute individual licenses. ¶ 35. Thus, unlike other holders of intellectual property, neither the players, teams, Leagues, nor players associations can effectively use their intellectual property independently to produce sports trading cards. There instead must be a combination of these rights plus the intellectual property and expertise of a third-party card supplier—like Panini—to design, manufacture, market, and distribute the cards. ¶ 38. As a result, Panini and other market

---

[2] Within the market for Major U.S. Professional Sports Leagues trading cards there exist smaller submarkets. These submarkets include the individual market for NBA player trading cards, the individual market for NFL player trading cards, and the individual market for MLB player trading cards (which Panini pleads here in the alternative), and submarkets distinguishing between mass market purchasers and hobbyists. ¶¶ 52–69.

participants must secure at least two licenses to produce fully licensed cards involving any player: one from the player's league ***and*** one from the player's association (each referred to here as a "Major League License"). ¶ 37.

## II.   Panini brings success to the Relevant Market.

When Panini entered the Relevant Market, it started with mostly nonexclusive, shorter-term deals lasting two-to-four years. For football, Panini started with short, two-year, nonexclusive deals with the NFL and NFL Players Association. ¶ 97. For basketball, Panini started with a four-year exclusive deal with the NBA, which at the time acted for the League and the Players Association. ¶ 96. Panini then negotiated for a five-year extension of that deal. ¶ 96. After proving it could perform, Panini built up to longer-term deals—some still nonexclusive.[3] Panini's longest deals are with the NFL Players Association (ten years) and NFL (five years, with the NFL—but not Panini—holding a five-year renewal right). At most, at any given point in time, Panini held, on an exclusive basis, only three of the possible six Major League Licenses at issue here: the NFL, the NFL Players Association, and the NBA.

With these licenses, Panini developed renowned brands, IP, trade secrets, skill, and creativity to design, produce, market, and distribute fully licensed sports trading cards. ¶ 38. As a result of Panini's efforts, the popularity of trading cards has ballooned since Panini entered the business in 2009. ¶ 84. Panini has reliably increased revenues year over year for the Leagues and players associations it has served—at times spectacularly so. ¶ 78.

## III.   Fanatics forecloses 100% of the Relevant Market for an unprecedented length of time.

Fanatics has monopolized 100% of the Relevant Market. Unbeknownst to Panini, and

---

[3] The NBA and NBA Players Association subsequently split, after which Panini secured its current six-year deal with the NBA Players Association lasting for the same term as its original deal with the NBA. ¶ 96. The NBA Players Association has recently interpreted its current agreement with Panini as nonexclusive rather than exclusive. ¶¶ 96–98.

without Panini having an opportunity to compete, Fanatics secured exclusive deals with every League and its players association of unprecedented length and scope. ¶¶ 102, 103, 110. Four of the licenses (NFL, MLB, and their players associations) are for twenty years and two (NBA and its players association) are for at least ten years. ¶ 104. Such extreme duration and combination of these licenses is something the trading-card industry—and particularly the Relevant Market—has never seen before. ¶¶ 103, 106, 114.

## IV.    Fanatics unleashes additional abusive behavior to further harm Panini, other industry participants, and consumers in the near term.

Securing its exclusive deals of extreme length for the entire Relevant Market was critical to Fanatics' overall plan to control the Relevant Market to the exclusion of all others. In the first instance, these deals gave Fanatics a monopoly of the Relevant Market for the long term. But then Fanatics engaged in other illegal acts to bolster and extend its monopoly power to the short term through coercive, unfair, and anticompetitive conduct aimed at locking up the inputs necessary for present competition in the Relevant Market, harming Panini and other participants. For example, after securing its exclusive deals, Fanatics:

- acquired control of GCP, Panini's critical special manufacturer and then used that control to undermine Panini's existing business, ¶¶ 121–49;

- acquired (eliminated) a competitor, Topps, ¶¶ 118–20;

- induced and coerced Panini employees to join Fanatics before it needed these employees, ¶¶ 156–62;

- induced and coerced rookie players to sign exclusive autographs deals with Fanatics preventing them from dealing with Panini even during periods in which Fanatics had no use for these rights, so the sole effect was to harm Panini, ¶¶ 163–67;

- defamed Panini to players and their agents and representatives, players associations, and Panini's current and now-former employees, ¶ 170;

- stopped supplying Panini with jerseys to include in Panini trading cards, ¶ 177;

- induced two parties—the NFL Players Association ("NFLPA") and World Wrestling Entertainment ("WWE")—to nearly simultaneously purport to terminate their licensing agreements with Panini, ¶¶ 179–90;

- coerced distributors, big-box retailers, local card shops, and case breakers to, respectively, give Fanatics higher margins, feature its cards over others, accept minimum price requirements, and join its own case-breaker platform, ¶¶ 194–206.

In short, Fanatics has anticompetitively attacked Panini on every front. Fanatics has cut off Panini's key inputs solely to harm Panini rather than boost Fanatics. It has undermined Panini's every act in competing in and for the Relevant Market—to the detriment of consumers in the form of reduced choice, reduced product quality, decreased output, and inevitably higher prices. ¶ 208.

## LEGAL STANDARD

In assessing a motion to dismiss, the Court "must accept" all well-pleaded facts "as true" and draw "all reasonable inferences" in Panini's favor. *Steginsky v. Xcelera Inc*., 741 F.3d 365, 368 (2d Cir. 2014). Moreover, there "are no heightened pleading requirements for antitrust cases," *Wacker v. JP Morgan Chase & Co*, 678 F. App'x 27, 29 (2d Cir. 2017), and "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 218 (S.D.N.Y. 2019).

## ARGUMENT

### I.   Panini has standing.

Fanatics devotes most of its Motion to challenging Panini's constitutional and antitrust standing. Its arguments largely ignore the harm to Panini caused by Fanatics' unfair, coercive, and anticompetitive conduct detailed in the Complaint. For this reason alone, it should be rejected. It also relies on the wrong legal standard. A proper Article III and antitrust standing analysis assumes the complaint states a violation and asks only whether, assuming the violation, the plaintiff has standing. *See Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022) ("For standing

purposes, we accept as valid the merits of appellees' legal claims."); *Gatt*, 711 F.3d at 76 n.9 ("When assessing antitrust injury, we assume that the practice at issue" violates "the antitrust laws."); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016). Fanatics does the opposite. It says Panini's allegations do not show unlawful conduct and defends its acts as procompetitive—an argument that has no place in a 12(b)(6) motion, *Keurig*, 383 F. Supp. 3d at 238–39.

When Fanatics does address the relevant standing criteria, it mischaracterizes the nature and effect of the injuries to Panini from Fanatics' exclusive deals and other misconduct. It ignores both the facts alleged in the Complaint and over a century of legal precedent establishing that competitors have Article III and antitrust standing to sue rivals who have foreclosed them from the relevant market through anticompetitive conduct. Panini, contrary to Fanatics' repeated assertions, does not claim an injury from "none of the IP owners" choosing "to award or renew their licenses with Panini." Mot. 14. Rather, Panini's injuries arise from the insurmountable barriers to competition in the future erected by the combination of Fanatics' exclusive-dealing agreements and Fanatics' other conduct intended to force Panini from the Relevant Market ***today***. ¶ 254. After abandoning its challenge to Panini's market definition, Mot. 7 n.5, Fanatics cannot challenge Panini's allegations that Fanatics has foreclosed 100% of the Relevant Market, thereby eliminating Panini's ability to compete in the Relevant Market in the future, nor that Fanatics is trying to control 100% of the Relevant Market today by ridding it of its only remaining competitor—Panini.

A competitor's standing to seek redress for injury arising out of exclusionary conduct by a rival that forecloses its ability to compete is foundational to the antitrust laws. A "rival clearly has standing to challenge the conduct of rival(s) that is illegal precisely because it tends to exclude

rivals from the market." Areeda ¶ 348a; *see also id.* at ¶ 348d1 ("Standing is clear and seldom challenged when the plaintiff alleges that its rival engaged in an exclusionary practice designed to rid the market of the plaintiff, to preclude its entry or raise its costs, so that the defendant could maintain or create a monopoly."). Fanatics' challenge to Panini's constitutional standing under Article III is, if anything, even more unsupported, since the antitrust standing doctrine is tougher and includes the elements for Article III standing. Even more so, if a court concludes a plaintiff has the antitrust standing necessary to proceed with its claims, there necessarily must be Article III standing. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact.").

Indeed, if Fanatics' theory of Article III and antitrust standing were correct, it would turn antitrust law on its head. It would mean that judges across the federal system—from the Supreme Court to the Courts of Appeals to the District Courts—have been acting lawlessly for over a century in allowing competitor plaintiffs to pursue claims targeting present or future market foreclosure from exclusive dealing, predatory pricing, group boycotts, or related anticompetitive conduct. A small sampling of the hundreds of such cases is provided here.[4]

---

[4] *See, e.g.*, *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959) (holding group boycott by retailer and other defendants against competitor retailer was an injury to competition without questioning plaintiff's Article III standing or requiring plaintiff to show certainty of additional business absent boycott); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007) (acknowledging predatory bidding by competitor could state antitrust injury without questioning Article III standing); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) (acknowledging predatory pricing by competitor could state antitrust injury without questioning Article III standing); *Pulse Network, LLC v. Visa, Inc.*, 30 F.4th 480, 487, 491–95, n.15 (5th Cir. 2022) (holding that competitor debit network operator plaintiff alleging illegal exclusivity agreements against defendant debit network operator sufficiently showed injury-in-fact and antitrust injury and explicitly rejecting defendant's argument that plaintiff needed to establish additional business would be gained to show standing); *Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1303–06 (11th Cir. 2010) (holding that competitor hospital alleging illegal tying agreements against defendant hospital had experienced antitrust injury and was an efficient enforcer as a competitor, while rejecting district court's logic that the plaintiff's damages "would be highly speculative because it would have to prove that it would be able to compete for in-network status" with the insurer); *LePage's Inc. v. 3M*, 324 F.3d 141, 154–59, 165–66 (3d Cir. 2001) (holding that competitor tape manufacturer established antitrust injury

For both Article III and antitrust standing, all these cases involve competitor plaintiffs that sued rivals for pushing the plaintiffs out of the market, denying them the opportunity to compete. What these cases did not turn on was whether such plaintiffs were certain to win future contracts or business once the barriers were removed. Indeed, the Supreme Court has expressly recognized that a "plaintiff need not prove an actual lessening of competition in order to recover," and "competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 480–81 (1982). And in all these cases it was understood that the competitors bringing these cases were proper antitrust plaintiffs. In fact, except for cases brought by the government, competitors situated similarly to Panini are the plaintiffs in virtually all antitrust cases involving foreclosure.

