November 22, 2024

**Via ECF**

The Honorable Valerie Figueredo
United States District Court Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

**Re: *Panini America, Inc. v. Fanatics, Inc. et al.*, Case No. 1:23-cv-09714-LTS (S.D.N.Y. 2023); *Fanatics Collectibles TopCo, Inc. v. Panini S.p.A.*, Case No. 1:23-cv-06895-LTS (S.D.N.Y 2023)**

Dear Judge Figueredo:

We write on behalf of the Panini entities ("Panini") in the above-referenced matters in response to the Fanatics entities' ("Fanatics") continued efforts to resist production of six license agreements (the "License Agreements") that (i) can be readily collected and provided by Fanatics without any burden, (ii) are undisputedly at the crux of Panini's case, and (iii) will be governed by heightened confidentiality designations proposed by Fanatics itself to protect precisely these materials. Production of these License Agreements now will ensure this case can proceed expeditiously, as Fanatics' November 15, 2024, letter (ECF No. 129[1] (the "Fanatics Ltr.")) effectively concedes. Fanatics' contrary arguments assume a discovery stay is justified, a position the Court already considered and rejected in allowing an incremental approach to disclosures while the parties' motions to dismiss are pending. Under this approach, the Court has required Fanatics to produce basic organizational information. Fanatics also told the Court it was "willing to discuss other types of discovery that will move this case forward more quickly in the event that the motion to dismiss is denied." ECF No. 126 (11/7/24 Tr.) at 24:17-20. There is no justification for treating the License Agreements any differently.

*First*, there is no basis to Fanatics' attempt to revisit the question of whether discovery in this matter should effectively be shut down. Fanatics made the same discovery stay arguments at the very first conference before the Court on September 23. *See* ECF No. 123 (9/23/24 Tr.) at 9:14-18 (arguing that "the overwhelming trend . . . in antitrust cases in the Southern District of New York is to stay discovery given the burdens associated and the difficulties in establishing viable antitrust claims"). Fanatics then offered these same arguments again in its submission in advance of the November 7 conference with the Court and at the November 7 conference itself. *See* ECF No. 120 at 4 (Fanatics, in parties' joint letter to the Court, citing *Tera Grp., Inc. v. Citigroup, Inc.*, No. 24-135-CV, 2024 WL 4501967 (2d Cir. Oct. 16, 2024) to argue "courts often stay all substantive discovery in antitrust cases pending decisions on motions to dismiss"); ECF No. 126 (11/7/24 Tr.) at 19:16-18 (Fanatics counsel again citing *Tera*). And Fanatics' November 15 letter now asserts these same stay arguments, relying on the same case law, for a

[1] ECF references are to *Panini America, Inc. v. Fanatics, Inc.*, No. 23-cv-09714-LTS-VF.

third time. Fanatics Ltr. at 1 (again citing *Tera* to argue the "prevailing trend in antitrust cases is to stay discovery pending motions to dismiss").

The Court, however, has recognized that "the filing of a motion to dismiss is not really itself a reason or good cause for a stay of discovery." ECF No. 123 (9/23/24 Tr.) at 12:12-14. Accordingly, at the September 23 conference, the Court permitted discovery to move forward, *id.* at 12:6-20, 14:8-11, recognizing that "there's a scenario in which the motion to dismiss decision doesn't eliminate all the claims, and so [the parties are] going to have to engage in discovery in any case," *id.* at 12:14-17.

Fanatics cites authorities concerned with the expense of discovery in antitrust cases. But the specific discovery at issue is six agreements that Fanatics already has in hand and would not require costly (or any) document collection or review. Indeed, a targeted production of these six documents is ***less*** than the limited discovery authorized in the *Netflix* opinion on which Fanatics relies. *In re Netflix Antitrust Litig.*, 506 F. Supp. 2d 308, 321 (N.D. Cal. 2007) (ordering disclosure of "all documents summarizing, describing, referring to or constituting written or oral communications between Netflix (or a representative), on one hand, and Wal–Mart or Amazon (or a representative), on the other hand, on the subject of the patents in suit (or either or them) from the date of issuance of the patents in suit (or either or them) to the filing of the complaint in this action"). Moreover, here, there is especially no risk of discovery getting out of control when the Court will manage discovery on a "month-to-month basis" precisely to "alleviate" the "concern from Fanatics about burden." ECF No. 123 (9/23/24 Tr.) at 12:17-19.

