UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PANINI AMERICA, INC.,

                            Plaintiff,

        -against-                                          23-CV-9714-LTS-VF

FANATICS, INC., et al.,

                            Defendants.

---

<u>Memorandum Order</u>

Panini America, Inc. ("Panini") brings this action against Fanatics, Inc., Fanatics, LLC, Fanatics Collectibles Intermediate Holdco, Inc., Fanatics SPV, LCC, and Fanatics Holdings, Inc. (together, "Fanatics" or "Defendants") asserting antitrust claims under provisions of the Sherman Act, 15 U.S.C. §§ 1-2, and the Clayton Act, 15 U.S.C. § 18, and common law claims of defamation, tortious interference with contract, and tortious interference with prospective and current business relations. (Docket entry no. 69 (the "Amended Complaint" or "AC").) The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. sections 1331 and 1367.

Before the Court is Defendants' motion pursuant to Rule 12(b) of the Federal Rules of Civil Procedure to dismiss Counts I-III and V of the AC for lack of subject matter jurisdiction and all counts of the AC for failure to state a claim upon which relief can be granted. (Docket entry no. 99 (the "MTD").) Also pending is Defendants' Rule 72 Objection to Magistrate Judge Figueredo's December 12, 2024 oral order pertaining to certain discovery disputes. (Docket entry no. 146 ("Def. R. 72 Mem.").) The Court has considered the Parties' submissions carefully. For the following reasons, Defendants' MTD is granted in part and denied in part. Defendants' Rule 72 Objection is overruled as moot.

BACKGROUND

Unless otherwise indicated, the following allegations are taken from the Amended Complaint, all well-pleaded factual content of which is presumed true for purposes of this motion practice.

This case primarily concerns alleged restraint of trade in the overall market for "major U.S. professional sports league trading cards," which include mass market and premium trading cards for the National Football League ("NFL"), the National Basketball Association ("NBA") and Major League Baseball ("MLB") (the "Relevant Market"). (AC ¶¶ 42, 67.) To produce trading cards sold in the Relevant Market, manufacturers must acquire one or more of six pertinent licenses (the "Relevant Licenses") — a license from each of the three leagues, and a license from each league's players association[1] (collectively, the "Relevant Licensors").[2] (Id. ¶ 68.) To produce a desirable trading card for a particular sport, sellers must combine licenses from the league itself and the relevant players association. (Id. ¶ 168.)

Panini is the American subsidiary of an Italian-owned corporation, Panini S.p.A., which began operating in the U.S. sports trading card industry in 2009 after it acquired Donruss Playoff, L.P., an American trading card company. (Id. ¶¶ 76-77.) Over the past fifteen years,

---

[1]     The Amended Complaint alleges that "each players association for each League — through a group-licensing agreement with its own member-athletes — generally controls the group licensing of the intellectual property of its members and each of the players associations' members agree to significantly restrict their ability to enter into individual licenses." (AC ¶ 35.) The respective players associations do not hold the intellectual property for any League marks, logos, team names, team uniforms, or color combinations. (Id. ¶ 36.)

[2]     Fanatics does not seek a ruling with respect to Panini's definition of the Relevant Market in this motion practice. (See docket entry no. 100 ("Def. Mem.") at 7 n.5.) Therefore, this definition is presumed accurate for the purposes of this motion.

Panini has owned various licenses within the Relevant Market, largely for terms of fewer than five years, and it has never held more than four relevant licenses on an exclusive basis simultaneously.  (Id. ¶¶ 76-79, 96-98.)  Panini currently holds exclusive licenses from the NFL (through March 2026), the NFL Players Association ("NFLPA") (through February 2026), and the NBA (through September 2025), and Panini also holds a license from the NBA Players Association ("NBPA") through September 2025.[3]  (Id. ¶ 98.)  Panini's current license with the NFLPA is the longest exclusive contract it has secured, for a term of ten years.  (Id. ¶ 97.)

　　　　Fanatics is a new entrant into the Relevant Market.  Prior to August 2021, Fanatics had no licenses to produce goods sold in the Relevant Market.  (Id. ¶¶ 110, 118.)  In August 2021, Fanatics announced that it had secured deals for exclusive licenses with five out of six of the Relevant Licensors for terms beginning in 2025 and 2026.  (Id. ¶ 102.)  Two deals were for a minimum of ten years (NBA and NBPA), and three were for twenty years (NFLPA, MLB, and the Major League Baseball Players Association ("MLBPA")).  (Id. ¶¶ 103-104.)  Shortly after announcing the first five deals, Fanatics also acquired a twenty-year exclusive deal with the last remaining Relevant Licensor, the NFL.  (Id. ¶ 102.)  As a result, starting in 2026, Fanatics will control 100% of the Relevant Market for a term of at least ten years.  (Id. ¶¶ 104, 114.)  Panini alleges that Fanatics achieved these deals by giving the Relevant Licensors equity in Fanatics and "other considerations" premised on "monopoly profits" Fanatics would earn once it controlled the Relevant Market.  (Id. ¶ 111.)  The MLBPA and NFLPA have stated that their deals with Fanatics "never would have happened" if their two organizations had not "joined

---

[3]　　　　It is unclear whether the NBPA license is exclusive or nonexclusive; Panini alleges that the "NBA Players Association recently interpreted [that license] as nonexclusive rather than exclusive."  (AC ¶ 98.)

forces" to create OneTeam, which is a joint venture combining the intellectual property of both associations.  (Id. ¶ 112.)

On January 4, 2022, Fanatics announced that it had acquired Topps, a trading card producer that was, at the time, Panini's only other competitor in the Relevant Market. (Id. ¶¶ 118, 224.)  By acquiring Topps and its licenses, Fanatics gained an immediate exclusive license with the MLB that lasts until 2025 and a semi-exclusive license — shared with Panini — with the MLBPA that expired at the end of 2022.  (Id.)

In March 2022, Fanatics also acquired a controlling stake in GC Packaging, LLC ("GCP"), a high-tech custom manufacturer that previously produced over 90% of Panini's U.S. trading cards.  (Id. ¶¶ 121, 132.)  Panini is the third-party beneficiary of a service contract between Panini S.p.A. and GCP.  (Id. ¶ 132.)  Fanatics' acquisition of GCP was effectuated without giving notice to Panini S.p.A., in violation of a "change of control" provision in the Panini S.p.A.-GCP contract.  (Id. ¶ 133.)  Panini alleges that Fanatics did not buy GCP to meet any current economic need but, rather, to "weaken Panini and hasten Panini's exit from the Relevant Markets."  (Id. ¶ 138.)  Specifically, Panini alleges that, by controlling GCP, Fanatics gained control over the production of nearly all of Panini's trading cards and used that control to "turn off the GCP [printing] machines devoted to Panini," causing GCP to dramatically underperform its contractual obligations to Panini in 2022 and 2023.  (Id. ¶ 144.)  GCP's underperformance "caused an output shortfall of over 100 million packs of Panini trading cards . . . resulting in canceled orders and lost or reduced sales."  (Id. ¶ 147.)

Additionally, following the announcement of the deals that would allow it to control the Relevant Market in the future, Fanatics engaged in a real-time campaign to bully market participants by threatening to exclude them from the Relevant Market when Fanatics'

exclusive licenses begin if they did not comply with Fanatics' immediate demands.  Specifically, Fanatics: demanded that big box retailers provide Fanatics with better margins than before and required retailers to carry a "more limited line of trading card options — the ones belonging only to Fanatics (through Topps)" (id. ¶¶ 194-95); forced local trading card shops to set minimum price requirements and threatened to drop them (in the future) if these price terms were not heeded (id. ¶ 200); forbade local card shops from selling trading cards on business-to-business websites (id. ¶ 203); forced case breakers[4] to migrate their streaming platforms to "Fanatics Live" on "terms so draconian as to run their case-breaking business into the ground" (id. ¶ 205); and pressured "star, rookie players" to sign exclusive deals with Fanatics before Fanatics owned the licenses necessary to utilize those rights, all simply to harm Panini's business (id. ¶¶ 164-66).

