May 30, 2025

**Via ECF**
Hon. Valerie Figueredo
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, New York, NY 10007-1312

      Re: *Panini America, Inc. v. Fanatics, Inc. et al.*, 1:23-cv-09714-LTS-VF (S.D.N.Y.)

Dear Judge Figueredo:

      Pursuant to Paragraph 14 of the Confidentiality Stipulation and Protective Order (Dkt No. 160), the Fanatics entities ("Fanatics") respectfully submit this letter requesting the Court resolve a dispute between the parties regarding limited redactions to irrelevant and commercially sensitive portions of the license agreements that Fanatics produced to Panini on May 13, 2025.

      Pursuant to the Court's order (Dkt No. 174), on May 13, 2025, Fanatics timely produced to Panini certain license agreements. Prior to doing so, Fanatics spent several weeks working with each of the licensors to identify discrete categories of terms that are both irrelevant to the litigation and highly sensitive, such that their disclosure would cause significant harm to Fanatics, the licensors, and the competitive process. Based on those discussions, Fanatics produced the license agreements to Panini with limited, narrowly tailored redactions to: (1) specific financial figures; (2) definitions of certain bespoke commercial terms; and (3) termination provisions.

      On May 19, 2025, Panini emailed Fanatics, arguing that "no redactions of these core trading card agreements are appropriate or justifiable under the Protective Order." Ex. 1 (May 19, 2025 Email from E. Brenner). Panini's counsel, however, offered only a two-sentence explanation for its position, addressing only the financial terms. *Id.* During a May 23 conferral, Panini's counsel maintained that no redactions to the license agreements are appropriate.[1] They refused to elaborate on their cursory objection to Fanatics' redaction of financial terms and offered no explanation whatsoever with respect to the redacted definitions and termination provisions. While Fanatics suggested the parties continue to confer to attempt to narrow the dispute, Panini refused and made clear that if Fanatics did not raise this issue with the Court by May 30, it would argue that Fanatics waived any objection to maintaining the limited redactions in question. Accordingly, Fanatics has no choice but to submit this letter now.[2]

**I.  Specific Financial Figures**

      Fanatics redacted specific financial figures in the license agreements, including contractual royalty rates, minimum guaranteed payments, marketing commitments, equity provisions,

---

[1] The conferral took place at 3PM on May 23 and lasted approximately 15 minutes. Kathryn Bonacorsi, Ted Ovrom, and Lawrence Buterman attended for Fanatics, and Eric Brenner attended for Panini, among others.

[2] Pursuant to Paragraph 14 of the Protective Order, Fanatics has simultaneously emailed chambers a copy of the license agreements with the proposed redactions highlighted.

insurance/indemnification figures, and certain other financial figures.[3] The limited redactions still allow Panini to see the terms the parties bargained for—just not the exact numbers that the parties agreed upon. These innovative contract terms, such as the grant of equity, set Fanatics apart from Panini and others in the industry, and it is the existence of these terms—not the dollar amounts in the licenses—with which Panini truly takes issue. *See, e.g.*, Dkt No. 69 (Amended Complaint) ¶ 8 (alleging Fanatics' equity grant "effectively preclude[ed] [licensors] from dealing with Panini and other competitors in any way that might disadvantage Fanatics").

Specific financial figures are among the most competitively sensitive information in the license agreements. Panini holds or has held licenses with almost all the relevant licensors and generally competes against Fanatics for those licensors' intellectual property. Disclosing the financial terms that Fanatics offered to obtain the licenses would be extremely harmful to competition. Indeed, the sharing of such information amongst competitors is the kind of conduct that antitrust enforcers often investigate and litigate. *See, e.g.*, *United States v. RealPage, Inc.*, No. 1:24-cv-00710 (M.D.N.C. Aug. 23, 2024); *United States v. Agri Stats, Inc.*, No. 0:23-cv-03009 (D. Minn. Sept. 28, 2023). Panini furthermore made almost no attempt to explain why it must see these specific financial figures. During conferral, Panini's only arguments were that (1) "financial terms like royalty rates and minimum guarantees … are … squarely relevant to the litigation, including to Fanatics' defense that it obtained the license agreements because it offered 'licensors better products and terms than Panini provided'"; and (2) "terms regarding equity … are directly at issue in Panini's claims." Ex. 1. Neither argument carries weight.

Panini does not need to see precise financial figures to challenge Fanatics' defense that Fanatics offered licensors a better opportunity than Panini. The unredacted portions of the agreements show the innovative terms Fanatics offered to obtain the licenses, such as the right to share in revenues not only from primary sales but also from secondary sales (e.g., through Fanatics Live) and complementary businesses such as card grading, card breaking, and storage and lending.[4]

Similarly, Panini need not see the exact amount of equity that Fanatics provided to licensors to argue that Fanatics "induce[d]" the licensors to "deal with" Fanatics by providing them "equity ownership in Fanatics." Am. Compl. ¶ 111. The fact that Fanatics provided equity to licensors is evident from the unredacted portions of the agreements and is public knowledge.[5] Panini should not obtain access to some of the most commercially sensitive financial terms of Fanatics' license agreements simply because Panini made a few vague allegations about equity—particularly where the substance of Panini's complaint is about the grant of equity itself, not its value. *E.g.*, *id*. ¶ 8. Were Panini to access the precise equity figures in the Fanatics agreements, that could reasonably deprive third party licensors of the benefit of competition over those terms in future negotiations.

