


June 6, 2025

**Via ECF**

The Honorable Valerie Figueredo
United States District Court Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

**Re: *Panini America, Inc. v. Fanatics, Inc. et al.*, Case No. 1:23-cv-09714-LTS (S.D.N.Y. 2023)**

Dear Judge Figueredo:

We write on behalf of Plaintiff, Panini America, Inc. ("Panini"), in response to Defendants' May 30, 2025 letter, Dkt. 179, and to ask the Court—again—to address the Fanatics Defendants ("Fanatics") continued efforts to obstruct Panini's access to six license agreements (the "License Agreements") that are at the crux of Panini's antitrust claims. On May 13, 2025, Panini finally received these License Agreements—***seven*** months after first requesting them. But, even now, the versions of these agreements produced by Fanatics contain sweeping redactions that cannot be reconciled with the obvious relevance of the License Agreements—in their entirety—to core issues in this litigation, as Fanatics' own pleadings make clear.

The making of redactions to clearly relevant documents such as the License Agreements is improper. In general, a party cannot "redact information from admittedly responsive and relevant documents, based on that party's unilateral determination of relevancy." *Al Thani v. Hanke*, 2022 WL 1684271, at *1 (S.D.N.Y. May 26, 2022); *see also Christine Asia Co. v. Alibaba Grp. Holding Ltd.*, 327 F.R.D. 52, 54 (S.D.N.Y. 2018) (citation omitted) ("party should not be permitted to unilaterally decide to redact portions of a responsive document because it determines that they are competitively sensitive and not relevant"). This is not a situation where a document concerns multiple business matters, only one of which is relevant. The entire License Agreements at issue are for sports trading cards and no redaction of information is appropriate. Even if making redactions were proper, it is Fanatics' burden to justify these redactions under the Protective Order. During the meet and confer process, Fanatics offered nothing—either in writing or during conversations—to meet this burden. And the arguments Fanatics now offers are entirely deficient.

## I. The License Agreements, Which Are the Core Agreements in the Litigation, Should Be Produced Without *Any* Redactions.

It is indisputable, as the Court has recognized, that the License Agreements are "at the heart of Panini's antitrust claims." Dkt. 136 (12/12/24 Hr'g Tr.) at 6:9-25. For example, as Judge Swain's motion to dismiss opinion recognized, the Complaint plausibly alleges that, because of these agreements, "starting in 2026, Fanatics will control 100% of the Relevant Market for a term



of at least ten years," and "that Fanatics achieved these deals by giving the Relevant Licensors equity in Fanatics and 'other considerations' premised on 'monopoly profits' Fanatics would earn once it controlled the Relevant Market." Dkt. 164 at 3. Fanatics' pleadings, in turn, try to defend the lawfulness of the License Agreements on the basis that Fanatics supposedly offered "licensors better products and terms than Panini provided." Dkt. 173 at 2. The merits of these claims and defenses are a question for another day. But, for now, there can be no serious question that the disclosure of the License Agreements and their terms—in full—is necessary to litigate whether Fanatics' acquisition of these agreements is actionable under the antitrust laws.

Fanatics claims that it has only proposed redactions of provisions in the License Agreements that are not "relevant" to Panini's claims. As noted above, a party cannot redact information from admittedly responsive and relevant documents, based on a belief that the information is not relevant. This is especially true where, as here, "a confidentiality stipulation and order ... is in place." *Durling v. Papa John's Int'l, Inc.*, 2018 WL 557915, at *9 (S.D.N.Y. Jan. 24, 2018). Such redactions "breed suspicions" and "may deprive the reader of context." *Hous. Police Officers' Pension Sys. v. State Glob. Advisors, Inc.* (*In re State St. Bank & Tr. Co., Fixed Income Funds Invs. Litig.*), 2009 WL 1026013, at *1 (S.D.N.Y. Apr. 8, 2009). Moreover, the redacted provisions cannot possibly be irrelevant here, given the centrality of the terms of the License Agreements to the core question of whether Fanatics' conduct in acquiring these six agreements was anticompetitive or procompetitive. Indeed, whatever the merits of allowing redactions that pertain to a "business line" other than Fanatics' trading card business, *see* Dkt. 136 at 56:7-12 (Court suggesting limiting redactions in this way), here, it is undisputed that the License Agreements pertain solely to the trading card business at issue.

Fanatics' attempts to justify the proposed redactions on a provision-by-provision basis just reinforce the flaws in its position. Fanatics does not even attempt to meet its burden of trying to justify many of its proposed redactions.[1] Regardless, even for the cherry-picked provisions that Fanatics actually addresses, its arguments fail badly.

