UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
PANINI AMERICA, INC.,

                              Plaintiff,                         **23-cv-9714 (LTS) (VF)**
                                                                         **23-cv-6895 (LTS) (VF)**

           -against-

FANATICS, INC. et al,                                         **ORDER**

                              Defendants.
------------------------------------------------------------------X
FANATICS COLLECTIBLES TOPCO, INC.,

                              Plaintiff,

           -against-

PANINI S.P.A.,

                              Defendant.
------------------------------------------------------------------X

**VALERIE FIGUEREDO, United States Magistrate Judge:**

       At ECF No. 133 in Case No. 23-CV-6895, the parties raised various discovery disputes which were discussed at a conference on August 11, 2025. Below is a resolution of the disputes that were raised at the conference.

- In RFP Nos. 46, 64, 65, 66, 67, Panini seeks various documents concerning Fanatics' acquisition of Topps. See ECF No. 133 at 5-7. Panini argues that these documents are relevant to its Section 2 claims because Fanatics acquired one of its exclusive licenses through the Topps acquisition (the MLB license), thereby enabling it to accelerate its monopolization of the market for trading cards. To the extent these requests seek documents concerning Fanatics' acquisition of the MLB license through its purchase of Topps, the documents are relevant to Panini's Section 2 claims and is not foreclosed by the dismissal of the Section 7 claim. FTC v. Facebook, 581 F. Supp. 3d 34 (D.D.C. 2022), upon which Fanatics relies is distinguishable. There, discovery into Facebook's platform policies was not relevant to the monopolization claim that remained in the case and which was based on distinct allegations concerning Facebook's acquisition of competitors and potential competitors in order to obtain monopoly power. By contrast, the acquisition of the MLB license is directly relevant to Panini's Section 2 claims. See, e.g., ECF No. 164 at 11-12 (reasoning that Panini had adequately alleged that Fanatics

possessed monopoly power in part through Fanatics' ownership of the exclusive rights to *all* the relevant licenses); see also id. at 15 (reasoning that Panini had adequately alleged an attempted monopolization claim in part because Fanatics controlled 100% of the relevant market through exclusive licensing deals). That the acquisition of the MLB license occurred through the Topps acquisition does not make the information any less relevant. Because Panini's Section 2 claims concern Fanatics' acquisition of the relevant licenses, discovery into the Topps acquisition for the limited purpose of seeking documents relating to the acquisition of the MLB license, does not seek discovery relating solely to a dismissed claim. However, some aspects of the discovery requests at issue are overbroad, to the extent they seek information unrelated to the acquisition of the MLB license. For example, it is not apparent to the Court why RFP No. 67, which seeks *all* communications with MLB and/or the MLBPA regarding the Topps acquisition, seeks relevant discovery if the communications are not concerning the MLB license. The parties should meet and confer to discuss appropriate narrowing of these requests in light of this ruling.

- RFP Nos. 129, 130, 131. See ECF No. 133 at 11. RFP No. 129 seeks documents relevant to Panini's Section 2 claims, in part because Panini has alleged that Fanatics attempted to gain its monopoly power by soliciting and hiring away key Panini employees. See ECF No. 164 at 11-12 (noting that Panini had plausibly alleged that Fanatics had monopoly power in part through its alleged use of pressure tactics to get Panini employees to join Fanatics). RFP No. 130 seeks information relevant to Panini's allegation that Fanatics induced employees to breach non-solicitation and nondisclosure provisions in their employment agreements. See ECF No. 164 at 28-29. RFP No. 131 seeks documents relevant to Panini's defense of Fanatics tortious interference with prospective business relations claim in the Case No. 23-CV-6895, because Panini would have had a valid basis to threaten litigation if employees were taking trade secrets with them to Fanatics. Even if these requests seek information that might also be relevant to the Texas litigation, because the information sought is relevant to the actions in this Court, the requests are appropriate despite the stay of discovery in Texas.

- RFP Nos. 74-75, 82. See ECF No. 133 at 16. Fanatics has agreed to produce documents concerning OneTeam through other RFPs from Panini. See ECF No. 133 at 18-19. Although Fanatics' relationship with OneTeam is relevant to Panini's Section 2 claims (see, e.g., ECF No. 164 at 20-21), it is not apparent at this point that the information Panini seeks through RFP Nos. 74-75, and 82 will not otherwise be produced by Fanatics in its response to other document requests from Panini (see, e.g., RFP Nos. 37-38, 76-79, 81). The parties are directed to meet and confer and if there are documents that are responsive to these requests which are relevant and not otherwise covered by a separate request, Panini can raise the issue again if there is a dispute as to the production of those documents.

- RFP Nos. 112-116. See ECF No. 133 at 20. To the extent these requests seek information about Fanatics' receipt of equity or other ownership rights, the requests do not seek information relevant to Panini's claims. However, information concerning the grant of an equity or other ownership interest in Fanatics to the licensors prior to the execution of the

2

relevant license agreements is relevant to Panini's Section 2 claims, as such an interest could have influenced the decision to grant an exclusive license to Fanatics. For this reason, Panini has sufficiently shown that information about Fanatics' grant of an equity ownership to a licensor, even if the equity ownership is unrelated to the trading card business line, is relevant so long as the equity ownership predated the license at issue. But it is not clear why Panini needs "all documents" relating to the receipt of an equity ownership by a licensor, even where the equity ownership is not in connection with Fanatics' trading card license agreements. And the requests at issue seek "all documents." For the non-trading card business units, to the extent Panini seeks information about an equity ownership or governance rights, the parties are directed to meet and confer to determine if a compromise can be reached, such that Fanatics could produce documents sufficient to show an equity stake, if one exists, in Fanatics' other business lines, without the imposition of an undue burden.

- RFP Nos. 118, 121, 124-125. See ECF No. 133 at 22. For these requests, the parties may benefit from further discussion as it appears that Fanatics is amenable to producing documents responsive to some portion of these requests after further discussion. Because it does not appear that these disputes are ripe for the Court's intervention, if the parties are at an impasse by the next conference, Panini can raise these RFPs again.

- RFP Nos. 134-136, 139. See ECF No. 133 at 25. To the extent these requests seek documents related to Fanatics' Commerce business, which involves Fanatics' sale of apparel but not trading cards (see ECF No. 133 at 27), the requests are overbroad and do not seek information relevant to the claims at issue in the case. Fanatics' trading card business uses different producers, production processes, distribution chains, and business units than its commerce business, such that it is not apparent how a complaint about, for example, an apparel product is relevant to Panini's claim that Fanatics' monopolization of the market for professional sports league trading cards will result in diminished quality and consumer harms in that specific market. See, e.g., ECF No. 164 at 2 (describing this case as concerning the alleged restraint of trade in the overall market for "major U.S. professional sports league trading cards").

**SO ORDERED.**

DATED:   New York, New York
         August 12, 2025

_____
VALERIE FIGUEREDO
United States Magistrate Judge

3