

September 30, 2025

**Via ECF**
The Honorable Valerie Figueredo
United States District Court Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

    Re:  *Panini America, Inc. v. Fanatics, Inc. et al.*, Case No. 1:23-cv-09714-LTS-VF (S.D.N.Y. 2023)

Dear Judge Figueredo:

    Pursuant to the parties' agreed-upon procedures for resolving discovery disputes [ECF No. 201] and Rule 26 of the Federal Rules of Civil Procedure, we write on behalf of Panini to compel Fanatics to add twelve, narrowly tailored ESI custodians to its custodian set. These individuals, identified through Fanatics' own initial disclosures and Panini's investigation, hold unique roles in Fanatics' trading card and collectibles business and are likely to possess relevant, non-duplicative evidence central to Panini's antitrust and state-law claims.

    **I. Background**

    The parties agreed to exchange proposed custodians in July. Fanatics initially proposed a plainly underinclusive list of only 8 Fanatics custodians. Ex. A, Email Correspondence, at 2-3 (Ovrom 7-23 Email).[1] Panini subsequently identified 21 additional Fanatics custodians whose roles and Panini's investigation showed they likely possess unique, relevant information, including key executives, product development leaders, athlete relations personnel, and others with direct involvement in the conduct at issue. Fanatics agreed to add just 4 of these 21 custodians, while asserting that the remainder were "unlikely to have unique responsive documents." Ex. B, Email Correspondence, at 16-17 (Ovrom 8-25 Email). During the parties' August 27 meet and confer, Panini asked Fanatics' counsel to explain the basis for this representation. Fanatics' counsel largely refused to provide additional details and instead claimed that their representations were based on privileged conversations with their client. At the same time, Fanatics' counsel acknowledged that they had not yet reviewed the rejected custodians' documents.

    In an effort to reach agreement, Panini agreed to withdraw its request to add 5 of the custodians, reducing the number of additional custodians that it was seeking to 12. Ex. B at 13-14 (Mugler 8-28 Email). As a further compromise, Panini also proposed that the parties agree to 20 custodians. *Id*. Fanatics countered with an offer to search the files of 15 custodians. But when Panini rejected this offer because it would deprive Panini of essential discovery, Fanatics removed 3 custodians from its list of 15, resulting in 12 custodians on Fanatics' agreed list (the "Existing Custodians"). *Id.* at 1. The parties remain at an impasse regarding the addition of the 12 custodians

---

[1] In contrast to Fanatics' approach, Panini carefully reviewed Fanatics' document requests and information gathered from custodian interviews and its investigation of the facts to date to prepare a list of appropriate Panini custodians. Based on this analysis, Panini identified 19 Panini custodians who may possess relevant information. Fanatics insisted on three more. Panini agreed, bringing the total number of Panini custodians to 22.



discussed below (the "Disputed Custodians"). [2]

## II. Argument

Panini requests that the Court compel Fanatics to add the Disputed Custodians. Document custodians are appropriate where "their inclusion in ESI searches is reasonably calculated to lead to relevant evidence that might not be captured if they were excluded." *Ft. Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 106 (S.D.N.Y. 2013); *Blackrock Allocation Target Shares: Series S Portfolio v. Bank of New York Mellon*, 2018 WL 2215510, at *8 (S.D.N.Y. May 15, 2018) (same). The "requesting party generally bears the burden of showing the relevance of the documents sought, while the resisting party bears the burden of justifying limiting discovery of relevant documents." *Ft. Worth Employees' Ret. Fund*, 297 F.R.D. at 107.

Here, searching the files of the Disputed Custodians is reasonably calculated to lead to unique, relevant evidence of Fanatics' anticompetitive conduct. And Fanatics' refusal to include these custodians is unsupported by any concrete or credible showing of burden or duplication.

