# Exhibit M

**Brian Bayne - Attorneys' Eyes Only - May 12, 2023**

**1**

NO. DC-23-04798

PANINI AMERICA, INC.,          )   IN THE DISTRICT COURT
                               )
    Plaintiff,                 )
                               )
VS.                            )
                               )
ELI NICHOLAS MATIJEVICH,       )
JR., CARLOS TORREZ, DAVID      )   DALLAS COUNTY, TEXAS
SHARP, BRIAN BAYNE,            )
ALEXANDER CARBAJAL, JOSEPH     )
REYES, ELIZABETH GALAVIZ       )
and FANATICS, LLC,             )
                               )
    Defendants.                )   44TH JUDICIAL DISTRICT

ATTORNEYS' EYES ONLY

ORAL AND VIDEOTAPED DEPOSITION OF

BRIAN BAYNE

MAY 12, 2023

ORAL AND VIDEOTAPED DEPOSITION of BRIAN BAYNE, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 12th of May, 2023, from 2:17 p.m. to 6:24 p.m., before Audra B. Paty, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Locke Lord, LLP, 2200 Ross Avenue, Suite 2800, in the City of Dallas, County of Dallas, State of Texas, pursuant to Notice and the Texas Rules of Civil Procedure.

**2**

APPEARANCES

FOR THE PLAINTIFF:
    Mr. Jeffrey M. McPhaul
    Mr. David M. Gregory
    Ms. Emma Bennett
    LOCKE LORD, LLP
    600 Travis Street, Suite 2800
    Houston, Texas 77002
    713.226.1200
    jmcphaul@lockelord.com
    dgregory@lockelord.com
    ebennett@lockelord.com
    Ms. Jessica Mugler (Remote)
    BOIES SCHILLER FLEXNER, LLP
    1401 New York Avenue, NW
    Washington, D.C. 20005
    202.274.1169
    jmugler@bsfllp.com

FOR THE DEFENDANTS:
    Mr. Vineet Bhatia
    SUSMAN GODFREY, LLP
    1000 Louisiana Street, Suite 5100
    Houston, Texas 77002
    713.653.7855
    vbhatia@susmangodfrey.com
    Ms. Canem Ozyildirim
    Mr. Nate Cullerton (Remote)
    Mr. Michael Thomas (Remote)
    WACHTELL, LIPTON, ROSEN & KATZ
    51 West 52nd Street
    New York, New York 10019
    212.403.1000
    cozyildirim@wlrk.com
    ncullterton@wlrk.com
    mthomas@wlrk.com

ALSO PRESENT:
    Ms. Lan Nguyen
    Ms. Shiri Ben-Yishai
    Mr. Guy Tubbs, Videographer

**3**

                INDEX
WITNESS                                          PAGE
BRIAN BAYNE
EXAMINATION BY MR. McPHAUL                          5
EXAMINATION BY MR. BHATIA                         172

CORRECTIONS MADE BY WITNESS                       178

SIGNATURE OF WITNESS                              179

REPORTER'S CERTIFICATION                          180

EXHIBITS                                    IDENTIFIED
Exhibit 1 - Spreadsheet                            58
Exhibit 2 - Bayne/Reyes text messages             70
Exhibit 3 - Bayne/Carby text messages             77
Exhibit 4 - Carbajal/Bayne/Reyes/Galaviz
            text messages                         136

Exhibit 5 - 4-13-23 Hull e-mail to all           145

Exhibit 6 - Bayne/Killian text messages          146

Exhibit 7 - Bayne/Kleiman text messages          147

Exhibit 8 - Fan-Bay Excel spreadsheet            150

Exhibit 9 - Fan-Bay Excel spreadsheet            152

Exhibit 10 - Bayne/Kirkland text messages        156

Exhibit 11 - Bayne/Frischer text messages        157

Exhibit 12 - Bayne/Galaviz text messages         163

Exhibit 13 - March 2023 calendar                 177

Exhibit 14 - April 2023 calendar                 177

**4**

PROCEEDINGS

THE VIDEOGRAPHER: We are on the video record at 2:17 p.m. beginning Media Number 1 of the videotaped deposition of Brian Bayne. Today's date is May the 12th, 2023.

If the attorneys present would please state their appearance for the record as well as any agreements, after which the court reporter will please swear in the witness.

MR. McPHAUL: Jeff McPhaul for the plaintiff.

MR. BHATIA: Vineet Bhatia for the witness and Fanatics.

MS. OZYILDIRIM: Canem Ozyildirim for Fanatics.

MS. NGUYEN: Lan Nguyen for Fanatics.

MR. McPHAUL: And it looks like on the line we also have a few people. One on our side, Jessica Mugler for the plaintiff as well.

MS. OZYILDIRIM: I jotted their names down for you, but, yeah.

