LATHAM&WATKINS LLP                    quinn emanuel trial lawyers | new york

September 30, 2025

**Via ECF**

The Honorable Valerie Figueredo
United States District Court Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:   *Panini America, Inc. v. Fanatics, Inc. et al.*, Case No. 1:23-cv-09714-LTS-VF (S.D.N.Y. 2023)

Dear Judge Figueredo:

Fanatics makes this submission before the conference on October 9, 2025 in the matter above to respectfully request that the Court compel Panini to produce documents in response to certain of Fanatics' Requests for Production ("RFPs"). Specifically, Fanatics seeks production of (1) several categories of documents and data for the period of 2009 to 2014, (2) several categories of ex-U.S. documents and data, and (3) documents responsive to RFP Nos. 51 and 67.

**I.   Fanatics' Requests for Certain Documents and Data from 2009 to 2014**

Panini refuses to produce several categories of critical documents for the period of 2009 to 2014. These documents are admittedly relevant—Panini has already agreed to produce them for the period of 2014 to present. But Panini objects to producing them back to 2009, purportedly due to burden. Any burden objection is baseless and unsubstantiated: Panini's lawsuit centers on Fanatics' conduct in entering into the collectibles business, which Panini has characterized as anticompetitive. To defend this claim—including by establishing that acquisitions and multi-year exclusive licenses are the norm—it is critical that Fanatics obtain discovery into the period when Panini "entered the United States trading card business" (i.e., 2009), ECF No. 69, Amended Complaint ¶ 76 ("Am. Compl."). Panini put documents from this time period directly in issue by alleging that, since it obtained exclusive licenses in 2009, it has achieved "win-win results" for licensors (Am. Compl. ¶ 78), and that it was Fanatics' conduct—instead of Panini's own business failings—that caused Panini to lose those licenses. Accordingly, Panini must produce documents going back to 2009 concerning its licensing practices, competition for licenses, pricing and other business practices, financial and competitive performance, and contemplated sales transactions. Panini has failed to substantiate why it would be prohibitively burdensome to search for such documents, which are central to disputed issues in the case.

Specifically, the requests at issue seek documents and communications concerning:

- Competition for licenses to produce or sell collectibles (**RFP No. 6**);

- Use or attempted use of exclusive licenses for the production or sale of collectibles, including any potential benefits, advantages, or harms thereof (**RFP No. 9**);

- Types and quantities of collectibles products Panini produced and sold (**RFP No. 14**);

- Panini's pricing for collectibles products, as well as its general practices and procedures for pricing collectibles products (**RFP Nos. 15-16**);

- Panini's allegations that it has "expanded" the collectibles category, brought "innovative designs, marketing, and distribution," and "generated win-win results" for collectibles licensors (**RFP Nos. 19-20**) (quoting Am. Compl. ¶¶ 2, 5, 78, 79, 176);

- Communications with licensors of collectibles regarding bidding for collectibles licenses and payments made to licensors (**RFP Nos. 35, 38**)[1]; and

- Any potential sale or securitization of Panini's business, including valuations of Panini's business (**RFP Nos. 59-61**).

*See* Ex. A (Panini's Responses & Objections to Fanatics' RFPs).

These discrete categories of documents and data from the period immediately after Panini's entry into the United States are relevant to numerous disputed issues in this case, including (1) whether Fanatics' conduct in entering the collectibles space—which mirrors Panini's—is consistent with industry norms and (2) whether Fanatics caused Panini's purported harms (or whether instead Panini's own failings caused any purported harm to its business). Panini should produce documents in response to the above requests dating back to 2009.

*First*, Panini should produce documents from the time it "entered the United States trading card business" (i.e., 2009) concerning Panini's competition for licenses (RFP 6), use or attempted use of exclusive licenses (RFP 9), and licensing bids and offerings (RFPs 35 and 38, not limited to a go-get search for "pitches" only), so that Fanatics can rebut Panini's allegations that Fanatics' business conduct was exclusionary and outside of industry norms. Panini alleges that Fanatics' conduct in entering the collectibles space by obtaining exclusive licenses with certain leagues and players associations—including Fanatics' acquisition of the MLB license through purchasing Topps—was anticompetitive. Am. Compl. ¶¶ 114-119. Panini demanded (and Fanatics agreed to produce) documents from several years prior to when Fanatics created a collectibles business. Ex. B at 2. Panini argued that these historical documents capture "relevant conduct" related to planning and license acquisition efforts. *Id.* At the same time, Panini seeks to shield itself from comparable discovery into its own licensing efforts. In January 2009, Panini obtained an exclusive license with the NBA—which it has held for more than 15 years. Am. Compl. ¶¶ 77, 96. Later that year, Panini obtained licenses with the NFL and the NFLPA (which it also continues to hold) by acquiring a competitor in the industry, Donruss. *Id.* ¶¶ 77, 97. Having put Fanatics' manner of acquiring licenses and entering the collectibles space at issue, Panini cannot now claim that its

---

[1] Panini has agreed to produce documents from January 1, 2009 in part for RFP 38, limited to a go-get search for "pitches to licensors" only. Fanatics seeks the full scope of documents requested in this RFP.

