

BOIES
SCHILLER
FLEXNER

September 30, 2025

**Via ECF**
The Honorable Valerie Figueredo
United States District Court Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

      Re: *Panini America, Inc. v. Fanatics, Inc. et al.*, Case No. 1:23-cv-09714-LTS-VF
      (S.D.N.Y. 2023)

Dear Judge Figueredo:

We write on behalf of Panini seeking an order compelling Fanatics to produce documents responsive to requests in Panini's First Set of Requests for Production ("First Requests") and Second Set of Requests for Production ("Second Requests"). The requested discovery is relevant under Rule 26(b)(1) and Fanatics has not offered any valid justification for withholding it. *See Johnson v. J. Walter Thompson U.S.A., LLC*, 2017 WL 3055098, at *2 (S.D.N.Y. July 18, 2017) ("Once relevance has been shown, it is up to the responding party to justify curtailing discovery.").

## ARGUMENT

### I.    Sports trading card agreements with resellers

> **Request 4, First Requests (as modified[1])**: *All policies, procedures, or agreements concerning the price, terms, or conditions pursuant to which distributors, retailers, hobby shops, breakers, or other resellers may sell Your products, including without limitation any suggested retail pricing policies or minimum advertised pricing policies.*

Fanatics complains that this request seeks every agreement with the listed third parties. But Fanatics—who served the same request on Panini—has conceded relevance.[2] And even if the request does seek all agreements with the listed third parties, that is not a basis for withholding relevant discovery. Fanatics has done nothing to substantiate a claim of undue burden—by, for example, proposing search terms, providing hit counts, or showing that the requested agreements are not reasonably accessible—or otherwise demonstrate good cause to justify non-disclosure. Indeed, Fanatics has refused to include this request in the parties' ongoing exchange of hit counts.

---

[1] In some instances, the disputed requests have been narrowed or modified during the meet and confer process. This letter includes the operative version of each request.

[2] The agreements sought by this request are relevant to Panini's allegations that—as part of its anticompetitive strategy—Fanatics restricted access to key distribution channels and market participants, including by leveraging its existing and anticipated market power to renegotiate its agreements with retailers and hobby stores on terms that compromise consumer choice, Amended Complaint ("AC") ¶¶ 195, 200–204, 228, and forcing case breakers to migrate to Fanatics Live on restrictive terms, *id.* ¶¶ 205, 207. *See also* Dkt. 172 at 7. During the meet and confer process, Panini agreed to modify the original version of Request 4 to track Fanatics' Request 57 verbatim to address Fanatics' purported overbreadth concerns.



## II.    <u>Documents concerning Fanatics' relationship with OneTeam</u>

> Request 75, Second Requests: *All Documents relating to Your agreements with OneTeam.*
>
> Request 82, Second Requests: *All Documents relating to Your control, voting rights, or other governance rights in OneTeam, including, but not limited to, all Documents and Communications concerning Your board seats or board observer rights on OneTeam's board of directors.*

Fanatics previously refused to produce documents responsive to these OneTeam requests because it claimed the requests were duplicative of others.[3] Fanatics now understands that these requests seek unique documents, but it claims such documents are irrelevant.

Request 74 seeks documents related to *all* of Fanatics' agreements with OneTeam.[4] To recap, OneTeam is the joint venture created by (at least) the NFLPA and MLBPA. AC ¶ 112. Fanatics contends the only relevant responsive documents are those related to Fanatics' exclusive trading card agreements with the NFLPA ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and MLBPA, which Fanatics has already agreed to produce. But public statements on OneTeam's website reveal that Fanatics' relationship with OneTeam extends far beyond these contracts: "***OneTeam launche[d] Fanatics Collectibles with Michael Rubin.***"[5] That statement means the NFLPA and MLBPA— through OneTeam—"launched Fanatics Collectibles" with "Michael Rubin," Fanatics' CEO, and then they self-awarded that newly launched entity twenty-year, exclusive deals. And it indicates deep, bidirectional governance and coordination ties between Fanatics and OneTeam that probe the "conspiracy between the NFLPA, the MLBPA, and Fanatics to license both players associations' intellectual property on an exclusive basis for twenty years each." Dkt. 164 at 20. Fanatics thus should be required to produce *all* documents related to its agreements with OneTeam so that Panini can discover the full scope of OneTeam and Fanatics' business ties.

