

November 13, 2025

**Via ECF**
The Honorable Valerie Figueredo
United States District Court Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

> Re:  *Panini America, Inc. v. Fanatics, Inc. et al.*, Case No. 1:23-cv-09714-LTS-VF (S.D.N.Y. 2023) – Panini's Motion to Compel Production of Non-Anonymized Information of 46 NBA and NFL Players in Response to RFPs 54 and 56

Dear Judge Figueredo:

Following the October 9 conference, the Court put off ruling on Panini's Requests 54 and 56 on the basis that (i) Panini had agreed to limit its request to a maximum of 50 specific athletes which it would identify, ECF No. 226 at 3, and (ii) Fanatics had committed "to sit down and have another conversation with [Panini] in the coming days" to discuss this proposal, Tr. 79:19-20.[1] The Court further ruled that if "there is no agreement [on these issues after further meet and confer discussions], Fanatics should be prepared to more concretely explain the notice obligations it would be required to comply with if the disclosure of an athlete's identity were required," and "the issue can be discussed again at the conference on November 6, 2025."  ECF No. 226 at 3.

Panini, as promised, provided Fanatics with a list of no more than 50 specific athletes.  Ex. A (Email Correspondence) at 3-5.  In response, Fanatics did not live up to its commitment to meet and confer on these issues.  In full, Fanatics' response to Panini's proposal was: "Fanatics does not agree to provide non-anonymized athlete agreement information and intends to address this issue with the Court on November 6."  *Id.* at 2.  Then, Fanatics did not address the issue at the November 6 conference.  And Fanatics thereafter took the position that it had no obligation to make a showing in advance of the upcoming November 20 conference to meet its burden of showing "more concretely" the "notice obligations" it says justify withholding materials that are undisputedly central to Panini's claims.  *Id.* at 1.  Thus, as counsel for Panini predicted at the October 9 conference, we are right back where we started except with more than a one-month further delay.  *See* Tr. 81:19-23 ("I think they have shown their cards, your Honor. I mean, we are just going to be back here, like we are doing every single time. We go back and we come back and have the same fight we had three months ago, and this just keeps happening.").

Panini respectfully submits Fanatics' continued dilatory tactics should be rejected.  The athlete agreements are undisputedly relevant, as even Fanatics recognizes.  Anonymized summaries of these agreements are patently insufficient given the nature of Panini's claims, which depend on specific information regarding which specific rookies received how much money.  Fanatics' asserted burden arguments could never trump these considerations.  In all events,

---

[1] "Tr." refers to the sealed transcript filed at ECF No. 224.



Fanatics has now failed—multiple times—to even try to make a showing to the contrary.

### Background

Panini alleges that Fanatics signed star NFL and NBA rookies to exclusive deals to prevent Panini from using their rights on fully licensed trading cards as one element of Fanatics' broader anticompetitive conduct. Am. Compl. ¶¶ 163-169. As the Amended Complaint explains, including with reference to specific athletes:

> Fanatics is effectively paying these players to prevent them from dealing with Panini since Fanatics cannot effectively use these rights in the interim. . . . In essence, Fanatics offered these players large sums to keep their original, handwritten autographs *off* the most important trading cards for the critical, early years of their careers during which they otherwise are trying to enhance their reputations and when their cards generally are most desired by consumers. That, indeed, is why Fanatics had to pay so much. . . . No Victor Wembanyama (NBA Draft #1 overall), Brandon Miller (NBA Draft #2 overall), Sterling "Scoot" Henderson (NBA Draft #3 overall), Bryce Young (NFL Draft #1 overall), or C.J. Stroud (NFL Draft #3 overall). Because of Fanatics's Anticompetitive Conduct, consumers can only find non-fully licensed autographed cards of these players in their street clothes or what in the trade is called "pajamas."

*Id.* ¶¶ 164-165, 232.

