LATHAM&WATKINS LLP                                  quinn emanuel trial lawyers | new york

November 17, 2025

**Via ECF**

The Honorable Valerie Figueredo
United States District Court Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:     *Panini Am., Inc. v. Fanatics, Inc. et al.*, No. 1:23-cv-09714-LTS-VF (S.D.N.Y. 2023)

Dear Judge Figueredo:

Fanatics makes this submission in response to Panini's improper successive letter-motion to compel filed on November 13, 2025. The Court should deny Panini's request for a cherrypicked set of non-anonymized athlete agreement information in response to RFPs 54 and 56, and instead adopt Fanatics' proposal to provide a fulsome set of anonymized athlete agreement information.

### I.    Panini's Successive Letter-Motion Is Improper.

On September 30, 2025, Panini filed a letter-motion seeking the same non-anonymized athlete agreement information that it is again seeking in its November 13 letter-motion. ECF No. 211 at 5. Fanatics responded on October 3, explaining why "the burden and confidentiality issues implicated by Panini's request far outweigh any purported relevance." ECF No. 214 at 5. In its October 23 order, the Court directed the parties to further meet and confer and held that, if the parties did not reach agreement, "the issue can be discussed again at the conference on November 6, 2025," at which time "Fanatics should be prepared to more concretely explain the notice obligations it would be required to comply with if the disclosure of an athlete's identity were required." ECF No. 226 at 3. While Fanatics was prepared to address that issue at the November 7 hearing (rescheduled from November 6), Panini did not raise it.

Rather than simply raise this already-briefed issue at the upcoming November 20 conference, Panini unilaterally filed a second letter-motion on the athlete agreements dispute. The Court did not direct any further briefing on this dispute, let alone allow Panini to rehash the same arguments in four additional pages. Despite Panini's improper second bite at the apple, Fanatics briefly explains why the non-anonymized, cherrypicked athlete agreement information Panini seeks is both irrelevant and unduly burdensome.

### II.    Non-Anonymized Athlete Agreement Information Is Irrelevant.

The parties' dispute is narrow: whether Fanatics must produce *non-anonymized* athlete agreement information for 46 athletes selected by Panini, or whether Fanatics may produce *anonymized* athlete agreement information for a fulsome set of its athlete relationships. As explained below, the non-anonymized information Panini seeks is not relevant to its claims.

Panini's theory as alleged in the Amended Complaint is that Fanatics signed agreements for NFL and NBA athletes' autographs before it could use those autographs on "fully licensed" NFL and NBA trading cards (because Fanatics' licenses had not taken effect). ECF No. 69 ("Am. Compl.") ¶¶ 163-169. Panini concedes that Fanatics was free to sign such deals—indeed, Panini

regularly signs autograph deals with MLB players despite not holding any MLB license—but maintains that Fanatics signed these athletes just to harm Panini by ensuring Panini could not use these autographs on Panini's "fully licensed" cards. *Id.* This theory is baseless and hypocritical, but regardless, Panini does not need any athlete-identifying information to test it. The anonymized summary sheets Fanatics has offered to produce will include: the relevant league, the term of the agreement, the payment terms, the nature of the services covered, and whether the agreement is exclusive. That information is more than sufficient for Panini to investigate whether Fanatics supposedly "locked up" autographs it could not immediately use on "fully licensed" cards— especially because Fanatics has already agreed to produce documents sufficient to show its actual use of athlete autographs on trading cards (in response to, *e.g.*, Panini's RFP 49).

Accordingly, "which specific rookies received how much money" (ECF No. 233 at 1) is irrelevant to the argument Panini claims it wants to make. Courts deny motions to compel identifying or unredacted information in similar situations. *See Wells Fargo Sec., LLC v. LJM Inv. Fund, L.P.*, 2022 WL 614399, at *4 (S.D.N.Y. Mar. 2, 2022) (finding good cause to redact customer identities because they were not relevant and were commercially sensitive, and allowing anonymized customer identifiers instead); *LPD New York, LLC v. Adidas Am., Inc.*, 2020 WL 6784179, at *1-2 (E.D.N.Y. Nov. 17, 2020) (allowing defendant "to redact competitively sensitive portions of the licensing agreements that are not relevant to the issues in this case").

To the extent Panini intends to litigate whether Fanatics supposedly overpaid specific athletes for their autographs, s*ee* ECF No. 233 at 3, that is a sideshow. This case should not be a trial-within-a-trial on whether, with the benefit of hindsight and from Panini's perspective, a particular athlete was promising enough to warrant a certain level of payment for their autographs.

Further, Panini's request that Fanatics produce non-anonymized summary sheets for 46 athletes of Panini's choosing proves Fanatics' point about lack of relevance. Panini has provided Fanatics with a list of 46 of the most famous athletes in the world. How are payments made to those 46 cherrypicked athletes representative of the many hundreds of other athlete agreements Fanatics has signed? They are not. Panini will not be able to credibly claim that Fanatics "overpaid" athletes based only on a cherrypicked set of the most famous football and basketball players. This strongly suggests that Panini's request is a fishing expedition to gain access to some of the most commercially sensitive information in its direct competitor's collectibles business. Fanatics' proposed approach—to provide anonymized information for a fulsome set of athlete agreements—is the better one.

