**LATHAM&WATKINS**LLP  quinn emanuel trial lawyers | new york

December 9, 2025

**Via ECF**

The Honorable Valerie Figueredo
United States District Court Magistrate Judge
Southern District of New York

Re:   *Panini Am., Inc. v. Fanatics, Inc. et al.*, No. 1:23-cv-09714-LTS-VF (S.D.N.Y. 2023)

Dear Judge Figueredo:

Fanatics makes this submission before the conference on December 16, 2025 in the above-referenced matter, respectfully requesting that the Court compel Panini to produce documents in response to certain of Fanatics' Requests for Production ("RFPs"). Specifically, Fanatics seeks production of documents regarding Panini's (1) actual or potential acquisitions of other trading card companies, (2) redemption fulfillment data, and (3) alleged unlawful or unethical conduct.

## I.   Panini's Actual or Potential Acquisitions of Other Trading Card Companies

RFP 68 requests documents regarding Panini's actual, potential, or contemplated acquisitions of other trading card companies. Ex. A (Fanatics' Second Set of RFPs). Panini agreed to produce responsive documents concerning its actual, potential, or contemplated acquisitions of (i) Donruss, from 2009 through the date of the acquisition; (ii) Topps, from 2017 through January 1, 2022, but only to the extent the documents "relate to Topps' license agreement with the MLB for Sports Trading Cards"; and (iii) Upper Deck or Leaf, from 2017 through January 1, 2022. Ex. C at 2 (meet and confer correspondence). But Panini refuses to produce responsive documents concerning its actual or attempted acquisitions (i) of other trading card companies or (ii) from other time periods, on relevance grounds.

Panini should be ordered to produce all responsive documents, from 2009 to present. Despite the Court's ruling dismissing Panini's Section 7 claim related to Fanatics' acquisition of Topps, Mem. Order at 8-9, ECF No. 164, Panini intends to argue that Fanatics' acquisition of Topps was part of an alleged Section 2 violation. Ex. C at 1, 4. Panini's actual or attempted acquisitions of other trading card companies are plainly relevant to Fanatics' defense against that argument. For instance, Panini's own acquisition-related documents may illustrate the procompetitive reasons for acquisitions, Panini's views of market definition and the competitive landscape in the collectibles industry, as well as collectibles industry norms regarding acquisitions since it entered the U.S. trading card industry in 2009. *See* Oct. 9, 2025 Hr'g Tr. 98:11-100:7; 110:3-19, 111:13-15, ECF No. 224 (finding Panini's analogous conduct in collectibles industry relevant); *accord* ECF No. 228 at 3-4. Panini was unwilling to represent during the meet and confer process that it never contemplated acquiring any trading card company other than the four listed above, Ex. C at 1, so it has no basis to exclude responsive documents concerning other companies. Similarly, Panini's attempt to limit its production to specified date ranges is improper, as Panini has not represented that its actual or attempted acquisitions were limited to those periods. And Panini's attempt to impose a reciprocal scope of discovery related to Topps is arbitrary gamesmanship: Despite the Court's rulings in favor of Fanatics, Panini still maintains that Fanatics' acquisition of Topps is broadly relevant to its Section 2 claim. Panini cannot take that

1

position while curtailing Fanatics' discovery into Panini's attempted acquisition of the same company. Panini should be compelled to produce all responsive documents from 2009 to present.

## II. Panini's Redemption Fulfillment Data

Panini refuses to produce documents responsive to Fanatics' RFP 73, which seeks "[d]ocuments sufficient to show the number of Redemption requests submitted to You, on a monthly basis, including what percentage of those Redemptions were ultimately fulfilled with the card promised, from 2020 to the present." Ex. A. Panini's primary objection is relevance.

A "redemption card" is a placeholder that can be exchanged ("redeemed") for a high-value autograph card that the manufacturer was unable to secure in advance of packaging the cards. Panini's redemption practices have generated enormous backlash over the years, due to Panini's heavy reliance on redemptions, persistent failure to fulfill redemptions in a timely manner, and nonresponsive customer service team. Panini currently lacks accreditation from the Better Business Bureau (which gives it a "C" rating, up from an "F" the year before), including because Panini has "failed to resolve underlying cause(s) of a pattern of complaints." The Better Business Bureau's website quotes dozens of customer reviews about Panini's "horrible service when it comes to redemptions."[1] Panini has even been sued by customers who claimed the company failed to honor and purposely obscured the expiration dates associated with the redemption cards.[2]

Against this background, Panini's redemption fulfillment data is directly relevant to Fanatics' defense that Panini lost the licenses due to its own poor performance, rather than Fanatics' allegedly anticompetitive actions. Answer, Aff. Defs. 14, 16, ECF No. 230. Indeed, Panini put its own performance directly at issue by alleging that it offers high-quality trading cards to which consumers were denied access due to Fanatics' conduct. Am. Compl. ¶¶ 79-84, 147, 169, ECF No. 69. The truth, as Fanatics will show, is that Fanatics' dramatically reduced reliance on redemptions and commitment to outstanding customer service are key reasons why fans and business partners prefer Fanatics over Panini. Panini's redemption fulfillment data will therefore be an important component of Fanatics' defense.

