

December 12, 2025

**Via ECF**

The Honorable Valerie Figueredo
United States District Court Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

**Re: *Panini America, Inc. v. Fanatics, Inc. et al.*, Case No. 1:23-cv-09714-LTS-VF (S.D.N.Y. 2023)**

Dear Judge Figueredo:

Fanatics' Letter Motion, Dkt. 252, seeks sweeping, tangential discovery that is neither relevant to the claims and defenses nor proportional to the needs of this case. It should be denied.

In antitrust litigation, the most probative materials typically lie with the alleged monopolist and its co-conspirators. *See In re Auto. Refinishing Paint Antitrust Litig*., 2004 WL 7200711, at *3 (E.D. Pa. Oct. 29, 2004) (explaining that in antitrust cases, direct evidence of anticompetitive conduct is rare and relevant materials are "***largely in the hands of the alleged conspirators***" (emphasis added)). This case is no different. However, even as Fanatics has resisted discovery focused on its own conduct and the licensors and market participants it influenced, Fanatics has pursued expansive discovery into nearly every corner of Panini's business. Panini has been largely accommodating: to date it has agreed to search and produce nearly twice the volume of documents as Fanatics, even though Fanatics' conduct is the central issue.

Fanatics' latest requests, however, cross a new line. They are divorced from the claims and defenses, and therefore irrelevant. And even assuming some limited relevance under Fanatics' strained theories, Fanatics' motion should be denied because compelling these materials would still be disproportionate to the needs of the case given the extensive discovery Panini has already agreed to provide that more directly addresses the issues raised by Fanatics.

## I. Panini's Actual or Potential Acquisitions of Other Trading Card Companies

Request 68 asks Panini to search for and produce documents concerning any "actual, potential, or contemplated acquisition" of any trading card company from 2009 to the present, including materials from Panini S.p.A. That request is untethered to the claims and defenses in this case and is therefore irrelevant. Nonetheless, in an effort to avoid litigating this dispute, Panini agreed to search for documents relating to potential acquisitions of the trading card companies Fanatics itself identified—*i.e.*, the largest market participants—and to produce materials within a reasonable timeframe—principally 2017 through January 1, 2022 (the pre-Fanatics licensing period), with a 2009 carve-out for Donruss that matches the time period of that specific acquisition.

Yet Fanatics wants more. It insists that Panini produces ***all*** documents concerning ***any*** actual, potential, or contemplated acquisitions of trading card companies going back to 2009. Remarkably, Fanatics itself contended that acquisition documents are irrelevant to this case. Dkt.



195 at 8–10. Fanatics cannot have it both ways—it cannot simultaneously argue that discovery into its acquisition of Topps is irrelevant to the case because the Court dismissed Panini's Section 7 claim related to the Topps acquisition, *id.*, while contending that Panini's same documents, and more, are relevant to Fanatics' defenses. And indeed, this Court has already addressed this issue in connection with Panini's requests concerning Fanatics' acquisition of Topps. Although Panini argued that documents relating to the acquisition of Topps were relevant to Panini's Section 2 monopolization claims, *id.* at 5 –7, this Court found that aspects of Panini's discovery requests were overbroad to the extent they sought information about Fanatics' acquisition of Topps "unrelated to the acquisition of the MLB License," Dkt. 197 at 2. Panini's proposed compromise tracks that ruling, and Fanatics has not offered any principled explanation for demanding a far broader search from Panini.

Fanatics' primary argument rests on a mischaracterization of Panini's Section 2 claim that focuses on the Topps acquisition in isolation. But as Panini alleges, the Topps acquisition was part of a broader course of exclusionary anticompetitive conduct by Fanatics aimed at solidifying its monopoly and harming competition. Am. Compl. ¶ 120, Dkt. 69 ("Fanatics's acquisition of Topps solidified and increased Fanatics's market power, which in turn it leveraged as described herein to disadvantage Panini."). Panini does not allege—as Fanatics suggests—that acquisitions, writ large, are anticompetitive, nor is there any analogous Panini conduct. Even if "potential acquisitions" could be probative of purported "industry norms," those norms are beside the point where Panini's Section 2 claim challenges Fanatics' Topps acquisition as part of its broader coordinated anticompetitive strategy, not generic M&A trends. Moreover, Panini's compromise already captures any arguably relevant information by agreeing to search for potential acquisitions of the most significant trading card companies. Fanatics does not even attempt to articulate why hypothetical, smaller, unnamed targets over a sixteen-year lookback would matter.

