```
                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK


PANINI AMERICA, INC.,              : Docket #23-cv-09714
                                             23-cv-06895
                 Plaintiff,    :

    -against-                      :

FANATICS, INC., et al,             : New York, New York
                                     December 16, 2025
                 Defendants.

---------------------------------:
                 PROCEEDINGS BEFORE
           THE HONORABLE VALERIE FIGUEREDO
            UNITED STATES MAGISTRATE JUDGE
APPEARANCES:

For Plaintiff:      BOIES, SCHILLER & FLEXNER, LLP
                    BY:  STUART SINGER, ESQ.
                         MEREDITH SCHULTZ, ESQ.
                         JASON HILBORN, ESQ.
                    333 Main Street
                    Armonk, New York 10504

For Defendant:      LATHAM & WATKINS, LLP
                    BY:  LAWRENCE E. BUTERMAN, ESQ.
                         AMANDA REEVES, ESQ.
                         ALICIA JOVAIS, ESQ.
                    1271 Avenue of the Americas
                    New York, New York 10020

                    QUINN EMANUEL URQUHART
                    & SULLIVAN, LLP
                    BY:  KATHRYN D. BONACORSI, ESQ.
                         MICHAEL B. CARLINSKY, ESQ.
                    295 Fifth Avenue
                    New York, New York 10016

Transcription Service: Marissa Lewandowski
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

THE DEPUTY CLERK:  Good morning.  This is the matter of Fanatics Collectibles Holdco, Inc. vs. Panini S.P.A., case number 23-cv-689,5, and Panini America, Inc. vs. Fanatics, Inc, et al., case number 23-cv-9714.  The Honorable Valerie Figueredo presiding.

Counselors, can you please make your appearances for the record.  And it's just for those that will be speaking during this conference.

For Fanatics?

MR. CARLINKSY:  Good morning, Your Honor. It's Michael Carlinsky from Quinn Emanuel.  With me is my partner Kathryn Bonacorsi, and we will be sharing the arguments.  I was intending to argue the motion that seeks to quash the subpoena that was served on Wild Card.  Ms. Bonacorsi will handle the other issues.

THE DEPUTY CLERK:  For Panini?

MR. BUTERMAN:  Good morning, Your Honor. This is Lawrence Buterman from Latham and Watkins. With me are my partners Amanda Reeves and Alicia Jovais.  And depending on what transpires, we may address certain issues.

THE DEPUTY CLERK:  For Panini?

MR. SINGER:  Good morning, Your Honor.

Good morning.  This is Stuart Singer from Boies Schiller Flexner.  And the arguments this morning will be handled by my partners Meredith Schultz and Jason Hilborn.

THE COURT:  Good morning, everyone.  This is Judge Figueredo.  I have the sets of letters that came in.  I think it would make sense to start with the third party subpoena issue.  There was a letter from December 5th at ECF 250 and then a response at ECF 258 dated December 12th.

I'm particularly interested in sort of understanding two points.  On the Panini front, I'd like to just get a better understanding of the nature of the documents and the type of, you know, privacy interest, personal right or privilege, if any, that might exist in these documents that would be coming from, it sounds like, Wild Card.

And then on the Fanatics front, I -- so I understand the argument that typically for a third party subpoena, the entity that's not being subpoenaed doesn't have standing to challenge it absent some protected interest, so the -- some, you know, personal right, privilege, et cetera.

But there is, there is case law.  There's not many cases, but one of them, I believe, Panini

cites. And then I ran a search and there's maybe like six in total that I saw where, and I'm referring to *Allstate*, which I understand is a case out of the eastern district, where the court seems to say that, even when a party doesn't have standing, the court has this inherent authority under Rule 26C when there's good cause to issue a protective order.

And so that's like another point I'm sort of interested, or I am interested in hearing from folks on, because at least I found two SDNY cases that seemed to go that route where an entity was challenging a nonparty subpoena wouldn't otherwise have had standing, and the court nevertheless addressed this under Rule 26.

So since this is Panini's application, if folks from Panini want to go first, I'm happy to hear from you.

MR. HILBORN: Thank you, Your Honor, this is Jason Hilborn on behalf of Panini America. I'm happy to touch on both of those points, Your Honor, starting with the personal right at issue, although, of course, we absolutely agree that, even if there's no standing, Your Honor, that you have inherent authority under Rule 26 to go ahead and rule on

relevance.

But as far as your direct question on the personal rights at issue here, you know, every request in this third party subpoena seeks information about Panini, many of which are confidential and some potentially subject to court protective orders.

And all of them are also colored by the fact that Fanatics once tried to buy Wild Card's claim against Panini around the same time as it was inducing the NFL Players Association and WWE to wrongfully terminate their Panini contracts.

And so that -- that's the main interest here, Your Honor. And even just to back out a little bit on the law on interest, you know, in the *FCX* case of Your Honor's, actually, that Fanatic cites, you discuss how there needs to be an interest in the subject matter of the disclosures.

And the solo case that we discuss in our letter talks about how confidential and competitively sensitive materials are enough of an interest. And this is consistent with cases --

THE COURT:  Can I -- can I just -- can I just ask you:  You say broadly that there is confidential information.  Is it confidential

because we're talking about, you know, trade secrets?  Are we talking about financial data that wouldn't otherwise get disclosed, and if it did, it would be competitively harmful?

Like, if you could be more specific as to what makes this information confidential, other than just the fact that it's covered by a protective order in the bankruptcy litigation or some other protective order in some other litigation.

MR. HILBORN:  Sure, Your Honor.  So I think the first point there would be, I mean, the entire Wild Card complaint.  And even this, this is consistent -- I'm looking at request number one from Fanatics -- is premised on what, what they allege was a closed door meeting between Panini and its distributors.

So even there, Your Honor, that's a, that's a confidential meeting occurring in the course of Panini's business that we believe we have a sufficient privacy interest in just to have standing.  Again, we're just talking about standing to challenge this third party subpoena.

We're not actually necessarily talking about that warranting some sort of relief.  We think the relief we're seeking comes from the fact that

the subpoena seeks irrelevant information, which Your Honor always maintains authority to rule on, should I convince you today that it does, in fact, seek irrelevant information.

But just to jump to Your Honor's other question about how, even if there's no standing, as Your Honor mentioned, there are cases saying that. So one we cite in our letter on page three. I'm going to mispronounce it, but it's a SDNY case called *Fecteau*, F-E-C-T-E-A-U. And that says, quote, Even where the party lacked standing, the court may nevertheless exercise its inherent authority to limit irrelevant or nonproportional discovery, end quote.

And current second circuit judge, Richard Sullivan, held the same back when he was still a member of this court in *Frazier v. Morgan Stanley*, which is at 2021 Westlaw 270-9250, where he again explains that, even if a party lacks standing to challenge a subpoena, Rule 26 authorizes district courts to limit discovery on their own.

So I'm obviously happy to answer any questions more on the personal right, Your Honor, but I do think the Fanatics making a big deal about standing here and even jurisdiction is really

somewhat of a distraction here, and that the real question for Your Honor today is whether the third party subpoena seeks relevant information.  If you agree with us that it does not, then Your Honor absolutely has jurisdiction to order it withdrawn.

THE COURT:  I'm just, I want to just make sure I got the cite for Judge Sullivan's case.  So I'm just pulling it up to make sure I wrote it down right.  If you just give me a minute.

MR. HILBORN:  Sure.  And I can repeat that.  The *Frazier* case by Judge Sullivan?

THE COURT:  Yeah, I have it.  I got the right cite.

MR. CARLINKSY:  I missed the cite.  It's Mike Carlinsky.  Can you repeat it, please?

MR. HILBORN:  Sure.  It's 2021 Westlaw, so WL, 270-9250.

MR. CARLINKSY:  And what page of your letter is that?

MR. HILBORN:  Oh, that's not in our letter but, you know, we didn't get a reply, so.  But there's also other cases that, you know, Your Honor cites and mentioned already that are in our letter.  The *Allstate* case out of EDNY and *Hughes* out of the district of Connecticut.

So I think this is actually a pretty well established point of law, Your Honor.  And if anything, what I think is incredibly messy is the actual interest that is required to be shown under Rule 26 versus Rule 45.

And that's an actually very thorny legal question that I think could even deserve further briefing.  But again, Your Honor, I don't think you even need to get into that here.  The real question is relevance.

THE COURT:  Mr. Carlinsky, would you like to address the argument as to why these documents are relevant?

MR. CARLINKSY:  Yeah, if I may, Your Honor. First, I want to start with the questions that you asked at the outset.  And I think the threshold issue here is whether this court even has the authority to hear the motion.

As Your Honor knows, and we cited *In re Smerling* case, which is a Judge Cronan decision, the recent decision from 2022, and there are other cases that are cited, the, the law is settled that, where a party is seeking -- sorry, somebody just dialed in.

The law is settled, Your Honor, that where,

where a subpoena is issued, and it was properly issued obviously out of this court, but compliance is required here in the Northern District of Texas, then a party seeking to quash the subpoena, and there's no end run around that by styling this as a motion for protective order, but that the court to hear the motion is the court where compliance is required. And again, you have our letter, Your Honor, and the law is clear on that. And so what the court -- I'm sorry.

(Overlapping cross-talk.)

