Exhibit H

**LATHAM&WATKINS**LLP                                    quinn emanuel trial lawyers | new york

March 9, 2026

<u>**VIA EMAIL**</u>
<u>**CONFIDENTIAL**</u>

Sabria McElroy
Boies Schiller Flexner
401 E. Las Olas Blvd. Suite 1200
Fort Lauderdale, FL 33301

> Re: *Panini America, Inc. v. Fanatics, Inc. et al.*, **Case No. 1:23-cv-09714-LST-VF**
> **(S.D.N.Y. 2023)**

Counsel:

We write in response to your February 20, 2026 letter regarding Fanatics' Responses and Objections ("R&Os") to Panini's First Set of Interrogatories ("ROGs") and Third Set of Requests for Production ("RFPs").

## I.    <u>Fanatics' Responses to Panini's First Set of Interrogatories</u>

### A.  <u>Fanatics' Interrogatory Responses Comply with Rule 33(b)(4)</u>

Fanatics' interrogatory responses do not "violate Rule 33(b)(4)." It is standard practice to incorporate objections by reference into specific responses, rather than re-stating those objections in each response. We continue to incorporate objections into our specific responses as stated in our R&Os. For the avoidance of doubt, we are not withholding responsive information except where explicitly indicated in our R&Os, which identify the ways in which we are limiting or qualifying our responses based on our stated objections.

### B.  <u>Fanatics' Interrogatory Responses Comply with Rule 33(d)</u>

Fanatics' interrogatory responses also comport with Rule 33(d). As you know, we served our R&Os prior to the substantial completion deadline. Now that we have made our substantial production, we are in the process of identifying produced records that contain responsive information and will supplement our R&Os to identify such records. We otherwise stand by all objections in our R&Os.

### C.  <u>Fanatics' Interrogatory Responses Are Consistent with Its Initial Disclosures</u>

There are no "discrepancies" between our interrogatory responses and our initial disclosures. Our interrogatory responses identify persons "most knowledgeable" about specified topics. Our initial disclosures (served almost a year earlier) identify "individuals who are likely to have discoverable information that Fanatics may use to support its defenses in this action." Those are materially different standards. We reserve the right to amend our interrogatory responses and initial disclosures as discovery progresses.

D.  Fanatics Properly Responded to Interrogatory No. 10

Fanatics' response to Interrogatory No. 10 is consistent with produced documents. Interrogatory No. 10 states: "Identify all Persons with knowledge concerning any *discussions with NFLPA* concerning NFLPA actually or potentially *seeking to terminate* its license agreement with Panini prior to the date it would terminate in the ordinary course."  The plain language of this interrogatory encompasses only (i) conversations between Fanatics and NFLPA (ii) prior to the date on which NFLPA provided formal notice of its termination of the Panini license (August 21, 2023) (iii) regarding NFLPA "actually or potentially seeking to terminate" the Panini license.  This comports with Panini's underlying allegation that "Fanatics induced the NFL Players Association … to find a way to claim it can terminate its agreement with Panini before its term expires."  ECF No. 69 ("Panini Am. Compl.") ¶ 181.

None of the communications you reference fall within the scope of this interrogatory as we understand it: FAN-PAN-SDNY00010058 is a letter from NFLPA to Fanatics providing notice of the termination, rather than any "discussion" between Fanatics and NFLPA regarding NFLPA "seeking to terminate" the license "prior to the date it would terminate in the ordinary course." FAN-PAN-SDNY00010056 is an internal Fanatics email, following receipt of the termination notice, which plainly does not qualify as a "discussion[] with NFLPA" concerning NFLPA actually or potentially seeking to terminate the license.  And the referenced testimony in FAN-PAN-SDNY00001104 does not on its face "concern[] NFLPA actually or potentially seeking to terminate" the Panini license.

Accordingly, our response to Interrogatory No. 10 is not "[c]ontradicted by Documents [Fanatics] has Produced."  In the interest of clarity, however, Fanatics will amend its response to Interrogatory No. 10 to expressly state its understanding of the limitations on the information sought by this interrogatory.

E.  Interrogatory No. 18 Is Improper

During the March 6, 2026 meet and confer, Panini indicated that it is dropping Interrogatory No. 18.  Please confirm.

## II.     Fanatics' Responses to Panini's Third Set of Requests for Production

Panini's Third Set of RFPs are an improper attempt to re-litigate settled issues regarding the scope of discovery.  As you know, since January 2025, the parties have exchanged dozens of letters and emails regarding the scope of discovery and over 20 search term hit reports.  Last summer, the parties reached agreement on the discovery period for Fanatics' collections and productions.  And by December 2025, the parties reached agreement on 121 search strings that Fanatics would run (and has now run) for 15 agreed and court-ordered custodians.  On the substantial completion deadline, Fanatics produced 148,324 responsive documents (totaling 768,185 pages) based on these settled search parameters.