Consider *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004). There, a drug manufacturer brought Section 1 and 2 claims based on a competing manufacturer's exclusive supply agreements that foreclosed the plaintiff from the market. *Id.* at 509. The Second Circuit reversed the trial court's summary judgment order dismissing the plaintiff's Section 1 and 2 claims without even questioning the plaintiff's constitutional or antitrust standing to bring them.

---

for alleged illegal exclusive dealing and bundled rebates against defendant tape manufacturer, and affirming damages model based on hypothetical expected sales in a but-for world without certainty of gained business); *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745 (10th Cir. 1999) (holding archery trade show promoter alleging group boycott against defendants including a competitor archery trade show adequately alleged antitrust injury); *McGahee v. N. Propane Gas Co.*, 858 F.2d 1487 (11th Cir. 1988) (holding propane gas distributor plaintiff adequately alleged illegal predatory pricing against distributor defendant); *Fido's Fences, Inc. v. Radio Sys. Corp.*, 999 F. Supp. 2d 442, 449–53 (E.D.N.Y. 2014) (holding competitor replacement battery maker and seller alleging illegal exclusive dealing against competitors had Article III standing, adequately alleged antitrust injury, and was an efficient enforcer, and damages were "not unduly speculative" because though "it may be difficult to account precisely for the effect on the alleged restraints on trade, '[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created'"); *Keurig*, 383 F. Supp. 3d at 220–24 (S.D.N.Y. 2019) (evaluating standing of direct and indirect purchaser plaintiffs but not even questioning the standing or antitrust injury of competitor manufacturers, nor competitors' status as an efficient enforcer, and holding the competitor plaintiffs had adequately alleged antitrust injury for a variety of exclusionary conduct); *Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc.*, 349 F. Supp. 2d 389, 403–05 (N.D.N.Y. 2004) (holding competitor surgical facility alleging exclusive dealing had constitutional standing and antitrust injury in suit against hospital defendant, and holding plaintiffs need not show with certainty defendants were solely responsible for lost business).

*Id*. at 502, 514. And in a recent analogous case from this District, Judge Castel had no trouble finding that a competitor excluded from the in-store promotions market because of the defendant's exclusive-contracting practices sustained antitrust injury: the plaintiff's "asserted antitrust injury is exclusion from the ISP market, which is a 'conventional form of antitrust injury' and 'exactly the type [of injury] that antitrust laws were designed to prevent.'" *Valassis*, 2019 WL 802093, at *12. The same principles apply here.

Other recent circuit decisions confirm these well-settled principles. In *Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 294 (1st Cir. 2022), the First Circuit reinstated a complaint by urologists and urology practices alleging illegal exclusive dealing against a competitor urology network and other defendants. The Court noted that "no defendant contests plaintiffs' Article III standing. Nor have we any doubts on that front." *Id*. at 293. It then made quick work of antitrust standing:

> Having been directly harmed by the alleged elimination of competition in that alleged market, [plaintiffs] have plainly suffered an antitrust injury (assuming that the challenged agreement is itself an antitrust violation). Nor is this by any means surprising. ***The competitor of an entity granted exclusive rights to a market is routinely the plaintiff that brings an antitrust complaint as the party directly harmed by the elimination of competition in the foreclosed market***.

*Id*. at 294. (emphasis added). In *ZF Meritor, LLC v. Eaton Corp.*, the Third Circuit, "having concluded that there was sufficient evidence from which a jury could determine that the [agreements] functioned as unlawful exclusive dealing agreements," had "no difficulty concluding that there was likewise sufficient evidence that Plaintiffs suffered antitrust injury." 696 F.3d 254, 289 (2012). The defendant's conduct "unlawfully foreclosed a substantial share" of the alleged market and the plaintiff "exited the market" because it "could not maintain high enough market shares to remain viable." *Id*. And its doing so was a "direct result" of the defendant's "exclusionary

conduct." *Id*.

This case is no different. Under *Geneva*, *Valassis*, *Vázquez-Ramos*, *ZF Meritor*, and over a century of caselaw involving competitor plaintiffs asserting claims for exclusive dealing, predatory pricing, group boycotts, and other related anticompetitive conduct, *see supra* note 4, Panini's constitutional and antitrust standing is clear.

**A.    Fanatics' arguments on Article III standing ignore well-settled antitrust law.**

Article III standing requires (1) an injury in fact that is (2) fairly traceable to the defendant and (3) likely to be redressed by the requested judicial relief. *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1619 (2020). Fanatics argues that Panini has not alleged redressable injury-in-fact because the players, teams, Leagues, and players associations may deal with whom they wish. But this argument ignores the antitrust doctrines discussed above allowing a competitor to seek redress for the injury caused when a rival's anticompetitive conduct forces it from the market.

As these cases make clear, it is routine in exclusive dealing challenges that the monopolizing defendant has obtained contract rights from counterparties (often retailers) who ordinarily may accept whatever deal they wish and may be particularly happy to enter into deals with monopolizers in exchange for attractive rebates, discounts, or other inducements. Still, starting with the Supreme Court's seminal decision in *Standard Stations*, many exclusive-dealing arrangements are nevertheless held illegal, and the defendant is found to be liable. *Standard Oil Co. of Cal. v. United States*, 337 U.S. 293, 314 (1949). There, as is often the case, the defendant is the forecloser, not the counterparties, and the illegality of the defendant's conduct is not nullified by any alleged innocence of the counterparties who, as here, are not sued. [5] *See infra* Section II.B.

---

[5] Fanatics is also wrong that Panini lacks Article III standing because this case involves intellectual property, Mot. 12–13, and, according to Fanatics, "Panini does not allege that Fanatics" did anything wrong to obtain the exclusive licenses, Mot. 13. These arguments, which implicate the merits and are improper in a standing analysis, are addressed in Section II.C, *infra*.

In the many other competitor-plaintiff, exclusive-dealing cases cited above, the same holds true, and those competitors have standing. It also was uncertain in those cases whether the plaintiffs would have won the business without the defendant's unlawful conduct. *E.g.*, *Pulse Network*, 30 F.4th at 491 n.15. Yet all had standing.[6]

The same is true of predatory pricing and other doctrines.[7] That consumers are happy to buy from the defendants at artificially low prices does not excuse the conduct. And that these consumers may have purchased from the defendant rather than the plaintiff, even if prices had not been suppressed, does not affect the competitor plaintiff's standing. Similarly, an antitrust plaintiff has standing to challenge the injury caused by a group boycott without establishing it will succeed in its commercial relationships if the anticompetitive action is removed. *See Klor's*, 359 U.S. at 212–13; *Full Draw Prods.*, 182 F.3d at 750–55; *Volvo N. Am.*, 857 F.2d at 72–73.

These cases recognize, explicitly or implicitly, that a competitor plaintiff's exclusion from the market is "injury-in-fact" for Article III standing (and antitrust injury). Applying these principles here, Panini has alleged classic injury-in-fact because Fanatics now controls, and has foreclosed competition in and for, the market for 20 years for MLB and the NFL and for at least 10 years for the NBA. ¶¶ 215, 222. This 100% foreclosure, not any lost bid as Fanatics repeatedly asserts, in the Relevant Market (that Fanatics does not challenge), is the type of injury-in-fact and

---

[6] Indeed, in *Fido's*, the court recognized that the plaintiff could even establish Article III standing to pursue claims that "defendant's exclusionary practices have prevented it from ***expanding its business into a second market***, so long as it could "allege facts showing that it was 'ready, willing, and able' to enter the market but for the anticompetitive conduct." 999 F. Supp 2d at 450. On the facts, the court found the plaintiff's "bare assertion" about future entry was inadequate to meet this test. *Id.* But the rule the court applied—which recognizes Article III standing ***even based on allegations of the foreclosure of hypothetical competition that does not yet exist***—only confirms the extent to which Fanatics' Article III standing arguments are untethered from existing doctrine.

[7] *Utah Pie Co. v. Cont'l Baking Co.*, 386 U.S. 685, 699–700 (1967) (rejecting court of appeals' "factual conclusion that [plaintiff] was not deprived of any pie business which it otherwise might have had" as basis to reject predatory pricing claim); *McGahee*, 858 F.2d at 1502–06 (neither the predatory pricing test nor analysis of the claim considers whether plaintiff had established it would necessarily have made more sales without the alleged predatory pricing).

antitrust injury the antitrust laws are designed to address. *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 813 (D.C. Cir. 2001). This injury-in-fact is fairly traceable to Fanatics' alleged antitrust violations—unlawful exclusive deals that foreclosed 100% of the Relevant Market. And as the caselaw discussed above shows, it is redressable through the injunctive relief that Panini seeks to remove the barriers to entry causing this injury and damages.