*Second*, Fanatics' attempt to justify withholding the License Agreements by trying to minimize their significance is disingenuous. As the Court is aware, these license agreements are between Fanatics and the NFL, the NBA, the MLB, and each league's respective players association. The gravamen of Panini's Complaint is that:

> Fanatics's anticompetitive, monopolistic acts, in undermining Panini's (and others) presence in the marketplace, have the purpose and effect of destroying competition in and for the market for the production and sale of Major U.S. Professional Sports Leagues trading cards, both immediately and for the long term. Competition "for" the market through bidding on licenses with the Leagues and players associations would normally take place every handful of years. Fanatics has ended that form of competition. ***By entering into licensing agreements of unprecedented length and scope, including with all major sports leagues,*** combined with its other Anticompetitive Conduct, ***Fanatics has created insurmountable barriers to entry to competition "for the market."***

ECF No. 69 ("Compl.") ¶ 12 (emphasis added). In short, while the interlocking, long-term nature of the License Agreements is not the only Anticompetitive Conduct alleged in the Complaint, it is unquestionably central.

Fanatics now contends that most of Panini's claims "indisputably have absolutely nothing to do with the license agreements." Fanatics Ltr. at 2. But Fanatics previously sought to transfer Panini's case from the Middle District of Florida to the Southern District of New York on the ground that "the crux of Panini's case" is Fanatics' six long-term license agreements and "the majority" of those licenses are with entities located in this judicial district. ECF No. 24 at 4, 15. In granting Fanatics' transfer motion, Judge Mizelle in turn cited the fact that "many of the

factual allegations occurred in the Southern District of New York where Fanatics negotiated the licenses with the leagues and players associations" and thus "many of the key witnesses reside there." ECF No. 75 at 8. Given that both parties recognize the License Agreements are at the "crux" of the case, Fanatics' attempt to parse precisely how much these license agreements bear on each of Panini's causes of actions is irrelevant. At a minimum, the License Agreements relate not only to Count III but are at the heart of the monopolization and attempt to monopolize claims (Counts I and II) and Section 7 claims.[2]

*Third*, Fanatics' claim that there is no "compelling need for immediate discovery" of the License Agreements is wrong and contradicts its own arguments elsewhere in its November 15 letter. Fanatics emphasizes that many of the licenses "require prior notice and/or written consent before disclosure." Fanatics Ltr. at 4. Thus, according to Fanatics, "if this Court were to order the production of the license agreements, Fanatics would be required to alert the third party licensors, who then might petition the Court for additional protections" or "move to quash the production." Fanatics Ltr. at 4 n.2. The risk of such protracted litigation, and the corresponding delay in any actual production of the most core documents in the case, is, of course, precisely what justifies starting the production process ***now***. The alternative—waiting for the District Court to decide the motions to dismiss and for formal discovery to begin before third party objections or concerns are heard—invites inefficiencies and disruption.

*Fourth*, there is no genuine prejudice that Fanatics will face if the License Agreements are produced now. Fanatics does not dispute that if Panini's antitrust claims proceed, these materials will be part of discovery. And, as the Court is aware from the November 7 conference, the parties have agreed to a protective order with a special Outside Counsel Eye's Only ("OCEO") designation that was suggested by Fanatics to ensure appropriate protection for precisely these agreements. There can be no serious argument that these confidentiality restrictions will be sufficient to protect Fanatics later in the case but somehow insufficient now, before a motion to dismiss is decided.

Fanatics claims it has a "reasonable concern that, even if Panini's businesspeople do not directly see or learn of the specific terms in Fanatics' agreements with third parties, Panini's positions in future negotiations would reflect knowledge of or otherwise benefit from its counsel's awareness of Fanatics' terms." Fanatics Ltr. at 4. This argument is wrong on multiple grounds. To start, Fanatics effectively assumes BSF, as Panini's outside litigation counsel, will breach the terms of the Protective Order, which expressly provides that OCEO material "shall not be disclosed, summarized, described, characterized, or otherwise communicated to" Panini's business people. To be clear and lest there be any doubt, BSF will respect this restriction.