Continuing this alleged campaign of anticompetitive conduct, around April 2023, Fanatics disseminated disparaging statements regarding Panini to various players, player associations, player agencies, and Panini's current and former employees.  (Id. ¶ 170.)  Fanatics' representatives allegedly told other market participants that Panini, inter alia, "[w]ould be unable to fulfill its contractual obligations to athletes, was going to go bankrupt, would lose its licenses with the NFL, NFLPA, NBA, and NBPA by June 2023 . . . will be out of business soon, [and] lacks the money to pay [contractual obligations]."  (Id. ¶¶ 170-72.)  Additionally, on or about April 4, 2023, Fanatics used "unlawful means" to lure away thirty-six former Panini employees by threatening to exclude them from the market once Fanatics' licenses began and by offering those employees compensation packages that "only made economic sense as part of a plan to force Panini out of the business."  (Id. ¶¶ 156-59.)  Panini alleges that these hires exceeded

---

[4]    "Case breakers" are video streamers who purchase new packets of trading cards for the purposes of opening them live over the internet.  Viewers pay to watch case breakers stream.

Fanatics' actual staffing needs because most of Fanatics' licenses would not begin until 2025. (Id. ¶ 161.) Panini further alleges that Fanatics induced these employees to breach non-solicitation and nondisclosure provisions of their employment contracts. (Id. ¶¶ 153, 160.)

In May 2023, Fanatics "cut off" Panini from submitting new orders for jerseys, which terminated a multi-year business relationship between the parties. (Id. ¶¶ 176-78.) In August 2023, two of Panini's then-current licensors — the NFLPA and World Wrestling Entertainment ("WWE") — attempted to terminate their exclusive contracts with Panini early and did so just days apart. (Id. ¶¶ 181, 188, 190.) The NFLPA asserted that Fanatics' raid of Panini's employees justified its breach under a provision of the NFLPA-Panini contract that provided for early termination if "Panini suffers a material change in executive management." (Id. ¶ 182.) Although both early terminations are being disputed in arbitration,[5] if they are successful, Fanatics will benefit from accelerating the start of Fanatics' exclusive license with each organization. (Id. ¶¶ 181, 189.)

Panini filed this antitrust action in the Middle District of Florida on August 3, 2023. (Docket entry no. 1.) On October 31, 2023, this action was transferred to the Southern District of New York pursuant to 28 U.S.C. § 1404(a). (Docket entry no. 75.) On May 3, 2024, this action was transferred to the undersigned.

---

[5]     On August 13, 2024, Panini informed the Court that, on July 30, 2024, the Final Arbitration Award concluded that the National Football League Players Incorporated ("NFLPI") invalidly purported to terminate the licensing agreement. (Docket entry no. 113.) Because Fanatics was not a party to those Arbitration proceedings, Fanatics has written to request the Court disregard the submission. (Docket entry no. 114.) The Court takes judicial notice of this update solely with respect to the outcome of the Arbitration proceedings and acknowledges that Fanatics is not bound in this litigation by any of the legal or factual conclusions expressed in the Final Arbitration Award.

<u>DISCUSSION</u>

Rule 12(b)(1) Motion

An action must be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate it.  Fed. R. Civ. P. 12(b)(1); <u>see</u> <u>also</u> <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000).  The party asserting subject matter jurisdiction has the burden of establishing by a preponderance of the evidence that jurisdiction exists.  <u>See</u> <u>Morrison v. Nat'l Australia Bank Ltd.</u>, 547 F.3d 167, 170 (2d Cir. 2008). When determining a motion to dismiss for a lack of subject matter jurisdiction, the Court must accept all factual allegations pleaded in the Complaint as true, <u>Nat. Res. Def. Council v. Johnson</u>, 461 F.3d 164, 171 (2d Cir. 2006), but the Court may also consider relevant materials beyond the pleadings.  <u>Makarova</u>, 201 F.3d at 113.  Plaintiff must show jurisdiction affirmatively; the Court will not draw argumentative inferences in Plaintiff's favor.  <u>APWU v. Potter</u>, 343 F.3d 619, 623 (2d Cir. 2003) (quoting <u>Shipping Fin. Servs. Corp. v. Drakos</u>, 140 F.3d 129, 131 (2d Cir. 1998)).

Article III of the Constitution of the United States restricts the jurisdiction of federal courts to actual cases or controversies.  <u>See</u> <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 338 (2016).  Standing to sue is an essential element of an "actual case or controversy."  <u>Id.</u>  To demonstrate constitutional standing, a plaintiff must establish: (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of; and (3) redressability of the injury by a "favorable decision."  <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560-61 (1992).  Plaintiffs must demonstrate standing separately for each claim asserted.  <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 352 (2006).

Fanatics has moved to dismiss Counts I-III and V —which assert antitrust claims under the Sherman and Clayton Acts, respectively — for lack of standing.  Antitrust injury is

more demanding than (and therefore necessarily satisfies) the injury and causation elements of the Article III standing threshold.[6]  See Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519, 535 n.31 (1983) ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact.").  For the reasons explained below in connection with the Court's discussion of the substantive sufficiency of Plaintiff's claims, the Court finds that Panini has adequately pleaded that it has satisfied the more demanding requirements of antitrust standing for Counts I-III.  Fanatics' Rule 12(b)(1) motion is accordingly denied with respect to Counts I-III.

In Count V, Panini alleges that it was injured when Fanatics acquired Topps — Panini's only contemporary competitor for the Relevant Market — because the acquisition unduly decreased competition in the Relevant Market.  (AC ¶¶ 269-71.)  Panini asserts that this is a quintessential antitrust injury because the loss of a competitor increases market concentration.  (Docket entry no. 101 ("Pl. Mem.") at 33 (citing Steves & Sons, Inc. v. JELD-WEN, Inc., 988 F.3d 690, 723 (4th Cir. 2021); F.T.C. v. H.J. Heinz Co., 246 F.3d 708, 725 (D.C. Cir. 2001)).)  Absent from Panini's allegations, however, is any allegation that could support a plausible inference of particularized harm to Panini.  See Spokeo, 578 U.S. at 339 (finding that a

---

[6]    A finding of antitrust standing is arguably not, however, coextensive with the constitutional requirement of "redressability" necessary to confer Article III standing. See Port Dock & Stone Corp. v. Oldcastle NE, Inc., 507 F.3d 117, 121-122 (2d Cir. 2007) (describing the requirement of finding a plaintiff to be an "efficient enforcer" for antitrust standing, which implicitly encompasses considerations of redressability); see also In re Pre-Filled Propane Tank Antitrust Litig., 893 F.3d 1047, 1054 (8th Cir. 2018) (finding antitrust plaintiffs lacked Article III standing to seek injunctive relief because a previous consent order already provided most of the relief sought and therefore negated the "redressability" requirement).  For the antitrust injuries described in Counts I-III above, the Court finds that Panini has also adequately alleged that those injuries are redressable through either the equitable relief requested or an award of damages.  (See docket entry no. 101 ("Pl. Mem.") at 14.)

"particularized" injury must "affect the plaintiff in a personal and individual way" (quoting

Lujan, 504 U.S. at 560 n.1)).  To the contrary, as one of the remaining two competitors in the

field, Panini benefitted from the alleged market concentration as a prevailing duopolist with "the

opportunity and incentive" to increase prices.  H.J. Heinz, 246 F.3d at 725.  The remainder of

Panini's alleged injuries in this action were not causally connected to Fanatics' acquisition of

Topps.  Therefore, the Court finds that Panini lacks standing to bring Count V, and that claim

must be dismissed for lack of subject matter jurisdiction.