---

[3] NFL Agreement at 3-7, 9-10, 14-18, 35, 43, 52, 54; NFLPA Agreement at 9-15, 18, 24; NBA Properties Agreement at 5, 9-17, 33, 37; NBA Hong Kong Agreement at 5, 9-15, 30-31; NBPA Agreement at 4-9, 20, 42, 50, 52; MLB Agreement at 10-12, 33; MLBPA Agreement at 8-12, 35.

[4] *See, e.g.*, MLB Agreement at 10; MLBPA Agreement at 2, 9.

[5] *See, e.g.*, ESPN, *Fanatics strikes deal to become exclusive licensee for MLB cards* (Aug. 19, 2021), https://tinyurl.com/ESPN-Fanatics.

## II.  Definitions of Certain Bespoke Commercial Terms

Fanatics also redacted the definitions of certain highly sensitive and bespoke commercial terms, including the definitions of revenue and sales metrics that have no relevance to the litigation (e.g., "Net Retail Revenue" or "Net Sales").[6]  Fanatics only redacted definitions that provide detailed information regarding how certain terms are calculated, as these definitions provide a window into Fanatics' competitive business strategy.  As with the specific financial figures, disclosure of these definitions to Panini would be both detrimental to competition and unnecessary.  During the meet and confer process, Panini offered no explanation for its objection to this specific category of redactions.  And indeed, there is no basis for arguing that these provisions are relevant to the litigation.  Thus, Panini will suffer no prejudice from the redaction of these terms.

## III.  Termination Provisions

Finally, Fanatics redacted parts of the agreements' termination provisions—namely, the grounds that allow the licensors to terminate license agreements with Fanatics.[7]  Disclosure of these provisions to Panini would provide Panini a roadmap for attempting to interfere with Fanatics' licenses.  As the Court knows, Fanatics' ongoing lawsuit against Panini alleges that, after losing "a number of major licenses" (including four of the six licenses at issue here), Panini "embarked on a protracted, unlawful, and deceitful campaign of unfair trade practices, strong-arm tactics, and tortious misconduct to hamper Fanatics Collectibles' nascent business." Fanatics' Second Am. Compl. ¶ 10, 23-cv-06895, Dkt No. 120.  Given Panini's persistent attempts to harm Fanatics' growing collectibles business, Fanatics is justifiably concerned that Panini will attempt to interfere with Fanatics' licenses in the future.  Those concerns will be heightened if Panini obtains access to these termination provisions.  Further, the precise language of these provisions has no relevance to the litigation—nor has Panini even attempted to articulate its relevance.

\*    \*    \*

Panini may argue that redactions are unnecessary because the license agreements have been produced on an Outside Counsel Eyes' Only basis.[8]  But the Protective Order governing this matter, which the parties spent months negotiating, expressly contemplates redaction of information that is both irrelevant to the litigation and commercially sensitive.  Fanatics respectfully submits that the limited categories of redactions outlined above are exactly what the Protective Order contemplates.

We appreciate Your Honor's consideration of this request.

---

[6]  NFL Agreement at 52; NFLPA Agreement at 31; NBA Properties Agreement at 21; NBA Hong Kong Agreement at 18; NBPA Agreement at 14; MLB Agreement at 2, 4-7; MLBPA Agreement at 4, 7, 9, 17-18, 21, 28-29, 31, 34, 37, 40, 52, 54-55.

[7]  NFL Agreement at 54, 56-58, 61; NFLPA Agreement at 17-18, 25; NBA Properties Agreement at 32; NBPA Agreement 26-27; NBA Hong Kong Agreement 29-30; MLB Agreement at 12, 24, 27-28, 31-32; MLBPA Agreement at 32-34.

[8]  As previously explained, because Panini has no in-house counsel, external counsel at Boies Schiller Flexner effectively assumes this role.  *See e.g.*, Dkt No. 120 at 3.

Respectfully submitted,

/s/ Michael B. Carlinsky
Michael B. Carlinsky
Kathryn D. Bonacorsi
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
295 5th Avenue
New York, NY 10016
michaelcarlinsky@quinnemanuel.com
kathrynbonacorsi@quinnemanuel.com

Derek L. Shaffer
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
1300 I Street NW, 9th Floor
Washington, DC 20005
derekshaffer@quinnemanuel.com

/s /Lawrence E. Buterman*
Lawrence E. Buterman
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1264
lawrence.buterman@lw.com

Amanda P. Reeves
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
amanda.reeves@lw.com

Christopher S. Yates
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
chris.yates@lw.com

* /s/ signature used with consent in accordance with ECF Rule 8.5(b)

cc: All Counsel of Record (via ECF)