First, it is frivolous for Fanatics to withhold the ***financial terms*** in the License Agreements on the basis that "it is the existence of these terms—not the dollar amounts in the licenses—with which Panini truly takes issues." Dkt. 179 at 2. To state the obvious, Fanatics cannot contend that it offered "licensors better … terms than Panini provided," Dkt. 173 at 2, while hiding the "dollar amounts" that speak to whether Fanatics' terms were, in fact, "better" and in what way and to what extent. Fanatics' proposed redactions of the ***equity provisions*** in the License Agreements are likewise egregious. The Complaint alleges, and Judge Swain recognized as plausible, that Fanatics

[1] In some instances, Fanatics redacted entire provisions without providing any explanation for the redactions. MLBPA Agreement, at 7, 17. Even as to provisions that Panini can identify, Fanatics' letter does not address (i) change of control and assignment provisions, NFLPA Agreement, at 24; NFL Agreement, at 56; NBA Agreement, at 37; MLB Agreement, at 31-32; MLBPA Agreement, at 31; (ii) sell-off rights, NBPA Agreement, at 20; NBA Agreement, at 33; NBA Hong Kong Agreement, at 31; MLB Agreement, at 24; MLBPA Agreement, at 35; (iii) territorial restrictions, NFL Agreement, at 56; (iv) other restrictions, MLB Agreement, at 7; (v) approval rights, MLBPA Agreement, at 21; and (vi) a portion of a confidentiality provision, MLBPA Agreement, at 37. In failing to defend these redactions, Fanatics has, by definition, failed to satisfy its burden of showing the redactions are justified.



provided equity shares to the leagues and players associations to induce them "to acquiesce in Fanatics's monopolization scheme." Dkt. 69 at ¶¶ 8, 111. The amount of equity granted under the licenses—and not just the existence of the equity grants—is central to this point. The interlocking equity positions of the leagues, players associations, and Fanatics is also precisely what ties them together as part of the underlying antitrust conspiracies at issue. *Id.* at ¶ 113. Fanatics even redacted the fees it owes OneTeam under the NFLPA Agreement.[2] Such consideration is, again, relevant to whether Fanatics' "terms" were actually "better," and also to Panini's allegations that the MLBPA and NFLPA conspired via OneTeam to enter into long-term exclusive deals with Fanatics. *Id.* at ¶¶ 112, 113. As MLBPA's and NFLPA's executives put it, the deals "never would have happened" had MLBPA and NFLPA not "joined forces to create OneTeam," *id.* at ¶ 112, which, along with Fanatics' CEO, Michael Rubin, "launche[d] Fanatics Collectibles," *About Us*, OneTeam, https://oneteam.com/about-us/.

Second, Fanatics' efforts to defend its proposed redactions of "***bespoke commercial terms***" fail for much the same reason. The only such terms Fanatics identifies are definitions of "Net Retail Revenue" and "Net Sales." But these definitions feed into the calculation of the compensation that Fanatics pays the leagues and players associations—precisely the kind of "terms" that bear on whether Fanatics' offers were "better." Indeed, Fanatics concedes that these terms "provide a window into Fanatics' competitive business strategy." Dkt. 179 at 3. But, of course, it is precisely this business strategy that Panini alleges is anticompetitive. Dkt. 69 at ¶¶ 207, 208.

Finally, Fanatics offers literally no argument in support of its summary assertion that the ***termination provisions*** in the License Agreements have "no relevance to the litigation." Dkt. 179 at 3. Fanatics wrongly suggests that Panini somehow bears the burden on this issue. But this is not how the Protective Order works. Dkt. 160 at ¶ 14. To the extent it matters, there is also good reason to believe that the termination provisions are not only relevant to the question of whether Fanatics offered "better" terms, but also bear on Fanatics' attempt to further entrench its market power by making it tougher for the licensors to legitimately terminate the agreements.

## II. The Outside-Counsel-Eyes-Only Restrictions in the Protective Order Fully Protect Defendants' Commercial Concerns.

As explained repeatedly over the past six months, Fanatics also cannot justify its proposed redactions based on purported commercial concerns. The Protective Order is express that outside-counsel-eyes-only materials cannot be disclosed by BSF to Panini (or anyone else). The Protective Order also contains use restrictions ensuring that documents produced for this matter may only be used in this matter. BSF will, of course, respect these restrictions. There is no reasonable basis to withhold core information relating to Panini's claims based on the offensive suggestion that, based on assumptions of BSF's noncompliance with a court order, "Panini will attempt to" use this information "to interfere with Fanatics' licenses," Dkt. 179 at 3, or "deprive third party licensors of the benefit of competition over those terms in future negotiations," *id.* at 2. The Court has heard, and rightly rejected, these arguments previously in recognizing that the "commercial" concerns raised by Fanatics can be addressed by the confidentiality restrictions in the Protective Order. Dkt. 136 at 6:9-13. Nothing has changed.

[2] NFLPA Agreement, at 9, 15.



Respectfully submitted,

*/s/ David Boies*
David Boies

cc: All Counsel of Record (by ECF)