### A. <u>Searching the Disputed Custodians' documents will lead to unique, relevant information.</u>

#### i. *Co-Founders of Fanatics Collectibles.*

<u>(1) Jeffrey Gordon, former Chief Strategy Officer, Fanatics Collectibles and (2) Josh Luber, Chief Vision Officer, Fanatics Collectibles.</u> As co-founders of Fanatics Collectibles,[3] Gordon and Luber were undoubtedly instrumental in planning, negotiating, and executing the exclusive license agreements at issue here—the foundation of Fanatics' "strategy" to enter the trading-card business. In its Initial Disclosures, Fanatics has also identified Gordon as having knowledge of Fanatics' acquisition of GCP. *See* Ex. C at 3 (Fanatics' Initial Disclosures).[4] That some of the Existing Custodians also played a role in the license negotiations does not mean Gordon and Luber's documents are duplicative. Rather, each executive is likely to have played a unique role in the operational and strategic planning of Fanatics Collectibles. Indeed, Luber was so key to Fanatics Collectibles' operations, that he ███████████████████████████████████████ .

#### ii. *Fanatics Collectibles Leadership Team Members*. 

Fanatics' website identifies these Disputed Custodians as members of the Fanatics Collectibles "Leadership Team."[5] Each is likely to hold unique documents central to Panini's claims.

<u>(3) Gregory Abovsky, CFO, Fanatics Collectibles.</u> Abovsky likely possesses division-specific financial analyses, business projections, and strategic communications regarding the collectibles business that differ from the broader corporate financial oversight of Glenn Schiffman, Fanatics' Chief Financial Officer and an Existing Custodian. Fanatics wrongly contends that

---

[2] The Existing Custodians and Disputed Custodians are listed and described in Appendix A.

[3] Ex. D (Jeffrey Gordon, LinkedIn Profile) ("Founder and Chief Strategy Officer at Fanatics Collectibles"); Ex. E (Reddit, *I am Josh Luber, co-founder of StockX and Fanatics Collectibles*) ("After StockX I co-founded Fanatics Collectibles with Michael Rubin.").

[4] ████████████████████████████████████████████████████. Ex. S (2024 charts) at '649.

[5] Ex. F (Fanatics Collectibles Leadership, https://www.fanaticsinc.com/fanatics-collectibles-leadership). As part of its campaign to limit custodians, Fanatics has repeatedly misrepresented to Panini that Bell has no involvement in the collectibles business. Ex. B at 17 (Ovrom 8-25 email) (Bell "does not work in the collectibles business"). But Fanatics' own public documents represent Bell as part of Fanatics Collectibles' leadership team. Ex. F at 3.



Abovsky is irrelevant because he joined in 2022 after Fanatics had signed the exclusive licenses. But Abovsky's post-2022 documents are plainly relevant to Fanatics' ongoing anticompetitive conduct and its anticompetitive effects. As Chief Judge Swain has concluded, Panini's allegations show Fanatics' monopoly power is "durable" and "will only increase with time"—leading to further anticompetitive effects. ECF No. 164 at 12.

(4) *Omar Wilkes, Head of Athlete Partnerships, Fanatics Collectibles*. Wilkes sits at the center of Fanatics' efforts to secure exclusive deals with rookie players—conduct directly alleged in Panini's complaint—and has already been identified in key communications that were not copied to any Existing Custodian, confirming the unique nature of his files. *See, e.g.*, Ex. G (Wembanyama notice); Ex. H (Levis notice); Am. Compl. ¶¶ 163-169, 232-233.

(5) *Nick Bell, CEO, Fanatics Collect/Fanatics Live*. Bell oversees the secondary marketplace and live case-breaking platform that Fanatics uses to coerce case breakers. Am. Compl. ¶¶ 205-206; Ex. Q (Nick Bell, Fanatics profile); Ex. R (Fanatics Collect, https://www.fanaticsinc.com/fanatics-collect). Additionally, ███ ███ ███████ ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████. Searching Bell's documents will thus also lead to unique, relevant evidence on the equity arrangements with licensors at issue here and Fanatics' broader conspiracy with those same licensors.[6]

***iii. Custodians with Unique, Relevant Operational Roles.*** The Disputed Custodians described below occupy critical operational roles in Fanatics' collectibles and related lines of business that position them to possess relevant evidence unavailable from the Existing Custodians.

(6) *Saj Cherian, Chief of Staff and Head of Fanatics Ventures, Fanatics Holdings, Inc*. As Chief of Staff, Cherian likely has detailed implementation documents, working-level analyses, and tactical communications necessary to execute Rubin's strategic decisions—materials that CEOs typically do not have. And Cherian's specific responsibility for "cultivat[ing] partnerships with all major sports leagues" positions him to have unique documents revealing how Fanatics coordinated the near-simultaneous acquisition of the exclusive licenses and his role in "capital raising and investments"[7] means he likely possesses financial analyses of the equity stakes granted to licensors. As Head of Fanatics Ventures, Cherian also likely has unique due diligence and investment materials related to the GCP acquisition.