MR. McPHAUL: And I think the only agreement is that we're operating under our protective order.

MR. BHATIA: Yes.

Brian Bayne - Attorneys' Eyes Only - May 12, 2023

53

Q. So I guess what does Mr. Howarth have to do with you copying that information you're talking about?

A. It doesn't have anything to do with me copying it. I simply was trying to hurry because he was talking to the staff while I was sitting in an office after I had resigned.

Q. And what was he saying to the staff that caused you to need to hurry?

A. He was rallying the troops. I didn't want to be there to any conversation -- privy to any conversation that I didn't need to given that I had now resigned.

Q. And was this just a thumb drive you had laying around in your office or what?

A. Yeah, it was just -- I had multiple thumb drives at work like I assume most people do.

Q. And do you think you did that in the morning?

A. It was after I resigned.

Q. In the morning or afternoon? Do you remember?

A. It was in the morning.

Q. What -- what exactly were you trying to take with you when you did this copying onto the thumb drive?

54

A. My children's pictures or any -- it was off the desktop. So multiple things on the desktop, so I just copied the desktop, anything that was there went onto it.

Q. Okay. Did you look at what it was that you were copying at all?

A. Look at it? It was on the screen. You had to look at it.

Q. Well, did you just drag and drop certain files, or how did you do it?

A. Just the whole thing. Just Control A.

Q. Okay.

A. Because there was a folder here, kid's picture there, kid's picture there, rah-rah speech out there. I was going.

Q. And you didn't -- you just kind of copied it all indiscriminately? You didn't look at what you were taking?

A. Correct. Correct.

Q. Do you understand that any of the stuff you took was confidential Panini information?

A. Potentially.

Q. Like what?

A. I'm not certain, but it was the desktop, so you know, anything, where I could have been working on

55

a plane where I saved to the desktop, could have been there.

Q. Okay. Any ideas as to the, like, types of files?

A. I'm not sure what was on there.

Q. What kinds of things would you consider to be confidential Panini information?

MR. BHATIA: Objection to the form of the question.

You can answer.

A. What types of things? Company information.

Q. (BY MR. McPHAUL) Like what?

A. I guess financial numbers would be confidential.

Q. Anything else?

A. I'm not certain.

Q. That's the only thing you can think of that would be confidential to Panini?

A. Well, I mean, any workflow systems, things like that, I supposed, if it was Panini owned.

Q. Like what?

A. I guess things with product development stuff or things that might have to do with unique products that are unique to the build creation for Panini alone.

56

Q. Would that be, like, form breaks?

MR. BHATIA: Object to the form of the question.

A. I don't know anything about form breaks.

Q. (BY MR. McPHAUL) Okay. Well, when you said product development stuff, what were you referring to?

A. You asked me what I thought was confidential. I don't think form breaks are confidential. I'm saying, like, proprietary information on product. You said form breaks. I didn't.

Q. Yeah, and I'm just trying to figure out what you're saying would be included within product development. Everything?

A. No, I don't think everything.

Q. Okay. So what were you referring to when you said product development stuff?

A. Well, if you create a unique product and it's -- and there's a unique thing that no technology is involved, that could potentially be confidential. That's not what I had, so I'm not certain what you're asking.

Q. What about budgets? Would that be confidential?

A. I would think so.

Q. You would agree that's something you

Dickman Davenport, Inc
214.855.5100    www.dickmandavenport.com    800.445.9548

**113**

You say, "Great. Applied yet?"

Do you see that?

A. I do.

Q. And he says, "They haven't. Do they need to apply to anything in our department."

And you say, "Hit you later. Apply for anything close."

Do you see that?

A. Correct.

Q. You're telling Mr. Carbajal to have his team apply, right?

A. No. They're saying they wanted to come -- Alex is telling me staff wanted to come on board. We can't hire if they haven't -- it's staff that may want to leave Panini, which is fine if they do. Couldn't come on board with Fanatics if they hadn't applied. That wouldn't make sense.

MR. McPHAUL: Objection, nonresponsive.

Q. (BY MR. McPHAUL) Sir, what did you mean when you said, "Apply for anything close"? What does that mean?

A. He would need to apply -- see how he says, "Drew Butterbaugh is my data entry guy"? Keep in mind I hadn't looked at Fanatics's postings. They had. I hadn't looked. So if Drew Butterbaugh wanted to apply

**114**

for a position, he would need to go on Fanatics's site and find something that would match close to what he does if there was a position.

Q. And you're telling Mr. Carbajal to have them go ahead and apply for anything close, right?

A. If Drew was interested in joining, he would need to apply.

MR. McPHAUL: Objection, nonresponsive.

Q. (BY MR. McPHAUL) You're telling Mr. Carbajal to have Mr. Butterbaugh and these data entry people apply for anything close, right?