2

analogous conduct is off limits for establishing facts such as the benefits of exclusive licenses and industry norms around obtaining such exclusives.

This Court has already recognized that Panini's previous exclusive licensing practices are relevant at least "for considerations of industry norms."  ECF No. 164, MTD Order at 18 n.11,; *see also U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1369-70 (2d Cir. 1988) (evidence of plaintiff's allegedly anticompetitive conduct relevant to causation and damages and also properly used for impeachment); *First Beverages, Inc. of Las Vegas v. Royal Crown Cola Co.*, 612 F.2d 1164, 1173 (9th Cir. 1980) (antitrust defendants may present "evidence of plaintiff's acceptance and advocacy of the restrictions challenged as relevant to the question of the reasonableness of the restrictions"); *In re Diisocyanates Antitrust Litig.*, 2024 WL 521221, at *3 (W.D. Pa. Feb. 9, 2024) (an antitrust plaintiff's "own parallel . . . conduct" may be relevant to demonstrate whether challenged activities are "'competition-enhancing' and consistent with industry norms").  Thus, discovery into Panini's licensing and other business practices back to 2009 is at the very least relevant to establishing the industry practice around license acquisitions and exclusivity and the reasonableness of Fanatics' challenged actions.

*Second*, Panini should produce documents from 2009 onward related to its own financial and competitive performance, including alleged innovations and "win-win results" (RFPs 19-20), manufacturing, sales, and pricing data and practices (RFPs 14-16), and attempts to sell or securitize its business (RFPs 59-61).  These documents are essential for Fanatics' defense of Panini's allegations that any purported harm to its business was caused by Fanatics.  Panini asserts that Fanatics' conduct—and not Panini's own business failures—caused Panini to suffer injury.  *E.g.*, Am. Compl. ¶¶ 207, 235.  Whether Panini's business declined due to its own failure to invest and innovate—e.g., by becoming distracted and complacent and failing to capitalize on business opportunities because it was focused on trying to sell its business—is directly relevant to assessing whether Panini suffered harm as a result of competition on the merits versus Fanatics' alleged conduct.  Accordingly, Panini should produce the requested documents because they contain information "probative on the central issue of whether [Panini's] alleged injury and damages . . . were caused by [Fanatics'] anticompetitive conduct or by [Panini's] own deliberate business judgments." *See U.S. Football League*, 842 F.2d at 1369.

Panini's production of documents from 2009 onward for this tailored set of requests is proportional to the needs of this case.  For months now, Panini has failed to articulate any specific burden objection, other than a vague claim that collecting its financial data for the period of 2009 to 2014 in response to RFP Nos. 15, 35, and 38 would be "extremely burdensome" because Panini "switched to a new system for recording financials and payments," such that the data is "not practically accessible." Ex. C at 2; Ex. D at 2.  Although Fanatics has repeatedly asked Panini to articulate the specific burden associated with retrieving this data, Panini has failed to substantiate its burden objection. Ex. E at 1-2; Ex. F at 2.  Panini's financial data in the five years after it entered the United States is critical (as outlined above), so that data should be collected absent a concrete, substantial showing of burden.  As to the remaining categories of documents, any burden concerns can be resolved with reasonable search terms.  Further, Panini's proposal to make productions from 2014 onward is insufficient.  *See* Ex. B; Ex. C.  By 2014, Panini was already an established industry participant in the United States, having held the NFL/NFLPA and NBA licenses for five years.  Documents from this later period would fail to capture relevant evidence, including contemporaneous documents about why and how Panini entered into multiple, multi-

3

year exclusive licenses. Panini should be compelled to produce documents from the full period that Fanatics requests.

## II. Fanatics' Request for Certain Ex-U.S. Documents and Data

Panini generally refuses to produce documents related to its collectibles business outside the U.S., even though it is best known for making and selling collectibles for globally popular sports (e.g., FIFA World Cup trading cards) that reach U.S. consumers through both primary and secondary sales. Certain limited documents and data related to Panini's production and sale of collectibles outside the U.S. are critical to Fanatics' potential defense regarding the appropriate geographic market: Panini contends the geographic market is limited to the U.S., Fanatics believes the market is likely broader, and Fanatics is entitled to pursue discovery tending to establish that defense. Further, certain ex-U.S. documents and data are essential to defend against Panini's allegation that U.S. trading card manufacturer GCP is "an essential input for Panini's entire business." Am. Compl. ¶ 122.