For the same reason, Fanatics should produce documents responsive to Request 82. While other requests seek discovery on OneTeam's rights ***in*** Fanatics (the opposite of Request 82) and financial arrangements between Fanatics and OneTeam, Request 82 is the only request for documents on Fanatics' voting and governance rights in OneTeam. This information may show that Fanatics and OneTeam are not merely part of standard licensor-licensee relationship but are instead intertwined in ways that facilitate coordination and reduce competition.

## III.    <u>Documents concerning Panini's contract with GCP</u>

> Request 125, Second Requests: *All Documents and Communications concerning Panini's contract with GC Packaging, including the change of control, confidentiality, property rights, and technical information provisions in that contract.*

Fanatics has refused to produce documents responsive to Request 125, arguing that the request concerns only Panini's dismissed claim for tortious interference with the change-of-control

---

[3] In its August 12 order, this Court recognized that Fanatics' relationship with OneTeam is "relevant to Panini's Section 2 claims" and directed the parties to meet and confer to discuss whether the information sought by Requests 74, 75, and 82 would "be produced by Fanatics in its response to other document requests." Dkt. 197 at 2. After further meet and confer discussions, Panini withdrew Request 75 after Fanatics confirmed it was treating it as duplicative of another request and would not withhold responsive information. The parties could not agree on Requests 74 and 82.

[4] Panini offered to narrow this request to "All Fanatics' agreements with OneTeam and all Documents concerning the negotiations and execution of those agreements, including, but not limited to, term sheets, memoranda of understanding, related Communications, and all drafts of such agreements." Fanatics refused this compromise.

[5] *About Us*, OneTeam, https://oneteam.com/about-us/.



provision in the GCP contract. This objection is misplaced. Panini's claim that Fanatics tortiously interfered with GCP's manufacturing obligations in Panini's production agreement with GCP remains. Dkt. 164 at 28. Fanatics' documents and communications on Panini's contract with GCP are central to this surviving claim. They bear on Fanatics' knowledge of the contract and its potential procurement of a breach—core elements of tortious interference. *See Rich v. Fox News Network, LLC*, 939 F.3d 112, 127 (2d Cir. 2019). These materials also support Panini's Section 7 claim, which the Court found adequately pleaded and tied to Fanatics' knowledge of the GCP contract. Dkt. 164 at 23. Documents and communications concerning that knowledge probe whether Fanatics acquired GCP "solely to control and cut off Panini's trading card production capabilities" by interfering with GCP's contractual obligations to Panini, *id.*, in violation of the Clayton Act. These same documents are also relevant to establishing Fanatics' anticompetitive intent, an important aspect of Panini's Section 2 claims. AC ¶¶ 138, 140, 207.

## IV. Equity agreements and governance rights held by licensors

> Requests 112 and 116, Second Requests (as modified): *Documents sufficient to show Fanatics provision of equity ownership in Fanatics to Major U.S. Professional Sports Leagues, Team Owners, professional Athletes, Players Associations, and OneTeam (including applicable equity agreements) and control, voting rights, or other governance rights held by Major U.S. Professional Sports Leagues, Players Associations, or OneTeam in Fanatics.*