To develop and prove these claims, Panini served Requests 54 and 56 of its Second Set of Requests for Production seeking information about Fanatics' individual athlete deals. Panini moved to compel production on Requests 54 and 56 before the October 9 discovery conference. ECF No. 211 at 5. The parties had already agreed to narrow their athlete-agreement productions to summary sheets of key terms, with the ability to seek specific agreements later. Fanatics, however, refused to include the athletes' names even in those summaries.

As Panini explained at the October 9 conference, such anonymized information is "useless" because "[u]nless you know who the athlete is, you don't know what a reasonable amount to pay the athlete is and whether they are locking up to deprive us of the athlete or whether there is some economic rationale." Tr. 77:1-5; *see also* Tr. 77:5-7, 79:6-13, 81:2-4. Fanatics has nonetheless sought to justify its position by claiming an undue burden based on unspecified "notice obligations." While Panini does not credit this unsupported assertion, it has narrowed its requests to 46 specified athletes to eliminate any conceivable burden argument. Tr. 77:15-23; Ex. A at 3-5. In response, Fanatics suggested repeatedly that it would discuss the offer with Panini in "a further conversation." Tr. 85:2-3; *see also* Tr. 78:6-8, 79:19-21, 80:23-81:1. The Court memorialized this exchange in its post-conference order, stating that "it appears that this dispute is not ripe, and the parties might be able to reach a compromise," but that if "there is no agreement, Fanatics should be prepared to more concretely explain the notice obligations it would be required to comply with if the disclosure of an athlete's identity were required." ECF No. 226 at 3.

After the conference, Panini did exactly as it said it would. On October 29, Panini served Fanatics with a list of 46 athletes that it would narrow its requests to, consisting of the NFL and NBA rookies with whom Fanatics contracted exclusively from 2023-2025, and offered to meet



and confer.  Ex. A at 3-5.  Fanatics rejected that offer, without explanation or counter, and has maintained its refusal to produce *any* non-anonymized information.  *Id.* at 2.

## Argument

### I.    The Information Requested by Panini Is Relevant.

"Fanatics does not dispute the relevance of" summary sheets of Fanatics' agreements with football and basketball players for the right to use their NIL or autographs on NFL or NBA Cards.  ECF No. 226 at 2.  Fanatics insists, however, that providing summary sheets in an anonymized form is enough.  But the specific identity of Fanatics' contractual counterparties is precisely what is at issue.  Without knowing which rookie received what payments (and whether, for example, the payments went to a number one draft pick or a lower draft pick), it is impossible to assess whether, as the Complaint alleges, the reason Fanatics paid these players so much is to deprive Panini of their original, handwritten autographs while Panini was still the exclusive trading card licensee.  For example, the Complaint references Fanatics' payments to 2023 NBA draft picks Victor Wembanyama, Brandon Miller, and Sterling "Scoot" Henderson.  Despite being the first, second, and third picks, respectively, these players are hardly interchangeable in terms of evaluating the value of their NIL rights, and treating them (as well as other NBA draft picks) in anonymized fashion would obscure precisely the information that matters.

While Fanatics has repeatedly stated that Panini can "come back" to Fanatics after seeing the anonymized information, Tr. 75:3-12; ECF No. 214 at 5, it is already plain that the anonymized information is insufficient.  Waiting to see an initial, anonymized production will simply cause more delay.

### II.   Fanatics' Undue Burden Arguments from Purported Notice Obligations Fail.

Since the requested discovery is relevant, it is Fanatics' burden to resist discovery.  *Hicks v. Leslie Feely Fine Art, LLC*, 2021 WL 3617208, at *4 (S.D.N.Y. Aug. 13, 2021) ("If the information sought is relevant, then '[t]he party resisting discovery bears the burden of showing why discovery should be denied.'" (citation omitted)).