Finally, contrary to Panini's claims, Fanatics has always disputed the relevance of *non-anonymized* athlete agreement information. Fanatics objected on relevance grounds to RFPs 54 and 56; maintained those objections to non-anonymized athlete information throughout the meet and confer process; and limited its offer of production to anonymized athlete agreement information. The Court's October 23 order does not say otherwise. The Court stated only that Fanatics does not dispute the relevance of "summary sheets of Fanatics' agreements with football and basketball players for the right to use their NIL or autographs on NFL or NBA Cards," ECF No. 226 at 2-3; it did not say that Fanatics conceded the relevance of *non-anonymized* information. Fanatics has always disputed, and continues to dispute, the relevance of that information.

### III.    The Burden Of Disclosing Individual Athletes' Identities Is Substantial.

Even if the Court determines that the identity of individual athletes is relevant, the burden and confidentiality issues implicated by Panini's request far outweigh any purported relevance.

*See* Fed. R. Civ. P. 26(b)(1) (requiring that discovery be proportional to the needs of the case after balancing the importance of the discovery against the burden of production); *Smith v. Bradley Pizza, Inc.*, 2018 WL 5920626, at *6 (D. Minn. Nov. 13, 2018) (denying motion to compel production of confidential settlement agreements where the "burden and expense" associated with the notice obligations "outweigh[ed] their benefit to resolving the issues in this case").

As with Fanatics' license agreements with leagues and players associations, Fanatics' agreements with athletes contain bargained-for confidentiality and notice provisions. Fanatics generally interprets those agreements to require individual athletes' written consent before Fanatics can disclose confidential information. As the Court has recognized, at the very least Fanatics would need to provide each athlete with notice and an opportunity to object. *See* Oct. 9, 2025 Hr'g Tr. at 83:24-25, 84:1-3 (recognizing that Fanatics "wouldn't want to go ahead [and disclose] until [it] get[s] confirmation from that individual [athlete]").

The burden of providing notice and obtaining consent or confirmation—even from just the 46 athletes on Panini's list—would be immense. These 46 athletes are some of the most famous in the world. It is difficult to get in contact with them both during the season and in the off-season because of the many demanding obligations on their time (*e.g.*, practice; games; business, media, and charitable obligations; and business and personal travel.) It would likely take several meetings or calls with an athlete's representative—who would in turn need to have separate meetings or calls with the athlete—to obtain consent or confirmation for even one agreement. For the volume Panini is requesting, it is reasonable to believe it could take hundreds of hours for Fanatics to obtain the appropriate permissions.

The notice process Fanatics undertook prior to producing its licensing agreements with the leagues and players associations illustrates the burden. Even though there were only six relevant licensors, and even though Fanatics' counsel was able to get in touch with their in-house and/or outside counsel quickly, that process took dozens of hours and many weeks of discussions. This lengthy notice process is not surprising: because Fanatics and Panini are direct competitors, Fanatics' commercial counterparties are understandably reluctant to allow Panini to obtain the confidential terms of their agreements with Fanatics given the prospect that Panini could use those terms to undermine competition for future agreements.

Tellingly, since raising this dispute, Panini has now admitted that providing athletes with notice is quite burdensome. In its November 3, 2025 response to a document request from Fanatics, Panini refused to produce *any information* about its agreements with MLB players, in part because "[t]he burden of complying with the notice requirements in those agreements is not proportional to the needs of the case." Panini's Resp. & Obj. to RFP No. 70. This admission severely undermines Panini's position.

Panini's request for non-anonymized information also is not proportional to the needs of the case given the highly sensitive nature of the material. *See Trellian Pty, Ltd. v. adMarketplace, Inc.*, 2021 WL 363965, at *4 (S.D.N.Y. Feb. 3, 2021) (holding that risks to a non-party direct competitor, plus lack of relevance and significant burden, weighed against production of commercially sensitive information).[1] The "direct, ongoing competition" between Fanatics and

---

[1] Panini's cited authority regarding confidentiality provisions dealt with situations where there was no dispute about relevance. *See, e.g.*, *Doe v. Benjamin Zaremski M.D., P.C.*, 2022 WL 2966041, at *9-10 (S.D.N.Y. July 27, 2022). Here, relevance is strongly contested.

3

Panini for autograph deals "requires the exercise of additional caution with respect to" athlete-identifying information, which may reveal Fanatics' business strategy and future plans. *Id.* While the sensitivity of this information is not dispositive given the outside-counsel-only tier of the Protective Order, it does mean Panini needs to make a strong case for relevance—which it has failed to do. Panini seeks some of the most competitively sensitive information in Fanatics' collectibles business, without a credible showing of relevance and despite the significant burden of providing athlete-identifying information. The Court should not allow it.

Respectfully submitted,

*/s/ Michael B. Carlinsky*  
Michael B. Carlinsky  
Quinn Emanuel Urquhart & Sullivan LLP  
295 Fifth Avenue  
New York, NY 10016  
michaelcarlinsky@quinnemanuel.com  
(212) 849-7000  

*Counsel for Fanatics*

*/s/ Lawrence E. Buterman*  
Lawrence E. Buterman  
Latham & Watkins LLP  
1271 Avenue of the Americas  
New York, NY 10020  
lawrence.buterman@lw.com  
(212) 906-1264  

*Counsel for Fanatics*

cc: All Counsel of Record (by ECF)