Panini objects that detailed redemption fulfillment data "is not relevant unless licensors relied on such metrics in making licensing decisions—information that will come from licensors' files and communications." Ex. B at 3 (Dec. 1 Panini Ltr.). That is incorrect. Fanatics need not exhaust third-party discovery before seeking discovery from Panini—indeed, just the opposite. And Panini is simply wrong that its internal redemption data is irrelevant unless licensors specifically relied on it. If, for example, Panini's internal data shows dismal, unimproved redemption fulfillment statistics year after year, that would support Fanatics' thesis that Panini lost the licenses because it failed to compete, invest in its business, and earn the privilege of continuing to sell trading card products featuring the licensors' intellectual property. That is true regardless of whether licensors had access to general information about Panini's redemptions or the more

---

[1] BBB: Panini America, https://www.bbb.org/us/tx/irving/profile/baseball-cards/panini-america-0875-90338985/customer-reviews (last visited December 7, 2025).

[2] *Brashear v. Panini America Inc.*, No. DC-20-08771 (Tex. Dist. Ct., Dallas Co., June 26, 2020), Original Petition ¶¶ 16, 20-25. That case settled in 2024. *Id.*, Agreed Order of Dismissal with Prejudice (April 4, 2024); *see also generally Fanatics Collectibles TopCo, Inc. v. Panini S.p.A.*, No. 23-cv-6895, Second Am. Compl. ¶¶ 45-49, ECF No. 120.

detailed data Fanatics seeks. Further, Panini cannot—and does not—deny that the requested documents are centrally held and easy to collect. Ex. B; *see also* Ex. C. Because the burden for Panini to produce these relevant documents is minimal while their probative value is straightforward and weighty, Panini should be compelled to make this production.

**III.     Panini's Alleged Unlawful or Unethical Conduct**

Panini refuses to produce several categories of documents related to its own unlawful or unethical conduct, including allegations of anticompetitive conduct related to the production or sale of collectibles.³ These documents are relevant to, among other things, (1) Fanatics' defense that Panini lost the licenses due to its own actions and business practices, Answer, Aff. Defs. 14, 16, ECF No. 230, and (2) Fanatics' unclean hands defense, Answer, Aff. Def. 10, ECF No. 230; *see* ECF No. 228 at 3-4; Oct. 9, 2025 Hr'g Tr. 99:12-100:7; 110:3-19; 111:13-15, ECF No. 224; *see also U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1369 (2d Cir. 1988) (evidence of an antitrust plaintiff's business practices is "highly probative on the central issue of whether [plaintiff's] alleged injury and damages . . . were caused by [defendant's] anticompetitive conduct or by [plaintiff's] own deliberate business judgments").

Contrary to Panini's objections at the meet and confer, these requests are not fishing expeditions to sweepingly scour for bad acts by Panini. Ex. B at 3. To the contrary, Panini has recently and pointedly been accused of engaging in unlawful and anticompetitive conduct that mirrors what Panini complains of here. For example, while Panini alleges that Fanatics unlawfully used its market power to "control[] and restrict[] access to key inputs," including by "coerc[ing]" distributors to "carry a more limited line of trading card options," Am. Compl. ¶ 195, ECF No. 69, another industry participant has now accused *Panini* of using its market power to threaten distributors with "allocation downgrade or program exclusion" unless they boycott Panini's competitor, Wild Card, Inc. *See Wild Card, Inc. v. Panini America, Inc.*, 25-cv-01216, ECF No. 1 (Compl.) ¶¶ 22-29. Similarly, Wild Card's allegations that Panini "threatened" a card manufacturer, "causing that manufacturer to withdraw" from producing Wild Card products and leading to "defective production [and] costly delays" for Wild Card, mirror Panini's allegation that Fanatics directed GCP to reduce manufacturing for Panini, resulting in a "shortfall" of Panini trading cards and "canceled orders and lost or reduced sales." *Compare id.* ¶¶ 30-31, *with* Am. Compl. ¶¶ 121-149, ECF No. 69. These and any other allegations of unlawful, anticompetitive, or unethical conduct are thus directly and palpably relevant to Fanatics' defenses to Panini's claims, including causation and unclean hands.⁴

---

³ Specifically, the RFPs seek documents concerning (i) allegations or findings of Panini's unlawful or anticompetitive activities in relation to the production or sale of collectibles (RFP 79); (ii) Panini's alleged infringement of others' intellectual property rights or violations of any athlete's contractual or legal rights (RFPs 77 & 78); and (iii) Panini's actual or potential autograph deals with athletes under the age of 18 (RFP 80). Ex. A.

⁴ Panini has argued that unclean hands is not a defense to antitrust allegations, but that misses the point: Panini seeks broad equitable relief against Fanatics, including on its antitrust claims. *See* Am. Compl. ¶ 298, ECF No. 69. And unclean hands is always a defense to equitable relief. *Henderson v. United States*, 575 U.S. 622, 625 (2015) ("The unclean hands doctrine proscribes equitable relief.").

Respectfully submitted,

| | |
|---|---|
| */s/ Michael B. Carlinsky* | */s/ Lawrence E. Buterman* |
| Michael B. Carlinsky | Lawrence E. Buterman |
| Quinn Emanuel Urquhart & Sullivan LLP | Latham & Watkins LLP |
| 295 Fifth Avenue | 1271 Avenue of the Americas |
| New York, NY 10016 | New York, NY 10020 |
| michaelcarlinsky@quinnemanuel.com | lawrence.buterman@lw.com |
| (212) 849-7000 | (212) 906-1264 |
| | |
| *Counsel for Fanatics* | *Counsel for Fanatics* |