Lastly, Fanatics' suggestion that Panini's acquisition documents are relevant to show "Panini's views of market definition and the competitive landscape in the collectibles industry" is wrong. And, even if Fanatics could articulate a coherent relevance theory—which it has not done—the discovery would still be disproportionate. Panini has already agreed to produce a broad scope of documents analyzing the market and the competitive landscape in the collectibles industry in response to multiple separate requests targeted at these issues.[1] There is no reason to think that broad-ranging discovery into all Panini's "actual, potential, or contemplated" acquisitions over a span of sixteen years would be more probative than the materials Panini is already producing.

**II. Panini's Redemption Fulfillment Data**

Request 73 asks Panini to collect and produce granular, internal redemption data and metrics over multiple years. This internal data has no relevance to the claims and defenses in this matter. Fanatics contends that internal redemption data bears on Fanatics' defense that Panini lost

[1] Among other documents, Panini has agreed to produce its own licenses and license negotiations with leagues and players associations since 2009 in response to Requests 3-4, Dkt. 209-3 at 13; "All Documents and Communications related to competition between any company for Licenses to produce or sell Collectibles" in response to Request 6, Dkt. 226 at 4; "All Documents and Communications related to competition for the sale of Collectibles in the United States" in response to Request 11, Dkt. 209-3 at 14; "Any analysis of the production or sale Collectibles in the United States" in response to Request 12, *id.*; and "Any analysis of the quantity, dollar value, or market share of Trading Card sales in the United States" in response to Request 13, *id.*



the licenses due to its own poor performance. Dkt. 252 at 2. This theory is logically incoherent: the claims and defenses turn on Fanatics' conduct and on what licensors and market participants considered in making licensing decisions. Fanatics seeks ***internal*** data on redemptions; it has no basis to contend such data was even known to the licensors, let alone a reason they licensed with Fanatics. And "[m]ere speculation cannot support discovery." *Lively v. Sourced Intel., LLC*, 2025 WL 2689044, at *1 (S.D.N.Y. Sept. 19, 2025); *Ravazzani v. Shop PO, LLC*, 2025 WL 3274223, at *1 (S.D.N.Y. Oct. 7, 2025) ("[D]iscovery inquiries should be accompanied by objective support rather than mere speculation.").

Even if internal redemption data had some marginal relevance, Fanatics' request should be denied because it is disproportionate to the needs of the case. *See In re OpenAI, Inc., Copyright Infringement Litig*., 2025 WL 2691297, at *5 (S.D.N.Y. Sept. 19, 2025) ("[Rule] 26(b)(1) permits discovery of any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." (quotation omitted) (emphasis in original)). Panini has already agreed to produce extensive information about its redemption fulfillment, including all documents and communications related to "reports, questions, complaints, or criticisms" concerning redemption fulfillment and all "complaints, correspondence, or demands … received from purchasers … regarding unfulfilled or delayed Redemptions."[2] If it were true that Panini's redemption fulfillment was a concern for licensors or consumers, that would be apparent from the documents Panini has already agreed to produce. The redemption minutiae Fanatics seeks is, at most, a collateral issue with limited importance to resolving Fanatics' purported procompetitive defenses and assertions as to why the licensors agreed to the unprecedented agreements at issue in this case. Given the broad redemption discovery Panini has already committed to, the incremental value of raw, internal metrics is negligible. Rule 26's proportionality factors therefore weigh decisively against compelling production of this data.

**III. Panini's Alleged "Unlawful or Unethical" Conduct**

Fanatics' far-reaching requests into what it terms "alleged unlawful or unethical" conduct by Panini are improper. Although the Court has already curtailed this kind of overreach, Dkt. 226 at 4, Fanatics now tries to repackage the same overbroad inquiry by downplaying what it actually seeks, *see* Dkt. 252 at 3 n.3. The requests are set out in full below:

- **Request 77**: All Documents and Communications concerning allegations by any Person, including Wild Card, Inc., that You infringed their Intellectual Property Rights, and any resolution related to those allegations, including settlement agreements.
- **Request 78**: All Documents and Communications concerning any dispute between You and any Athlete, including disputes related to Your alleged unauthorized use or infringement of any Athlete's Intellectual Property Rights or Your alleged violation of any Athlete's contractual or other legal rights.
- **Request 79**: All Documents and Communications, including all settlements, resolutions,

[2] Request 18 seeks: "All Documents and Communications related to reports, questions, complaints, or criticisms, whether formal or otherwise, related to Panini's Collectibles, customer service, or policies, including without limitation product quality, redemption fulfillment, customer service, innovation, or prices." Dkt. 209-1 at 21. Request 74 seeks: "All Documents and Communications from 2017 to the present involving complaints, correspondence, or demands You have received from purchasers of Your Collectibles regarding unfulfilled or delayed Redemptions." Dkt. 252-1 at 4.



compromises, or agreements not to sue, regarding complaints, allegations, or findings that Panini America, Inc. or ***Panini S.p.A*** has engaged in ***any unlawful activity*** in connection with the production or sale of Collectibles, including anticompetitive conduct, unfair competition, or bribery.

- **Request 80**: All Documents and Communications from 2020 to the present related to any actual or potential Autograph Deals between You and Athletes who were under 18 years of age at the time of the formation of the agreement.

Fanatics makes no effort to defend these requests on an individual basis, each of which is improper on its face. Instead, it lumps them together and claims they are relevant to (1) Fanatics' defense that Panini lost the licenses due to its own actions and business practices, and (2) Fanatics' unclean hands defense. Both theories fail.

<u>(1) Licensor Decision Making</u>. The Court already rejected a similar request by Fanatics to seek a broad scope of documents concerning "investigations into any breaches of [Panini's] Code of Ethics," *see* Dkt. 209 at 5, finding, "to the extent Fanatics seeks this information to argue that the licensors were dissatisfied with Panini's performance, that information will be apparent from other discovery Fanatics is obtaining concerning Panini's performance during its licensing period" and it was otherwise "overly broad," Dkt. 226 at 4. The same is true here. Fanatics' theory that the requests go to alleged conduct that was relevant to the licensors' decision-making process amounts to nothing more than pure speculation, which is not a basis for discovery. *Collens v. City of New York*, 222 F.R.D. 249, 253 (S.D.N.Y. 2004) ("While Rule 26(b)(1) still provides for broad discovery, courts should not grant discovery requests based on pure speculation that amount to nothing more than a 'fishing expedition' into actions or past wrongdoing not related to the alleged claims or defenses."); *Lively*, 2025 WL 2689044, at *1. To the extent licensors raised with Panini any issues regarding the alleged conduct that is the subject of these requests, Panini has already agreed to produce those documents in response to other requests.

Fanatics' assertions concerning the unproven allegations raised by Wild Card against Panini prove the point. That complaint alleges conduct from November 2021—***after*** most licensors had already signed with Fanatics. Moreover, using that separate dispute to justify sweeping discovery here would devolve into litigating a case within a case—requiring mini-trials on unrelated and unproven allegations that have no direct bearing on licensors' licensing decisions.[3]

Requests 77–79, in particular, are not only extraordinarily broad in terms of the scope of conduct they seek discovery into, but are also far-reaching in time-period, going back to 2009. Fanatics offers no reason to think that the licensors considered alleged and unspecified wrongful conduct by Panini that occurred sixteen years before the licensing decisions (or ***after the licensing decisions were made***) in choosing Fanatics.

<u>(2) Unclean Hands</u>. The Supreme Court has long held that in pari delicto and unclean

[3] To take another example of how outlandish Fanatics' argument is, Request 77 seeks documents "concerning allegations by . . . Wild Card, Inc., that You infringed their Intellectual Property Rights, and any resolution related to those allegations, ***including settlement agreements***." *See* Dkt. 252-1 (Ex. A) at 4 (emphasis added). As Fanatics well knows given its attempt to buy the claim against Panini, Wild Card lodged copyright allegations against Panini in February 2022, and the parties settled that litigation in ***August 2023***, long after the licensors had already signed new licenses with Fanatics. *See* Dkt. 250 at 1.