THE COURT: Yeah, if you don't mind, because I agree with you, the law is settled as to, you know, the motion to quash and the appropriate court that has jurisdiction to hear that. But, and I'll admit, until this dispute came up, I've had this issue come up repeatedly and no one's ever asked me to exercise the inherent authority to issue a protective order, otherwise stop the disclosure of the information pursuant to the third party subpoena because it's irrelevant.

But I'm looking, for instance now, at the *Frazier* case that was discussed, that is a Judge Sullivan decision. And he finds that, you know, there was no standing by the party to

challenge the third party subpoena. And then he nonetheless goes into this Rule 26 analysis that says, you know, what we've said before, which is the court has the inherent authority to limit discovery on its own if it's unduly burdensome or not relevant.

So I -- you know, I understand the argument you're making. But it seems like there is this, like, almost end runaround that would allow me to hear the issue even if it, even if I wasn't the appropriate court under Rule 45. And perhaps it's just a question of, you know, Panini request was styled as a motion to quash, and perhaps it should have been a motion for a protective order, some other relief. But it sounds like there is some case law that would allow another way for them to challenge this.

MR. CARLINKSY: Well, I obviously haven't seen the *Frazier* case and I would pull it up. But let me just pick up on the last, very last point Your Honor just raised. This was not styled as a motion for a protective order. This was styled as a motion to quash and so we addressed it. And so any argument otherwise, I would say, has been waived.

My second point is, I do think the law,

notwithstanding Judge Sullivan, whom I have great respect for, decision, I think the case law is consistent, particularly post the amendments to Rule 45.

The law is clear that, whether it is a party, like here, Panini -- and the case you can look to for that proposition, Your Honor, is Judge Ellis' decision in *KGK Jewelry*, which was a SDNY decision -- that party or third party, you have to bring the motion to quash, which is the proper way to do this in the court where compliance would be required.

So point one is they're in the wrong court. No disrespect, of course, to Your Honor. They're in the wrong court. They could go to the Northern District of Texas or they could have, I should say, and then sought to have the matter referred back to Your Honor. They didn't. So point one is there's no authority or jurisdiction for the court. Now, I'll certainly address Your Honor's question.

The second point, which, I mean, if there were a case that were directly on point, it is Your Honor's decision in *FCX Solar*. Your Honor is clear here that only the recipient of a subpoena has standing to seek a protective order quashing or

modifying the subpoena on grounds of relevance or burden.  The argument here is relevance.  And Your Honor cites in that decision I think six or seven cases from the Southern District of New York, again, establishing that is a clear line of authority.

And there is a narrow, extremely narrow exception, which is why Your Honor started the questioning of Panini, which was, please tell me what confidential or privileged information is at issue here.  Because that is the only narrow thread by which the courts say that the general rule that I just articulated, quoting really right out of your decision, can apply.

So the test becomes whether there is any, any confidential or proprietary or privileged information.  They have the burden.  They've made no showing.  Now, if you take a step back, and this will also address the relevance question, what we are seeking are documents from a party, a third party, rather, Wild Card, which has brought an antitrust suit alleging that Panini engaged in antitrust behavior.

And the allegations are, among other things, that what Panini did in order to keep Wild Card out of the market was it, my words,

coerced, pressured, threatened, manipulated distributors who would have distributed Wild Card's product to ultimately decline to do so.

Now, if you just ask yourself, in that example, in that illustration, how could there possibly be anything that's confidential, proprietary, or privileged with respect to Panini, if Wild Card has communications with distributors that are telling Wild Card, sorry, we can't do business because Panini has instructed us or threatened us or coerced us, there's not a world in which any of that information would be such that Panini has a proprietary interest.

They've identified no such thing. The notion that we have or that Wild Card is going to have financial information from Panini, it's just pure, pure speculation. It's ranked speculation. It borders on frivolity.

There is no basis for Panini to tell this court and Your Honor that there is anything that is protectable such that they can thread the needle here and argue that the rule articulated in Your Honor's case in *FCX* and this unbroken line of authority that says you don't have standing unless you can show you have this proprietary interest,

privilege interest, or privacy interest can be demonstrated.  It just doesn't exist.

Now, on the question of relevance, again, the way Panini positions this is, well, wait a minute, Judge, what we're seeking isn't relevant because there's no basis for an unclean hands defense or a in pari delicto defense to an antitrust case.  Well, a few responses.

First of all, and maybe most importantly, Panini is seeking a broad, sweeping injunction. Part of the relief, so forget the claim for a minute, which is there are antitrust claims.  There are also a multitude of other claims.  I'll come back to that point in a minute.

They're seeking broad, sweeping injunctive relief, including divestiture of licenses and a whole bunch of other things.  We learn in first year of law school that one who seeks equity must come with clean hands.  So whether or not this would go to a defense to an antitrust case is beside the point.

They are seeking relief where this type of evidence would go directly to defeating that relief. We could stop the analysis there, but it goes on because they have a whole host of other claims in

their complaint, claims that survived the motion to dismiss.

This evidence is relevant to the defenses of those claims.  It is also relevant, and I would submit highly relevant, to showing conduct by Panini that they are now claiming when they allege Fanatics engaged in similar conduct, it's an antitrust violation.

I want to have the evidence so, when I question their witnesses and I ask the question: Why did you do this, did you think what you were doing was inappropriate, and if they say, no, this was business, well, that's going to be relevant or it at least will go to their credibility whether or not it is a defense to their Sherman and Clayton claims.

So it is highly relevant.  It's relevant to market conduct, industry norms.  So there are -- and again, Your Honor knows the definition of relevance under our federal rules is extremely broad.  If there are issues regarding the relevance of these documents and their admissibility at trial, that'll be for Judge Swain at trial or later in the proceedings.

But now, to say this type of conduct and

the discovery we seek is not relevant, they don't want us to see this evidence. I understand. If I were in their shoes, I would be terrified of it.

I would not want the party that I'm accusing of antitrust conduct to see evidence where Panini engaged in antitrust conduct. But that's not a basis for saying it needs to be precluded. It should be quashed. So there are multiple reasons.

And last point, as I said, they don't address in their letter the fact that they have, I forget whether it's five, six other claims, unfair competition, tortious interference, breaches of contract, or tortious interference with contract. There's a multitude of other claims they don't even address.

These documents, this information, this discovery will certainly go to those claims on the merits defenses, let alone just the prayer for injunctive relief. So for all of those reasons, all Your Honor has to do is frankly change the names in your *FCX* decision, because it is so directly on point, coupled with the fact that they're in the wrong court asking for the relief where they should have been in the Northern District of Texas. Thank you, Your Honor.

THE COURT: Mr. Carlinsky, can I just ask you a few questions? I wrote *FCX Solar*. I remember the case. The problem is, I don't -- I'm pretty sure the parties didn't raise this other argument, this inherent authority argument, which I think I'd already indicated, I don't think anyone's ever raised and which is why I was a bit surprised that there was this ability to do this under, you know, Rule 26.

What am I to do with that case law?

MR. CARLINKSY: Well, again, I think that the easiest thing is that what -- I'm pulling up their motion.

THE COURT: Is it just to say they didn't ask for the appropriate relief, so they waited?

MR. CARLINKSY: I think that's the easiest. That's the starting point. Then to the extent that the court has the -- look, if the court has the inherent authority -- and I'm never going to tell the court, no, you don't.

If the court has the inherent authority, it seems to me it has to be the extreme case, the extreme case where, in addition, you have a third party, not a party here, a sophisticated party here represented by the best counsel, but a case -- I was

looking at the decision that they do cite, which was a Judge Parker decision.  And there it was a bunch of third parties that might have been in the wrong place.

And the court there, it seems to me, was, was -- let me pull that decision open -- was, I'm sorry, it's a Judge McCarthy decision.  This is *Fecteau*.  Plaintiff's motion.  Well, it looks like there you had, you had, you had discovery that the court was concluded was abusive.  It was clearly not relevant.

And I see that the court goes on.  The court doesn't really, as I'm reading the decision quickly, address the line of authority that I'm relying upon and that Your Honor relied upon.  But even if there is this inherent authority that the court has to somehow govern discovery, this is not the case.

A, they didn't ask for it.  B, they didn't file the appropriate document request with your, with Your Honor.  And, and I think that this would be a totally inappropriate case to vary from what is a clear line of authority and invoke some doctrine on inherent authority, which is not something that is warranted given the high relevance of the

discovery here.  So I think that's the response.

If Your Honor wants us to further address it, I don't think you need to.  I think this is more than sufficient in the showing that we've made.  And again, they've got the burden.  They've done nothing.  They've come in and all they've said is, in general tones, oh, this is not relevant.

They invoke the fact that, at some point, Fanatics try to buy Wild Card.  So what.  What does that have to do with the issues before the court? So their argument on relevance is a half-hearted argument.  And there's no basis here for invoking the inherent authority of the court to quash the subpoenas, which is the relief that they asked for.

THE COURT:  Mr. Carlinsky, you had said that this information was relevant to market conduct and industry norms.  Is the conduct vis a vis Wild Card, you know, temporarily close in time like this happened either near in time when the license agreements with Fanatics were being negotiated or, you know, generally at a point in time when you can still make an argument that this would be similar industry norms or market conduct?

MR. CARLINKSY:  Yes.  In fact, I think from the Wild -- I think Your Honor has the Wild Card

complaint but it's a good question.  The Wild Card complaint alleges, I believe, that this conduct occurred in 2021.  Let me just, yeah, so what it says right here:  In 20 -- I'm reading the Wild Card complaint right at the paragraph 1.