In late December, Panini served a series of broad, duplicative RFPs on Fanatics, which effectively seek to re-open threshold discovery issues such as the relevant time period and finalized search terms that the parties spent months negotiating.  Fanatics will not rehash foundational issues agreed on months ago, especially after having already collected and produced nearly 150,000 documents using the parties' agreed parameters.  Nonetheless, Fanatics is willing to meet and confer, and in some instances to compromise, as described in more detail below.

### A.  Definitions and Time Period

**Definition of "Topps."**  Fanatics maintains that Panini's definition of "Topps" is vague, ambiguous, and overly broad.  Nonetheless, to the extent Fanatics agrees to produce any documents responsive to Panini's Third Set of RFPs, Fanatics will not withhold responsive documents from agreed-upon custodians simply because of the Topps entity that has possession, custody, or control of such documents.

**Definition of "Wild Card, Inc."**  Fanatics maintains that Panini's definition of Wild Card, Inc. is vague, ambiguous, and overly broad.  To the extent Fanatics agrees to produce any documents responsive to Panini's Third Set of RFPs related to Wild Card, Inc., Fanatics is willing to negotiate domain restrictions with Panini that Panini believes cover the relevant Wild Card, Inc. entities at issue.

**Time Period for RFP Nos. 1–3.**  Fanatics objects to producing documents going back to January 1, 2014 for RFP Nos. 1–3.  Discovery from Fanatics back to 2014 is unnecessary, overly broad, and irrelevant to the allegations in this case—particularly because 2014 is *eight years* before Fanatics acquired Topps.[1]  The parties spent months negotiating the relevant time period, and already agreed to custodial searches of Fanatics' documents for the time period January 1, 2017 to July 31, 2025, unless otherwise indicated or provided for in agreed-upon search strings.  Now,

---

[1] In your February 20 letter, you take the position that Panini is entitled to discovery going back to 2014 because Fanatics has requested documents going back to 2009 on identical topics.  As the parties have previously discussed at length, however, Panini's own allegations establish the relevance of its documents dating back to 2009.  Panini Am. Compl. ¶¶ 76-78.  In comparison, the earliest alleged anticompetitive conduct by Fanatics supposedly occurred in August 2021, when Fanatics announced that it obtained the challenged sports card licenses.  *Id.* ¶ 102.  Moreover, Panini has alleged no anticompetitive conduct by Topps—and certainly none that precedes Fanatics' acquisition of Topps.

Panini inexplicably demands documents beyond the parties' already-negotiated time period.  To the extent Fanatics produces additional documents related to Topps in response to Panini's Third Set of RFPs, Fanatics will produce documents within this agreed upon time period from the files of agreed-upon custodians.  This approach is consistent with the agreed-upon approach for Panini's Second Set RFPs Nos. 64, 67, 98, 110, and 122 that seek discovery of Topps' documents starting on January 1, 2017.

Nonetheless, Fanatics is willing to meet and confer about the time period for these Requests to better understand Panini's position.

B.  <u>Individual Requests for Production</u>

**RFP No. 1.**  RFP No. 1 seeks documents related to negotiations with any League, Association, Player, or Entertainment Licensor concerning the production or sale of Trading Cards. During the March 6, 2026 meet and confer, Panini confirmed that it produced the full scope of documents in response to Fanatics' RFP No. 4, *i.e.*, documents related to negotiations with any League, Association, Player, or Entertainment Licensor concerning the production or sale of Collectibles.  Therefore, Fanatics is willing to meet and confer regarding additional search terms to capture documents related to negotiations with leagues, associations, and entertainment licensors other than the NFL, NFLPA, MLB, MLBPA, NBA, and NBPA.[2]

**RFP No. 2.**  RFP No. 2 seeks documents related to the use or attempted use of exclusive licenses for the production or sale of Collectibles.  Fanatics maintains that this Request is duplicative of other requests for which Fanatics has already agreed to produce documents, including Panini's Second Set RFP Nos. 36, 41, 42, 44, 106, 107, 108, 109, and 110.  The agreed-upon search terms for these RFPs all relate to Fanatics' use or attempted use of exclusive licenses for the production or sale of Collectibles.  If you maintain that these search terms do not capture documents you seek in RFP No. 2, please identify the terms you believe are missing from Fanatics' existing search strings.

**RFP No. 3.**  RFP No. 3 seeks communications between Fanatics or Topps and any League, Association, Player, or Entertainment Licensor concerning bidding for Licenses.  During the March 6, 2026 meet and confer, Panini confirmed that it produced the full scope of documents in response to Fanatics' RFP No. 38, *i.e.*, communications with any League, Association, Player, or Entertainment Licensors concerning bidding for licenses.  Therefore, Fanatics is willing to meet and confer regarding additional search terms to capture communications with leagues, associations, and entertainment licensors other than the NFL, NFLPA, MLB, MLBPA, NBA, and NBPA concerning bidding for licenses.[3]

---

[2] Fanatics maintains its objection to producing documents related to negotiations with players in response to RFP No. 1 because those documents are subject to the parties' ongoing negotiations regarding athlete agreements, communications, and negotiations.