Ignoring this precedent, Fanatics mainly relies on *Am. Cricket Premier League, LLC v. USA Cricket*, 445 F. Supp. 3d 1167 (D. Colo. 2020), which has never been cited by any court, except for the proposition that dismissal for lack of Article III standing should be without prejudice. In *American Cricket*, the plaintiff sued the entity that administered cricket in the United States, alleging it had been wrongly denied a license in an allegedly corrupt bidding process. *Id.* at 1170. The court dismissed the complaint on lack of redressability, holding that it had no power to remedy the injury of a disappointed bidder by "order[ing] USA Cricket to redo the bidding" or "accept Plaintiff's bid." *Id.* at 1175. Whatever the merits of this isolated decision, Panini's claims relate to future competition for the Relevant Market, which has been foreclosed for decades by Fanatics' exclusive-dealing agreements. As in other exclusive-dealing cases, this Court can remedy the antitrust violation by shortening the exclusivity period, ordering the contracts not be exclusive, and awarding damages.

Fanatics also relies on *American Cricket* for its claim that Panini has endured no more than "a type of 'procedural injury'"—*i.e.*, "the lost opportunity to compete for" licenses. Mot. 11, 13.[8]

---

[8] The concept of "procedural injury," advanced in *American Cricket* and relied on heavily by Fanatics, comes from cases involving government conduct, such as *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571–72 (1992), where plaintiff claimed the government had limited the geographic scope of the Endangered Species Act without undertaking the proper consultative process. Even in cases that genuinely involve "procedural injury," the courts recognize Article III standing even without "pro[of] that the substantive result would have been different had [plaintiff] received proper procedure; all that is necessary is to show that proper procedure **could have done so**." *California v. Azar*, 911 F.3d 558, 571 (9th Cir. 2018) (emphasis added); *see also Lujan*, 504 U.S. at 572 n.7. There is no distinction in Article III that somehow lowers the standard for claims of environmental injury but not for antitrust injury. Fanatics also cites

14

But as shown above, the foreclosure from the market in the future is not properly viewed as a "procedural injury." And Fanatics is causing injury ***now***, *see* ¶¶ 115–206, and for this reason alone, there is no merit to Fanatics' Article III standing challenge to Panini's Section 2 claims, which are based on both Fanatics' unlawful exclusive deals and its subsequent unlawful and unfair conduct aimed to destroy competition in the near term. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016) ("Any monetary loss" or "small financial loss" "suffices" for injury in fact).

### B.     Panini has sustained antitrust injury.

The Supreme Court has described antitrust injury as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). This Circuit employs a three-step inquiry to determine whether the antitrust injury requirement is met:

> First, the plaintiff must identify the practice complained of and the reasons the practice is or might be anticompetitive. Second, the court must identify the actual injury alleged by the plaintiff. Third, the court must compare the anticompetitive effect of the practice at issue to the actual injury alleged by the plaintiff.

*Keurig*, 383 F. Supp. 3d at 220. The Complaint satisfies these requirements.

Here, assuming Panini's allegations of 100% foreclosure of the Relevant Market establish a violation of Sections 1 and 2 of the Sherman Act, *Gatt*, 711 F.3d at 76 n.9, there is no question that the "low bar" of establishing an anticompetitive practice has been met for step one. *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 63 (2d Cir. 2019).[9] And as the cases discussed

---

three federal contracting cases involving the Administrative Procedure Act. Again, these principles have no application here where redressability is readily established by the Court's power to order injunctive and other relief remedying the barriers to entry that foreclose Panini's ability to participate in the Relevant Market.

[9] Even Fanatics does not seriously contest Step 1 other than to assert (at 18), without support, that Panini's allegations concerning *consumer* harm, such as an increase in price, are conclusory and speculative because Panini does not allege that these harms have occurred yet. This (incorrect) argument goes to liability. It has nothing to do with antitrust injury which assumes the violation and asks whether *Panini* sustained the type of injury that the antitrust laws were intended to prevent. At any rate, that a monopolist has not yet used its power to raise prices at the time of the complaint is no "defense to liability." *Keurig*, 383 F. Supp. 3d at 226.

above show, Panini's alleged "exclusion from a market is a conventional form of antitrust injury" because it is "exactly the type" of injury "that antitrust laws were designed to prevent." *Valassis*, 2019 WL 802093, at *11–*12 (collecting cases); *see also Palmyra*, 604 F.3d at 1303 ("Exclusivity arrangements" that prevent a plaintiff "from competing" merely "as it previously did" in the relevant market is "precisely the type of harm" courts "allow plaintiffs to vindicate through the antitrust laws."). Panini's injury flows from "the competition-reducing aspect of [Fanatics'] conduct," *Valassis*, 2019 WL 802093, at *11—Fanatics' foreclosure of 100% of the Relevant Market—thus satisfying the final step of the analysis. Indeed, it is "hard to imagine a closer connection between anticompetitive effect and injury than the destruction of [one of two competitors] and the loss of competition in the … market." *Full Draw Prods.*, 182 F.3d at 754.

Fanatics' argument that Panini lacks standing because it is merely a "victim of competition," Mot. 18, wrongly assumes Fanatics' actions were legitimate rather than illegal exclusion. This merits issue is inappropriate in an antitrust-injury analysis or, indeed, at all in resolving a motion to dismiss where the plaintiff's alleged facts are taken as true. "Any procompetitive justification" Fanatics posits "is not appropriately weighed" at this stage. *Keurig*, 383 F. Supp. 3d at 238–39.[10]

### C.   Panini is an efficient enforcer of the antitrust laws.

Fanatics' contention that Panini is not an efficient enforcer also ignores that in almost all private antitrust cases of this type in federal courts, a competitor like Panini is the ***typical*** plaintiff to challenge a rival's foreclosure of the market. Panini is the ***only*** antitrust enforcer "whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement" of

---

[10] Fanatics standing arguments also ignore that Panini has also sued for injunctive relief under Section 16 of that same Act (15 U.S.C. § 26). ¶¶ 14, 298. The "standing analysis under section 16 is still less rigorous than under section 4." *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 259 n.6 (2d Cir. 1989).

its claims. *Associated Gen. Contractors*, 459 U.S. at 542. Panini and other competitor plaintiffs, being heavily invested in the relevant market and the direct targets of the challenged practices, are ideally situated to detect and identify illegal behavior and bring the relevant facts before a court. *E.g.*, *Palmyra*, 604 F.3d at 1304 (competitors "best suited to efficiently enforce the antitrust laws").

On the other hand, dispersed consumers are not. Although the monopolistic outcome of Fanatics' anticompetitive conduct will result in further consumer harm in the form of higher pricing, lower trading card quality, and diminished choice if Fanatics' conduct is not addressed, ¶ 228, the injuries to consumers are far more distant and attenuated than the injury to Panini. Yet Fanatics would have the legal system wait for these consumers, years later, to go back to reconstruct the market's complex evolution to determine whether a violation occurred and, if so, to develop proof of that to bring to court. That is not what the law requires and is not provided for in the Sherman Act or any applicable Supreme Court or Second Circuit decisions.

It is therefore unsurprising that there is no authority to support Fanatics' suggestion (at 27–28) that the legal system should wait for future consumers to bring claims. The only case offered by Fanatics—*Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 444 (2d Cir. 2005)— does not support this assertion. Unlike here, *Daniel* did not involve a competitor plaintiff alleging injury due to market foreclosure.[11] Meanwhile, Fanatics ignores the many cases, including exclusive-dealing cases, holding that the competitor plaintiff has antitrust injury and is a proper antitrust plaintiff in circumstances like those here.

---

[11] *Daniel* was brought by a group of doctors who claimed that defendant licensing boards and hospitals conspired to deny plaintiffs a certification that would allow them to command a higher salary. Plaintiffs' theory of injury was "not that they were denied the competitive remuneration that the market would have awarded but for domination by the defendants' cartel." *Id*. at 439. Rather, it was their inability to "command [the same] super-competitive remuneration" as the certified doctors. *Id*. Further, the Second Circuit noted that plaintiffs may not be efficient enforcers because "health care insurers"—not the physician plaintiffs—were the parties directly injured by having to reimburse hospitals for higher medical costs resulting from the supercompetitive salaries of certified doctors. *Id*. at 444.

## II.   Fanatics' unprecedented exclusive licenses and its other anticompetitive conduct violate Sherman Act Sections 1 and 2.

### A.   Panini adequately pleads Fanatics' conduct violates Sections 1 and 2.

Panini adequately pleads that Fanatics' conduct—considered as a whole and drawing all reasonable inferences in Panini's favor, *LePage's*, 324 F.3d at 162—violates Sections 1 and 2 of the Sherman Act. While "no set formula" exists for analyzing exclusive-dealing claims under Sections 1 and 2, a successful plaintiff generally needs to prove at trial **(1)** "significant market power by the defendant" and "substantial foreclosure" of the relevant market(s); **(2)** "contracts of sufficient duration to prevent meaningful competition by rivals"; and **(3)** "likely or actual anticompetitive effects," such as "coercive behavior," considered "in light of any procompetitive effects." *ZF Meritor*, 696 F.3d at 271–72 (collecting cases). On a motion to dismiss, though, "procompetitive effects" are "not appropriately weighed." *Keurig*, 383 F. Supp. 3d at 239.

Panini meets these pleading benchmarks. *First*, by not challenging Panini's market definition, Fanatics cannot challenge Panini's allegations that Fanatics has foreclosed ***100%*** of the Relevant Market. ¶ 214. That scope is far more than is typically required to plausibly allege that an antitrust defendant has engaged in unlawful anticompetitive conduct in violation of Sections 1 and 2. *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 830, 837 (11th Cir. 2015) ("40% has been a threshold" for liability and "between 70% and 80%" typically required for monopoly power).