Fanatics wrongly attempts to cast doubt on this point by citing the existence of a dispute earlier this year involving GCP, an entity that prints Panini trading cards and is also implicated by Panini's claims in the Complaint. Fanatics' November 15 letter contends that, in June 2024, BSF partner Stuart Singer "interjected himself into commercial negotiations between Panini and Fanatics over GCP print program specifications and pricing." Fanatics Ltr. at 4. But Mr. Singer

[2] Fanatics' parsing of Panini's causes of actions is also wrong. The Complaint is express that the "coercive, unfair, and anticompetitive conduct" targeted in Panini's Section 7 and state law claims "were themselves facilitated by Fanatics's long-term, exclusive-dealing arrangements," *i.e.*, the License Agreements. Compl. ¶¶ 115, 117.

BSF

was involved because GCP was seeking to impose conditions that violated the production services agreement it had with Panini. Mr. Singer's letter to GCP detailed those breaches while reserving Panini's right to recover for any losses Panini suffered. It was and is perfectly appropriate for BSF, as Panini's litigation counsel, to address these issues regarding a contractual dispute. And, in any event, GCP is not a Fanatics licensee, and Panini's dispute with GCP had nothing to do with the terms of any of the License Agreements nor with any of the licensors with which Fanatics competes on terms with Panini.

Fanatics speculates that producing the License Agreements could cause it harm because "Fanatics and Panini are constantly negotiating license agreements with various third party leagues and players associations." Fanatics Ltr. at 3 n.1. To be clear, Fanatics does not contend that disclosure of the terms of the License Agreements now will somehow prejudice Fanatics in future renewal negotiations of these specific agreements, which will not be up for renewal for ten or twenty years. Instead, Fanatics argues that producing the License Agreements would supposedly "erode[] the competitiveness" of ***other*** negotiations with ***other*** entities. *Id.* Fanatics, however, does not name a single such upcoming negotiation where it contends these supposed competitive concerns could be in play. Nor does Fanatics even try to explain how the economic terms of Fanatics' licenses with the three preeminent U.S. sports leagues and their players associations would be relevant to negotiations with other, decidedly different, entities. More fundamentally, Fanatics' entire argument assumes (i) BSF would be involved in these hypothetical license negotiations with these hypothetical other entities, and (ii) if BSF somehow was involved, it would ignore the clear restrictions on the use of OCEO information in the Protective Order. Again, BSF is not going to breach a court order governing the use of the License Agreements in connection with hypothetical negotiations or anything else. It follows that there is no reasonable basis to speculate that Panini's position in hypothetical future negotiations will benefit from BSF's "awareness of Fanatics' terms." Fanatics Ltr. at 4.

*Finally*, in again seeking to justify a stay that would prevent discovery of the License Agreements, Fanatics argues that the Court should consider the merits of its motion to dismiss pending before Judge Swain. Fanatics Ltr. 2-3 (contending its motion presents "substantial arguments for dismissal"). As noted, however, the Court has already stated that Fanatics' motion to dismiss is not good cause for a stay of discovery here. ECF No. 123 (9/23/24 Tr.) at 12:12-14. Regardless, Panini welcomes the Court's review of the full motion to dismiss briefing, which shows, among other things, that Fanatics' lead dismissal argument (standing) not only avoids the substantive merits of Panini's Complaint, but ignores decades of caselaw, including Supreme Court cases, recognizing that claims like Panini's are cognizable.

Moreover, even under Fanatics' caselaw, the merits of its motion to dismiss are just one consideration in a multi-factor analysis that also incorporates (i) the breadth of the discovery Panini seeks and the burden on Fanatics of responding to it, and (ii) the risk of unfair prejudice to Panini. Fanatics Ltr. at 2 (citing *N.Y. by James v. Pa. Higher Educ. Assistance Agency*, 2020 WL 605944, at *1 (S.D.N.Y. Feb. 7, 2020)). For all the reasons shown, here, the breadth of the discovery at issue could not be more targeted (just six agreements); the burden of producing these agreements could not be lower (none); and the risk of unfair prejudice is effectively undisputed, given that Fanatics concedes the License Agreements are the "crux" of Panini's case and has itself noted that the production of these materials will require prior notice to third parties

who may well object. The corresponding likelihood of delays is precisely the kind of unfair prejudice that can be avoided if Fanatics produces the License Agreements now.

Respectfully submitted,

*/s/ David Boies*
David Boies

cc: All Counsel of Record (by ECF)