Rule 12(b)(6) Motion

   Federal Rule of Civil Procedure 12(b)(6) permits a party to bring a pre-answer

motion to dismiss a complaint on the grounds that it fails to state a claim upon which relief may

be granted.  To survive a motion to dismiss for failure to state a claim, a complaint must plead

"enough facts to state a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly,

550 U.S. 544, 570 (2007), and "allow [] the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009).  In

deciding a Rule 12(b)(6) motion to dismiss, the Court must "draw all reasonable inferences in

[p]laintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether

they plausibly give rise to an entitlement to relief." Faber v. Metro. Life Ins. Co., 648 F.3d 98,

104 (2d Cir. 2011) (internal quotation marks omitted).  "In adjudicating a motion to dismiss, a

court may consider only the complaint, any written instrument attached to the complaint as an

exhibit, any statements or documents incorporated in it by reference, and any document upon

which the complaint heavily relies." ASARCO LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir.

2014) (citation omitted).

Antitrust Claims

The Clayton Act empowers any person "injured in [their] business or property" by reason of an antitrust violation to sue for treble damages, 15 U.S.C.A. § 15 (Westlaw through P.L. 119-1), or to seek injunctive relief against "threatened loss or damage" caused by an antitrust violation, 15 U.S.C.A. § 26 (Westlaw through P.L. 119-1). To plead a viable antitrust claim, Panini must allege both a statutory violation and antitrust standing to bring a claim based on that violation. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977); see also Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1197 (9th Cir. 2012) (describing the elements of a Section 1 claim). Antitrust standing requires facts demonstrating three elements: (1) that Panini suffered an injury "of the type the antitrust laws were intended to prevent," (2) that Panini's injury "flows from" that which makes Fanatics' conduct unlawful or anticompetitive, and (3) that Panini is an efficient enforcer of the antitrust laws in these circumstances. Brunswick, 429 U.S. at 489; see also Port Dock, 507 F.3d at 122. The Court will consider the viability of each of Panini's antitrust claims in turn.[7]

Monopolization

Count II asserts that Fanatics' pattern of anticompetitive behavior has resulted in willfully obtained monopoly power in the Relevant Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. Section 2. To show a violation of Section 2, Panini must plead that Fanatics (1) possessed monopoly power within the Relevant Market and (2) that it willfully acquired or maintained such power through anticompetitive conduct, as opposed to proper

---

[7]     Because, as explained above, the Court finds that Panini lacks constitutional standing to bring Count V, the Court does not discuss the merits of that claim in this section.

desirable means, or through events beyond Fanatics' control.  United States v. Grinnell Corp.,
384 U.S. 563, 570-71 (1966).  Monopoly power is defined as (1) "the power to control prices or
exclude competition," United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391
(1956), and (2) persistence in exercising such control "for a significant period without erosion by
new entry or expansion," AD/SAT, Div. of Skylight, Inc. v. Assoc. Press, 181 F.3d 216, 227 (2d
Cir. 1999).  "Because . . . direct proof [of the ability to control prices and exclude competitors] is
only rarely available, courts more typically examine market structure in search of circumstantial
evidence of monopoly power."  United States v. Microsoft Corp., 253 F.3d 34, 51 (D.C. Cir.
2001) (en banc) (per curiam).  Absent direct evidence of monopoly power, courts look to
circumstantial factors regarding the structure of the market[8] and predominance of market share,
using control of over 80% of the market as a typical threshold.  McWane, Inc. v. F.T.C., 783 F.3d
814, 830 (11th Cir. 2015) (collecting cases).

Although Fanatics currently only holds 33% of the licenses in the Relevant
Market on an exclusive basis, Panini has adequately pleaded facts supporting a plausible
inference that Fanatics currently possesses monopoly power as demonstrated through its ability
to set prices and exclude competitors.  (See AC ¶¶ 163-209.)  Specifically, Panini alleges that
Fanatics has used threats of future exclusion from the market to (1) set minimum price
requirements, (2) require big box retailers to give Fanatics higher margins, (3) exclude
competitors by requiring retailers to carry only Fanatics' trading card lines, (4) lock up rookie
players (thus excluding Panini from the ability to make and sell cards using their images even

---

[8]    These include "the size and strength of competing firms, freedom of entry, pricing trends
and practices in the industry, ability of consumers to substitute comparable goods, and
consumer demand."  McWane, 783 F.3d at 830 (quoting United States v. Dentsply Intern.,
Inc., 399 F.3d 181, 187 (3d Cir. 2005)).

though Fanatics lacks the licenses to produce such cards until at least September 2025), and (5) pressure Panini's employees into joining Fanatics.  (Id. ¶¶ 157, 166, 194-95, 200.)  Furthermore, this monopoly power is sufficiently alleged to be durable.  See AD/SAT, 181 F.3d at 227. Fanatics' current market control was allegedly accomplished by utilizing threats of future exclusion from the Relevant Market once Fanatics owns the exclusive rights to all Relevant Licenses.  (AC ¶¶ 157, 166, 194-95, 200.)  Drawing all reasonable inferences in favor of Panini, these allegations are sufficient, at the pleading stage, together with the allegations regarding future licensing rights, to show that Fanatics not only has the current power to set prices and exclude competitors from the Relevant Market, but that its power will only increase with time as Fanatics is able to exploit its decades-long exclusive licenses.  Therefore, the Court finds that Panini has adequately pleaded that Fanatics has acquired monopoly power in the Relevant Market.

Furthermore, Panini alleges sufficiently that Fanatics garnered its current monopoly power through anticompetitive means in violation of Section 2.  While a dominant manufacturer's imposition of vertical restraints on other market participants may have possible procompetitive justifications in certain circumstances, see, e.g., Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 889-90 (2007), where a business uses its dominant market power to "coerce" market participants into such agreements, it crosses the line into anticompetitive conduct.  See Simpson v. Union Oil Co. of Cal., 377 U.S. 13, 17 (1964) ("[A] supplier may not use coercion on its retail outlets to achieve resale price maintenance." (citation omitted)); Acquaire v. Canada Dry Bott. Co. of N.Y., 24 F.3d 401, 410 (2d Cir. 1994) ("[E]vidence of threats of termination or other explicitly coercive conduct that secure adherence to fixed prices is what supports 'a finding of [a transgression of the Sherman Act].'" (citation

omitted)).  Therefore, Panini has adequately pleaded that Fanatics achieved its market dominance through anticompetitive coercion, supporting a claim for monopolization under Section 2.

The Court must next consider whether Panini has "antitrust standing" to bring this claim.  First, Panini alleges that it has been injured by the loss of business opportunities, sales, and exclusion from the market because of Fanatics' anticompetitive, coercive acts.  (See AC ¶¶ 163-209.)  A competitor's exclusion from the market is a quintessential example of antitrust injury that the Sherman Act was designed to prevent.  Higgins v. N.Y. Stock Exch., 755 F. Supp. 113, 116 (S.D.N.Y. 1991) (citation omitted); see also Areeda, Hovenkamp, & Blair, ANTITRUST LAW ¶ 348 (2d ed. 2002) ("[A] rival has clear standing to challenge the conduct of rival(s) that is illegal precisely because it tends to exclude competitors from the market.").  This injury sufficiently "flows from" that which makes Fanatics' conduct anticompetitive — the coercive arrangements.  Brunswick, 429 U.S. at 489.  Therefore, taking all factual allegations as true, Panini has pleaded antitrust injury in connection with this claim.

Finally, the Court finds that Panini has pleaded facts sufficient to show that it is also an "efficient enforcer."  To make that determination, the Court must consider four factors: (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculative nature of the alleged injury, and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.  Daniel v. Am. Bd. of Em. Med., 428 F.3d 408, 443 (2d Cir. 2005) (citations omitted).  The relative weight given to each factor "will necessarily vary with the circumstances of the particular case."  Id. (citation omitted).  Here, Panini has adequately

pleaded a direct injury, both already realized and sufficiently likely to occur in the future (when Fanatics' exclusive licenses begin), that it cannot be considered merely speculative.