(7) *Julie Yoo, SVP of Global Expansion, Fanatics Collectibles*. Fanatics listed Yoo in its initial disclosures as likely possessing discoverable information on "Fanatics' sports trading card licensing agreements; Fanatics' negotiation of sports trading card licensing agreements; [and] Fanatics' investment in GCP." Ex. C at 4. Publicly available information shows that Yoo was integral to Fanatics' acquisition of Topps, which gave Fanatics the MLB and MLBPA licenses. Ex. K (*Julie Yoo — Fanatics*, Sports Business Journal). Yoo built the first model for the Topps acquisition and "for a couple of weeks" was the only person on the acquisition team. *Id.* Searching

---

[6] Additionally, Fanatics' organizational charts show ████████████████████████████████ ████████████████████ Ex. I (2023 organizational charts) at '010. He reports ████████████ ████████████████. *Id.*; Ex. T (2025 organizational charts) at '681.

[7] According to Fanatics, Cherian "works closely with CEO Michael Rubin across several areas, including business development and partnerships, …capital raising, and investments," and helped "cultivate 10 long-term strategic partnerships (including [with] every major U.S. professional sports league)." Ex. J (Fanatics, Saj Cherian, https://www.fanaticsinc.com/saj-cherian). Fanatics' initial disclosures confirm Cherian has knowledge of "Fanatics' sports trading card licensing agreements" and their negotiation. Ex. C at 2.



her documents will thus lead to unique, relevant evidence on the exclusive license agreements and Fanatics' efforts to acquire control of GCP to harm Panini.

(8) <u>Denise Albero, SVP of Business Process, Fanatics Holdings, Inc. (previously SVP of Financial Planning and Analysis and Investor Relations (Oct. 2021 – Aug. 2024))</u>. As SVP of Financial Planning, Albero "[r]aised ~$2.5Bn in two separate equity rounds" and "[o]versaw integration of the Topps trading cards business upon close December 2021 which was foundational to the creation of the Collectibles operating segment."[8] Albero thus likely has unique, relevant information on Fanatics' equity arrangements and strategic rationale for the Topps acquisition.

(9) <u>Clay Luraschi, SVP of Global Product Development, Fanatics Collectibles</u>. Luraschi . Ex. T (2025 organizational charts) at '681, '694-'698. . *Id.* As the leader of Fanatics' trading-card-product development, Luraschi likely has unique, relevant evidence relating to product strategy,[9] the definition of the relevant market, and Fanatics' retailer and distributor anticompetitive conduct.

(10) <u>Brian Boyce, former GCP Account Manager</u>. Boyce was assigned to Panini's GCP account and has relevant information on "GCP's operations." Ex. C at 5. Boyce was at GCP when Fanatics acquired control of GCP and used that control to interfere with Panini's card production. Am. Compl. ¶¶ 121-149. Thus, Boyce likely has unique, relevant documents related to Fanatics' strategy to suppress Panini's output.

### *iv. Former Panini Employees with Unique Knowledge.*

(11) <u>Brian Bayne, VP of Athlete Partnerships, Fanatics Collectibles and (12) Elizabeth Galaviz, Director of Athlete Partnerships, Fanatics Collectibles</u>. Both Bayne and Galaviz are former Panini employees with information relevant to Panini's claim that Fanatics unlawfully raided Panini for its employees and trade secrets, Am. Compl. ¶¶ 150-162, and executed exclusive deals with rookie players to deprive Panini of the ability to use those players' autographs in its cards, *id.* ¶¶ 163-169, 232-233. Despite Fanatics' misrepresentations to the contrary, Panini knows from its own investigation and non-confidential information from other litigation[10] that Bayne and Galaviz have unique, relevant information on these matters. *See* Ex. M (Bayne Dep. Tr.) at 114:25-115:9, 119:24-120:12 (Bayne sent names of Panini employees to Fanatics to assist raid), 166:18-23 (Bayne "gathering names" from Galaviz to assist Fanatics in its raid on Panini employees), 54:20-22 (Bayne "potentially" took "confidential Panini information"); Ex. N (Galaviz Dep. Tr.) at 31:17-22 (Galaviz returned a thumb drive of Panini property after exit).