A. Mr. Carbajal asked me if they needed to apply in the department. My response to him was if he wants to, he would need to apply.

Q. And you're telling him go ahead and have him apply, right?

A. If he wants to join, he's his data entry guy. Alex is telling me who -- someone may want to join the company. My response is "Alex, he needs to respond -- he needs to apply if he wants to join the other company. That's all. I didn't bring up Drew's name or ask that he bring Drew on board.

Q. Did you ever suggest to Alex, to Liz, to Joseph, or Joe Reyes, or -- sorry. There's too many names. Mr. Eric. Excuse me. Did you ever suggest to

**115**

Eric, Joe, Alex, or Liz that they have certain employees apply to work at Fanatics?

A. Those top directors you're referring to had told me that there was staff that did not want to be there and wanted to join Fanatics, and I said, Tell them to apply, sure.

Q. You did tell Alex, Liz, Eric, and Joe to have their staff apply to work at Fanatics, right?

A. The only way you could be hired is to apply.

Q. Go to the next page. There is a photo.

A. Is that 917.

Q. 917, yes.

A. Yes, sir.

Q. Go to 917, Exhibit 3. There's a photo in the middle of the page.

Do you see that?

A. I do.

Q. What is that?

A. What?

Q. Do you know what it is?

A. I don't. It's an attachment. I don't know what that is.

Q. Well, two down -- or the next message from you, it says, "LOL. We should meet next week." And you say, "Now delete. LOL."

**116**

Do you see that?

A. I do.

Q. Why are you telling him to delete this message?

A. I don't know. I'm saying LOL, and he said LOL.

Q. You have no idea what this refers to?

A. I don't. Do you have the image?

Q. I suspect y'all do, but, no, I don't unfortunately.

A. I'm sorry. It just has an attachment.

Q. And Mr. Carbajal says, "Uh, yeah," and then it looks like a laugh emoji.

Do you see that?

A. I do.

Q. You don't have any idea what this image is?

A. Unfortunately, I do not, sir.

Q. And you say, "By the way, I love that I asked you about applying, and you give detailed response. Literally, same question to Liz, and I get. I'm not sure about either of them."

Do you see that?

A. Correct.

Q. Were you frustrated that Ms. Galaviz was not getting her team to apply fast enough?

Brian Bayne - Attorneys' Eyes Only - May 12, 2023

117

A. No. Ms. Galaviz was never asked to get her team to apply.

Q. What did you mean in the message here? Were you frustrated with Ms. Galaviz for something?

A. No. I was -- remember, all the staff had mentioned that people did not want to be at Panini and wanted to join Fanatics. In order to join Fanatics, they needed to apply. So I was simply just as I asked Alex who was interested in joining, and Liz didn't say, but, yet, people in her department may have wanted to.

Q. And what did you want her to do?

A. If someone similar to Alex -- had someone on her team expressed interest to her, as his team expressed interest to him, simply let me know, because with thousands of applications pouring in, because these people worked closely with me, I would simply same as Alex. There is no way you can get hired or an interview without knowing you applied because it's chaos.

Q. And then would you go to Fanatics and identify for them which people Alex and Liz wanted them to hire?

A. It refers to the exact same situation as before with Alex, where if a name came in, I can't

118

recall if I sent it or called him and said, Hey, if these people want to come over, like anywhere you would do, pull a resume and interview them. I didn't hire anyone. I had nothing to control that. There may have been tons of people that were more -- I had nothing do with that, but if they did, at least try to sort their resumes out.

Q. And you would help Fanatics identify which of these applicants you thought were worth interviewing and hiring, right?

A. I didn't flag applicants that were worth interviewing and hiring. I flagged applicants that had applied, and then it would be for Fanatics to determine if they were worthy of hiring. I didn't hire.

Q. Do you know of any applicants that you flagged for Fanatics that they didn't hire?

A. I didn't flag applicants. I simply sent over names of anyone that was interested in leaving the company. I wasn't flagging. It wasn't my position to flag. All these applications came in, and people were hired based on applying for a different company.

Q. Okay. So you were sending names to Fanatics of people that you understood had applied; is that right?

119

A. Correct.

Q. And of those names that you sent, do you know of any of them that Fanatics did not hire?

A. I do not recall.

Q. Okay. And when you would send their names to Fanatics, who were you sending them to?

A. That's who I'm not sure. I'm not sure if it was Katie Shea. That seems reasonable, but I'm not certain.

Q. You can't tell me how you sent them to -- well, you can't tell me who you sent them to, right?

A. Definitively. There was a lot of chaos going on.

Q. You think it might have --

A. I wish I could remember. I just -- sorry.

Q. No, no. Sorry. You were still talking.

A. No, no. It's okay.

Q. Let me try it again.

You received names from Ms. Galaviz, from Mr. Reyes, from Mr. Carbajal of team members that they wanted to add to their team, true?