*First*, to develop its defense that consumers look beyond the U.S.—and beyond the three U.S. sports leagues in Panini's artificially narrow market—to buy collectibles, Fanatics needs all documents and data, including ex-U.S. documents and data, responsive to its requests regarding:

- Panini's sale in the U.S. of trading cards depicting athletes from leagues, teams, or contests outside of the U.S., such as FIFA World Cup, FIFA Women's World Cup, Ligue 1, LaLiga, and the Premier League (**RFP 30**);

- Panini's allegation that consumers of sports trading cards in the U.S. generally purchase trading cards depicting only athletes from the NFL, NBA, or MLB (**RFP 31**);

- Panini's ex-U.S. manufacturing, sales, and pricing data (**RFPs 14-15**);

- Financial information related to Panini's ex-U.S. collectibles sales (**RFPs 32-34**);

- Panini's ex-US trading-card-related licenses (**RFP 3**); and

- Panini's corporate structure (**RFP 2**).

*Second*, to defend against Panini's claim that trading card manufacturer GCP is "an essential input for Panini's entire business," Am. Compl. ¶ 122, Fanatics needs documents regarding Panini's actual and potential ability to manufacture trading cards outside the U.S., including documents responsive to Fanatics' requests for:

- The identity of any manufacturer involved in producing trading cards, including the volume and type of trading card by manufacturer, that Panini sold in the U.S., *regardless of where that manufacturer was located* (**RFP 43**);

- Information regarding the quantity of trading cards GCP manufactured for Panini, *regardless of where those cards would be sold or distributed* (**RFP 45**); and

4

- The identity of all sources of materials integrated in Panini's trading cards, *regardless of where those sources are located* (**RFP 55**).

Panini's offer to produce only "documents concerning products *sold in the U.S. under a license authorized to distribute in the U.S.* regardless of where the licensee or licensor are physically located" is not sufficient. *See* Ex. E at 2 (emphasis added). The fact that Panini may not be "authorized to distribute [a product] in the U.S." does not prevent its distribution in the U.S.—in particular on the secondary (i.e., resale) market. While Panini contends that the relevant market is limited to "newly issued trading cards" (Am. Compl. ¶ 43), Fanatics contends that any collectibles market must include secondary sales. Accordingly, documents and data relating to Panini's ex-U.S. manufacturing and sale of collectibles—even if Panini is not itself authorized to distribute those collectibles in the U.S.—are directly relevant to Fanatics' defense of Panini's improperly narrow market.

### III. Fanatics' Individual Requests to Panini

***RFP 51.*** Fanatics' RFP 51 seeks "[d]ocuments sufficient to show all payments [Panini has] made or offered to make to any rookie for the right use that rookie's original, handwritten autograph." Similar to documents regarding Panini's own efforts to secure multi-year exclusive licenses (*supra* Section I), the timing and amount of Panini's payments (and offers of payment) to rookies across sports are relevant to, among other things, industry norms regarding these types of payments. Panini alleges Fanatics wrongfully paid NBA and NFL rookies "large sums" for their autographs, even though Fanatics could not use their autographs on league-licensed cards until 2025 or 2026. Am. Compl. ¶ 165. If, for example, Panini paid similarly "large sums" for players' autographs in sports where it does not hold any league licenses, that fact would be plainly relevant to Fanatics' defenses. Yet Panini insists on limiting it response to this request to *only* NFL, NBA, and MLB rookies (even though Fanatics contends the market encompasses many other sports leagues) and *only* going back to 2021 (even though Panini has held relevant licenses since 2009). Panini should be required to produce documents sufficient to show all payments it has made or offered to make to any rookie going back to at least January 1, 2017.

***RFP 67.*** Fanatics has already limited RFP 67 to "documents sufficient to show the nature and outcome of any formal investigations into breaches of [Panini's] Code of Ethics and/or Organization, Management, and Control Model," yet Panini refuses to produce any documents on the ground of relevance. These documents are relevant to Panini's performance in the collectibles industry and the integrity of its business practices, including the reasons why licensors and athletes may not want to be in business with Panini. Accordingly, they are relevant to Fanatics' defenses regarding causation and damages. *See, e.g.*, ECF No. 173, Fanatics' Affirmative Defense No. 14. Further, RFP 67 as narrowed imposes minimal burden: it is a "sufficient to show" request seeking only the nature and outcome of any formal investigations.

Respectfully submitted,

| | |
|---|---|
| */s/ Michael B. Carlinsky* | */s/ Lawrence E. Buterman* |
| Michael B. Carlinsky | Lawrence E. Buterman |
| Quinn Emanuel Urquhart & Sullivan LLP | Latham & Watkins LLP |
| 295 Fifth Avenue | 1271 Avenue of the Americas |
| New York, NY 10016 | New York, NY 10020 |
| michaelcarlinsky@quinnemanuel.com | lawrence.buterman@lw.com |
| (212) 849-7000 | (212) 906-1264 |
| | |
| *Counsel for Fanatics* | *Counsel for Fanatics* |