This Court has found that "information concerning the grant of an equity or other ownership interest in Fanatics to the licensors prior to the execution of the relevant license agreements is relevant to Panini's Section 2 claims, as such an interest could have influenced the decision to grant an exclusive license to Fanatics." Dkt. 197 at 2–3. The Court also directed the parties to "meet and confer" on Requests 112 and 116 to determine whether a "compromise can be reached, such that Fanatics could produce documents sufficient to show an equity stake, if one exists, in Fanatics' other business lines, without the imposition of an undue burden." *Id.* In response, Panini agreed to accept for Request 112 documents sufficient to show Fanatics' provisions of equity ownership so long as the production includes the equity agreements. Fanatics refused this compromise, insisting it need only disclose documents showing the amount of the equity stakes. But the terms of the equity agreements—including rights, restrictions, or conditions attached to the equity—may bear directly on the economic value and influence of the stake, and thus on the licensors' incentives and decisions to grant exclusivity for such an unprecedented duration. Without the agreements, Panini cannot fully assess the scope or impact of the equity interests at issue. Fanatics has also refused to produce documents in response to Request 116, even though the Court recognized that the governance rights are relevant to Panini's Section 2 claims. *Id.* Fanatics has no valid justification for withholding these materials.

## V. Individuals and entities with financial ownership in Fanatics

> Request 5, Second Requests (as modified): *Documents sufficient to show all individuals or entities that own equity or other financial interests in Fanatics, Inc., Fanatics, LLC, Fanatics Collectibles Intermediate Holdco, Inc., Fanatics SPV, LLC, Fanatics Holdings, Inc., Fanatics Collectibles Topco, and Fanatics Collectibles AB, Inc., and the nature and amount of each individual's or entity's equity share.*

Request 5 seeks a discrete set of documents directly relevant to Panini's antitrust claims. First, the identity of the equity holders (beyond just the major leagues and their respective players



associations) and the nature of their financial interests in Fanatics are critical to understanding the scope of Fanatics' influence over the relevant market. Equity interests held by individuals with decision-making power or influence over the players associations and leagues (such as team owners, athletes with leadership positions in the players associations, and significant investors) could present conflicts of interest and create incentives for these market participants to favor Fanatics in licensing decisions in ways that harm competition. For example, the President of the NBA Players Association when the exclusive licenses were negotiated holds equity in Fanatics.[6] These documents thus bear on Panini's allegation that Fanatics "provided equity shares in Fanatics to induce the Leagues and players associations to acquiesce in Fanatics's monopolization scheme." AC ¶ 8. Second, Fanatics' burden and overbreadth objections are unfounded. Panini has agreed to limit the request to a defined set of Fanatics entities that are either named defendants or otherwise central to its trading card business and seeks only documents sufficient to show the identity, nature, and amount of equity or financial interests. This type of information is routinely maintained in the ordinary course of business and Fanatics has offered nothing to support its objections.

## VI.    Fanatics' use of customer data

> **Request 48, Second Requests (as modified):** *Documents discussing or reflecting Fanatics' strategy or rationale for using customer data collected in connection with any of Fanatics' products or services for the marketing or sale of trading cards.*

The requested documents are important to understanding how Fanatics obtained its exclusive deals and intends to exercise and maintain its monopoly. Fanatics has publicly touted its access to vast amounts of consumer data[7] and indicated that it intends to use this data to expand the reach of its trading card business.[8] Documents showing how Fanatics plans to use this cross-product customer data to market trading cards demonstrate its intent to leverage its broader platform to dominate the trading card market and evidence barriers to entry for potential competitors lacking a comparable data infrastructure. These documents may also be relevant to Fanatics' defenses. ███████████████████████████████ ████████████████████████████████████████████████████ To the extent Fanatics argues its consumer data constitutes a competitive advantage explaining why licensors chose Fanatics over Panini, these strategy documents directly address that contention and allow Panini to test whether such purported efficiencies justify Fanatics' anticompetitive conduct. Nor does the Amended Complaint's silence on data use render these documents irrelevant, as Fanatics contends; antitrust discovery is "extremely broad and not limited to the allegations of the pleadings." *New York v. Yonkers Contracting Co.*, 1991 WL 167981, at *2 (S.D.N.Y. Aug. 16, 1991).[9] Whether and how Fanatics uses customer data to maintain its monopoly is relevant to proving market power, intent, barriers to entry, and competitive effects.