Despite multiple opportunities, Fanatics has never once substantiated the notice obligations it claims justify withholding the information that Panini seeks.  While Fanatics asserts the obligations are "cumbersome," Tr. 75:23, it has never shown what the contracts actually require.  And despite the Court's instruction that if "there is no agreement, Fanatics should be prepared to more concretely explain the notice obligations it would be required to comply with if the disclosure of an athlete's identity were required," ECF No. 226 at 3, Fanatics has failed to provide Panini or the Court with any cognizable evidence regarding the specific provisions that are at issue.  This alone should resolve the matter: the Court gave Fanatics an opportunity to support its burden claims, and it declined to do so.  *See Melendez v. Greiner*, 2003 WL 22434101, at *1 (S.D.N.Y. Oct. 23, 2003) ("General and conclusory objections as to relevance, overbreadth, or burden are insufficient to exclude discovery of requested information."); *Eletson Holdings Inc. v. Levona Holdings Ltd.*, 2025 WL 1314239, at *2 (S.D.N.Y. May 6, 2025) ("A 'conclusory assertion of burdensomeness is entitled to no weight whatsoever.'" (quoting *Jackson v. Edwards*, 2000 WL 782947, at *3 (S.D.N.Y. June 16, 2000))).



In any event, there is no credible burden on Fanatics to send a notice to 46 athletes addressed to whomever is the specified contact in Fanatics' contracts with these athletes.[2]  While Fanatics represented at the October 9 hearing that it spent time negotiating with its counterparties before producing other licenses, Tr. 82:8-23, that was Fanatics' choice to accommodate its partners; there is nothing that says negotiation is required or that negotiation overcomes the need for a production compelled by Rule 34.

Further, Fanatics has cited no case—and we are aware of none—that stands for the proposition that a contractual notice provision can be used as a shield for otherwise relevant discovery issued pursuant to the Federal Rules of Civil Procedure.  To the contrary, it is well established that privately contracted-for nondisclosure or confidentiality provisions cannot preclude otherwise required production, especially where a protective order is in place.  "Even documents that are subject to third-party confidentiality agreements or understandings may be discoverable under Rule 26."  *Hicks*, 2021 WL 3617208, at *4, *8 (ordering production of client's identity).  Indeed, "nondisclosure agreements do not preclude discovery in federal litigation. . . . Instead, protective orders can be used to maintain confidentiality of information disclosed in discovery."  *Doe v. Benjamin Zaremski M.D., P.C.*, 2022 WL 2966041, at *10 (S.D.N.Y. July 27, 2022) (citation omitted).  And the protective order entered in this case provides ample protection for any business relation or confidentiality concerns.  *See In re Subpoena Duces Tecum Served on Bell Commc'ns Rsch., Inc.*, 1997 WL 10919, at *2-*3 (S.D.N.Y. Jan. 13, 1997) (protective order adequate to protect "business relations and prevent a breach of confidentiality arrangements" between third-party subpoena recipient and its customers).

Finally, even if there is minimal burden here, Fanatics cannot show that the burden outweighs the information's relevance, which, as discussed above, is crucial to Panini's claims of anticompetitive conduct regarding star, rookie athletes.

Respectfully submitted,

/s/ Eric Brenner

David Boies
Eric Brenner
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
dboies@bsfllp.com
ebrenner@bsfllp.com

Stuart H. Singer*
Sabria A. McElroy*

---

[2] Panini is not seeking to impose burdens on Fanatics that go beyond what it is willing to itself assume.  Panini recognizes that it will need to make a parallel production to Fanatics of its own athlete agreements.  This production will implicate the same notice process that is at issue here.



    Jason Hilborn*
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
smcelroy@bsfllp.com
jhilborn@bsfllp.com

James P. Denvir*
Richard A. Feinstein*
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
jdenvir@bsfllp.com
rfeinstein@bsfllp.com

*Counsel for Panini America, Inc.*

*\*pro hac vice*

cc:    All Counsel of Record (by ECF)