hands are not defenses to private antitrust claims. *See Perma Life Mufflers, Inc. v. Int'l Parts Corp*., 392 U.S. 134, 140 (1968) ("[T]he doctrine of in pari delicto … is not to be recognized as a defense to an antitrust action"); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc*., 340 U.S. 211, 214 (1951) (explaining that plaintiff's alleged violations "could not legalize the unlawful combination … nor immunize" defendants)[4] That settled doctrine reflects the "overriding public policy in favor of competition" and the role of private suits in antitrust enforcement, *Perma Life*, 392 U.S. at 139, and applies even in antitrust cases seeking equitable relief, *see Scheiber v. Dolby Lab'ys, Inc*., 293 F.3d 1014, 1022 (7th Cir. 2002) ("[W]henever some maxim of equity (such as that to get equitable relief you must have 'clean hands') collides with the objectives of the antitrust laws, the equity maxim must give way." (quotation omitted)). *See also Natcontainer Corp. v. Cont'l Can Co.*, 362 F. Supp. 1094, 1099 (S.D.N.Y. 1973) ("[T]he defense of unclean hands is available neither with respect to relief by way of damages nor by way of equitable relief."). *Henderson v. United States*, 575 U.S. 622 (2015) (cited by Fanatics at Dkt. 252 at 3 n.4) is not an antitrust case and is therefore beside the point.

Fanatics' reliance on *United States Football League v. National Football League*, 842 F.2d 1335 (2d Cir. 1988) is also misplaced. That case acknowledged "anticompetitive conduct generally cannot be raised as a defense to liability in an antitrust action," noted that "the *in pari delicto* defense was never interposed by the NFL," and permitted consideration of evidence that the plaintiff pursued a merger strategy with the defendant, only insofar as the evidence directly broke the causal chain between the defendant's anticompetitive conduct and plaintiff's injuries. *Id*. at 1369. By contrast, the alleged violations by Panini that are the subject of Fanatics' requests could not have *caused* Panini's damages, but, instead, *would have benefited* Panini. This alleged conduct is in no way probative of the harm Panini suffered.

Even if Fanatics could raise an unclean hands defense here, the conduct into which Fanatics seeks discovery is far afield from the conduct at issue in the case and thus cannot support an unclean hands defense. "The unclean hands doctrine applies only where the misconduct alleged as the basis for the defense 'has immediate and necessary relation to the equity that [plaintiff] seeks in respect of the matter in litigation.'" *Specialty Mins., Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005) (citation omitted) (striking Defendants' unclean hands defense because Plaintiff's misconduct was not related to conduct at issue). None of the alleged conduct that is the subject of these requests has anything to do with Fanatics' conduct at issue in this litigation. It does not even involve Fanatics.

Accordingly, Fanatics' Letter Motion should be denied.

---

[4] *See also PharmacyChecker.com LLC v. LegitScript LLC*, 137 F.4th 1031, 1039 (9th Cir. 2025) ("[N]either the equitable defense of *in pari delicto* nor that of unclean hands can act as a complete bar to [a Section 4 action]."); *Memorex Corp. v. Int'l Bus. Machines Corp.*, 555 F.2d 1379, 1382 (9th Cir. 1977) ("A wrongful act committed against one who violates the antitrust laws must not become a shield [to liability]."); *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 604 (S.D.N.Y. 1989) ("Since *Kiefer-Stewart*, . . . unclean hands is not a defense to an antitrust action."); 54 Am. Jur. 2d Monopolies and Restraints of Trade § 507 ("Most courts, however, refuse to countenance an 'unclean hands' defense in antitrust actions, because the United States Supreme Court largely rejected the similar defense of in pari delicto[.]"). Chief Judge Swain has already correctly recognized that "there is no *in pari delicto* defense under the Sherman Act." Dkt. 164 at 18 n.11.



Respectfully submitted,

*/s/ Stuart H. Singer*

David Boies
Eric Brenner
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
dboies@bsfllp.com
ebrenner@bsfllp.com

Stuart H. Singer*
Sabria A. McElroy*
Meredith Schultz*
Jason Hilborn*
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
smcelroy@bsfllp.com
mschultz@bsfllp.com
jhilborn@bsfllp.com

James P. Denvir*
Richard A. Feinstein*
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
jdenvir@bsfllp.com
rfeinstein@bsfllp.com

*Counsel for Panini America, Inc.*

**pro hac vice*

cc: All Counsel of Record (by ECF)