At its October 2021 distributor meeting in Texas, Panini's head of hobby sales warned that supporting Wild Card would carry consequences. Several weeks later, on November 10 and 11, four major distributors abruptly withdrew from profitable.

So if we were looking at this temporally, this is right in literally in the middle of the events at issue in our lawsuit.  Because, as Your Honor knows, it was in that time period that Fanatics was both at some point in talks with Panini about a potential transaction where Panini would have effectively surrendered the licenses.

And then, when that transaction fell apart, Fanatics pivoted to hiring people and obviously was in the process and was acquiring or had acquired the licenses from various leagues.  So temporally, it's right in the wheelhouse of the allegations of this case.

MR. HILBORN:  Your Honor, could I respond

to that point and also the many other points my friend has made?

THE COURT:  Yes, go ahead, Mr. Hilborn.

MR. HILBORN:  So quickly on that, but then again, they just touched on jurisdiction, standing and relevance, so I'm anxious to speak with you about those.  But quickly on the timeline point, so Fanatics' unprecedented exclusive deals here for 100 percent of the relevant market were announced in August 2021.  Right.

And the conduct that's alleged to have occurred in the Wild Card complaint was in October '21 and November 2021.  So I think they have a gaping hole here from a chronological perspective.  But just to kind of tick back through what my colleague on the other side mentioned, you know, I mentioned several things.

One, he tried to ding us for the style of our letter.  I mean, the first sentence of our argument section makes clear that we're traveling under Rule 26, not Rule 45.  You know, they mentioned the *Smerling* case that they cite.  That involved a non party itself seeking to quash under Rule 45.  So I think that's neither here nor there.

The *KGK* case that they reference, it's

certainly interesting, Your Honor, and maybe two points there. One, that's also Rule 45.

And second, you know, there's an interesting discussion towards the end of that case that again goes to this inherent authority point, because under Rule 45, the court says that it doesn't have jurisdiction to quash the subpoena. But despite that, the court goes ahead and orders sanctions for the issuing party and the issuing lawyers for having issued the sanctions -- I mean, having issued the third party subpoena.

And so obviously, we aren't seeking sanctions here. We just want the subpoena withdrawn so you can continue litigating this actual case. But if *KGK* stands for anything, it's that Your Honor can always order sanctions even when you don't have jurisdiction over a Rule 45 motion to quash. And if you can do that, you can certainly order the subpoena withdrawn. And as far as, you know, the Judge Sullivan case -- yes.

THE COURT: Mr. Hilborn, can I just ask a quick question? Do you want to just address Mr. Carlinsky's point that you waived a request for a protective order given that it's not in the letter?

MR. HILBORN:  Sure.  I mean, I think, again, the first instance of our argument makes clear we're moving under Rule 26 or is seeking a protective order there.  And I think the cases we also cite --

(Overlapping cross-talk.)

THE COURT:  Just to ask, when you say "first instance," I'm looking at your letter.  Where should I be looking for the request for a protective order?

MR. HILBORN:  Well, so the first sentence on the argument section asks for relief under Rule 26, not 45.  But you know, I do recognize that we use the language of quash.  But I would point out that, you know, courts recognize, in fact, this is the *Allstate* case, which I believe we cite in our letter.

And that case says, quote, Though courts often use the language of quashing a subpoena when discussing relevance, end quote.  So I think, at the end of the day, we're just talking about semantics here when we made clear that we're moving under Rule 26.  Even though we called it quashing, I'm not sure that should really carry the day here.

And then a couple other points, Your Honor,

you know, they love this case, this *FCX* case of yours.  But unfortunately, they're conflating the standing and the jurisdiction analyses.  So in the *FCX* case, exactly what was sought there was a protective order to withdraw the subpoena.  And so that's what, that's what we're seeking here.

And then on standing, again, they keep mentioning this interest section and our interests.  You know, again, I think there's a lot of debate in this district and other districts of exactly what is required.  It's certainly not required that you have to point to financial records.  There's actually a case that says exactly that.  And of course that's not the whole universe.

But I guess, in my limited time, Your Honor, if I could switch to relevance quickly just to put forward our argument on there, which I believe my colleagues would restrain.  So you know, Wild Card case has absolutely nothing to do with Panini's case here.

Chief Judge Swain has described this case as, About Fanatics' complete market foreclosure through unprecedented and significant duration of exclusive deals with every major US sports league.

And so that's this case.  And then the

Wild Card case, in turn, that alleges that Panini pressured distributors, again at a October '21 meeting, not to carry Wild Card products and that four of them acquiesced over a one-week period in November 2021.

And so you can accept all of those allegations as true, and they have nothing to do with Panini's case against Fanatics here. And they're also unproven allegations. So to go back again to this *Fecteau* case, which is on page three of our letter, that case also mentions how courts avoid turning lawsuits into mini trials of other lawsuits.

And that's exactly what will happen here if discovery is permitted. And again, we now have touched on this. You know, fanatics argues that the Wild Card allegations go to causation and damages. I think the biggest flaw there is, chronologically, for the deal at issue here, which Fanatics has even said themselves are at the crux of this case.

But as far as other unlawful conduct that we allege that absolutely did survive the motion to dismiss, you know, like Fanatics buying Panini's printer, decreasing Panini's production, stealing their employees and trade secrets and defaming them,

you know, those, I'll grant you, occurred after the Wild Card events.  But they're just, have absolutely on their face no relevance or no connection to Wild Card's lawsuits.

And even as a matter of law, Your Honor, they're just, they're just, I guess at best, stretching these cases a little bit too far.  So you know, they cite this *U.S. Football* case.  And under their reading of that case, antitrust defendants would effectively get discovery into an entire history of an antitrust plaintiff's business to determine if any business decision caused that plaintiff self-inflicted harm.

And for one, you know, that flips the plaintiff-versus-defendant relationship on its head.  But it's also not what *U.S. Football* says.  So that case was about the new U.S. Football League that came up with, you know I guess, a bold strategy of opening in smaller TV markets where the NFL could possibly expand in the future with the idea that this would force the NFL to merge with it.  Right.  So that was a business strategy call.

But of course, then the NFL didn't merge with it.  And because U.S. Football was in smaller TV markets, U.S. Football missed out on the TV

contracts.  It then sued the NFL for antitrust violations over missing out on those contracts, and the court said the evidence about U.S. Football's business decision to go to the smaller TV markets was allowed in because it went directly to why U.S. Football didn't get the TV contracts.

And the unclean hands, I mean I can go into them more, but the unclean hands cases are very similar.  It's all directly related to the actual transaction or events that are at issue in the lawsuit.  So it just has no application here, Your Honor.  And so with that, I'd ask you to please withdraw the subpoena to Wild Card.  Thank you.

THE COURT:  Mr. Hilburn, can I just ask. It strikes me as the simplest approach, at least I think from my perspective, would just be to say you have standing under Rule 45.  So I'm just, if there is anything else you could say with regards to the documents and why -- I understand they don't, you know, you can get some interest in challenging the subpoena even if it's not financial documents.

But do you have any more concrete information about what these documents, how they could be confidential for Panini?

MR. HILBORN:  I mean, I think I would still

just go back to the fact that they're all premised on a, quote, the allegation and claim says this a closed door meeting between Panini and its distributors, among other things. So that's, I think that's inherently private and confidential.

And I actually think Fanatics' counsel would agree with that, that if, for any, say, distributor meetings or hobby store meetings, the Fanatics held with its hobby stores and distributors, that would also, you know, be private and confidential.

THE COURT: Because the meetings, did the meetings discuss, you know, distribution channels? Did they discuss, like, planning for the launch of something like it? I don't know that it would be enough. But if you, if you had a case like -- you know, obviously I'm willing, I'll look at it, but I don't know that it's enough just to say it's a closed door meeting with a third party that you have a contractual relationship with.

Was the substance of the discussion in some way competitively sensitive if it were disclosed?

MR. HILBORN: I mean, I guess candidly, Your Honor, I don't know the exact specifics of what would have occurred at that meeting yet. But you

know, the fact that it was a closed door meeting, you know, it was very much private. It was very much confidential, and it's between Panini and its distributors.

But I would say, you know, I don't know if it's necessarily established that the, this whole privacy interest under Rule 45 perfectly equates to the interest that's required under Rule 26. So, you know, there's certainly language in the SDNY that it does absolutely equate the two.

But notably, Your Honor, in the *FCX* case, even though Fanatics says you were equating it, you just say that the relief still needs to be an interest of some sort. And that's consistent with many other district courts that have really wrestled with the difference in the required interest under Rule 45 and Rule 26.

You know, there's the *Accusoft* case, which is, you rely on in your *FCX* decision. That's at 2012 Westlaw 135-8662. And then there's also other cases we found. You know, a really good example that has a robust discussion of the differences and cites many other cases is *HDSherer* out of the District of South Carolina, which is at 292 F.R.D. 305.

And so my point of all of that, I would say, is that, you know, what is actually required here under Rule 26 as a matter of interest instead of Rule 45 is quite thorny.  And I think, if Your Honor is inclined to issue a ruling on standing, even though I think you can just disregard standing and exercise your inherent power here, I would ask for the chance to fully brief that more.

MR. CARLINKSY:  Your Honor, it's Mike Carlinsky.  Can I respond very briefly?

THE COURT:  Of course.