[3] Fanatics maintains its objection to producing communications with players in response to RFP No. 3 because those documents are subject to the parties' ongoing negotiations regarding athlete agreements, communications, and negotiations.

4

**RFP No. 4.**  RFP No. 4 seeks payments Fanatics or Topps has made to certain rookies. Fanatics objects to producing documents responsive to this Request because all documents related to payments made to athletes are subject to the parties' ongoing negotiations regarding athlete agreements, communications, and negotiations.

**RFP No. 5.**  RFP No. 5 seeks communications with any Trading Card printer or manufacturer relating to Panini.  To assist in Fanatics' consideration of this Request, please confirm whether Panini produced or will produce the full scope of documents in response to Fanatics' RFP No. 40, *i.e.*, communications with any Manufacturer related to the production of Trading Cards or any business combination with that Manufacturer.  If Panini has or will do the same, Fanatics is willing to meet and confer regarding additional search terms and domain restrictions to capture communications with any trading card printer or manufacturer involved in the production of trading cards relating to Panini.

**RFP No. 6.**  RFP No. 6 seeks data about the volume of Trading Cards that GCP manufactured, as well as volume projections through 2045.  Fanatics maintains that this Request is duplicative of other Requests for which Fanatics has already produced documents, including Second Set RFP Nos. 120, 122, and 123.  Nonetheless, Fanatics is willing to supplement its production with additional historical GCP manufacturing data from 2017 to present, as well as GCP projections, to the extent and in the form that such data exists in the ordinary course.

**RFP Nos. 7 and 8.**  RFP No. 7 seeks documents related to GCP's efforts to protect Panini's confidential information after Fanatics acquired a stake in GCP, and RFP No. 8 seeks communications related to GCP's access to Panini's trade secrets.  Fanatics maintains that these Requests are duplicative of other requests for which Fanatics has already produced documents, including Second Set RFP Nos. 122 and 124.  Fanatics also maintains its objection that these RFPs seek information not relevant to any claim or defense in this litigation and are instead an improper attempt to seek early discovery for a different, unrelated matter.[4]

In any event, the search strings Fanatics used for Second Set RFP Nos. 122 and 124 are broad.  Specifically, the search string for Second Set RFP No. 122 captures all documents that mention "Panini" and were exchanged between GCP and Fanatics.  The search string for Second Set RFP No. 124 captures all documents that mention GCP in relation to any Panini agreement, contract, memorandum of understanding, term sheet, license, deal, or sale agreement.  Given these broad search terms and the scope of Second Set RFP Nos. 122 and 124 (as modified), documents responsive to RFP Nos. 7 and 8 would have been captured by Fanatics' previous responsiveness review and production.  *See, e.g.*, FAN-PAN-SDNY00761888.

**RFP No. 9.**  RFP No. 9 seeks communications between Fanatics and Wild Card, Inc. relating to Panini or any contemplated or actual legal action by Wild Card, Inc. against Panini. Fanatics maintains that this Request seeks documents that have no relevance to any claim or defense in this litigation.  Your letter states that Fanatics "invited" this discovery by requesting

---

[4] In your February 20 letter, you point to paragraphs 137 and 138 of the Amended Complaint to justify these Requests, but those paragraphs do not allege actual misappropriation of Panini's trade secrets.  In any event, as explained herein, paragraphs 137 and 138 are covered by documents Fanatics has already agreed to produce in response to Second Set RFP Nos. 122 and 124.

documents concerning Wild Card, Inc.'s allegations against Panini. Not so. Fanatics requested documents concerning Wild Card, Inc.'s allegations that Panini engaged in anticompetitive conduct in 2021—the same year in which Panini alleges that Fanatics engaged in anticompetitive conduct. Panini, by contrast, appears to be seeking alleged communications between Fanatics and Wild Card, Inc. concerning a lawsuit that Wild Card, Inc. filed in fall 2025—more than two years after Panini filed this lawsuit, and months beyond the agreed discovery period—based on vague speculation regarding "Fanatics' involvement in or knowledge of those claims." In that respect, RFP No. 9 mirrors Panini's RFP Nos. 147-149, which, as the Court recognized, sought irrelevant documents and lacked any "concrete basis." ECF No. 228 at 3 (denying Panini's motion to compel).

Fanatics is willing to meet and confer on RFP No. 9 to better understand Panini's theory of relevance, but at this time is not willing to produce documents in response to this Request.

We reserve all rights.

*/s/ Michael B. Carlinksy*
Michael B. Carlinsky
Quinn Emanuel Urquhart & Sullivan LLP

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman
Latham & Watkins LLP

6