*Second*, the length of Fanatics' exclusive deals defies historical norms in the trading-card industry, in which shorter-term exclusive deals historically have been common. ¶ 7. Indeed, in *Geneva*, the Second Circuit held that the plaintiffs provided sufficient evidence that far shorter exclusive deals of ***15-months*** were "a substantial impediment to competition." 386 F.3d at 501, 509; *see also Valassis*, 2019 WL 802093, at *3, *12 (denying summary judgment over a defendant's combining exclusive deals averaging a mere ***4.5*** years); *ZF Meritor*, 696 F.3d at 265

(*five*-year exclusive deals "unprecedented in terms of their length" for the industry were unlawful).

The effects of Fanatics' deals of unprecedented length are made worse by their 100% market foreclosure. Deals of far less length and scope are routinely held unlawful or at least survive 12(b)(6) dismissal. *See ZF Meritor*, 696 F.3d at 284, 286–87 (90% of market for five years); *Denstply*, 399 F.3d at 185, 188 (75-80% of the market terminable at will); *LePage's*, 324 F.3d at 146, 158 (90% of the market for 3-plus years); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1298, 1307 (9th Cir. 1982) (24% of the market for 10-plus years); *McWane*, 783 F.3d at 840 (90-100% for *not* "lengthy duration"); *Microsoft*, 253 F.3d at 73 (95% of the market for five-plus years); *Keurig*, 383 F. Supp. 3d at 212, 243 (73-95% of the market for five years); *Pecover v. Elecs. Arts Inc.*, 633 F. Supp. 2d 976, 978 (N.D. Cal. 2009) (100% of the market for four years). Fanatics' motion fails to mention even one of these cases. Nor does it cite any case upholding exclusive deals with the length and scope of its own, particularly at the pleading stage.[12] Panini is unaware of *any* exclusive dealing case upholding a deal with 100% foreclosure and decades-long duration.

*Third*, the Complaint adequately pleads likely anticompetitive effects, including high barriers to entry, where competition for the market will not occur for decades. *See Geneva Pharms. Tech. Corp.*, 386 F.3d at 509 ("high barriers to entry" show exclusionary conduct); ¶¶ 223–25. Panini alleges the deals created insurmountable barriers to entry, ¶ 225, and cemented Fanatics' ability to exclude competition for decades, ¶ 223, leading to higher pricing, ¶ 228, reduced output, ¶ 229, reduced product quality, ¶ 230, and reduced consumer choice, ¶ 231–32. Panini also alleges additional anticompetitive effects consisting of Fanatics' many strategies to exclude Panini from

---

[12] The closest appears to be *Tampa Electric v. Nashville Coal*, 365 U.S. 320 (1961), where the Supreme Court upheld an exclusive deal that lasted for twenty years but foreclosed "*less than 1%*" of the relevant market. *Id.* at 334 (emphasis added).

the Relevant Market even before Panini's contracts expire. *See* Background § IV.

**B.    Intellectual-property agreements can violate the antitrust laws.**

The Supreme Court has rejected Fanatics' suggestion that Congress silently excluded intellectual property from the antitrust laws. In *Actavis*, 570 U.S. 136, the Court held the lower court erred "by measuring" a settlement's "anticompetitive effects solely against patent law policy, rather than by measuring them against procompetitive antitrust policies as well." *Id.* at 148. "Traditional antitrust factors"—not the scope of intellectual-property rights—is what the court should have evaluated to decide the legality of the agreements before it. *Id.* at 149. This has been the law for decades.[13]

Relying on *Actavis*, the Second Circuit has held that the "mere fact that an agreement implicates intellectual-property rights does not 'immunize [the] agreement from antitrust attack.'" *1-800 Contacts, Inc.*, 1 F.4th at 113. The D.C. Circuit has been even more forceful, calling arguments like Fanatics' "frivolous" and "no more correct than the proposition that use of one's personal property, such as a baseball bat, cannot give rise to tort liability." *Microsoft*, 253 F.3d at 63. This Court, too, recently held that, among other things, a defendant's "exclusive licensing agreements" for its intellectual property plausibly alleged violations of Sections 1 and 2. *Keurig*, 383 F. Supp. 3d at 236–40. Indeed, most antitrust cases, including most exclusive-dealing cases, involve intellectual property. These include branded gasoline (as in the Supreme Court's seminal

---

[13] The Court's opinion in *United States v. Griffith*, 334 U.S. 100 (1948), is also instructive. The defendant there, like Fanatics here, obtained exclusive licenses with the upstream licensors of movies (intellectual property), pushing out other competitors from the relevant market. *Id*. at 101–04. The Court explained that any licensee with a "right to exhibit a film" has "a monopoly" and violates the antitrust laws by using that monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Id.* at 106–07. The Court held that the intellectual-property-licensee defendant did just that in *Griffith* by using its monopoly power to acquire further "exclusive privileges." *Id*. at 109. That these exclusive privileges were exclusive licenses to use intellectual property was irrelevant. *See also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 18–19, 24 (1979) (holding "blanket licensing" to "the performing rights to copyrighted music" is to be analyzed under the rule of reason); *Am. Needle, Inc., v. Nat'l Football League*, 560 U.S. 183, 197, 203 (2010) (holding that NFL intellectual-property licensing was subject to rule of reason analysis under the antitrust laws).

exclusive-dealing case, *Standard Oil*, 337 U.S. 293), or myriad patented, copyrighted, and usually trademarked products.

Panini does not dispute that, in a vacuum, businesses are ordinarily free to trade with whomever they wish on whatever terms they like. But every exclusive dealing case implicitly but necessarily seeks to restrict the commercial behavior of the monopolist and its counterparties.[14] In any case seeking relief for exclusive dealing—whether through damages or an injunction—it is understood that, if an antitrust violation is proved at trial, neither the monopolizing firm nor its counterparties would be permitted to do business as in the past. And, as just explained, intellectual property is routinely involved in these cases—indeed, in some vertical cases, the seller's brand name is the essential ingredient in the exclusive arrangement.

Fanatics' own law firm, relying on some of the same case law, previously made Fanatics' same intellectual-property argument in a case involving some of the same "IP owners" present here—***and lost***. In *Pecover*, 633 F. Supp. 2d 976, Electronic Arts ("EA"), the video-game company, like Fanatics, obtained "multiple exclusive licenses" in "separate agreements" giving it the right to use the intellectual property of the NFL, the NFL Players Association, the NCAA, and the Arena Football League (for only four years). *Id.* at 978–79; EA's Mot. to Dismiss, *Pecover v. Elecs. Arts Inc.*, No. 08-cv-02820 (N.D. Cal.), ECF 17 at 8. EA was sued under the Sherman Act and moved to dismiss. Like Fanatics, EA argued that under *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139 (3d Cir. 1981), intellectual-property licensors are "free to grant licenses to any competitor, or none at all." EA's Mot. to Dismiss at 8; *see also* Mot. 30 (licensors are "free to grant licenses to

---

[14] In *Geneva*, for example, a sodium manufacturer and ingredients supplier's "right" to control their own property did not extend to doing so in a way that violated the antitrust laws. 386 F.3d at 506. Same for the pipe-fitting supplier and distributors in *McWane*, 783 F.3d at 814, the truck-transmission manufacturer and direct purchasers in *ZF Meritor*, 696 F.3d at 263, the fake-teeth manufacturer and dealers in *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 190 (3d Cir. 2005), and the urology-service providers and insurer in *Vázquez-Ramos*, 55 F.4th at 291.

any competitor, or none at all"). The Northern District of California rejected these arguments, explaining that the "Third Circuit decided *Fleer* on a motion for summary judgment rather than on a motion to dismiss." *Pecover*, 633 F. Supp. 2d at 983. And on a motion to dismiss, the court "must take as true plaintiff's factual allegations that the series of exclusive deals between EA and the NFL, AFL and NCAA 'killed off' competition and 'prevented [competitors] from reentering the market.'" *Id.* So too here.

Moreover, although Fanatics' law firm now tells this Court the licenses in *Fleer* "were of **long** duration," Mot. 30 (emphasis added), it emphasized to the *Pecover* court that a "critical factor" in *Fleer* "was that the exclusive licenses at issue were for **only** five years," so the defendant "had not absolutely foreclosed competition for subsequent contracts." EA's Mot. to Dismiss at 10 (emphasis added). Panini agrees that the unusually long duration of the Fanatics licenses—like the shorter duration of the *Fleer* licenses—**is** a critical factor for the Court to consider in assessing the plausibility of Panini's claims. Unlike the deals in *Fleer*, Fanatics' deals are for ten-to-twenty years and thus have "foreclosed competition for subsequent contracts." *Id.*

*Spinelli v. National Football League*, 96 F. Supp. 3d 81 (S.D.N.Y. 2015), relied on by Fanatics, merely stands for the unremarkable proposition that exclusive intellectual-property licenses, like all exclusive deals, are presumptively legal unless they cross the line into anticompetitive conduct under the fact-intensive, rule-of-reason analysis. *Id*. at 118. *Spinelli* does not hold intellectual-property licenses are exempt from the antitrust laws. The contracts there "were of limited duration" of **three** years maximum duration. *Id.* at 117–18.

Fanatics also misleadingly quotes Areeda & Hovenkamp's treatise as stating that intellectual-property deals "stand on a different footing" than other exclusive deals. Mot. 21. But Fanatics leaves out what Areeda says follows from that statement—that **Section 3 of the Clayton**

22

*Act* thus doesn't apply to exclusive deals for intellectual property. Areeda ¶ 1803e. This matters because the Sherman Act "does not contain" the same "limitations" as the Clayton Act. *Id.* And the "most important" policy underlying this quote is the "policy of the patent and copyright statutes," *id.*—neither of which the trademark agreements here implicate.