Fanatics argues that the danger of increased prices to consumers has not yet been realized, and that it would be more consistent with the purposes of the Antitrust Laws to wait to see the market effect of Fanatics' control and allow consumers to bring an antitrust action themselves, if necessary. (Def. Mem. at 27.) This argument ignores Panini's allegations of current, realized harms that resulted from Fanatics' alleged pattern of anticompetitive, monopolistic activity. (See AC ¶ 207.) Many of these allegations involve harm primarily affecting Panini, as Fanatics' only competitor in the Relevant Market, or implicate harm to a dispersed, attenuated group less well suited to vindicate their interests through litigation. See Palmyra Park Hosp. v. Phoebe Putney Mem. Hosp., 604 F.3d 1291, 1304-06 (11th Cir. 2010) (finding that the plaintiff, as the defendant's chief competitor, was "undoubtedly well suited" to vindicate the harms caused to competition and consumers by the defendant's exclusive tying arrangements). Furthermore, precedent advises that the Court not dismiss otherwise viable antitrust claims through overly restrictive applications of standing — particularly if the result would be to allow antitrust violators to go unpunished. See Blue Shield of Va. v. McCready, 457 U.S. 465, 473 n.10 (1982) ("Permitting McCready to maintain this lawsuit will, of course, further certain basic objectives of the private enforcement scheme embodied in § 4. . . . But in addition to allowing Blue Shield to retain a palpable profit as a result of its unlawful plan, denying standing to McCready and the class she represents would also result in the denial of compensation for injuries resulting from unlawful conduct."). The Court therefore finds that Panini has pleaded satisfactorily that it is an efficient enforcer and has antitrust standing to sue for damages and injunctive relief.

For these reasons, Fanatics' motion is denied to the extent it seeks the dismissal of Count II.

### Attempted Monopolization

Count I asserts a claim under Section 2 of the Sherman Act for attempted monopolization.  (AC ¶ 237.)  Rather than requiring facts indicative of "actual monopoly power," a claim of attempted monopolization requires Panini to allege facts supporting a plausible inference that the Defendants (1) engaged in predatory or otherwise anticompetitive conduct, and (2) had specific intent to ultimately seize such power in the market, and (3) present a "dangerous probability" of ultimate success.  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993).  The requisite intent is commonly inferred from the defendant's predatory or anticompetitive acts.  Id. at 459.

Panini plausibly alleges attempted monopolization in violation of Section 2.  First, the Complaint adequately alleges facts demonstrating that Fanatics has a dangerous probability of monopolizing the Relevant Market through sheer market control.  (AC ¶ 117.)  Fanatics possesses exclusive licensing deals which will confer control of 100% of the Relevant Market, starting in early 2026 and lasting for at least a decade.  (Id. ¶ 102; see also McWane, 783 F.3d at 830 (describing around 80% of market share as the typical threshold necessary to find monopoly power) (collecting cases).)  As discussed above, Panini also alleges a pattern of anticompetitive conduct demonstrating the specific intent to obtain such a monopoly.  (AC ¶¶ 150-209.)

The next inquiry is whether Panini has also alleged facts showing antitrust standing to pursue this claim, which requires a showing that Panini's injury —exclusion from the

Relevant Market[9] — "flows from" Fanatics' allegedly anticompetitive or unlawful conduct.

Brunswick, 429 U.S. at 489 ("The injury should reflect the anticompetitive effect either of the

violation or of anticompetitive acts made possible by the violation.").  Although Panini describes

a widespread campaign of anticompetitive, coercive acts (AC ¶¶ 118-209), most of Panini's

allegations of anticompetitive conduct concern events that occurred after Fanatics procured its

exclusive licenses.  The Amended Complaint alleges that Panini's total market exclusion solely

"flows from" Fanatics' scheme of creating unprecedented, economically unjustified,

decade(s)-long exclusive deals with all six Relevant Licensors.  The Court must therefore decide

whether Fanatics' entry into those deals itself constitutes anticompetitive conduct.[10]  (Id. ¶¶ 105-

109; see also Pl. Mem. at 24.)

 Vertical exclusive supply agreements (such as Fanatics' agreements with the

Relevant Licensors) are not necessarily anticompetitive, even where one competitor excludes

another from the market by accumulating exclusive deals comprising a significant proportion of

the Relevant Market.  See, e.g., NicSand v. 3M, Inc., 507 F.3d 442 (6th Cir. 2007).  In NicSand,

the Sixth Circuit found no antitrust injury when the plaintiff (NicSand) was driven out of the

automotive sandpaper industry because the defendant (3M) executed exclusive deals — lasting

---

[9]     "Competitors may be able to prove antitrust injury before they actually are driven from
the market and competition is thereby lessened."  Blue Shield, 457 U.S. at 483 (internal
quotation and citation omitted).

[10]    Fanatics allegedly achieved those deals by offering licensors equity in Fanatics and
"other considerations premised on the monopoly profits Fanatics expected to earn."
(AC ¶ 111.)  Although a predatory bidding practice constitutes anticompetitive conduct,
Panini does not argue that Fanatics' bidding rises to the level of "predatory bidding."  See
Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc., 549 U.S. 312, 325
(2007) (describing an impermissible predatory-bidding scheme as one where a purchaser
of inputs "bids up the market price of a critical input to such high levels that rival buyers
cannot survive (or compete as vigorously)" with the intention to "reap monopsonistic
profits that will offset any losses suffered in bidding up input prices").

"for a few years" — with six major retailers comprising 80% of the relevant market.  Id. at 451-
52.  The court reasoned that NicSand's injury — exclusion from the relevant market —did not
"flow from" any anticompetitive acts because 3M's ability to outbid the industry-dominant
supplier by offering retailers more advantageous terms constitutes archetypal procompetitive
behavior.  Id. at 451.  The fact that 3M used multi-year exclusive deals unprecedented in the
industry did not change this analysis because, the Circuit reasoned, the market had low barriers
to entry, the industry had a unique structure (a custom requiring suppliers to front-load costs by
purchasing retailers' remaining stock) that made longer-term deals potentially advantageous to
new entrants, and the retailers themselves made exclusivity a requirement of any supply deals.
Id. at 452.  The court found that the procompetitive justifications of the multi-year deals, and the
plaintiff competitor's failure to plead injury arising from any anticompetitive behavior, defeated
the plaintiff's assertion of standing under the Sherman Act.  Id.

        The allegations in Panini's complaint are materially distinguishable from those of
NicSand in a few critical respects.  First, the scope and duration of the deals at issue here are
significantly greater; where 3M tied up 80% of the automotive sandpaper market for "a few
years," Fanatics will tie up 100% of the Relevant Market for at least a decade.  This dramatically
decreases the likelihood of any sufficiently procompetitive justification for the deals.  ZF
Meritor, LLC v. Eaton Corp., 696 F.3d 254, 287 (3d Cir. 2012) ("[T]he significance of any
particular contract duration is a function of both the number of contracts and market share
covered by the exclusive-dealing contracts." (internal citation omitted)).  Second, although
Fanatics will have the opportunity later to present evidence of any procompetitive effects of
these deals, such effects are not obvious from the facts pleaded in Panini's Amended

Complaint.[11]  To the contrary, the Amended Complaint contains numerous allegations that the licensors themselves have not historically demanded exclusive deals, and, indeed, that several have recently engaged in nonexclusive deals with Panini, Fanatics, and Topps alike.  (AC ¶¶ 97-98.)  These highly factual considerations relevant to attempted monopolization are more appropriately evaluated at later stages of litigation.  See In re Keurig Green Mt Single-Serve Coffee Antitrust Litig., 383 F. Supp. 3d 187, 239 (S.D.N.Y. 2019) (finding a plausible Sherman Act claim because the boundary between competitive and exclusionary conduct "is a highly contextual analysis" and, therefore, "any procompetitive justification for such [deals] is not appropriately weighed on a motion to dismiss" (internal citations omitted)).