### B. <u>Fanatics cannot justify excluding the Disputed Custodians.</u>

In correspondence and meet and confer discussions, Fanatics has advanced two arguments for excluding the Disputed Custodians. Neither argument has merit.

*First*, Fanatics claims that 20 or more custodians is "facially excessive." Ex. B at 10 (Ovrom 9-2 Email). Its position disregards the complexity and breadth of this case. Seven of Panini's claims—spanning multiple federal statutes and state tort laws—have survived Fanatics'

---

[8] *See* Ex. L (Denise Albero, LinkedIn Profile, https://www.linkedin.com/in/denise-brogan-albero/).

[9] Fanatics' disclosures confirm that Luraschi has documents concerning product innovation—a key theme of Fanatics' purported defense. *See* Ex. C at 3.

[10] The information in Exhibits M and N was de-designated confidential on August 30, 2023.



Motion to Dismiss. In this context, Panini's proposal to add 12 more custodians (for a total of 24) is both reasonable and conservative. A similar exclusive-dealing, antitrust case—relied on by Chief Judge Swain in her order largely denying Fanatics' Motion to Dismiss, ECF No. 164 at 18—involved more than *fifty* defendant custodians. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 490 (S.D.N.Y. 2022). Other large, complex cases in this court are in accord. *E.g.*, *Ft. Worth Employees' Ret. Fund*, 297 F.R.D. at 105-106 (granting 18 additional defendant custodians for a total of *60*); *Blackrock*, 2018 WL 2215510, at *1, 13 (granting 2 additional defendant custodians for a total of *30*). Moreover, Fanatics' burden argument is unsupported.[11] A defendant "cannot object to searches on burden grounds without substantiating" the claim "with a hit report." *Felder v. Warner Bros. Discovery*, 2025 WL 1718098, at *10 (S.D.N.Y. June 20, 2025). Yet Fanatics has refused, without explanation, to provide hit counts for the Disputed Custodians despite Panini's requests. Ex. B at 1 (Ovrom 9-11 email).

*Second*, Fanatics' claim that the Disputed Custodians are "unlikely to have unique responsive documents," Ex. B at 16-17 (Ovrom 8-25 Email), is unsubstantiated and implausible. Fanatics concedes it has not reviewed the Disputed Custodians' documents and relies instead on custodian interviews. But "[i]nterviews of witnesses about the content of their electronic communications is likely to provide, at best, an incomplete picture of the content of relevant and discoverable ESI." *Thomas v. City of New York*, 336 F.R.D. 1, 4 (E.D.N.Y. 2020). Fanatics compounds this deficiency by refusing to disclose any details of these interviews, citing privilege. Thus, neither Panini nor the Court can meaningfully assess Fanatics' duplication argument, which rests on nothing more than blanket claims.

Moreover, Fanatics' speculation that all relevant documents will be in the files of the Existing Custodians—who are largely top-level executives—is unfounded. Lower-level executives are more likely to have documents reflecting the implementation of business strategies and communications with third-parties—materials that may never reach the highest level of management and are highly relevant here. *Capitol Recs., Inc. v. MP3tunes, LLC*, 261 F.R.D. 44, 50 (S.D.N.Y. 2009) (directing the search of 6 additional low-level custodians' emails in addition to more senior custodians because it "may be true that employees at [a senior] level took care not to say anything incriminating and that lower-level employees were less guarded in their email communications").[12] And the "mere existence of overlap and some duplication is insufficient to preclude" discovery. *Thomas*, 336 F.R.D. at 2. Rule 26(b)(2)(C) requires that duplication be "unreasonably cumulative or duplicative," not that there be no overlap at all. *Kenyon v. Simon & Schuster, Inc.*, 2016 WL 5930265, at *5-6 (S.D.N.Y. Oct. 11, 2016).[13]

Accordingly, Fanatics has failed to provide any legitimate basis for excluding the Disputed Custodians from discovery.