A. I don't believe Ms. Galaviz gave a name because she just didn't want to, I guess.

Q. Okay. You received names from Mr. Carbajal and Reyes and names they wanted to add to their team,

120

true?

A. That wanted to be hired, yes.

Q. The names that they wanted to add to their teams, right?

A. The names they worked with at Panini but thought might be a good fit for a position if there was opportunity there. Once again, I hadn't seen the job postings.

Q. And then you took those names, and you sent them to somebody at Fanatics, but you don't remember exactly who, right?

A. That's accurate.

Q. You think it might have included Ms. Shea, but you're not sure, right?

A. Correct.

Q. You can't tell me how you sent them, right?

A. I believe I did it over the phone, but I said one there, I was copy and pasting because I know I was at dinner a couple of times, too. So it could have even been because I was -- you know, if I would be out of pocket or whatever. It's not saying I wouldn't have sent it to Omar saying, Hey, you know, these people were interested. I have nothing to do with this. It may have been Omar.

Q. Okay. So you might have sent it to Mr.

Brian Bayne - Attorneys' Eyes Only - May 12, 2023

165

Do you see that?

A. I do.

Q. And why was it a rush? What was the rush? Do you know?

A. I do.

Q. What was it?

A. I was at my son's friend's birthday party at Main Event, and I was in the car.

Q. And were you rushing to try to get this over to someone? Why couldn't it wait until after the birthday party?

A. Because it was getting late, and I wanted to get it done, so I was in the car while they went in. I wanted to...

Q. Could it have waited until the next day?

A. I'm not certain.

Q. Who was waiting on this list? Do you know?

A. No one was waiting on it. I wanted to get it over if anyone similar to our prior discussion had wanted to apply and they were -- their names were there.

Q. You say, "Pasting --

A. No rush.

Q. Oh, sorry. I thought you were done. You say, "Pasting all three lists at once in a minute."

166

Do you see that?

A. I did.

Q. What are the three lists? Do you know?

A. I'm not certain, but given that I have Elizabeth, Joe, and Alex who had employees that mentioned wanting to leave or at least be interviewed, I would assume that was the three.

Q. So you think you're gathering names from Joe Reyes, Alex Carbajal, and Elizabeth Galaviz to then provide to Fanatics, right?

A. I'm certain that there was thousands of applicants going in and that at that point it was getting -- because if you see the date, it was many applications were going in. So I was trying to get those over if anyone wanted to get an interview.

Q. You're gathering --

MR. McPHAUL: Objection, nonresponsive.

Q. (BY MR. McPHAUL) You're gathering lists of names from Joe Reyes, Alex Carbajal, and Elizabeth Galaviz that you were then going to turn around and provide to Fanatics, true?

A. This text shows that I was gathering names or getting names from Elizabeth.

Q. And you were also gathering them from Joe Reyes and Alex Carbajal, right?

167

A. We have went through Alex Carbajal's. I'm not certain on Joe Reyes, though, because I don't have those texts.

Q. All right. So I thought you told me a minute ago -- well, actually let's look at it because it was one of the earlier ones we marked.

A. Sure.

Q. I guess Number 2. Yeah, Number 2. Do you have Number 2 there?

A. Number 2. I do have Number 2.

Q. Okay. Go to page 787 of Number -- Exhibit Number 2.

A. Okay. I'm there.

Q. And do you see at the bottom it says, "Need" -- the same "Need you top people. You'd add to the team quickly."

Do you see that?

A. Yeah.

Q. So it looks like you did copy and paste it to Mr. Reyes, Mr. Carbajal, and Ms. Galaviz, right?

A. I would assume that way, yeah, because it's three in a row.

MS. OZYILDIRIM: Exhibit 2, page Bates ending 0787?

MR. McPHAUL: Correct.

168

Q. (BY MR. McPHAUL) And if we -- if we go on to the next page, the top, it's 788, Mr. Reyes responds, "Larkin Heldt, Monica Rodriguez, Drake Moss would take anything to come over but understand you're only asking for top."

Do you see that?

A. I do see that.

Q. All three of those individuals have been hired by Fanatics, right?

A. Larkin, Monica. They have, yes.

Q. And did you provide those names to Fanatics that Mr. Reyes gave you here?

A. I'm not certain because I don't have that.

Q. Do you think you might have turned around and not provided these to Fanatics?

A. I'm saying I don't recall what names I provided to Fanatics. I didn't -- anyone that had applied and wanted -- interest, I was going to just tell them to interview that staff.

Q. Did you vouch for how great anyone was when you went and talked to Fanatics?

A. That was for them to determine when they interviewed them.

Q. So you didn't vouch for how great they were?

A. I wouldn't need to vouch for them. They have