---

[6] *See* https://www.inquirer.com/sixers/sixers-michael-rubin-daryl-morey-mit-sloan-conference-20240301.html.
[7] *See* https://sports.yahoo.com/collectibles/article/michael-rubin-on-building-fanatics-into-a-billion-dollar-empire-195924772.html. ("Today, we probably have 120 million customers.").
[8] *See* https://www.sportscollectorsdaily.com/fanatics-hobby-shops/.
[9] *See also Delta Air Lines, Inc. v. Lightstone Grp., LLC*, 2021 WL 2117247, at *2 (S.D.N.Y. May 24, 2021) (relevancy under Rule 26(b)(1) is a "broad concept").



### VII.  Fanatics' individual agreements with NBA and NFL players

> Requests 54 and 56, Second Requests (as modified): *Summary sheets of Fanatics' agreements with football and basketball players for the right to use their NIL or Autographs on NFL or NBA Cards that include the following terms: athlete's name, term of the agreement, payment terms, the nature of the services covered by the agreement, and whether it's exclusive or non-exclusive.*

Fanatics does not dispute the relevance of the information sought by Requests 54 and 56. But it insists that the requested summaries be anonymized, citing confidentiality provisions that purportedly require athlete notification before disclosure. This position is untenable. The identity of the athletes is essential to Panini's claims that Fanatics "execute[d] exclusive deals with star, rookie players to deprive Panini of the ability" to use those players' autographs on trading cards during the remaining term of Panini's licenses—even though Fanatics itself could not use those rights in the interim. AC ¶¶ 164–68. Knowing which athletes signed these agreements is necessary to assess whether the terms correspond to the economic value of the athletes' rights or, as Panini alleges, whether Fanatics was threatening and "paying these players to prevent them from dealing with Panini." *Id.* ¶¶ 164–66. Confidentiality provisions do not shield relevant information from discovery, particularly where, as here, a protective order is in place. *Hicks v. Leslie Feely Fine Art, LLC*, 2021 WL 3617208, at *4 (S.D.N.Y. Aug. 13, 2021). And Fanatics' obligation to notify athletes of disclosure is not a legitimate basis to withhold discovery. Fanatics has not shown that providing such notice—whether through its regular business contacts with athletes or via counsel—would impose any undue burden.

### VIII.  Documents related to ███████████████

> Requests 147–149, Second Requests (as modified): *All pleadings, legal briefs, orders from the panel, deposition and hearing transcripts (including exhibits), and all settlement-related documents and communications from the* ██████████████████████████.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████.[10] And Fanatics has not shown "good cause" to withhold these materials. Settlement agreements and related communications are not privileged, and no heightened showing of relevance is required for their disclosure. *Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC*, 394 F. Supp. 3d 461, 464 (S.D.N.Y. 2019) (collecting cases); *Brown v. Northridge Constr. Corp.*, 2021 WL 3540241, at *1 (E.D.N.Y. July 2, 2021).

---

[10] In 2023, Fanatics induced the NFLPA to terminate its license agreement with Panini. AC ¶¶ 179–87. Panini challenged the termination in an arbitration against the NFLPA and prevailed. Dkt. 114.



Respectfully submitted,

*/s/ Stuart Singer*

David Boies
Eric Brenner
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
dboies@bsfllp.com
ebrenner@bsfllp.com

Stuart H. Singer*
Sabria A. McElroy*
Jason Hilborn*
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
smcelroy@bsfllp.com
jhilborn@bsfllp.com

James P. Denvir*
Richard A. Feinstein*
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
jdenvir@bsfllp.com
rfeinstein@bsfllp.com

*Counsel for Panini America, Inc.*

**pro hac vice*

cc:    All Counsel of Record (by ECF)