MR. CARLINKSY:  Yeah.  So let me just hit the two questions Your Honor asked.  First of all, on relevance grounds, I just went back and looked.  So I just want to point out to the court, paragraph 194 of the Panini lawsuit against Fanatics says, quote, Fanatics threatened distributors with cutting them off for not providing favorable terms.  That's paragraph 194.

In the Wild Card case, quote, Panini warned distributors that, quote, supporting Wild Card would carry consequences in allocation of programs and access.  So you have sort of perfectly tracking allegations in both cases.  Paragraph 4 of Panini's complaint, quote, Fanatics monopolized and attempted

to monopolize the market by controlling and restricting access to key inputs.

In the Wild Card case, paragraph 82, Panini attempted to monopolize the relevant markets, evidenced by its dominant shares, controls over allocations, and the immediate foreclosure effects. And that case goes on to allege how what Panini was doing was cutting off Wild Card's access by threatening the distributors.

There are other paragraphs that track almost perfectly, but the relevant can't be seriously questioned. And then Your Honor asked the question: How is any of this going to be proprietary, privileged or private? And whatever conversations took place between Panini and those distributors, which themselves can't possibly be privileged, if Panini is in a room with its distributors, it's hard to imagine there's anything privileged or that there's anything private.

But we are seeking documents from Wild Card. If this were a motion to quash the subpoena directed to the distributors, that might become a relevant consideration. But if Wild Card has communications, Wild Card, remember, is the third party that is being excluded, that is being

foreclosed from the market, according to its complaint.

If Wild Card is having communications with distributors to confirm what is going on and what happened and why are those distributors cutting them off, there is not a world, there is not a world in which any of the information in Wild Card's possession, leave aside the distributors, in Wild Cards possession, could be Panini's proprietary or confidential or privileged information.  It's unfathomable.  So there is no answer to that question.

THE COURT:  Mr. Carlinsky, let me just make sure.  Wild Card was not -- so at this, we talked about the documents relating to this closed door meeting with distributors.  Wild Card would not have been a distributor at that meeting?

MR. CARLINKSY:  Of course not.  Wild Card is not a distributor.  Wild Card is another company, like Panini, that was manufacturing a high end card, a sports collectible card, and was hoping to be able to use those same distributors.  These are distributors that are nationwide distributors.

They're third parties to Panini.  They're third parties to Wild Card.  And Wild Card was

hoping to get its product to market using the same distributors that Panini used at the time. And so the allegations in the complaint are that Panini threatened, coerced those distributors so that they ultimately declined distributing Wild Card's product.

And what we are seeking is the evidence from Wild Card that is effectively referenced in their complaint that supports their allegations and communications they had with distributors, for example, about what the distributors told them, what were the reasons that were given.

There's an allegation in the Wild Card complaint brought by its lawyers that at least one distributor specifically told Wild Card that it was because Panini was threatening the distributors and that's why the distributors cut off that distribution channel. So take a step back.

THE COURT: So --

MR. CARLINKSY: Sorry. Go ahead. I'm sorry, Your Honor.

THE COURT: No worries. I just. So if you, if you take all that, it sounds like, even if you put aside the antitrust claims, that your argument would be that this would show, you know,

information about what was accepted practice in the market that would at least be relevant to the unfair competition or the tortious interference claim?

MR. CARLINKSY:  At least, yes, and as I said earlier, I mean, the relief they seek is broad. This would all go to broadcast.  It'll also go to, one of our allegations is that what Panini was doing at the time was it had, it was desperate to try to hang on to its business because the transaction with Fanatics had, at that point, I think, been effectively terminated.

And this shows the kind of steps that Panini was taking.  But, but back to Your Honor's point, it will certainly show what the practices were like in the market.  And it may be the case that a Panini witness says, yeah, I didn't think there was anything wrong with telling my distributors that I would prefer you not do business with a competitor.

Well, that would be really interesting. That may be okay.  That may not be okay.  But that has parallels to what they're alleging in the case against Fanatics.  And from a relevant standpoint, I mean, with the broad definition of relevance, this is highly relevant.  And there's no protectable

interest.  That's clear.

The last thing I wanted to say is I went, while Your Honor has been speaking with my friend on the other side, I took a quick look at the *Frazier* case.  And even though Judge Sullivan does say Rule 26 authorizes the court to limit discovery, that case, notably, there was no issue raised about whether the court had the authority in the first instance, remember, as the court where compliance was required.

I started my argument by pointing out that under the *Smerling* case, we're in the wrong court.  In the *Frazier* case, they were in the right court, because the discovery was issued out of SDNY, and compliance, from what I can tell, was required in SDNY.  And so Judge Sullivan had the authority and then goes on to say Rule 26(b) gave the court the inherent authority to limit discovery.

And by the way, Judge Sullivan, in that case, let's talk about the punchline, goes on to say almost all of the discovery that was sought was granted.  So even though the court muses, I'll say, about its inherent authority to consider the issue despite the lack of standing, the court goes on to allow the plaintiffs to conduct largely all of the

discovery which the plaintiffs had been seeking in that case and that was the subject of the motion.

So that's all I have, Your Honor, and I appreciate the court's indulgence.

THE COURT: Mr. Carlinsky, it sounds -- I have to -- I pulled up -- I haven't, I haven't read it fully, but it sounds like your argument would be that, for me to even have the inherent authority, I still have to be the court where compliance is required. I can't just otherwise pull the inherent authority from some other bucket.

MR. CARLINKSY: I believe that's correct. And the case I would cite, Your Honor, for that proposition, which I think is important in a case here, where you have a party, as opposed to the third party, that is seeking to quash the subpoena is *KGK Jewelry*, 2014 Westlaw 1199-326. And it was a Magistrate Ellis decision.

MR. HILBORN: Your Honor, if I may, I think that case actually might stand for the opposite proposition, because the court there holds that it lacks jurisdiction, okay, under Rule 45, and then it continues on to grant sanctions under its inherent authority. So I'm not sure how we get to the other way. But my friend did mention a lot on more

broader relevance arguments. And my colleague, Ms. Schultz, is prepared to speak more on those, since that leads into their motion to compel. That would be helpful.

MS. SCHULTZ: May it please the court, Your Honor. This is Meredith Schultz on behalf of Panini. It's my first time appearing in this matter. I am here to address the motion to compel that will be argued next, but it's clear that there are overlapping issues.

And I wanted to address some of the points that Mr. Carlinsky just raised, and I want to do so quickly. But we are also, I think, saving time when it comes to the next argument. There are just five quick points I wanted to go over.

First, with regard to the unclean hands defense, there is no unclean hands defense in antitrust cases. And Judge Swain explained that that is a well established legal principle in the motion to dismiss, citing *Perma Life*. Our letter motion has many other cases.

There is sort of a narrow exception for this. The only time an unclean hands defense applies to antitrust claims is when the plaintiff has participated in the exact same alleged scheme,

the same cartel, as one of the plaintiffs.  In other words, we're talking about when the plaintiff is a co-conspirator, basically blowing the whistle on the cartel.

In those cases, the court essentially asks: Well, which party bears fault for the antitrust scheme, plaintiffs or defendants?  It does go to damages.  It's never a defense, Your Honor, to say that, oh, the plaintiff participated in some other antitrust scheme taking place at another time concerning other parties, which is what we have here.

As Mr. Carlinsky has explained, that case is completely different.  And my colleague, Jason Hilborn, has pointed out that there are timeline deficiencies which I want to go into.  You have just, if I were in the courtroom, Your Honor, I'd have a demonstrative on this timeline.

But just to frame this, by August of 2021, Fanatics had signed license agreements with the MLB, the MLBPA, the NVPA, the NBA and the NFLPA.  This antitrust case against Panini was not filed until November of 2025, over four years after most of the licensors signed with Fanatics.  And all the allegations in that complaint relate to conduct in

November and October of 2021.

Again, this is after the MLBPA, MBL -- sorry, MLB, NVPA, NBA and NFLPA, have all signed with Fanatics. So these requests that target allegations against Panini or for events that occurred after it lost the licenses, so they can't be probative of, you know, Panini's actions and what they did to lose licenses, which I understand is the basis of their seeking this.

Just also really quickly, you know, this discovery into past alleged bad acts is something that this court's already addressed. In this court's October 29th order, it stated that, to the extent Fanatics seeks this information to argue that the licensors were dissatisfied with Panini's performance, that information will be apparent from other discoveries Fanatics is obtaining concerning Panini's performance during the licensing period. However, to the extent the request seeks documents concerning any formal investigation, regardless of the basis for the investigation or connection to the claims in this issue, regardless of whether the investigation was public, the request is overly broad. If during discovery Fanatics learns of information that may allow it to make more targeted

requests for documents, Fanatics can raise that issue again.

Right now, Your Honor, there is no rational or even alleged tie between behavior that took place after Fanatics signed these deals and why these deals were signed with Fanatics.

And I just wanted to comment a little bit about industry norms which was raised by Mr. Carlinsky. Fanatics' requests here center on Panini's alleged antitrust violations. If Fanatics' best defense in this case is that the industry norms are antitrust violations and cartel behavior such that their own antitrust violations should get a pass and are no big deal, I would welcome that presentation to the jury.

But Rule 26 doesn't allow that discovery. There's no affirmative defense pled by Fanatics that says it's normal for the industry to violate antitrust laws.

And then finally, I just wanted to flag, because I think the case law here is very important, Judge Marrero, *Specialty Men's* opinion. This is at 395 F.Supp.2d 109. And it talks about that narrow exception to the no unclean hands defense for antitrust cases. You know, Judge Marrero struck

down the defense of unclean hands because the misconduct was not related to the conduct at issue, and specifically held,  The unclean hands doctrine applies only where there is misconduct alleged as the basis for the defense as immediate and necessary relation to the equity that plaintiff seeks in respect to the matter of the litigation.