Even if they were, patent law may give the patentholder "a temporary monopoly" to use that patent but, critically, "***not*** a right to use the[] patent[] as part of a scheme to interfere with competition beyond the limits of the patent monopoly." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (emphasis added). It "is the *combination* of" Fanatics' exclusive deals of extreme length and scope—and its abusing those deals to engage in additional anticompetitive conduct—"that places [its] conduct beyond the scope of" whatever "rights" it may have to use the intellectual property of the Leagues and players associations. *Id.* Areeda & Hovenkamp do not suggest, in this single brief discussion, that the many cases discussed elsewhere in their treatise (some discussed above) all should have been dismissed because intellectual property was involved.[15]

Finally, unlike the cases cited by Fanatics, producing trading cards requires combining multiple licenses from multiple, independent licensors. ¶¶ 33–41. So unlike *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23 (2d Cir. 2006), it is not the case that each League or players association could have "established its own in-house" trading-card business. *Id.* at 29. And it is not the case here that "a monopolist" is "substitut[ing] one supplier for another" or that existing

---

[15] The other cases cited by Fanatics are also readily distinguishable from the facts here. In *Gatt* (*see* Mot. 21), the plaintiff complained about its exclusion from what it alleged was an ***unlawful*** bid-rigging scheme. 711 F.3d at 72. The court held that the plaintiff had no right to participate in the scheme because it was unlawful. *Id.* at 77. *Arcesium, LLC v. Advent Software, Inc.*, 2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) (*see* Mot. 19–21), confirms underlying exclusive-dealing principles that rebut Fanatics' arguments. That court explained that "it is beyond dispute that refusals to deal and exclusive dealing arrangements"—even in the intellectual-property context under consideration—"*may* give rise to antitrust liability." *Id.* at *6. The court, however, rejected plaintiff's claims because the plaintiff could not allege the exclusive arrangements prevented it from accessing a "significant fraction" of the relevant market. *Id.* at *9.

monopoly power has merely been "shift[ed]" or "transfer[red]" to "different hands." Mot. 29. Fanatics implicitly concedes this point, recognizing that each League would need to "join[] together" with the players association for that League to "produce and sell" trading cards. Mot. 30. Nothing about that is "in-house." *E & L Consulting*, 472 F.3d at 29. Fanatics has therefore not "deprived" Panini of any monopoly, Mot. 29, because neither Panini—nor anyone—has ever held the monopoly Fanatics concededly holds here.

Even if each sport's League and players association could "join together" to form an individual monopoly of that sport, they could not further lawfully combine with their counterparts in the other sports to form a single, super league of all three Major U.S. Professional Sports Leagues and players associations. *Cf. Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir. 1952) (patent pools "illegal" when they "effect a restraint of trade or create monopolies"). What Fanatics has done here is no different.

**C.      Panini sufficiently pleads that Fanatics' exclusive deals are anticompetitive.**

Assembling decades-long exclusives that foreclose 100% of the Relevant Market—unprecedented, to Panini's knowledge, in nearly a century of exclusive-dealing cases—itself plausibly alleges harm to competition. *See supra* Section II.A. Still, Fanatics maintains it did nothing "wrongful" to get the deals. Mot. 19. But as explained above, whether Fanatics engaged in misconduct to obtain the licenses entirely misses the point. In classic exclusive-dealing cases, as here, the monopolizing defendant typically did not (or was not alleged to) engage in acts that are, by some unstated standard, "wrongful." Instead, it offered inducements sufficient to entice the counterparties to accept the monopolizer's offers, thereby tying up the market. The "wrong" is *the foreclosure brought about or effected by the deals*, not how each deal was negotiated or executed.

That is why the courts of appeals in *Microsoft*, 253 F.3d 34; *McWane*, 783 F.3d 814; and *Vázquez-Ramos*, 55 F.4th 286, never considered how a defendant *obtained* its unlawful deal. They

considered only whether the deal was unlawful, which requires analyzing its anticompetitive *effects*, *see ZF Meritor*, 696 F.3d at 271–72 (collecting cases), and is consistent with rule-of-reason analysis more generally, *see Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). *Sometimes*, like in *Balaklav v. Lovell*, 14 F.3d 793 (2d Cir. 1994), and *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010), courts consider how the deals were obtained—such as through public bidding (which did not occur here, ¶ 110) or coercion—but that is not *necessary* to holding a deal unlawful. *Race Tires*, 614 F.3d at 78. "Coercion" is not "an essential element" of an exclusive-dealing claim, so defendants "are *not* entitled to summary judgment merely because there is an absence of coercion." *Id.*

### D.   Panini sufficiently pleads that Fanatics' other conduct was anticompetitive—involving attempted and actual monopolization in the near term.

The exclusive deals are not the only conduct at issue. Panini details a host of additional, unlawful exclusionary acts by Fanatics. *See* Background § IV. Fanatics urges the Court to consider these acts as innocent steps "to develop its business" that were "procompetitive." Mot. 25.[16] Again, "any procompetitive justification" for Fanatics' conduct "is not appropriately weighed on a motion to dismiss." *Keurig*, 383 F. Supp. 3d at 239. And when assessing the anticompetitive effects of an antitrust defendant's conduct, the "relevant inquiry is the anticompetitive effect of" the defendant's "exclusionary practices" and "various activities" "considered together" "as a whole" rather than— as Fanatics does—"considering each aspect in isolation." *LePage's*, 324 F.3d at 162. Panini has pleaded, in detail, anticompetitive conduct by Fanatics and its corresponding anticompetitive effects.

To begin, Fanatics secured control of Panini's critical manufacturer, GCP, and used that

---

[16] Fanatics raises these arguments in the Antitrust Injury sections of its brief. Because they go to the merits and are improper in a standing analysis, they are addressed here.

control to harm Panini and competition through reducing manufacturing output. *See infra* Section III.A. Fanatics' contrary factual assertions should be ignored at this stage. Fanatics also bought Topps, which eliminated a competitor and an entry channel and was an indispensable part of Fanatics' plan to rid the Relevant Market of all competition. *See infra* Section III.B.

Fanatics also fails to defend its exclusive rookie deals. Mot. 25. These deals prevented players from dealing with Panini ***during the years when Fanatics could not yet effectively use their rights***, depriving consumers of cards they could otherwise buy. ¶¶ 163–69, 232. That is, Fanatics paid a premium to hurt Panini's business in a way that could not produce a legitimate benefit to itself, and it immediately harmed consumers to boot. And the Complaint alleges that Fanatics "used its monopoly power" in the Relevant Market "to force," *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 485 (7th Cir. 2020)—and coerce—the rookies not to deal with Panini and instead sign exclusive deals with Fanatics. ¶¶ 163–69. Fanatics threatened the rookies that if they did not immediately sign with Fanatics, they would never get an autograph deal in the future when Fanatics' long-term, exclusive deals began. ¶ 166. A monopolist's inducing or coercing third parties not to deal with competitors to help it obtain monopoly power—as Fanatics has done here— is anticompetitive. *See, e.g.*, *Lorain J. Co. v. United States*, 342 U.S. 143, 149–50 (1951); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985).

Fanatics' raid of Panini's employees similarly cannot be justified by asserting "it needed them." Instead, as Panini alleges, ¶ 156, Fanatics raided these employees to "injure" Panini. *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109–10 (3d Cir. 2010) (anticompetitive hiring); *see also Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990) ("Unlawful predatory hiring occurs when talent is acquired … for purposes of

denying it to a competitor.").[17] Fanatics also threatened these employees with never working in the industry again if they did not join Fanatics, ¶ 157, and induced them to breach their contracts with Panini by recruiting other Panini employees and stealing Panini trade secrets, ¶ 160.[18]

Fanatics' purported defenses to its other illegal acts also lack merit. It says nothing is wrong with cutting Panini off from jerseys because it has no "duty to deal" with Panini. Mot. 25. But a defendant's refusal to deal is anticompetitive when the parties had previously been engaged in a voluntary, cooperative, and profitable venture that the defendant terminated due to a desire to harm the terminated competitor. *See Aspen Skiing*, 472 U.S. at 608–11. And Panini's success so far in defending WWE and NFLPA's attempts to enjoin Panini from operating under its contracts with them does not absolve Fanatics of illegally inducing the NFL Players Association and WWE to purport to terminate their contracts with Panini. This conduct disrupted and decreased Panini's production of trading cards, ¶¶ 179–93, and was anticompetitive, *see Tops Mkts., Inc. v. Quality Mkts, Inc.*, 142 F.3d 90, 100 (2d Cir. 1998) (interfering with and inducing a third party to breach a contract can be basis for anticompetitive conduct).[19] So, too, is Fanatics' disseminating "false and misleading" statements about Panini to key industry participants, ¶¶ 170–75; *see infra* Section IV.C, which themselves "provide a basis for antitrust claims," *Keurig*, 383 F. Supp. 3d at 240.

Lastly, Fanatics' abuse of already-obtained monopoly power to harm distributors, big-box

---

[17] Fanatics suggests Panini, in another case, stated through a declaration that Fanatics' raiding its employees didn't impact it. *See* Mot. 7 (quoting Decl. of Mark Warsop ¶ 31, *Panini v. WWE*, No. 1:23-cv-08324, ECF 28); *see also* Mot. 25. What the declaration actually says is that the Fanatics raid did not "impact[] Panini's ability to meet ***its obligations to WWE***" specifically, and that Panini replaced the raided employees to keep its work "on track," Decl. of Mark Warsop ¶ 31 (emphasis added)—a far cry from saying Panini was generally unaffected.