Therefore, considering the complete market foreclosure, the unprecedented and significant duration of the deals, and the high barriers this monopoly may create for future competitors to enter the industry, the Court finds that Panini has plausibly alleged that, by soliciting and entering into these deals, Fanatics engaged in anticompetitive conduct.  Therefore, Panini has adequately pleaded that its injury — market exclusion — flows from Fanatics' anticompetitive conduct.  The injury is also direct and nonspeculative, such that Panini is an efficient enforcer for this claim.  Palmyra, 604 F.3d at 1303.  The Court therefore finds that Panini has antitrust standing to seek injunctive relief against the implementation of the exclusive long-term arrangements.  See also Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1452 (11th Cir. 1991) ("Courts are less concerned about whether the plaintiff is an efficient enforcer of the

---

[11]     In its briefing, Fanatics highlights the allegations in the Amended Complaint that Panini itself has previously executed exclusive deals in the Relevant Market for terms of eight and ten years.  (Def. Mem. at 18-19; see also AC ¶¶ 96-97.)  While these allegations are important for considerations of industry norms, as Panini argues, there is no in pari delicto defense under the Sherman Act.  Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 140 (1968).

antitrust laws when the remedy is equitable because the dangers of mismanaging the antitrust laws are less pervasive in the [section 16] setting.").  The motion is therefore denied insofar as it seeks the dismissal of Count I.

Unreasonable Restraint of Trade

Count III asserts that Fanatics' deals with each of the six licensors violated Section 1 of the Sherman Act, which prohibits "every contract, combination . . . or conspiracy" that tends to "unreasonably restrain[] trade."  Geneva Pharm. Tech. Corp. v. Barr Labs Inc., 386 F.3d 485, 506 (2d Cir. 2004); see also 15 U.S.C.A. § 1 (Westlaw through P.L. 118-70) ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce . . . is declared to be illegal.").  Exclusive licensing arrangements — such as those at issue here — are "presumptively legal" unless they run afoul of the rule of reason.  Spinelli v. Nat'l Football League, 96 F. Supp. 3d 81, 118 (S.D.N.Y. 2015); see also U.S. DEP'T OF JUSTICE AND FEDERAL TRADE COMM'N, Antitrust Guidelines for the Licensing of Intellectual Property § 4.3 (2017) ("Absent extraordinary circumstances, the Agencies will not challenge a restraint in an intellectual property licensing arrangement if (1) the restraint is not facially anticompetitive and (2) the licensor and its licensees collectively account for not more than twenty percent of each relevant market significantly affected by the restraint.").  To determine whether an exclusive arrangement is unreasonable, courts must consider factors such as (1) the Defendants' degree of market power within the Relevant Market, (2) the extent of market foreclosure resulting from the arrangement, (3) the impact of the arrangement on competitors and

consumers, and (4) competitive justifications for use of an exclusive dealing arrangement.
Geneva Pharm., 386 F.3d at 506.

       Panini seems to argue that the Court must consider the effects of the six exclusive deals together.  (Pl. Mem. at 18.)  However, Panini only alleges a horizontal-level agreement between the two licensors comprising "OneTeam" (the NFLPA and MLBPA), who worked together to create their exclusive contracts with Fanatics.  (AC ¶¶ 112-13.)  Panini has not provided any other allegations that could support a plausible inference that the other licensors engaged in any horizontal conspiracy or agreement when entering their respective deals.  See United States v. Apple, Inc., 791 F.3d 290, 315 (2d Cir. 2015) ("Parallel action is not, by itself, sufficient to prove the existence of a conspiracy[.]").  Therefore, Panini has not provided sufficient allegations that the exclusive deals were part of a single, connected conspiracy.  See In re Zinc Antitrust Litig., 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016) ("Existing case law makes clear that a hub-and-spoke theory is cognizable under Section 1 only if there are both vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other."); Dickson v. Microsoft Corp., 309 F.3d 193, 203-204 (4th Cir. 2002) ("[T]he Supreme Court was clear: a wheel without a rim is not a single conspiracy." (citing Kotteakos v. United States, 328 U.S. 750, 755 (1946))).  The Court must consider the agreements as five separate "conspiracies" in restraint of trade.

       First, the "OneTeam" allegations suffice to show that there was a conspiracy between the NFLPA, the MLBPA, and Fanatics to license both players associations' intellectual property on an exclusive basis for twenty years each.  (AC ¶¶ 112-13.)  Combined, these two licensing deals alone would give Fanatics exclusive control over one-third of the licenses making up the Relevant Market for two decades.  Additionally, accepting as true Panini's allegations

about the market structure, the exclusive licensing of the NFLPA and MLBPA licenses also precludes the effective utilization of any IP licensed from either the NFL or the MLB, effectively precluding competitor manufacturers of trading cards from accessing two-thirds of the Relevant Market for that period.  (See id. ¶¶ 168, 232.)  This effect is exacerbated by Fanatics' complete market control.  ZF Meritor, 696 F.3d at 287.  Although these arrangements may have justifiable procompetitive effects, at the pleading stage, Panini has alleged plausibly that there are no sufficient justifications apparent for such a significant restraint on the market.  Therefore, the Court finds that Panini has adequately alleged that the OneTeam conspiracy unreasonably restrains trade in the Relevant Market in violation of Section 1.

The other four alleged conspiracies (between Fanatics and each of the MLB, NFL, NBA, and NBPA) involve strictly vertical licensing agreements because Panini alleges no horizontal agreement among those licensors.  Each individual contract only restrains approximately one-sixth of the Relevant Market.  Defendants argue that these licenses are not restrictive enough to run afoul of the rule of reason, regardless of "how long the leagues and PAs choose to empower someone else to exclusively exploit the same rights they could exclusively (and indefinitely) exploit themselves."  (Def. Mem. at 21 (citing Spinelli, 96 F. Supp. 3d at 118; E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 29-30 (2d Cir. 2006)).)  While a licensor does possess a natural and unobjectionable monopoly over its own intellectual property, vertical licensing arrangements may still run afoul of antitrust laws, particularly in a highly concentrated market.  See, e.g., United States v. United Shoe Mach. Corp., 110 F. Supp. 295, 346 (D. Mass. 1953) aff'd 347 U.S. 521 (1954); L.G. Balfour Co. v. F.T.C., 442 F.2d 1, 14-15 (7th Cir. 1971).  To hold otherwise would immunize intellectual property from the antitrust laws altogether, a protection that has no legal basis.  See 1-800 Contacts, Inc. v. F.T.C., 1 F.4th 102,

113 (2d Cir. 2021) (applying a rule of reason analysis to an exclusive license because "the mere fact that an agreement implicates intellectual property rights does not 'immunize [it] from antitrust attack'" (citation omitted)).  Under the rule of reason, the Court must examine the likely future effects of these particular restraints in the context of the actual market structure.  <u>See Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 768 (1984).  The Court finds that the alleged effects of each agreement (considered individually), in the context of their significant durations, the complete market concentration, and the significant market share foreclosed by each individual deal, are sufficiently likely to be anticompetitive to frame a viable Section 1 claim for unreasonable restraint of trade with respect to each of the four remaining deals.  <u>ZF Meritor</u>, 696 F.3d at 287.  Fanatics will have the opportunity to present evidence, as the case proceeds, that the procompetitive justifications for the restrictions outweigh the likely anticompetitive effects.  <u>See</u> <u>1-800 Contacts</u>, 1 F.4th at 114.

For substantially the reasons discussed above, Panini has antitrust standing to bring a claim regarding the market foreclosure caused by each of these restrictions.  Therefore, Fanatics' motion to dismiss is denied with respect to Count III.

<u>Claim Regarding Acquisition of GCP</u>

Count IV asserts a violation of Section 7 of the Clayton Act arising from Fanatics' March 2022 acquisition of a controlling stake in GCP.  (AC ¶ 261.)  The Clayton Act prohibits acquisitions of one business by another if their effect "may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C.A. § 18 (Westlaw through P.L 119-1).  "The primary vice of a vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a clog on competition, which deprives rivals of a fair

opportunity to compete." <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 324 (1962) (internal quotation marks and citations omitted). One such "clog on competition" occurs when the acquisition forecloses competitors from sources of supply necessary to compete effectively in the market. <u>See</u> <u>Ford Motor Co. v. United States</u>, 405 U.S. 562, 568-69 (1972).