---

[11] Fanatics' complaints about its purported burden in this case contrast with its demands in its suit against Panini S.p.A., Case No. 1:23-cv-06895. That case involves only a single, narrow tort claim and yet Fanatics has insisted on 7 custodians from Panini S.p.A. and non-party Panini America.

[12] *See also Family Wireless #1, LLC v. Automotive Technologies, Inc.*, 2016 WL 2930886, at *3 (D. Conn. May 19, 2016) ("[L]ower-level employees may discuss execution of policies amongst themselves and with third parties other than their superiors. These communications may be particularly revealing."); *Stinson v. City of New York*, 2015 WL 4610422, at *6 (S.D.N.Y. July 23, 2015) (adding 74 custodians, reasoning that "lower-level officers in any organization may be more candid about dubious practices than the organization's more media-savvy executives").

[13] Plus, to the extent some overlap in custodians' emails, texts, and other documents exists, Fanatics can use basic ESI procedures to eliminate duplication. *See Fort Worth*, 297 F.R.D. at 106 ("[D]efendants may continue to utilize procedures to eliminate duplicative search output from their production.").



        Respectfully submitted,

        */s/ Stuart Singer*

David Boies
Eric Brenner
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
dboies@bsfllp.com
ebrenner@bsfllp.com

Stuart H. Singer*
Sabria A. McElroy*
Jason Hilborn*
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
smcelroy@bsfllp.com
jhilborn@bsfllp.com

James P. Denvir*
Richard A. Feinstein*
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
jdenvir@bsfllp.com
rfeinstein@bsfllp.com

*Counsel for Panini America, Inc.*

**pro hac vice*

cc:    All Counsel of Record (by ECF)



## APPENDIX A

**Existing Custodians:**

| Individual | Title |
|---|---|
| **Fanatics** | |
| Michael Rubin* | Chief Executive Officer, Fanatics |
| Mike Mahan* | Chief Executive Officer, Fanatics Collectibles |
| Gary Gertzog* | President of Business Affairs, Fanatics Commerce |
| Glenn Schiffman* | Chief Financial Officer, Fanatics |
| David Leiner* | President of Trading Cards, Fanatics Collectibles |
| Carlos Sousa* | Senior Vice President of Manufacturing, Fanatics |
| Tucker Kain* | Chief Strategy & Growth Officer, Fanatics |
| Nick Matijevich | VP Brands, Fanatics Collectibles |
| Stephanie Putnam | VP of Talent Acquisition, Fanatics Collectibles |
| Robert Springs | Senior Director of Football Product Development, Fanatics Collectibles |
| **GCP** | |
| Steve Skalski* | Former Chief Executive Officer, GCP |
| Richard McKinnie* | Director of Facilities and Scheduling, GCP |

*Listed in Fanatics' Initial Disclosures as likely possessing relevant information.

**Disputed Custodians:**

| No. | Individual | Title | Relevant Information |
|---|---|---|---|
| 1 | Jeffrey Gordon* | Founder and Former Chief Strategy Officer, Fanatics Collectibles | • Listed in Fanatics' initial disclosures as likely having knowledge of "Fanatics' sports trading card licensing agreements; Fanatics' negotiation of sports trading card licensing agreements; Fanatics' investment in GC Packaging, LLC ('GCP'); GCP's operations." Ex. C at 3. |



| No. | Individual | Title | Relevant Information |
|---|---|---|---|
|  |  |  | - Gordon was the "Founder & Chief Strategy Officer at Fanatics Collectibles" from September 2021 to January 2025. Ex. D at 1.<br>- ███████████. Ex. S (2024 organizational charts) at '649.<br>- Likely has unique, relevant information regarding Fanatics' GCP acquisition and use of GCP to restrict output of Panini cards, Am. Compl. ¶¶ 121-149, and the negotiations and execution of the exclusive, long-term license agreements, id. ¶¶ 102-114. |
| 2 | Josh Luber | Co-Founder and former Chief Vision Officer, Fanatics Collectibles | - Founded Fanatics Collectibles along with Michael Rubin. Ex. E ("After StockX I co-founded Fanatics Collectibles with Michael Rubin.").<br>- ███████████.<br>- Likely has unique, relevant information regarding Fanatics Collectibles' formation and the negotiations of the exclusive, long-term license agreements. Am. Compl. ¶¶ 102-114. |
| 3 | Gregory Abovsky | CFO, Fanatics Collectibles | - CFO of Fanatics *Collectibles* specifically. Glenn Schiffman is the CFO of Fanatics Holdings, Inc.<br>- "As Chief Financial Officer of Fanatics Collectibles, Greg oversees all business and financial planning, accounting, investor relations, purchasing, tax, treasury and divisional finance for the company." Ex. O (Fanatics, Greg Abovsky, https://www.fanaticsinc.com/greg-abovsky). |