That is absolutely not the case here.  We have an antitrust violation alleged by Panini and one that is completely different as to party, time, circumstances and actions that has been pled by Wild Card in a separate litigation.  There's no overlap.  There's no exception here for this defense.

Your Honor, I just wanted to make it quick, so that's all I have on that.

THE COURT:  Okay.  Thank you, Michelle.

I think, I don't know that we need to keep going on this one.  Unless anyone else wants to say anything new, I will issue a written decision on this.

Do we want to move on to the next letters?

MS. BONACORSI:  Yes.  Your Honor, this is Kate Bonacorsi from Quinn Emanuel.  I think we're ready to move on to the next RF or I guess our RFPs.

THE COURT:  Okay.  So the opening letter was, just for purposes of the record, was Fanatics' letter that came in on December 9th at ECF 252.  And then I have the response from Panini at ECF 257 from December 12th.

Ms. Bonacorsi, can I ask you a couple of questions about some of these document requests?  And I'm not sure if you're the one who's going to address this, but I'm also happy to ask someone else on the Fanatics side.

MS. BONACORSI:  No, Your Honor.  That makes perfect sense.  I'm happy to answer your questions.

THE COURT:  For the fulfillment -- let's take the fulfillment data, which is section -- I think it's page two of your letter.  For it to be relevant, doesn't there need to be a link to the licensors?  In other words, like, wouldn't they have had to have known or have been aware that this was going on and, you know, they were unhappy with it and for, you know, for it to be somehow tied to the licenses for it to be relevant to the claims here?

MS. BONACORSI:  So Your Honor, that question's a good one and it has a couple answers.  So in the first place, the licensors could easily have been aware of the redemption issues within

Panini.  It is publicly reported that Panini's had issues with redemptions.

There was a publicly filed lawsuit in Texas District Court in 2020 regarding the redemption issues.  And that matter just resolved in 2024.  I can give you the docket cite there, it's *Brashear versus Panini America, Inc.*, No., sorry, Number DC 20-08771.  So as a factual matter, licensors easily could have been aware that Panini had redemption issues.

Furthermore, I don't think that Panini is acknowledging that it has alleged that it was a superior, it was offering a superior product, it was performing better as a company.  And redemptions and customer service, those things go hand in hand to being a superior product and a better performing company.

And I can cite numerous allegations for you, Your Honor, from their complaint.  For example, paragraph 38 of their amended complaint, Panini has developed its renowned brands, intellectual property, trade secrets, skill and creativity to produce and sell fully licensed sports trading cards that meet and exceed consumer expectations.

At paragraph 79, Your Honor, Panini's

success is due in part to innovations it brought to the trading card industry that have benefited consumers along with the leagues and player associations that Panini has served.

At paragraph 84, Panini has invested heavily in the establishment of brands, has developed a wide range of strategy softwares and formulas for the production and sale of its sports trading card in the relevant markets.

Paragraph 85 is similar, Unlike Panini's success of bringing innovations and high quality products.  I think that one's directly on point. And another one, Your Honor, at paragraph 147, Fanatics' purposeful disruption, indeed, appropriation of this critical supply chain for high quality trading cards has denied consumers the many benefits of having the opportunity to buy superior product from Panini when and how they prefer.

And Your Honor, I believe we talked about this a few, a few conferences ago, but redemptions are essentially IOUs to consumers.  And to the extent that Panini had issues with redemptions, that would go to customer service, that would defy these allegations that Panini put directly at issue in its own complaint.

I think for Panini to attempt to deemphasize and attempt to walk away from these allegations to suit its needs in discovery is improper. So, you know, I guess, long story short, with respect to your question is, one, you know, licensors could easily be aware of this because it's public.

And answer number two is that it's separately relevant because Panini put the quality of its product directly at issue and redemptions go directly to the point of quality.

THE COURT: And for the redemptions, you're not seeking from 2009 to the present, you're just seeking from 2020 to the present?

MS. BONACORSI: We are seeking from 2017 to present. Oh, wait, sorry, no, you're correct. Sorry, 2020 to present. And this is sufficient to show and our understanding is these documents are likely centrally held and easily accessible. This came up during a meet and confer.

And to the extent that Panini intends on standing on a burden argument, they have made no showing of burden on this point. I know, you know, we've been through, you know, various RFPs here where, you know, the necessary showing was

emphasized, and we've not seen one here.

THE COURT: Okay. For these, since there's only three categories, if we want to just go back and forth before switching to the next category, I think that might be easier to keep track.

So if anyone from Panini wants to respond to Ms. Bonacorsi's argument that these documents would go, essentially, it sounds like, to showing that Panini didn't really offer, you know, a superior product, higher quality product.

MS. SCHULTZ: Yes, Your Honor. Meredith Schultz, on behalf of Panini. I think Your Honor's first question is the most important thing here. You know, Fanatics is trying to make an argument that the licensors left Panini because Panini was so bad. But again, licensors are not privy to Panini's internal data on redemption, so there's no way that this data could have influenced them.

And just to give you a little bit of background, Your Honor, Panini has already agreed to produce extensive data about its redemption fulfillment in response to multiple other requests. For example, we've agreed to produce, All documents and communications relating to reports, questions, complaints, or criticisms, whether formal or

otherwise, related to Panini collectibles, customer service or policies, including, without limitation, product quality, redemption, fulfillment, customer service, innovation, or prices.

We've also agreed to RFP 74, All documents and communications from 2017 to the present involving complaints, correspondence, or demands from purchasers.

So we have complaints coming in from all parties, purchasers, any other party, plus specifically any issues or complaints or questions related to redemption fulfillment.  So we have already agreed to produce all of that.

MS. BONACORSI:  And I'll just point out, Your Honor, I don't think that answers your question regarding Panini's own --

MS. SCHULTZ:  Right.  So I wasn't quite finished.  Sorry.

That is to say, Your Honor, if it's true that Panini's redemption fulfillment was a concern for licensors, that would be apparent from what Panini has agreed to produce already.  And you know, Fanatics has no basis to contend that the redemption data it seeks, again, this is internal data that Panini kept, was known to the licensors.

This is confidential data compiled by Panini that they don't touch. This does not go to a defense. As far as it goes to claim -- I've forgotten my opposing counsel's name. I'm sorry, it's my first time meeting her.

But this is not about quality of cards. This doesn't go to whether the card stock was good or imprinted well. This is a separate issue entirely.

MS. BONACORSI:  To quickly respond -- yes, of course.  Sorry.

THE COURT:  No worries.  I'll give you time.  I just was curious.  The request seeks -- hold on, let me just.  Documents sufficient to show the number of redemption requests submitted on a monthly basis.  It sounds like Panini has agreed to give you communications and other documents, such as complaints that would show that they were -- that they, if they were having this problem, that consumers were complaining.  Why do you need the specific number of redemption requests?

MS. BONACORSI:  I think the volume of complaints and redemption requests go to quality of the product.  And as I just, you know, I rehashed all those allegations earlier and I won't do it

again, but, you know, they allege superior product. And to the extent there are five versus 100 a month, we would absolutely want to know that.

And to the extent that they have an internal tracker, that would be something that should be centrally held, easily produced.  It would not require, you know, additional work product and should not require, you know, too much additional, you know, searching for to collect that.

You know, the consumer complaints is helpful.  However, I think knowing volume is more helpful, because I think that says more about, you know, what the issues are internal to Panini.  And you know, as I said earlier, just because a licensor didn't complain to Panini about its redemption does not mean that the licensors didn't know that the Panini product, you know, wasn't a superior product.

I think that's sort of a silly argument. And I do think that, given especially what I've said regarding the public nature of Panini's redemption issues, this issue is a core one from our perspective.  And, you know, they've touted the superior product over and over again.  And, you know, it's in their amended complaint.  It's also in our affirmative complaint in this matter.

And so I, you know, despite the fact they've offered to produce some of what we've requested, I think that we can agree that it wouldn't be duplicative.  And then it's a different type of document.  It would be centrally held.

And I think both sides have gone back and forth on producing stuff that does have some overlap or that relates to the same topic.  And we produced that stuff.  I can name, you know, numerous examples on the Fanatics side where we've done this exact exercise.

MS. SCHULTZ:  Your Honor, can I respond to that quickly?  I'm not here making a burden argument.  This is a request that's not proportional to the needs of the case.  Whether there are five or 100 redemption requests does not go to any of the claims or the defenses here.

Panini is a global company with hundreds of millions of customers around the world.  It's akin to Samsung or Nike with the type of reach its products have.

So there, if you say there are five redemption requests, 100, 500,000, it doesn't matter.  It doesn't go to the product quality.  It doesn't -- it's not probative and it's not

proportional.  This is of tangential relevance.  And even there it's stretched thin.

And again, if this was a well-known problem among licensors in a public case, then that will be in other materials we're producing.  The licensors have no idea.  This is confidential data, have no idea what the numbers are on redemptions and therefore could not influence their decisions.

MS. BONACORSI:  Two quick responses.  It's confidential.  A lot of the stuff in this case is confidential.  That's why we've got a robust protective order.  That doesn't mean that the data that goes into it is confidential.  It's presumably based on -- it's presumably based on consumer complaints and collected in a summary form, which actually should be easier to produce than the other documents.