[18] Nor do what have long been understood by courts to be illegal, monopolistic acts somehow become procompetitive because federal regulators encourage increasing "worker mobility." Mot. 25 (citing DOJ Antitrust Division Comment). Plus, the same DOJ Antitrust Division Comment expressly acknowledges (at 6) that trade secrets deserve protection regardless of worker-mobility goals.

[19] Fanatics also claims Panini's complaint lacks sufficient facts to show Fanatics' involvement in these purported terminations. Mot. 26. But it overlooks that NFLPA and WWE acted in "lockstep" to execute the exact same playbook. ¶ 190. They both purported to terminate their contracts at almost the same time, and they both purported to execute new deals with Fanatics immediately. ¶¶ 184, 190. Their doing so was no coincidence, and these facts are more than sufficient at this stage.

retailers, local card shops, and case breakers is also anticompetitive. These actions limit the outlets at which cards may be bought and deprive consumers of choice in where to buy their cards, from whom to buy their cards, and the mix of cards from which to choose. ¶ 231.[20]

> **E.**      **Panini's Section 2 claims are not monopoly-leveraging claims.**

Fanatics offers almost no argument that Panini's claims, particularly its exclusive-dealing claims, are insufficient under Section 2. Fanatics does not even mention the elements; nor does it show that any of them are not satisfied. Instead, it mischaracterizes Panini's Section 2 claims as insufficient "monopoly leveraging" claims. Mot. 30–32. This is a red herring used to suggest Panini's Section 2 claims fail by exploiting Panini's use of "leverage" in the Complaint.

As Fanatics notes, monopoly leveraging occurs when a defendant holds monopoly power in one market and uses that power to gain an advantage "in a different distinct market." *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001). Panini is not alleging that Fanatics engaged in this type of anticompetitive conduct. Rather, the harm here is occurring in the ***same*** market. Panini's allegations, taken as true, establish Fanatics has abused its power through the exclusive deals "to restrain competition" in the Relevant Market in the long run, and also in the short run by using that power and by engaging in further anticompetitive conduct harmful to Panini, competition, and consumers even before its exclusive licenses commence. *Keurig*, 383 F. Supp. 3d at 227; ¶¶ 102–235. These allegations suffice. *See Keurig*, 383 F. Supp. 3d at 238–39;

---

[20] Fanatics retorts that "changes to distribution strategy are not anticompetitive." Mot. 26. The unpublished case it cites in support, though, clarifies that changing "distribution strategy" by subbing out one distributor for another does not *by itself* violate the antitrust laws. *S.W.B. New England, Inc. v. R.A.B. Food Grp., LLC.*, 2008 WL 540091, at *4 (S.D.N.Y. Feb. 27, 2008). Fanatics is not *by itself* subbing out one distributor for another nor is it changing "distribution strategy." It is abusing its illegally obtained monopoly power to coerce distributors and other industry participants to treat it more favorably or push its products over others, thus eliminating consumer choice. That is anticompetitive. *See Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 490 (S.D.N.Y. 2012).

*supra* Sections II.A–D.[21]

## III. Panini's allegations establish that Fanatics violated Clayton Act Section 7 and, in doing so, caused Panini an antitrust injury.

### A. Fanatics' buying GCP violated Section 7 and caused Panini antitrust injury.

Section 7 of the Clayton Act forbids acquisitions "whose effect 'may be substantially to lessen competition, or to tend to create a monopoly.'" *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). It is concerned with "probabilities, not certainties." *Id.* at 323. And there is "no requirement that the anticompetitive power manifest itself in anticompetitive action before" Section 7 applies. *F.T.C. v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967).[22]

Fanatics argues that Panini fails to allege harm to competition from its buying GCP. It says Panini complains only about temporary shortages of cards. Mot. 35. This mischaracterizes the nature and scope of Panini's injury. Fanatics, as part of its campaign to monopolize the Relevant Market, acquired control of GCP to disrupt its competitor's (Panini's) ability to meet its production goals, ¶ 147, reduce its competitor's output, ¶¶ 142–44, cause its competitor reputational harm and monetary losses, ¶ 147, and ultimately exclude its competitor from the Relevant Market, ¶¶ 122, 140. The reduced output from Fanatics' actions resulted in fewer trading cards for consumers, less consumer choice, and a disruption of the normal cadence of releases depended on by Panini, licensors, and consumers alike. ¶¶ 147–48, 229. These reductions were *not* to serve any legitimate interest of Fanatics, but to destroy Panini. ¶¶ 9, 138, 140.

---

[21] Fanatics also asserts that conduct undertaken for the purposes of expanding into a new market cannot subject a plaintiff to antitrust scrutiny. Mot. 32 (citing *Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*, 2020 WL 58247, at *3 (S.D.N.Y. Jan. 6, 2020)). But that is not what *Apotex* says; it says that "expanding into a new market to compete on the basis of increased efficiency" cannot be the basis of antitrust claim. 2020 WL 58247, at *3. In *Apotex*, plaintiff's allegations revealed that defendants' conduct was undertaken for a legitimate purpose. *Id.* That is a far cry from this case.

[22] Fanatics attempts to contort the standard applied here by implying the Department of Justice declines to bring vertical merger cases and stating that the two cases it brought recently were unsuccessful. Mot. 35 n.18. These are red herrings; the cases Fanatics cites were decided at the *trial* stage, not on motions to dismiss. *See United States v. AT & T Inc.*, 310 F. Supp. 3d 161, 163 (D.D.C. 2018) (bench trial); *United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 123 (D.D.C. 2022) (same).

These allegations are enough to allege harm to competition for purposes of Section 7. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 711 (4th Cir. 2021) (violation where merger decreased access to supply). Section 7 plaintiffs may show harm to competition by alleging that a vertical acquisition such as this one provides the merged firm the "ability and the incentive to foreclose its rivals, either from sources of supply or from distribution outlets." *Illumina, Inc. v. F.T.C.*, 44 F.4th 1036, 1051 (5th Cir. 2023); *see also United States v. Northrop Grumman Corp.*, 2003 WL 21659404, at *15–*16 (D.D.C. June 10, 2003). Fanatics not only has the ability and incentive to foreclose Panini, it has done so—Fanatics has already accomplished foreclosing Panini "from sources of supply."

Panini's allegations about Fanatics' buying GCP are also sufficient to show antitrust injury for its Section 7 claim. Panini alleges that Fanatics acquired GCP to drive Panini out of the Relevant Market by denying it access to essential inputs. ¶ 138. GCP is one of the only manufacturers able to meet Panini's technological quality and capacity requirements. ¶ 122. And it is the only one that was "positioned to supply cards in the short term." *Id.* Fanatics has used its purchase of GCP to harm Panini and reduce competition by foreclosing Panini's access to manufacturing supply relative to Panini's requirements. ¶¶ 140–49. While Panini is working to arrange alternative suppliers for the future, this lack of supply has already harmed Panini by reducing its revenues and profits from what they would have been. And Fanatics has harmed competition by (i) denying consumers the product they otherwise would have received, (ii) reducing consumer choice, (iii) forcing licensors to have products on the market for fewer weeks, and (iv) reducing output below what it would have been but for Fanatics' interrupting Panini's supply. *See* ¶¶ 147–49, 228–29.

The "competitive significance of a vertical merger results primarily from the degree, if

any, to which it may increase barriers to entry into the market or reduce competition by (1) foreclosing competitors of the purchasing firm in the merger from access to a potential source of supply, or from access on competitive terms." *Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 673 (S.D.N.Y. 2002); *see also Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 2000 WL 264295, at *25 (S.D.N.Y. Mar. 9, 2000) (antitrust injury adequately alleged for § 7 claim when the plaintiff alleged that the merger enabled defendants to "further thwart Plaintiff's and other exhibitors' access to movies" and such restricted access "could potentially harm competition"); *Steves & Sons*, 988 F.3d at 711 (antitrust injury where merger hindered plaintiff's access to supply). Additionally, plaintiffs may show antitrust injury if the defendant intentionally deploys its enhanced market power to harm the plaintiff. *Id*. at 711. Here, Fanatics' acquisition of GCP not only increased barriers to entry, it foreclosed the only remaining competitor to Fanatics "from access to a potential source of supply, or from access on competitive terms," *Yankees*, 224 F. Supp. 2d at 673, and harmed consumers.

Fanatics argues (at 23) that any "delay in the release of some Panini cards" (a euphemism for a reduction in supply of 100 million units) because of Fanatics' acquisition affects only Panini. But an acquisition likely to reduce a competitor's supply of an essential input is a classic antitrust injury. This point is established by the lines of cases discussed and quoted in Part I. Targeted competitors are archetypical plaintiffs who routinely experience antitrust injury and are regarded to be the best enforcers of antitrust law in these settings. *See supra* Section I.[23]

---

[23] *See also R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 111 (2d Cir. 1989) (denying defendant summary judgment on § 7 claim where "following the merger Lipton would be likely to eliminate competition in that market by, inter alia, reducing [competitor's] access to supermarket shelf space for its products"); *Steves & Sons*, 988 F.3d at 711; *Six W. Retail Acquisition*, 2000 WL 264295, at *25. That Panini is a competitor of Fanatics makes this case different from the proposition invoked by Fanatics (at 23) that "*dealers or distributors* terminated in the aftermath" of an acquisition "do not have standing to assert claims ... for monopolization at the manufacturing level." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 123 (2d Cir. 2007) (emphasis added); *see also S.W.B. New England, Inc. v. R.A.B. Food Grp., LLC*, 2008 WL 540091, at *5–*6 (S.D.N.Y. Feb. 27, 2008) (same). Where a

**B.** **Fanatics' acquisition of Topps violated Section 7 and Panini sustained antitrust injury as a result.**

Fanatics' acquisition of Topps was anticompetitive and harmed Panini. It supplemented Fanatics' plan to eliminate all competition through exclusive deals of extremely long duration, unprecedented in the industry and longer than justified by any legitimate purpose. ¶ 105. Never before had any firm acquired all six of the licenses necessary to compete in the Relevant Market.