Panini alleges that GCP was an essential supplier of its U.S. trading card business for fourteen years prior to Fanatics' acquisition of that company. (AC ¶¶ 135, 142.) GCP's production capabilities were specialized, complex, and specifically developed to meet Panini's needs for large volume trading card production. (<u>Id.</u> ¶¶ 122-36.) There were no suitable, alternative manufacturers that Panini could use to meet its short-term market obligations. (<u>Id.</u> ¶ 147.) Panini further alleges that Fanatics acquired GCP solely to control and cut off Panini's trading card production capabilities. (<u>Id.</u> ¶¶ 140, 144, 147.) Taking these allegations as true, Panini's claim that Fanatics' acquisition of GCP had the effect of foreclosing Panini from access to a necessary input, thereby depriving Panini of a fair opportunity to compete, and lessening competition in the market, is plausible. These allegations sufficiently plead a violation of Section 7.

The Court also finds that Panini has antitrust standing to bring this claim. Panini was directly injured by the acquisition because it gave Fanatics control over one of Panini's vital and inelastic inputs. Accepting these allegations as true, Panini's injury flowed from anticompetitive, coercive conduct, and Panini's injury is direct, easy to apportion, and non-speculative. Therefore, Panini suffered antitrust injury and is an efficient enforcer for this claim.

For these reasons, the motion is denied insofar as it seeks dismissal of Count IV.

State Law Claims

The remaining Counts assert claims of defamation, tortious interference with contract, and tortious interference with business relations.   Many of the events underlying these claims occurred in other jurisdictions, such as Texas.  (AC ¶ 155.)  When adjudicating state claims, a federal court must "apply the choice of law rules of the forum state" to determine which jurisdiction's law should govern the claims.  Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989).  "A choice-of-law analysis need not be performed unless there is an 'actual conflict' between the applicable rules of two relevant jurisdictions.  If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law."  Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 672 F.3d 155, 157 (2d Cir. 2012) (internal quotation marks and citations omitted).  In their briefing, Defendants apply New York law to Panini's state claims.  (Def. Mem. at 36-40.)  Panini does not concede that New York law governs but argues that there is no actual conflict because the pleading standards for each claim under the law of all potentially applicable jurisdictions — Texas, New York, and Florida — are substantively the same.  (Pl. Mem. at 35 n.25.)  Because the Court finds no "actual conflict" at this time, the Court applies New York law in adjudicating the instant Motion.

Defamation

Count VIII asserts a defamation claim arising from a series of disparaging statements that Fanatics made in April 2023 regarding Panini's business.  (AC ¶¶ 170, 290.)  To plead a prima facie claim of defamation, Panini must allege: (1) a defamatory statement of fact concerning Panini, (2) publication of that statement to a third party, (3) fault, the degree of which

depends on the status of the defamed party, (4) falsity of the statement, and (5) special damages

or per se actionability.  Palin v. N.Y. Times Co., 940 F.3d 804, 809 (2d Cir. 2019).

Fanatics persuasively argues that the majority of Panini's alleged incidents of

defamation are pleaded without the specificity required to state a claim.  (Def. Mem. at 39-40.)

"A defamation claim 'is only sufficient if it adequately identifies the purported communication,

and [includes] an indication of who made the communication, when it was made, and to whom it

was communicated.'"  Thai v. Cayre Grp., Ltd., 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010)

(citation omitted).  Panini's general allegations that "Fanatics" disseminated disparaging

statements in April 2023 about Panini's business to "(1) players, player agents, and player

representatives, (2) player associations; and (3) Panini's current and now-former employees" (see

AC ¶¶ 170-71, 173-74) lack the specificity necessary to give Fanatics sufficient notice of the

communications to defend itself.  See Biro v. Conde Nast, 883 F. Supp. 2d 441, 456 (S.D.N.Y.

2012).

Panini has, however, sufficiently pleaded its allegation that,

> [I]n or around April 2023, Michael Rubin, Mike Mahan, Omar Wilkes,
> and other Fanatics employees told . . . sports agencies representing current
> and prospective NFL and NBA players, including CAA Sports and WME
> Sports (William Morris Endeavor), that Panini would be unable to fulfill
> its contractual obligations to athletes, that Panini was going to go
> bankrupt, and that Panini would lose its licenses with the NFL, NFL
> Players Association, NBA, and NBA Players Association by June 2023.

(AC ¶ 172.)  This allegation also satisfies the elements of a prima facie defamation claim.  First,

the statement, as one injurious to Panini's business and livelihood, is defamatory per se.  Davis v.

Ross, 754 F.2d 80, 82 (2d Cir. 1985) ("New York recognizes a limited category of statements to

be [defamatory] per se, [including] . . . a writing which tends to disparage a person in the way of

his office profession or trade." (internal citations omitted) (emphasis omitted)).  Next, Panini has

sufficiently alleged facts that "would allow a reasonable person to consider the statement false."

Moraes v. White, 571 F. Supp. 3d 77, 94 (S.D.N.Y. 2021) (citing Tannerite Sports, LLC v.

NBCUniversal News Grp., 864 F.3d 236, 247 (2d Cir. 2017) (collecting cases)).  Even if — as

Fanatics argues — a reasonable person could have concluded that Panini's business was "in

serious trouble" in April 2023 (Def. Mem. at 40), at a minimum, Panini has alleged that it was

well-capitalized and had exclusive licenses at the time of the allegedly false statements.  (AC

¶ 171.)  At later stages of this litigation, Fanatics will have a chance to present evidence of the

statements' truthfulness, but at the pleading stage, these allegations support a plausible inference

of falsity.  See also Martin v. Hearst Corp., 777 F.3d 546, 552 (2d Cir. 2015) ("[T]ruth is an

absolute defense to a defamation claim.  But in certain circumstances even a technically true

statement can be constructed to carry a false and defamatory meaning[.]").

   Finally, Panini's allegations are sufficient to support an inference of even the most

stringent level of fault, "actual malice."  Where a defamation plaintiff is a "public figure," they

must prove that the defamatory statement "was made with actual malice, that is, made with

knowledge it was false or with reckless disregard" of falsity.  Palin, 940 F.3d at 804.  Panini's

complaint is rife with allegations that — taken as true — show Fanatics engaged in a scheme to

harm Panini's business and monopolize the Relevant Market.  Fanatics was directly aware of

Panini's licenses with the NFL, NFLPA, NBA, and NBPA, which were not going to terminate

until late 2025 at the earliest.  (AC ¶¶ 98, 278.)  These allegations suffice to demonstrate that

Fanatics' representatives, at a minimum, made these statements with reckless disregard as to their

falsity and with the intention of harming Panini.

   Fanatics' motion to dismiss Panini's defamation claims is therefore denied with

respect to the disparaging statements allegedly made to the sports agencies (AC ¶ 172) and is

granted with respect to Panini's other generalized allegations of disparaging statements made to Panini's employees, players, and player associations.

<u>Tortious Interference with Contract</u>

Count VI asserts a tortious interference with contract claim based on alleged breaches of Panini's contracts with GCP, its former employees, the WWE, NFLPA, NFL, NBPA, and NBA. (AC ¶ 276.) To plead a viable interference claim, Panini must allege: (1) the existence of a valid and enforceable contract between Panini and a third party, (2) Fanatics' knowledge of the contract, (3) Fanatics' intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of the contract by the third party, caused by Fanatics' conduct, and (5) damages resulting from the breach. <u>Oddo Asset Mgmt. v. Barclays Bank PLC</u>, 19 N.Y.3d 584, 594 (2012).

<u>GCP</u>: First, Panini alleges that it is a third-party beneficiary of a valid and enforceable contract between Panini S.p.A. and GCP, under which GCP agreed to manufacture "over ninety percent of Panini's trading card requirements." (AC ¶¶ 132-33.) A third-party beneficiary of a contract has standing under New York law to sue for tortious interference. <u>See Debary v. Harrah's Operating Co., Inc.</u>, 465 F. Supp. 2d 250, 262 (S.D.N.Y. 2006). Panini alleges that Fanatics induced two breaches of S.p.A.'s contract with GCP: breach of a change-of-control provision when Fanatics acquired GCP without Panini's knowledge in March 2022, and breach of the manufacturing agreement by dramatically underproducing promised output. (AC ¶ 276.) As to the change-of-control provision, Panini alleges that Fanatics "was clearly aware of the Panini S.p.A.-GCP relationship and of GCP's contractual obligations to produce cards for Panini." (<u>Id.</u> ¶ 134.) Panini does not allege, however, that Fanatics had specific knowledge of the terms of the contract, nor any indication that the acquisition would violate a

specific change-of-control provision of that contract.  See N. Shipping Funds I, LLC v. Icon Cap. Corp., No. 12-CV-3584-JCF, 2013 WL 1500333, at *4 (S.D.N.Y. Apr. 12, 2013) (finding that a defendant "must have actual knowledge of the specific contract" and "of the specific covenants [they induced to be breached]" (collecting cases)).  Panini has therefore failed to state a claim for tortious interference with the Panini S.p.A.-GCP contract on the basis of GCP's breach of the change-of-control provision.