| No. | Individual | Title | Relevant Information |
|---|---|---|---|
|  |  |  | • ▮▮▮▮▮▮▮▮▮▮. Ex. T (2025 organizational charts) at '682-'683.<br>• Likely has unique, relevant information on Fanatics Collectibles' business, such as sales and other financial information that is relevant to determining the relevant market and its anticompetitive effects. |
| 4 | Omar Wilkes | Head of Athlete Partnerships, Fanatics Collectibles | • ▮▮▮▮▮▮▮▮▮▮. Ex. T (2025 organizational charts) at '681, '687.<br>• Sent Panini key communications—not copied to any Existing Custodian—reflecting Fanatics' exclusive deals with star, rookie players that deprive Panini of the ability to include those players' autographs on its trading cards. *See, e.g.*, Ex. G (Wembanyama notice); Ex. H (Levis notice).<br>• During the parties' negotiations, Fanatics offered to add Wilkes to its list of custodians, but it withdrew this offer when Panini refused to agree to a 15-custodian cap. Ex. B at 3, 8, 10.<br>• Likely has unique, relevant communications concerning Fanatics' exclusive deals with rookie players aimed at depriving Panini of the ability to obtain player autographs. Am. Compl. ¶¶ 163-169, 232-233. |
| 5 | Nick Bell | CEO of Fanatics Collect | • Head of Fanatics Collect, Fanatics' secondary marketplace for trading cards and memorabilia and Fanatics' live case-breaking platform. Ex. Q (Fanatics, Nick Bell, https://www.fanaticsinc.com/nick-bell); |

| No. | Individual | Title | Relevant Information |
|---|---|---|---|
| | | | Ex. R (Fanatics Collect, https://www.fanaticsinc.com/fanatics-collect).<br>• Bell is part of the Fanatics Collectibles leadership team, Ex. F at 3, and ███ ███, Ex. T (2025 organizational charts) at '681.<br>• As recently as July 2023, ███ ███ ███ Ex. I (2023 organizational charts) at '010.<br>• Likely has unique, relevant information on Fanatics' coercing case breakers to join Fanatics Live, Am. Compl. ¶¶ 205-206, and its ███ ███ ███ ███ |
| 6 | Saj Cherian* | Chief of Staff and Head of Fanatics Ventures, Fanatics Holdings, Inc. | • Listed in Fanatics' initial disclosures as likely having knowledge of "Fanatics' sports trading card licensing agreements; Fanatics' negotiation of sports trading card licensing agreements." Ex. C at 2.<br>• Cherian "works closely with CEO Michael Rubin across several areas, including business development and partnerships, executive and board recruiting, capital raising, and investments to build the leading global digital sports platform." Ex. J (Fanatics, Saj Cherian, https://www.fanaticsinc.com/saj-cherian) at 1.<br>• Cherian helped "cultivate 10 long-term strategic partnerships (including [with] every major U.S. professional sports league)." *Id.* |



| No. | Individual | Title | Relevant Information |
|---|---|---|---|
|  |  |  | • Likely has unique, relevant information on the equity stakes granted to licensors by Fanatics, the GCP acquisition, and the licensing agreements at issue. |
| 7 | Julie Yoo* | Senior Vice President of Global Expansion, Fanatics Collectibles | • Listed in Fanatics' initial disclosures as likely having information regarding "Fanatics' sports trading card licensing agreements; Fanatics' negotiation of sports trading card licensing agreements; Fanatics' investment in GCP." Ex. C at 4.<br>• Integral to Fanatics' acquisition of Topps, which gave Fanatics the MLB and MLBPA licenses. Ex. K (*Julie Yoo — Fanatics*, Sports Business Journal). Yoo built the first model for the Topps acquisition and "for a couple of weeks" was the *only* person on the acquisition team. *Id.*<br>• Yoo ███████████████████ ███████████████████ ███. Ex. T (2025 organizational charts) at '681, '688, '692.<br>• Likely has unique, relevant information on the licensing agreements at issue, the Topps acquisition, and the GCP acquisition. |
| 8 | Denise Albero | Senior Vice President of Business Process (former SVP of Financial Planning and Analysis and Investor Relations), Fanatics Holdings, Inc. | • Currently Fanatics' SVP of Business Process and formerly the Senior Vice President of Financial Planning and Analysis and Investor Relations for Fanatics from October 2021 to August 2024. Ex. L at 1.<br>• As SVP of Financial Planning and Analysis and Investor Relations, Albero "[r]aised ~$2.5Bn in two separate equity rounds" and "[o]versaw integration of the Topps trading cards business upon close December 2021 which was foundational to the creation of the |