And I heard you say, you know multiple times, disproportionate.  Well, that one part of the disproportionate analysis is burden.  You said it's not a burden argument.  It plainly is.  Again, given this is a centrally held document, I don't understand that argument, frankly.  And you've not supported the burden.  The burden prong of the disproportionate analysis with any showing of

burden.

So, you know, I'm happy to answer more questions on this one, Your Honor, but I'm not sure what else there is to add.

THE COURT:  Can I just --

MS. SCHULTZ:  This is not --

THE COURT:  Oh, sorry.  Sorry, Ms. Schultz, I'll definitely let you respond.  I just want to make sure I understand what the redemption card is because I thought I heard you say that the number of redemption cards, you know, this is like a large company, widespread reach, akin to, I think, Nike.

The redemption card would have been, I guess, an IOU, because they, at the time they were packaging these cards, they weren't able to obtain this autographed card.  Is that right?

MS. BONACORSI:  In some cases, yes, Your Honor, but there are some -- oh, sorry.

THE COURT:  So if you -- I'm just -- I don't think redemption cards existed when I was collecting.  I don't ever remember opening a card and getting not what I thought would be in there. But if you're getting a lot of these, wouldn't that necessarily show that you were either overextending, you know, or not, you know, not able to keep up with

whatever demand the market had?

MS. SCHULTZ:  To the contrary, Your Honor, this shows that we're on the forefront and on the cutting edge of getting new products to consumers.

THE COURT:  But the consumer wasn't getting the product.  It was getting a placeholder for the product because presumably it couldn't be delivered in time to distribute it out to the market in whatever time it had to be done.

MS. SCHULTZ:  Correct.  They're giving them the benefit of being able to be the first in line for that product when it's available.

THE COURT:  And then I cut you off, Ms. Schultz, too, were going to say something.

MS. SCHULTZ:  Oh, sorry.  Yeah.  I am not making a burden argument.  This is a, you know, I'm not making a burden argument.  This is a discrete dataset.  When I say it's not proportional to the needs of the case, this is not of importance to the issues at stake in the litigation.  It is not important to resolving any of the issues in this litigation.  So that's why I'm saying it's not proportional.

This is a side quest, tangential, irrelevant request.  And it's particularly

irrelevant in light of the fact we've agreed to produce anything related to these, particularly any materials that would bear on a licensor's decision to discontinue services with Panini.

MS. BONACORSI:  One thing, and, Your Honor, very quickly, if I may.  I think a summary submission-to-show-type document illustrating volume of redemption requests goes to directly what Your Honor just raised that whether five customers a month are saying they need cards because they didn't receive the packs that they paid for versus 100 versus 500, I think we would absolutely want to know that.

It's as important, if not more, more important than individual complaints or claims from consumers regarding same.  And again, they've not provided any explanation why it wouldn't be easy enough to pluck this document if it's centrally held and provided to us.

The disproportionate analysis, proportional to the needs of the case analysis, whatever, you know, my friend wants to call it, that's a burden argument.  And again, we've not heard a single response to that point.

I know this case has, you know, voluminous

discovery incoming.  This one, to me, seems like a no brainer given that it's, from our understanding, likely to produce this.  And you know, I've just not heard anything from the Boies, Schiller side here that says otherwise.

MS. SCHULTZ:  Your Honor, we can see this is not a burden argument.  I'm making an argument under Rule 26(b)(1) about proportionality.  Just because it's not burdensome doesn't mean that you're entitled to the information.

It has to be relevant and actually highly relevant because it has to have importance related to the issues at stake in the action.  It has to go directly to a claim that's made directly to a defense.  And here, we don't have that.  This is a relevance argument.

MS. BONACORSI:  It's causation and injury under Section 2.  If the licensors made choices about who to license with based on perceived consumer satisfaction or actual consumer satisfaction is reflected by including, among other things, public complaints regarding Panini's redemption issues, that goes core to the claim.  Your core claim at this point, which is the Section 2 claim.

MS. SCHULTZ:  And we've agreed to produce that.  This does not go to the licensors' decision because the licensors did not have this granular data.

MS. BONACORSI:  The granular data would reflect the volume of the problem.

MS. SCHULTZ:  The licensors would not know that.  This is proprietary data.  I'm not making an argument.  And to be clear, I'm not making arguments about production.  Because it's proprietary, we have a confidentiality order in this case.  I'm making the argument it doesn't go to the defense.  So because the licensors didn't know it.  That's all I have on this.

THE COURT:  Ms. Schultz, can I just ask a question?  If it's proprietary data, would you still have the same objection if it were produced attorney's eyes only?

MS. SCHULTZ:  Yes, because I'm not making an objection based on the fact that this is a confidential internal document.  I'm making an objection on relevance.

To be clear, we have a protective order in this case.  That's not where I'm going here.  This is just a tangential, even relevance and no value

because the licensors didn't have this data.  That's all.

MS. BONACORSI:  Just to point one more thing out, and I'm sorry, this is the last point, and I just remembered this from some of our papers, that the redemption statistics are publicly reported at a higher level on Panini's website.

If I'm a licensor and I'm wondering consumer satisfaction about Panini and I go to their website and I say, oh, wow, it looks like there's some issues with redemptions, I think that that is exactly what we're saying here.  I mean, they're making allegations of a superior product.

We're trying to understand the depth of an issue that was known at least on some level or could have been known on some level to licensors, the proprietary nature of it.  You know, I'm kind of failing to see, because presumably this document is just compiled from third party complaints.

You know, obviously they can store it in whatever way they want to, but I don't think that necessarily transforms it, you know, into groundbreaking, you know, proprietary information.

And I don't want to beat a dead horse on the relevance issue here, but you know, I read

numerous allegations regarding superior product. The trading cards, the packs they're sent in, the cartons are sent in, that goes directly to the product here. And unless they're willing to, you know, drop all of those allegations in their complaint, I think these issues are squarely relevant.

THE COURT: I think we're good on this one unless anyone wants to add anything else.

Ms. Bonacorsi, since I have you, I wanted to ask about the actual potential acquisitions of other trading card companies by Panini. This is a situation where it seems like you're seeking far broader acquisition-related documents than Panini would be getting, because I think they're limited to acquisition-related documents that are tied to the MLB license.

That strikes me as, you know, for lack of a better word, somewhat unfair. Do you want to just address that?

MS. BONACORSI: Yeah, no, I'm happy to address that, Your Honor. So Panini obviously is the party here that sued Fanatics for Section 2 violations, and they've made the allegations regarding the MLB and TOPS deal. And those are the

ones that I understand, as you just quoted, you know, we've agreed to produce.

However, we served these requests on Panini because we understand that Panini is, has faulted us for, you know, anticompetitive acquisitions, you know, more generally speaking. And you know, we've, we've raised this during meet and confers and in our papers that, unless Panini is willing to withdraw its claims that Fanatics' acquisition of TOPS was not anticompetitive, as a general matter, you know, we were going to pursue these discovery requests.

I think at a prior conference, Your Honor recognized that Panini's analogous conduct when it entered the market in 2009 was relevant. And you specifically recognize that in, I believe, your order, which was at, I think, docket 228.

And there's a handful of RFPs that go to different types of anticompetitive conduct that Panini has alleged against Fanatics. Some of those are the competition for the licenses, pricing practices, exclusive long-term deals, communications with licensors rebid.

And on those categories, you've allowed us to seek documents regarding Panini's analogous conduct from when it entered the market in 2009,

because, of course, that relates to what Fanatics did when it entered the market many years later.

And so we believe that Panini's efforts to acquire trading card companies throughout this time period is particularly relevant.  They've agreed to produce documents regarding Donruss, which we know they acquired in 2009 and, you know, that's been publicly reported.

They've agreed to produce TOPS documents from 2017 through January of 2022.  However, we understand that they, Panini had made an earlier attempt to acquire TOPS from 2012.  So this date range selection by them appears to be slightly convenient to exclude that acquisition attempt.  And that would be just three years after Panini entered the market.

And then a narrow, a narrow production for acquisition efforts of Upper Deck or Leaf.  And Your Honor, in our RFP we named those four companies Donruss, TOPS, Upper Deck or Leaf as examples. There are a handful of additional card companies that would have been operating around 2009 and in the early years after Panini entered the U.S. market, SAGE, Press Pass, Tristar, Razor, Rittenhouse.

We're not intending this to be a super broad, you know, overly burdensome request here.  We could run, you know, we could propose search terms, meet and confer with Panini, and come up with, you know, narrowly tailored, you know, search strings to get at these documents.

But as Your Honor already, you know, recognized, the analogous conduct as they entered the market is relevant.  And I will add, you know, the acquisition-related documents may contain, you know, pro competitive reasons for the acquisitions and information related to the collectibles industry norms more broadly speaking.

And it could show that acquisition, for example, of another trading card company does not further an anticompetitive goal, but rather is simply how companies do business in this space.  And while, on the one hand, alleging that Fanatics' efforts to buy TOPS, you know, was anticompetitive, Panini ignores its own business got off the ground through its acquisition of Donruss.

And, you know, I think on this point we're entitled to seek, you know, the non duplicative discovery on these points.

And I would add, you know, again, unless

they, you know, counsel agrees to amend their complaint or represent that they won't rely on Fanatics' acquisition of TOPS as an anticompetitive, you know, act in support of their Section 2 claim, I think that these are documents, you know, fairly produced in discovery, from Fanatics' perspective, to defend against the claim that Panini's acquisition efforts, you know, were, you know, likewise improper, you know, rather establishing that it's a little bit of a hypocritical argument on their part.