Fanatics argues that Panini fails to allege increased concentration in any Relevant Market. Mot. 33. The Complaint's allegations are enough to meet the requirements of Section 7. To begin with, Fanatics' buying Topps is suspect because "where the arrangement effects a horizontal merger between companies occupying the same product and geographic market, whatever competition previously may have existed in that market between the parties to the merger is eliminated." *Brown Shoe*, 370 U.S. at 335. To allege a Section 7 case for a horizontal merger, "once the relevant market has been established," as it has here, the merger violates Section 7 if it "would produce a firm controlling an undue percentage share of the relevant market and would result in a significant increase in the concentration of firms in that market." *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 35 (D.D.C. 2022) (quoting *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001)); *see also Bertelsmann*, 646 F. Supp. 3d at 37 (enjoining horizontal merger where merger would result in "a highly concentrated market dominated by four

---

competitor merges with a manufacturer, restraining a plaintiff competitor's supply is classic antitrust injury. *See Six W. Retail Acquisition*, 2000 WL 264295, at *22 (antitrust injury adequately alleged because merger restrained "Plaintiff's access to quality motion pictures and effectively, depriv[ed] Plaintiff of its ability to compete for first-run films"). The cases on which Fanatics relies (at 23) are distinguishable. *SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39 (1st Cir. 1995), involved an "incidentally connected plaintiff," *id.* at 45, whereas Panini, as explained above, is the most appropriate enforcer here. And the court recognized that "if the breach played a part in an antitrust violation, the conduct itself was an antitrust violation," *id.* at 44—exactly the case here due to the supply reduction. In *Orion Pictures Distrib. Corp. v. Syufy Enters.*, 829 F.2d 946 (9th Cir. 1987), damages were already fixed by contracts entered before the conspiracy occurred, *id.* at 948–49. By contrast, here, supply reduction occurred because of Fanatics' acquiring the GCP ownership interest, or, in other words, because of Fanatics' attempted monopolization. Supply reduction is a classic antitrust injury.

main players" with the merged company holding 49 percent share). "Such a showing establishes a 'presumption' that the merger will substantially lessen competition." *H.J. Heinz*, 246 F.3d at 715.

Fanatics' buying Topps eliminated Topps as its competitor and left Panini as the "only remaining significant competitor in the United States" to Fanatics in the Relevant Market. ¶ 224. Competition in the Relevant Market thus decreased from three firms to two, and "three is better than two." *Steves & Sons*, 988 F.3d at 723. These allegations show increased concentration and the opportunity and incentive to raise prices. *Id.*; *see also H.J. Heinz*, 246 F.3d at 725 ("The creation of a durable duopoly affords both the opportunity and incentive for both firms to coordinate to increase prices."). Because of the Topps acquisition and Fanatics' other anticompetitive conduct, Fanatics has boosted its short-term market power, which is cemented further by its other actions to undermine Panini immediately. ¶ 108.

Determining concentration in a market is a "deeply fact-intensive inquiry." *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001). So it is "better suited for summary judgment" than the pleading stage. *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *2 n.1 (S.D.N.Y. Sept. 8, 2021). Fanatics' cited cases (at 33–34) were decided on the accuracy of market-share trial evidence, challenged a merger in a market with easy entry (also established at trial), or failed because the plaintiff did not allege facts to support "conclusory" allegations of market changes following the merger. [24]

Finally, Fanatics asserts that Panini "did essentially the same thing a little over a decade prior" by buying the assets of Donruss. Mot. 24 n.11. That assertion is factually incorrect, s*ee*

---

[24] *See In re AMR Corp.*, 2023 WL 2563897, at *1, *4 (2d Cir. Mar. 20, 2023) (affirming bench trial decision); *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 983 (2d Cir. 1984) ("*Turning to the evidence in this case*, we believe that entry … by new firms or by existing firms … is so easy that any anti-competitive impact of the merger before us would be eliminated more quickly by such competition than by litigation." (emphasis added)). The present case is completely different. ¶¶ 70–72, 220 (markets here characterized by barriers to entry). *See also Camaisa v. Pharm. Rsch. Assocs., Inc.*, 2022 WL 843653, at *7 (D. Del. Mar. 22, 2022) ("Camaisa alleges in a conclusory fashion that the acquisition of Parallel 6 by PRA has anticompetitive effects.").

*supra* at Background § 2, and legally irrelevant. Whether a plaintiff was "previously involved in a scheme that they now claim is anticompetitive" is not relevant to the antitrust injury analysis. *Nostalgic Partners, LLC v. Off. of Comm'r of Baseball*, 637 F. Supp. 3d 45, 50 (S.D.N.Y. 2022); *see also Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968) ("We therefore hold that the doctrine of in pari delicto, with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action."); *IQ Dental*, 924 F.3d at 64 ("Regardless of how [plaintiff] entered the market, once [plaintiff] was in the market it had a right to do business in a market undistorted by unlawful anticompetitive conduct.").

Panini's allegations also state an antitrust injury from Fanatics' buying Topps. A merger that eliminates "the independent existence of a major competitor" causes antitrust injury. *Consol. Gold Fields*, 871 F.2d at 258; *see also Procter & Gamble*, 386 U.S. at 578 ("the substitution of the powerful acquiring firm for the smaller, but already dominant, firm may substantially reduce the competitive structure of the industry by raising entry barriers and by dissuading the smaller firms from aggressively competing"). So, too, does one that "weaken[s] the competitive pressures on [the defendant] to provide good customer service." *Steves & Sons*, 988 F.3d at 711. Fanatics' buying Topps had both these effects. It harmed Panini and the public by raising barriers to entry, eliminating one critical way that a new entrant might gain a foothold into the Relevant Market, and thus foreclosing competition. ¶¶ 270–71. It also weakened the pressures on it to serve trading-card customers well—as has been shown by the poor quality of its trading-card offerings. ¶¶ 85–94.

Fanatics is wrong that the market foreclosure resulting from its Topps purchase "does not 'flow[] from' the Topps acquisition" because "Panini's core complaint is about Fanatics' future licenses with the MLB, NFL, NBA, and their respective PAs." Mot. 34 (quoting *Brunswick*, 429

U.S. at 489). The Topps purchase builds on the unlawfully long licenses and Fanatics' other anticompetitive conduct to perpetuate Fanatics' monopoly scheme. It helped Fanatics shore up its market power and foreclose all competition for the next two decades. By acquiring Topps, Fanatics boosted barriers to entry so that it could eliminate all other competition in the Relevant Market.

Further, Fanatics is wrong in asserting (at 24) that its buying Topps "did not change the future competitive landscape in the" Relevant Market. Acquiring Topps was integral to Fanatics' scheme to eliminate all other competition in the Relevant Market; first by acquiring Topps and then trying to drive Panini out of business, Fanatics' only remaining competitor. *E.g.*, ¶¶ 224, 270. Such foreclosure changes "the future competitive landscape in the" Relevant Market and caused antitrust injury by raising barriers to entry. *See Procter & Gamble*, 386 U.S. at 578.

## IV.    Panini adequately pleads that Fanatics has violated State tort law.

The rest of the Complaint properly asserts that many of Fanatics' actions—on top of being part of its monopolization scheme in violation of the antitrust laws (*see supra* Section II.D)—also independently raise several state-law claims for tortious conduct. Fanatics' Motion argues under New York law.[25] Without conceding New York law's application, Fanatics' arguments fail.

### A.    Fanatics tortiously interfered with Panini's contracts.

Panini alleges that Fanatics tortiously interfered with Panini's contracts with licensors (NFLPA and WWE), its critical manufacturer (GCP), and its employees. ¶¶ 121–62, 179–93, 275–81. Fanatics wrongly argues this claim should be dismissed because Panini has failed to plausibly

---

[25] The law of other jurisdictions, including Texas or Florida, could apply to Panini's State-law claims. But to resolve the present motion, the Court need not make a choice-of-law determination at this stage because the pleading requirements for each claim under Texas, New York, and Florida law are substantively the same. *See El Paso Healthcare Sys., Ltd. v. Murph*y, 518 S.W.3d 412, 420 (Tex. 2017), and *Burger King Corp. v. Ashland Equities, Inc*., 161 F. Supp. 2d 1331, 1336 (S.D. Fla. 2001) (tortious interference with contract); *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013), and *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla. 1994) (tortious interference with prospective business); *In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015) and *Jews For Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008) (defamation).

allege that Fanatics procured breaches of these agreements. Mot. 36–37. *First*, as to NFLPA and WWE, Fanatics wrongly asserts that each had a "legitimate, legal basis to terminate" its contracts with Panini, foreclosing any claim for tortious interference. Mot. 37. Panini, however, specifically alleges the opposite and therefore this disputed issue cannot be resolved on a motion to dismiss. ¶¶ 183, 191.

Fanatics also argues that its inducing breaches of the NFLPA and WWE agreements rest on "pure speculation." Mot. 26. But Panini describes how Fanatics provided Leagues and players associations equity to induce them to acquiesce in Fanatics' monopolization scheme, including by improperly seeking to persuade them to terminate Panini's license agreements early. ¶¶ 8, 111, 181. Panini also describes how the Fanatics-NFLPA agreement includes a springing provision that accelerates so that Fanatics becomes the licensee if NFLPA prematurely terminates its agreement with Panini. ¶ 180. These allegations logically and plausibly suggest that the coordinated purported terminations of the NFLPA and WWE contracts were not just a coincidence, but the fruits of Fanatics' efforts to cause its League and players associations partners to end their contacts with Panini early. *See Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1137 (S.D.N.Y. 1996) (defendant's efforts to cause a "programmed divorce" between the plaintiff and a third party that "weaken[ed] the image and credibility of [plaintiff]" sufficiently alleged defendant "either knew that its actions were certain or substantially certain to induce a breach ... or acted with the primary purpose of inducing a breach").