Panini has, however, adequately pleaded that Fanatics intentionally induced an unjustified breach of GCP's manufacturing obligations to Panini.  Fanatics had knowledge of the production agreement (AC ¶¶ 134, 140), and — taking all of Panini's allegations as true — intentionally induced a breach to harm Panini's business (id. ¶¶ 140, 144-46).  This breach damaged Panini's business.  (Id. ¶¶ 146-48.)  Therefore, Panini has adequately pleaded a tortious interference claim with respect to the Panini S.p.A.-GCP contract on the basis of the disrupted production.

Employees:  Panini alleges that it had valid contracts with thirty-six of its employees, whom Fanatics hired in April 2023 and induced to breach their non-solicitation and propriety-information agreements with Panini.  (AC ¶ 160.)  Panini has also provided sufficient allegations to support a plausible inference that Fanatics knew about these agreements.  (Id. ¶¶ 153-54.)  Panini further alleges that it suffered damages resulting from these breaches. Specifically, by inducing breaches of the non-solicitation provisions (which "prevent[ed] employees from recruiting other employees to leave Panini"), Fanatics was able to recruit thirty-six Panini employees.  The loss of these employees harmed Panini's business directly and indirectly, by providing a basis for the NFLPA to attempt to terminate its agreement with Panini

based on material change in Panini's executive management.  (See id. ¶ 182.)  Panini has

therefore stated a viable interference claim with respect to the employee contracts.

NFLPA and WWE:  Panini has alleged that it was a party to, or was a clear third-

party beneficiary of, valid contracts with the NFLPA and WWE.  (Id. ¶ 276.)  Panini further

alleges that Fanatics knew about these contracts (id. ¶¶ 179, 189) and induced both organizations

to breach their exclusive contracts with Panini by improperly attempting to terminate the

agreements early, "[i]n lockstep fashion."  (Id. ¶ 190; see also Union Carbide Corp. v. Montell

N.V., 944 F. Supp. 1119, 1136-37 (S.D.N.Y. 1996) (finding that allegations of defendant's efforts

to affect a "programmed divorce" between plaintiff and third party "provide ample support for

the inference" that the defendant acted either with awareness that its actions were substantially

certain to induce a breach or with the primary intention of inducing a breach).)  Both

terminations lacked any factual or legal basis (id. ¶¶ 183, 191), and both organizations purported

to begin exclusive partnerships with Fanatics following the terminations (id. ¶¶ 184, 190).  These

allegations create a plausible inference that Fanatics induced the early terminations without

justification.  See N. Shipping, 2013 WL 1500333, at *4 ("'[I]t is not necessary to allege that the

interference was malicious or done through wrongful means' but rather . . . only to allege that the

interference was 'done without justification.'" (citation omitted)).  Panini has therefore stated a

viable interference claim with respect to these contracts.

NFL, NBA, and NBPA:  Panini has not alleged any breach of its agreements with

the remaining leagues and players associations with which Panini has existing contracts and thus

has failed to plead a viable tortious interference claim as to those contracts.  See Lama Holding

Co. v. Smith Barney Inc., 88 N.Y.2d 413, 414 (1996) ("Tortious interference with contract

requires . . . actual breach of the contract.").  Therefore, Fanatics' motion to dismiss is granted as to those claims.

For these reasons, Fanatics' motion to dismiss Count VI is denied with respect to the breaches of the GCP supply contract, the employment contracts, and the NFLPA and WWE exclusive licensing contracts, and is granted with respect to Panini's claims relating to its contracts with the NFL, NBA, and NBPA, and the change-of-control provision of Panini S.p.A.'s contract with GCP.

<u>Tortious Interference with Business Relations</u>

Count VII alleges Fanatics' tortious interference with Panini's current and prospective business relations with the six Relevant Licensors, the WWE, GCP, Panini's former employees, and various "star, rookie" players in the Relevant Market.  (AC ¶¶ 283-84.)  To state such a claim, Panini must allege: (1) it had a business opportunity or an existing business relationship, (2) Fanatics knew of the opportunity or relationship, (3) Fanatics intentionally interfered with wrongful purpose or by using "dishonest, unfair, or improper means," and (4) Panini lost the opportunity or suffered injury to the relationship because of Fanatics' interference.  <u>Scutti Ent., LLC. v. Park Place Ent. Corp.</u>, 322 F.3d 211, 215 (2d Cir. 2003) (citations omitted); <u>Glob. Packaging Serv. LLC v. Glob. Printing & Packaging</u>, 248 F. Supp. 3d 487, 494 (S.D.N.Y. 2017).  To sustain a tortious interference claim, "as a general rule, the defendant's conduct must amount to a crime or independent tort."  <u>Carvel Corp. v. Noonan</u>, 3 N.Y.3d 182, 190 (2004).  There is a "narrow" exception to this requirement, which applies when the defendant's conduct was not independently objectionable, but the defendant still acted wrongfully, "for the sole purpose of inflicting intentional harm on plaintiffs."  <u>16 Casa Duse, LLC v. Merkin</u>, 791 F.3d 247, 262 (2d Cir. 2015).  "When a defendant has acted with a

permissible purpose, such as 'normal economic self-interest,' wrongful means have not been shown[.]" Id. (emphasis added). The Court now examines Panini's claims for tortious interference with prospective relations in light of these principles.

Employees: Panini alleges that Fanatics damaged its existing business relationships with its now-former employees. Panini alleges, in conclusory fashion, that Fanatics accomplished this interference through defamation. (AC ¶ 174.) Because Panini has insufficiently alleged defamation involving statements to its former employees, defamation cannot support its tortious interference claim. See Kramer v. Skyhorse Pub. Inc., 989 N.Y.S.2d 826, 836-37 (Sup. Ct., N.Y. Cnty. 2014). Panini has, however, alleged that Fanatics interfered with these relationships solely to harm Panini, and against its normal economic interest, both by offering supra-competitive compensation packages and by hiring in excess of its actual employment needs. (AC ¶¶ 161-62.) Taken as true, these allegations frame a viable claim at this stage.

GCP: Panini next alleges that Fanatics damaged its business relationship with GCP. (AC ¶¶ 283-84.) As discussed above, Panini has adequately pleaded that Fanatics purposefully interfered with the Panini-GCP business relationship by acquiring GCP, and Panini has plausibly alleged that Fanatics' acquisition of GCP was an anticompetitive act in violation of Section 7 of the Clayton Act, which would establish the requisite "wrongful means." See Reading Intern., Inc. v. Oaktree Cap. Mgmt. LLC, 317 F. Supp. 3d 301, 334 (S.D.N.Y. 2003) ("It seems obvious that alleging violations of federal antitrust law . . . should satisfy the pleading requirements for wrongful conduct."); see also Cinema Village Cinemart, Inc. v. Regal Ent. Grp., No. 15-CV-5488-RJS, 2016 WL 5719790, at *7 (S.D.N.Y. Sept. 29, 2016) (dismissing a tortious interference claim even though "antitrust violations can constitute 'wrongful means' for the

purposes of [interference claims]" because plaintiff failed to state a valid antitrust claim).  Panini

has, additionally, adequately alleged that Fanatics interfered with Panini's production needs once

it was in control of GCP for the sole purpose of inflicting harm on Panini, and that this

interference caused sufficient injury to the Panini-GCP business relationship.  Therefore,

Fanatics' motion is denied with respect to Panini's claim that Fanatics' acquisition and control of

GCP tortiously interfered with Panini's current and future business relationship with GCP.