| No. | Individual | Title | Relevant Information |
|---|---|---|---|
| | | | Collectibles operating segment." *Id.* at 1-2.<br>• Likely has unique, relevant information on the equity stakes granted to licensors by Fanatics and the Topps acquisition. |
| 9 | Clay Luraschi* | Senior Vice President of Global Product Development, Fanatics Collectibles | • Listed in Fanatics' initial disclosures as likely having knowledge of "Fanatics' product innovation." Ex. C at 3.<br>• Luraschi ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Ex. T (2025 organizational charts) at '681, '694-'698. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *Id.*<br>• Luraschi was at Topps for years before Fanatics' acquisition. *See* Ex. P (Luraschi LinkedIn Profile).<br>• During the parties' negotiations, Fanatics offered to add Luraschi to its list of custodians, but it withdrew this offer when Panini refused to agree to a 15-custodian cap. Ex. B at 3, 8, 10.<br>• Likely has unique Topps and Fanatics documents relevant to product market definition. |
| 10 | Brian Boyce* | Former GCP Account Manager | • Listed in Fanatics' initial disclosures as likely having relevant information on "GCP's operations." Ex. C at 5.<br>• Boyce was at GCP during Fanatics' acquisition and during the period that Fanatics began using GCP to decrease output of Panini cards. Am. Compl. ¶¶ 121-149.<br>• During the parties' negotiations, Fanatics offered to add Boyce to its list of custodians but it withdrew this offer when Panini refused to agree to a 15-custodian cap. Ex. B at 3, 8, 10.<br>• Likely has unique, relevant information on Fanatics' use of GCP to restrict |



| No. | Individual | Title | Relevant Information |
|---|---|---|---|
|  |  |  | output of Panini cards. Am. Compl. ¶¶ 121-149. |
| 11 | Brian Bayne | Vice President of Athlete Partnerships, Fanatics Collectibles | <ul><li>Former Panini employee who now works for Fanatics.</li><li>Likely has unique, relevant information regarding Fanatics' raid on Panini for its employees and trade secrets. *See* Am. Compl. ¶¶ 150-162; Ex. M at 114:25-115:9, 119:24-120:12, 166:18-23 (Bayne "gathering names" from Galaviz to assist Fanatics in raid), 54:20-22 ("Q. Do you understand that any of the stuff you took was confidential Panini information? A. Potentially.").</li><li>Likely has unique, relevant information regarding Fanatics' executing exclusive deals with rookie players to deprive Panini of the ability to include those players' autographs with its trading cards. Am. Compl. ¶¶ 163-169, 232-233.</li></ul> |
| 12 | Elizabeth Galaviz | Director of Athlete Partnerships, Fanatics Collectibles | <ul><li>Former Panini employee who is now at Fanatics.</li><li>Likely has unique, relevant information regarding Fanatics' raid on Panini for its employees and trade secrets. *See* Am. Compl. ¶¶ 150-162; Ex. M at 166:18-23 (Galaviz sent names to Bayne of who Fanatics should target at Panini); Ex. N at 31:17-22 (Galaviz returned thumb drive of Panini property after exit).</li><li>Likely has unique, relevant information regarding Fanatics' executing exclusive deals with rookie players to deprive Panini of the ability to include those players' autographs with its trading cards. Am. Compl. ¶¶ 163-169, 232-233.</li></ul> |

\*Listed in Fanatics' Initial Disclosures as likely possessing relevant information.