MR. HILBORN:  Your Honor, may I respond to that, please?

THE COURT:  Yes, Mr. Hilborn.

MR. HILBORN:  Yes, this is Jason Hilborn on behalf of Panini America.  Your Honor, everything my friend on the other side just said relies on a complete mischaracterization of our Section 2 claim. No, we do not challenge the TOPS acquisition in isolation.  We argue that the TOPS acquisition was part of a broader course of exclusionary anticompetitive conduct by Fanatics.

It was part and parcel to everything they were doing here and that's, I mean, I think that's fairly laid out in our complaint.  And we also don't

challenge the TOPS acquisition as some sort of challenge to generic M&A trend in the industry. And so again, they're just mischaracterizing what we're at, what our claim actually is.

And I do want to zoom out into everything that we've agreed to try to reach on a compromise here to not have to come before Your Honor. So again, we've agreed to give over documents concerning Panini's actual potential or contemplated acquisitions of Donruss from 2009, so 16 years ago, through the date of the acquisition, TOPS from 2017 through January 1, 2022, to the extent it relates to the TOPS license agreement with MLB, and Upper Deck or Leaf from 2017 through January 1, 2022.

So Donruss, TOPS, Upper Deck, Leaf, all going back several years. And it actually even, there's actually even more if you look at the other RFPs we agreed to here. And again, so Fanatics, their whole point is, like, oh well, you know, these requests go to help inform market views and competitive landscape and industry norms. But here's some more RFPs that cover that perfectly, Your Honor, that we've already agreed to produce.

First, all documents and communications related to competition for the sale of collectibles

in the United States.  That's RFP 11.

All documents and communications related to competition between any company for licenses to produce or sell collectibles.  That's RFP 6.

Any analysis of the quantity, dollar value or market share of trading card sales in the United States, any analysis of the production or sale of collectibles in the United States, and I could go on.

But I would submit that, in all of that, first off, none of this is relevant to begin with. But now, after having agreed to all of this, it's certainly no more relevant to add more and certainly not proportional.

And you know, my friend said that we're being hypocritical.  I don't really see us as being hypocritical when, you know, Your Honor's ruling in response to Fanatics' arguments limits the documents that Panini can get about Fanatics buying TOPS to only information related to the MLB license.

You know, they haven't offered any principled explanation for why we're limited there and they get this broad search of historical M&A activity from Panini when again, Panini, Panini is the plaintiff here.

Fanatics is the antitrust defendant who is now subject to what has been held to be plausible allegations of anticompetitive conduct. So if anything, and we even cite case law saying that the antitrust defendant obviously is the one who has the bulk of the relevant materials here. And what Fanatics is seeking is just flipping that on its head.

MS. BONACORSI: Briefly, Your Honor, I have three additional points to make on this one. So I will say that we haven't heard -- you haven't heard a cogent explanation from us of why, you know, our production is limited and theirs isn't. He just said it.

He noted at the very beginning of his argument that it can't be viewed in isolation, that the TOPS acquisition is part of (inaudible) anticompetitive conduct to support their Section 2 claim. Yes, of course, it's an element of what they're arguing constitutes a Section 2 antitrust violation. It is inherently part of their case. They have not agreed to drop it. They've not backed away from it. In fact, Counsel just doubled down on it.

Second of all, with respect to the Donruss

acquisition, he tried to note that they're producing documents from 2009 through the date of the acquisition. You know, I don't know whether counsel understands or knows, but Donruss was bought shortly thereafter. That's not like a extreme or burdensome production request or involving many months of documents there.

And finally, Your Honor, it bears noting, as I mentioned at the beginning of the argument on this point, that we understand that TOPS, that Panini made an effort to buy TOPS in 2012. And that specific date range is, was unilaterally excluded from what Panini is trying to produce here.

Obviously, this raises concerns. It bears emphasizing that TOPS is the very same company that Fanatics is being faulted for acquiring years later, and it's, again, core to its allegations here. I think that it is certainly relevant.

Panini made a play for the same company years ago and, for some reason, that deal did not come through. I think that that goes directly to what they're claiming is anticompetitive here. We are concerned that what they've offered in terms of date range would exclude efforts to buy TOPS in 2012.

You know, I know that they are harping on Fanatics as the defendant.  But again, I think that you've already observed that analogous conduct when Panini entered the U.S. is relevant here.  And I think rightly so.  And I think other RFPs have gone to different elements of what Panini has claimed are anticompetitive actions by Fanatics.

And I think the acquisition of other trading card companies is a core component, as I believe he put, as a part of anticompetitive conduct.  And I think they've conceded that.

And so I think, as with the other RFPs, I think that there, you know, should be discovery on more than just the acquisitions that they've offered here and seem to have selectively carved out things that we understand to have happened.

We can work with Panini on search terms for, you know, the discrete names of the other trading card companies and types of acquisitions or communications that would go to those and whether there are potentially sufficient to show or centrally held documents that would reflect the same to ease burden arguments.

THE COURT:  Ms. Bonacorsi, what about the last category, the unlawful or unethical conduct,

did you want to just quickly address that one?

MS. BONACORSI: Yes. So this would be, I believe, this is RFP 77 through 80. I believe counsel for Panini touched on 77 earlier on, insofar as it related to compelling Panini to produce its own documents on Wild Card. That's certainly one component of this.

I think Panini's infringement of others' intellectual property rights could show that it has produced and sold collectibles that were not fully licensed and thus deemed inferior by licensors and consumers.

Again, if there are reports and an understanding in the industry and within consumers that Panini is offering unlicensed products that infringe on others' intellectual, intellectual property, I think licensors would want to know about that.

I think this also goes to causation. Being accused as an infringer could also lead to brand, brand evaluation and customer loss. Again, those are things that would be relevant to a licensor and would go to causation under their Section 2 claims.

On RFP 78, you know, this one I think, similar to, you know, RFP 77, Panini's unauthorized

use of athletes' intellectual property could show, you know, that it was offering inferior products that were not fully licensed.

Their violation, you know, any potential violation of athletes' legal rights, also relationships with athletes and business goodwill, again, this could be a factor considered by licensors.

You know, again, this goes back to what we were discussing earlier with respect to redemption data.  You know, Panini itself alleges superior, better product, innovation, customer satisfaction, better service.  You know, these documents go squarely to what they've alleged in their own claims.

RFP 79, on this one I would say, Panini's unlawful activity in connection with the production or sale of collectibles similarly could lead to brand evaluation, customer loss, which could go to the reasons that it lost the licenses from the leagues and PAs.

Unlawful business practices such as, you know, various anticompetitive conduct, unfair competition, could introduce compliance risk that could make Panini a undesirable or risky business

partner.

And then RFP 80, that's the contracts with underage athletes, those present unique legal challenges and have additional requirements in place to protect the minor, such as guardian consent, things of that nature, NAL agreements. You know, it's a shifting landscape. But there are state-by-state variances which come into play.

And if Panini was entering or contemplating entering into contracts with minors without complying with the applicable laws or rules, violations could hurt Panini's brand image, relationship with athletes, be perceived negatively by the industry, consumers and licensors.

I recall earlier counsel for Panini mentioned that Your Honor had already ruled that certain types of unethical conduct and like a broader bucket, I believe it was regarding the code of ethics, you've already rejected that. And so that necessarily, you know, leads to the conclusion that these should also be rejected.

I would say that these requests, 77 through 80, are externally focused and more narrowly tailored to Panini's violations and things that would bear on licensor decision making with respect

to contracting with Panini.

I think that these are things that have outward perception, outward impacts on brand valuation, goodwill, customer satisfaction, for all the reasons, you know, that I've already walked through. And importantly, you know, I don't think that Panini has denied that these documents exist.

And so, to the extent that Your Honor deems that they are relevant, you know, we would again work with Panini on search terms to, you know, limit any excessive burden and work with them through that process.

MS. SCHULTZ: Your Honor, may I address that argument? This is Meredith Schultz for Panini.

THE COURT: Yes, please. Thank you.

MS. SCHULTZ: Ms. Bonacorsi has told the court, with regard to 77, that a licensor would want to know about that. With regard to 78, these alleged bad acts could be a factor considered by a licensor. Sure, they could be. But in this case, Fanatics has not provided any information or any allegations or any substantives that says that these are factors that licensors consider. Okay.

Fanatics' theory that these requests go to alleged conduct that were relevant to the

licensors', licensors' decision making process amounts to nothing more than speculation.  It's Fanatics saying, well, maybe the licensors didn't like this alleged behavior that we have no, you know, nothing to point to to show it.

So that's not enough under Rule 26.  You don't just get to say, well maybe the licensors didn't like this alleged behavior that's not even proven and not, certainly not even tethered to what the licensors knew or didn't know about.  So "could be a factor" does not carry the burden.

I also just want to say that these are four separate very different requests, and they must be disaggregated because Ms. Bonacorsi carries a burden to show the relevance of each one.  And I just want to start somewhere in the middle actually.

79, Your Honor, requests, all documents and communications, including all settlements, resolutions, compromises or agreements not to sue regarding complaints, allegations or findings that Panini America, Inc. or Panini S.P.A., which of course is a non party, has engaged in any unlawful activity in connection with the production or sale of collectibles, including anticompetitive competition and bribery.

Okay.  So, Your Honor, this is breathtakingly broad.  This goes back to 2009 and the any unlawful activity of these two companies, Your Honor, this would encompass OSHA violations, fairly, you know, wage and hour law violations, in Italian companies, complaints about EU regulations.

This is sweepingly overbroad and disallowed by Rule 26.  You don't get that kind of discovery.  You don't get to serve a request that's like any alleged unlawful activity you've done in the last 16 years here and abroad relating to anything.  So this 79 is just a loser right out of the gate because of that.

And again, Fanatics does not identify any unlawful activity that the licensors consider in deciding to license with Fanatics.  Again, you don't get could be a factor.  Maybe they want to know about this.  That doesn't meet the standard for relevance.

Going back to, for example, the next one, Aiden talked about, you know, deals with or potential deals with athletes under the age of 18.  Again, there's no there, there.  There's no relevance to this.  There's nothing in the discovery or anything else that shows that this is something

going on.

Now, Your Honor, a couple months ago had an order, you know, about requests similar to this, and you said, you know, to the extent Fanatics seeks this information to argue that the licensors were dissatisfied with Panini's performance, that information will be apparent from other discovery that Fanatics is obtaining concerning Panini's performance.

There is no discovery right now that shows any of these four have any bearing on the licensor's decision to leave, to leave Panini.  And therefore Ms. Bonacorsi has not met the relevance requirements that are required under Rule 26.  I know, Your Honor -- go ahead.

MS. BONACORSI:  No, no, if you're not done.

MS. SCHULTZ:  Well, I'm happy to go into the details of all of these RFPs.  I know we've already taken a fair amount of Your Honor's time, but there's a reason that these were, you know, lighted, aggregated, and then rephrased in the letter motion is that these are absolutely over and broad sweeping RFPs that on their face are invalid under Rule 26.

MS. BONACORSI:  Just briefly --

(Overlapping cross-talk.)

MS. SCHULTZ:  I'm happy to answer questions on the individual --

THE COURT:  Ms. Bonacorsi, I think you wanted to say something.

MS. BONACORSI:  Yeah.  So the reason why they're grouped is because they all go at the same theme, which is improper, unethical business practices.  It's grouped just because they're thematically the same.

The assertions from counsel that these are breathtaking in nature, Your Honor, we've repeatedly offered to work with them on search terms and narrowing and things of that nature, and they've not engaged in that regard and they've not denied that they these documents exist.  So if they're making a burden argument, once again, we have no insight into what the burden actually would be or how to negotiate from there.

The relevance argument really falls flat from my perspective.  They've argued that Panini's losing the licenses is due to anticompetitive actions by Fanatics.  We get to investigate why Panini lost those license in actuality.  We don't know what the licensors were thinking.  We don't

know what the licensors knew. And we don't know internally what actions by Panini, contrary to their own allegations regarding a superior product, led to them losing the licenses.

We have a good faith basis for all of these given the public allegations regarding Panini's actions. These are not pulled out of thin air. We're not looking for OSHA violations. We're of course willing to work with them on the types of violations that we'd be interested in on all of these, these requests.

And I just want to point one thing out further, which is, you know, they served 154 RFPs, and I think it's hard to say with a straight face that we're being overbroad when that's how many that they've served on us. And I think that we've been successful in reaching agreement and compromise on many issues.

And the failure to engage on something that, you know, we've served on them in good faith is disappointing, because we have not received any arguments, you know, that explain whether these are actually burdensome. And we've explained why they're relevant.

And again, I don't want to, you know,

rehash all of the allegations I read to you regarding Panini's superior product and customer service and customer satisfaction. But they put this at issue. And unless those, those allegations are dropped, you know, Panini's allegations that this is all Fanatics' fault I think is an unsupported one to make.

MS. SCHULTZ: Your Honor, in response, I would just direct you to the RFP. Let's take 77 for example, All documents and communications concerning allegations by any person, including Wild Card, Inc., that you infringed on their intellectual property rights and any resolution relating to those allegations, including settlement agreements.

Okay. So that obviously does not go to customer service. It's overbroad. And two months ago, Fanatics argued that its own settlement agreements that resulted from a confidential arbitration are not discoverable. And you know, this court denied that request for discovery on October 29th.

You know, you have a situation, this IP case filed by Wild Card, it was filed in February of 2022. You know, this is a, it has to do with producing cards that feature sports copyrighted

works.  I mean this is, Wild Card is not, you know, a distributor.  And it's not -- it doesn't go --

All this to say is that this case, we have a mini trial within this trial.  But this case, which was resolved, which Fanatics knows all about because it attempted to buy the claim, has nothing to do with whether Panini is putting out superior products.  This is an IT case with a third party that's not relevant.  It doesn't fit into the timeline.

You know, same thing, I still haven't heard in any reason why there should be discovery about number 80, Communications related to actual or potential autograph deals between you and athletes who are under 18 years of age at the time of the formation of the agreement.

Again, any tangential relevance of such discovery is not proportionate to the needs of the case.  This is just, this is a fishing expedition.  And they cannot articulate how alleged potential communications with minors has anything to do with customer service or quality of products.  It's just simply so far afield.

And of course there's an enormous burden associated with each of these requests.  I mean, two

of them are targeting entirely separate lawsuits and one is targeting bad acts of two companies going back 16 years.

MS. BONACORSI:  And I'll just highlight and I'll leave it at that is you end that argument with burden, disproportionate, excessive burden.  You've not made any showing of burden on any of these.  We, again, have engaged with you on meet and confers to narrow.  If there's no -- you were very dismissive of 80 seeking deals with minors.

Okay, if you're this dismissive of it, let's run some search terms, agree on them and see how many hit counts there are.  That should be a pretty simple one to come up with a search string for and see whether, you know, your assertion that there's, you know, these things don't exist and allow us to explore that.

That's the entire purpose of discovery.  We brought, you know, we served all of these RFPs in good faith.  And again, I think that, you know, burden has repeatedly been raised here and the standard we're being held to is have we showed burden.  And I think the failure to engage and run the search terms here is inconsistent with how we've proceeded thus far.

MS. SCHULTZ:  But this is not how discovery works.

(Overlapping cross-talk.)

MS. BONACORSI:  And if there's no there there, I don't understand.  Hold on, hold on, hold on.  Yes, it's exactly how it works.  And if there's no there there, this should be a nonissue.

MS. SCHULTZ:  No, that's not how discovery works.  Each request, there must be a straight line between the information sought and a claim or defense in the case.  That is Rule 26.  It has to be rationally related to a claim or defense in the case.  And it is the initial burden to show that what is being sought relates to a claim or a defense.

You have failed to meet that burden.  And that is a threshold issue before anyone collects data for 16 years and starts running search terms.  That's the threshold issue that's not been made here.

MS. BONACORSI:  Well, again, you put the reason why you lost, Panini lost the licenses at issue here, claiming that Panini is a better business, better performing, better product.  I read those allegations once.  I won't read them again.

All of these issues of improper unethical conduct bear directly on that issue and potentially why Panini lost those licenses.

The whole point of discovery is to explore that issue. There could be other reasons. We don't know. We're just at the beginning of discovery. That's why we served these RFPs.

MS. SCHULTZ: And if there is anything to hang your hat on there, if there is any discovery, either party discovery or third party discovery, that showed any indicia that the licensors discontinued services with Panini based on the interactions with athletes under 18 or any of these other things that you've requested, that would be a legitimate basis for asking for this.

But right now there is none. There is no connection between what, the data sought by these requests and what has been pled.

MS. BONACORSI: I mean, I will just point to the Wild Card lawsuit, which outlines various anticompetitive and unethical actions by Panini. I think that that is, I think that's a very strong basis for us to have sought these or served these requests in the first place.

Wild Card isn't filing lawsuits for no

reason.  And I think we pointed out earlier the conversations with distributors about supporting Wild Card would carry consequences.  That's what Panini has alleged here.  Wild Card alleges Panini has attempted to monopolize markets.  That's what Panini has alleged Fanatics has done here.

And this is exactly what we're trying to get at with the unethical conduct is Panini -- and this is the Wild Card complaint -- Panini threatened at least one of the manufacturers, causing that manufacturer to withdraw from doing business.  And similarly here, Panini has alleged that, following Fanatics acquisition, GCP delivery dropped causing canceled orders and loss or reduced sales.

These are not RFPS pulled out of thin air. These are RFPS drawn from what we've found through investigation thus far and what's in the public record.  I think the efforts to walk away from that and paint these as flimsy and completely unsupported just don't pass the smell test.

THE COURT:  So I think we're probably good on this.  I will give you a written order that addresses this and then the other motion to, motion to quash.

Does anyone have anything else that needs

to be discussed?

MS. BONACORSI:  Not from our side, Your Honor.

MS. SCHULTZ:  Not from Panini.  Thank you.

THE COURT:  Okay.  So I know we have another conference on the calendar.  It seems like the procedure we have for filing letters is working.  So we'll just keep what we've got going, and I will issue an order on these pending letter motions.  Thank you very much, everyone.

C E R T I F I C A T E

I, Marissa Lewandowski, certify that the foregoing transcript of proceedings in the case of Panini America, Inc. v. Fanatics, Inc et al, Docket #1:23-cv-09714-LTS-VF and 23-cv-06895 was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature  *Marissa Lewandowski*
_____

Marissa Lewandowski

Date:      December 19, 2025