*Second*, as to GCP, Fanatics is wrong to suggest that intent and knowledge to procure a breach must be pleaded with particularity for a tortious-interference claim.[26] Even when pleading

---

[26] Fanatics cites (at 37–38) a single decision, *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 2013 WL 1500333 (S.D.N.Y. Apr. 12, 2013), for the contrary proposition. The magistrate judge did suggest that the plaintiff in that case failed to plead knowledge of a specific contractual provision, but also recognized that all that must be pleaded is

fraud subject to Rule 9(b)'s heightened pleading standards, intent and knowledge may be pleaded generally. *Michael Grecco Prods., Inc. v. Alamy, Inc*., 372 F. Supp. 3d 131, 139 (E.D.N.Y. 2019). And, for tortious-interference claims, a plaintiff need not plead "that the defendant had perfect or precise knowledge of the terms and conditions of the contracts in issue," only knowledge "of the *existence* of the contract." *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 775 (S.D.N.Y. 1990); *see also Oddo Asset Mgt. v. Barclays Bank PLC*, 973 N.E.2d 735, 742 (N.Y. 2012); *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 450 (N.Y. 1980).

At any rate, Panini alleges facts supporting the inference that Fanatics knew the contractual change-in-control provision in the GCP contract at issue. ¶¶ 133–34. Contrary to Fanatics' suggestion, Mot. 38, the Complaint contains ample basis to conclude that Fanatics' alleged interference with the GCP contract was improper. *See, e.g.*, ¶¶ 121–22, 138–40 (Fanatics' wrongful conduct relating to GCP was to "undermine Panini's ability to perform even in the short run" and "weaken Panini and to hasten Panini's exit from the Relevant Markets"). It is inconceivable that Fanatics, a sophisticated business, acquired a controlling stake in a firm that was almost entirely devoted to servicing Panini without knowing the contractual arrangement with Panini. This was not merely *a* contract but *the* contract for most of the business activity of the firm Fanatics was buying. ¶ 135. It is plausible (and nearly certain) that Fanatics had the requisite knowledge.

*Third*, as to Panini's contractual relationships with its employees, again, Panini needs only to plead "knowledge of the contract" itself. *Oddo Asset Mgt.*, 973 N.E.2d at 742. And again, in any event, the Complaint "sufficiently set[s] forth facts to plausibly suggest," *N. Shipping Funds*, 2013 WL 1500333, at *4, Fanatics' knowledge of the governing nondisclosure agreement and non-

---

knowledge of the "specific contract," *id.* at *4, consistent with binding New York Court of Appeals decisions like *Oddo Asset Mgt. v. Barclays Bank PLC*, 973 N.E.2d 735 (N.Y. 2012), that hold the pleading burden is knowledge of the contract itself. *Id.* at 742.

solicitation provision. ¶¶ 153–54. It explains how Panini's employee contracts require its employees to notify prospective employers like Fanatics of the terms and conditions of their nondisclosure agreement, which includes a non-solicitation provision, before accepting a job with Fanatics. *Id.* Panini also expressly alleges that employees "stole Panini's trade secrets and helped Fanatics recruit other employees" "[w]ith the aid and encouragement of Fanatics," ¶ 160, induced by Fanatics "offering compensation packages at levels that make economic sense only as part of a plan to force Panini out of" key business lines, ¶ 159. Fanatics' suggestion that it lacks enough notice of the trade secrets at issue (Mot. 38)—even though they are the subject of active litigation in Texas (in which the court has ordered preliminary relief in Panini's favor)—is unavailing. In all events, that suggestion creates a burden that does not exist at this stage of the case.

None of the cases that Fanatics cites (at 38) require that a plaintiff identify the specific stolen trade secrets to state a tortious interference claim. Instead, those cases implied this obligation when the plaintiff pleads "trade secret misappropriation under the DTSA," which is not the cause of action here. *Redcell Corp. v. A.J. Trucco, Inc.*, 2022 WL 683007, at *7 (S.D.N.Y. Mar. 8, 2022); *see also Medidata Sols., Inc., v. Veeva Sys. Inc*., 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018).

*Finally*, contrary to Fanatics' argument (Mot. 37), Panini has standing, as a third-party beneficiary, ¶ 188, to sue for interference with its parent company's contracts with GCP and WWE. *See In re Joe's Friendly Serv. & Son, Inc.*, 2019 WL 1313519, at *20 (Bankr. E.D.N.Y Mar. 21, 2019). In any event, Panini's parent, Panini S.p.A., is prepared to assert these claims if necessary.

## B.    Fanatics tortiously interfered with Panini's prospective business relationships.

Fanatics also has tortiously interfered with Panini's prospective business, including with the Leagues, players associations, GCP, its employees and former employees, other business partners like WWE, and star, rookie players. ¶¶ 282–88. Fanatics' attacks on the adequacy of this

claim are baseless. They assume that Panini was required to plead that Fanatics' sole purpose in interfering with Panini's business relationships was to inflict intentional harm. Mot. 38. But as Fanatics' own case law shows, *id.* (citing *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (N.Y. 2004)), this requirement exists only if the defendants' conduct does not amount to an independent tort. Here, the anticompetitive conduct that is the basis of Count VII includes Fanatics' alleged defamatory statements. ¶¶ 170–75. At any rate, even assuming the issue were relevant, the question of whether Fanatics has an "economic interest justification defense" that contradicts the "solely to inflict harm" standard is "an *affirmative defense* to a tortious interference claim, rather than an element to be pled." *Ithaca Capital Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 372–73 (S.D.N.Y. 2020) (emphasis added). It is not a basis for dismissal on the pleadings.

Fanatics also wrongly argues that Panini failed to plead that "but for" Fanatics' conduct it would have successfully realized certain additional business. Mot. 39. Courts find but-for causation satisfied when it is "reasonable to infer" from the allegations that the defendant's actions induced the breach. *See Sidney Frank Importing Co. v. Beam Inc*., 998 F. Supp. 2d 193, 214 (S.D.N.Y. 2014) ("reasonable to infer from the FAC that [defendant]'s alleged misrepresentations of [plaintiff's] viability ... convinced these distributors to cease distribution."). Here, Panini's lengthy allegations of systematic, substantial, and multifarious wrongful conduct by Fanatics alleged in the Complaint are enough to give rise to an inference at the pleadings stage that this conduct was the but for cause of lost business by Panini.

### C.    Fanatics has defamed Panini.

Fanatics has defamed and disparaged Panini's business reputation and goodwill by falsely disseminating defamatory, derogatory statements to third parties such as players, player agents, player representatives, players associations, and Panini employees and former Panini employees. ¶ 290. Both of Fanatics' arguments on this claim lack merit. *First*, Fanatics is wrong to suggest

that Panini does not allege "the most basic details" of its defamation claims. Mot. 39. Panini alleges the nature of the statements made, ¶ 170; the class of persons to whom they were published, ¶¶ 170, 172–74; and the approximate dates that the statements were disseminated, ¶¶ 170, 172. For example, Panini recounts how Fanatics told athletes' agents that "Panini was now 'dead.'" ¶ 9. Indeed, Fanatics' own argument recognizes that Panini's defamation claim involves allegations relating to "players, players agents" and others "in or around April 2023" that "Panini is incapable of performing for them, will be out of business soon," and the like. Mot. 39. These allegations are "specific enough to afford" Fanatics "sufficient notice of the communications complained of to enable" Fanatics "to defend" itself. *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012).

*Second*, contrary to Fanatics' suggestion, Panini alleges facts that, if true, give rise to a plausible inference that Fanatics acted with enough fault when it disseminated the statements here. Mot. 40. The Complaint brims with allegations of an elaborately manufactured scheme by Fanatics to destroy competition for the production and sale of trading cards in certain markets along with further specific allegations of Fanatics' intentional plan to disparage Panini as part of this wrongful scheme. ¶¶ 170–75, 291–93. These allegations are enough to survive a motion to dismiss. *See Moraes v. White*, 571 F. Supp. 3d 77, 99 (S.D.N.Y. 2021). If, as its motion suggests, Mot. 40, Fanatics wants to claim its statements were non-defamatory because Panini was in fact non-viable when the statements were made, this is a fact question that cannot justify dismissal now.

## CONCLUSION

The Motion to Dismiss should be denied.

January 12, 2024

Respectfully submitted,

/s/ David Boies

Stuart H. Singer*
Sabria A. McElroy*
Jason Hilborn*
**Boies Schiller Flexner LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
(954) 356-0011
ssinger@bsfllp.com
smcelroy@bsfllp.com
jhilborn@bsfllp.com

David Boies
Eric Brenner
**Boies Schiller Flexner LLP**
55 Hudson Yards
New York, NY 10001
(212) 446-2300
dboies@bsfllp.com
ebrenner@bsfllp.com

Ursula Ungaro*
**Boies Schiller Flexner LLP**
100 SE 2nd Street, Suite 2800
(305) 539-8400
Miami, FL 33131
uungaro@bsfllp.com

James P. Denvir*
Richard A. Feinstein*
**Boies Schiller Flexner LLP**
1401 New York Ave, NW
Washington, DC 20005
(202) 237-2727
jdenvir@bsfllp.com
rfeinstein@bsfllp.com

*Counsel for Panini America, Inc.*

*Admitted pro hac vice*

41