        Rookie Players:  Panini alleges that it had a business opportunity to sign "star,

rookie players" to licensing deals, which was lost when Fanatics improperly induced such

players not to deal with Panini.  (AC ¶¶ 232, 284.)  Although Panini has not adequately pleaded

an underlying tort for this claim, Panini <u>does</u> adequately allege that this interference was

conducted solely to harm Panini because Fanatics itself could not effectively utilize the licenses

at the time it made these deals (because it lacked the supporting licenses of any relevant league).

(<u>Id.</u> ¶ 164.)  Panini must also show that Fanatics' interference caused Panini to lose a business

opportunity; in other words, it must be reasonable to infer from the allegations that the

Defendants' actions caused Panini to lose the opportunity.  <u>See</u> <u>Ritani, LLC v. Aghjayan</u>, 880 F.

Supp. 2d 425, 451-52 (S.D.N.Y. 2012).  Panini must plead "the basis on which it claims the

'relationship' and the expectation it would yield future business."  <u>Id.</u> at 451; <u>see</u> <u>also</u>

<u>A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC</u>, 131 F. Supp. 3d 196, 217 (S.D.N.Y. 2015)

(plaintiff must "identify interference with a specific business relationship").  Panini proffers

allegations that Fanatics' interference deprived Panini of the ability to sign autograph deals with

five specific players from the NBA and NFL.  (AC ¶ 232.)  This, coupled with allegations that

Panini historically has produced rookie cards with original signatures and other licensed

identifiers (<u>id.</u> ¶ 82, 169), provides a plausible basis for Panini's assertion that the prospective

relationships with the identified "star, rookie players" would have yielded future business "but for" Fanatics' interference.  (See id. ¶¶ 163-69.)  Therefore, the Court finds that Panini has pleaded a viable interference claim with respect to its alleged prospective relationships with the "star, rookie players."

    NFLPA/WWE:  Panini alleges that Fanatics interfered with the existing business relationships between Panini and both the NFLPA and the WWE.  (Id. ¶ 284.)  Fanatics allegedly did so to accelerate the beginning of Fanatics' own exclusive license with each organization.  (Id. ¶¶ 184, 190.)  To the extent Panini's claim of "wrongful" conduct is based on Fanatics' alleged inducement of NFLPA and WWE to breach their contracts with Panini, it is at best duplicative of Panini's tortious interference with contract claim.[12]  Panini does not allege that Fanatics interfered with these relationships through other "wrongful means."  Despite vague allegations throughout the complaint that Fanatics defamed Panini to players associations and leagues, Panini does not allege any specific defamatory statements that Fanatics directed to either the NFLPA or WWE prior to their decisions to terminate Panini's licenses.  See Skyhorse Pub., 989 N.Y.S.2d at 836-37.  Furthermore, the complaint does not allege facts suggesting that Fanatics interfered with these relationships solely to harm Panini; by ending Panini's contracts, Fanatics could accelerate its own, which seems to align with its "normal economic self-interest."  16 Casa, 791 F.2d at 262.  Therefore, the Complaint does not state a viable, nonduplicative tortious

---

[12]  As discussed above, Panini has stated a claim for tortious interference with contract premised on Fanatics' alleged inducement of NFLPA and WWE to breach their contracts with Panini.  While tortious interference claims may be pleaded in the alternative, Fanatics' alleged tortious interference with contract cannot also provide the basis for the "wrongful means" necessary to state viable a claim for tortious interference with business relations, because a "plaintiff may not recover on both claims."  360 Mortgage Grp., LLC v. Fortress Inv. Grp. LLC, No. 19-CV-8760-LGS, 2022 WL 4086829, at *4 (S.D.N.Y. Sept. 6, 2022).

interference claim with respect to Panini's existing business relationships with either the WWE or the NFLPA, to the extent such claim is premised on the alleged induced breach of contract.

Relevant Licensors:  Panini alleges that Fanatics "engaged in . . . Anticompetitive Conduct . . . that interfered with Panini's existing or prospective business relations with the [six Relevant Licensors]."  (AC ¶ 284.)  Panini's prospective business relationships with the Relevant Licensors were undoubtedly injured when Fanatics entered into exclusive deals with each of them for terms of either 10 or 20 years.  "[T]he New York Court of Appeals has recognized that a competitor can be held liable for tortious interference with prospective contractual relations where 'unlawful restraint of trade is effected.'"  Reading Intern., 317 F. Supp. 3d at 334 (citation omitted); see also 2301 M Cinema LLC v. Silver Cinemas Acquisitions Co., 342 F. Supp. 3d 126, 140 (D.D.C. 2018) ("[P]laintiff's tortious interference claim rises and falls with plaintiffs' Sherman Act claims.").  Because, as explained above, Panini has adequately alleged that Fanatics' aggregation of long-term exclusive deals with each of the Relevant Licensors constitutes a Sherman Act violation, the Court finds that Panini has also alleged sufficient "wrongful conduct" to support a tortious interference claim for Panini's future business relations with each of Relevant Licensors.

For these reasons, Fanatics' motion to dismiss Count VII is granted with respect to Panini's claim that Fanatics tortiously interfered with its current business relationships with the WWE and NFLPA and denied in all other respects.

Leave to Amend

Rule 15(a) provides that a court "should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  There is a particularly strong preference for allowing

amendment when "the plaintiff has not had the benefit of a court ruling with respect to the deficiencies of its pleading." <u>Allianz Glob. Invs. GmbH v. Bank of Am. Corp.</u>, 473 F. Supp. 3d 361, 365 (S.D.N.Y. 2020); <u>see also</u> <u>Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC</u>, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies."). Additionally, "where a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice[.]" <u>Carter v. HealthPort Tech., LLC</u>, 822 F.3d 47, 54 (2d Cir. 2016). Therefore, Plaintiff may file a motion for leave to amend its deficient Clayton Act, defamation, and tortious interference claims. Any such motion must comply with all applicable federal, local and individual rules of motion practice. Should Plaintiff fail to file such a motion within **21 days** of the entry of this Memorandum Order, Plaintiff's deficient claims will be dismissed with prejudice and without further advance notice.

<u>Rule 72 Motion</u>

Also pending before the Court is Fanatics' Rule 72 Objection (docket entry no. 146) to Magistrate Judge Figueredo's December 12, 2024 oral order, requiring Fanatics to produce, on an "attorneys' eyes only basis," the confidential licensing agreements between Fanatics and each of the six Relevant Licensors (docket entry no. 136 ("Conf. Tr.") at 4). Fanatics argues, in principle, that the Court should not require production of the licensing agreements while it remains unclear whether any of the relevant claims will survive the pleading stage. (<u>See</u> Def. R. 72 Mem. at 2-3.) Because the Court now finds that Panini has viably pleaded several Antitrust claims premised on the licensing agreements at issue, the Court overrules Fanatics' Rule 72 Objection as moot.

C<span>ONCLUSION</span>

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.  Count V is dismissed in its entirety for lack of standing; Count VI is dismissed only as to the NFL, NBA, and NBPA contracts, and the alleged breach of the change of control provision in the Panini S.p.A.-GCP contract; Count VII is dismissed as to Panini's alleged current business relationships with the NBPA and WWE; and Count VIII is dismissed to the extent it relies on Plaintiffs' generalized allegations of defamatory communications to the former employees, the leagues, and the players associations.  The motion is denied with respect to all other claims.  Plaintiff may file a motion for leave to file a Second Amended Complaint regarding any deficient claims within **21 days from the date of this order**.  Any such motion must comply with the procedures outlined above.

Fanatics' Rule 72 Objection to Magistrate Judge Figueredo's December 12, 2024, oral order is overruled as moot.

This Memorandum Order resolves docket entry nos. 99 and 146.  This case will remain referred to Magistrate Judge Figueredo for general pretrial management.

SO ORDERED.

Dated: New York, New York
        March 10, 2025

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge