

June 12, 2026

**Via ECF**

The Honorable Valerie Figueredo
United States District Court Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

> Re: *Panini America, Inc. v. Fanatics, Inc. et al.*, Case No. 1:23-cv-09714-LTS (S.D.N.Y. 2023) – Response to Fanatics' Motion to Compel

Dear Judge Figueredo:

We write on behalf of Plaintiff Panini America, Inc. ("Panini"), in opposition to Fanatics' June 9, 2026 Letter Motion to Compel ("Motion"), ECF No. 331.

### I.     Fanatics' Effort to Dictate Panini's Search Methodology for Producing Responsive Citigroup Materials Is Improper.

Fanatics is asking the Court to compel Panini to produce Citigroup documents after the parties' agreed July 31, 2025 cut-off date for custodial production using an unnecessary and inefficient search process. *See* Motion at 1. This exceptional request is unjustified and should be rejected.

Begin with Fanatics' characterization of the facts. Its Motion asserts that the search process it seeks to compel was "previously agreed." *Id.* The parties collected custodial documents and agreed that searches of custodial collections would end on July 31, 2025, while reserving the right to request "supplemental" productions for documents dated after the cut-off. ECF No. 209-4 at 1. But the parties never agreed that supplemental productions would require using the same search process as the initial productions. To the contrary, Fanatics strenuously objected during the parties' meet and confer negotiations to imposing any default obligation to supplement custodial productions past the July 31, 2025 date, claiming it would be "unduly burdensome" and "disruptive." Ex. 4[1] at 19. Now, Fanatics seeks to impose on Panini the very obligation it previously insisted must be avoided—demanding that Panini refresh its custodial collections and run search terms to locate a discrete, readily identifiable set of post-cutoff documents.

On May 8, 2026, relying on the parties' agreement preserving the right to request supplemental productions, Fanatics demanded that Panini supplement its productions for Request Nos. 59-61 with Citigroup documents dated through present. Ex. 4 at 16. Those Requests seek documents concerning valuations or potential sales of Panini S.p.A. or Panini America. Panini agreed to the supplementation request and—consistent with the parties' prior agreement— indicated it would produce the Citigroup documents on a go-get basis, which means identifying

---

[1] References herein to exhibits or "Ex. #" refer to exhibits attached to Fanatics' Motion unless stated otherwise.

**BSF**

and retrieving responsive documents without going back to square one. Ex. 4 at 7, 8-9.[2]

This should have ended the matter. But Fanatics demanded that Panini bear the burden and expense of a full custodial recollection for this discrete set of documents, which would require Panini to: (1) again collect all documents from the relevant custodians; (2) rerun the search terms the parties agreed to apply through July 31, 2025; (3) review the resulting hits, which will be overbroad; and (4) produce the responsive documents. That process made sense when Panini was searching for all documents concerning any potential sale of its business over a 16-year period. It makes no sense to locate recent documents from a single financial advisor engagement. A targeted go-get search is efficient and proportional.

Fanatics cannot point to any authority supporting its attempt to dictate the methodology Panini uses to collect and search for responsive documents before they have even been produced. To the contrary, courts in this district have repeatedly recognized that "Responding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information." *Hyles v. New York City*, 2016 WL 4077114, at \*3 (S.D.N.Y. Aug. 1, 2016) (quoting *The Sedona Principles, Third Edition*, 19 Sedona Conf. J. 1, Principle 6); *Royal Park Invs. SA/NA v. HSBC Bank USA Nat'l Ass'n*, 2016 WL 11805202, at \*1 (S.D.N.Y. July 15, 2016) (same); *Franck v. N.Y. Health Care Inc.*, 2022 WL 471333, at \*2 (S.D.N.Y. Feb. 16, 2022) (same). *Hyles* is instructive. There, the requesting party sought to force the responding party to use technology-assisted review instead of keyword searching. 2016 WL 4077114, at \*1. The court refused, holding that "it is not up to the Court, or[3] the requesting party ... to force the [responding party] ... to use [a particular methodology] when it prefers to use" another, and the requesting party could only ask for a "re-do" of a search after demonstrating deficiencies in the production. *Id.* at \*3. The same principle applies here: the parties' prior agreement to run custodial searches through July 31, 2025 does not authorize Fanatics to dictate a new custodial collection to search for a discrete, post-cutoff supplemental production.

None of Fanatics' cases support its position. All but one stand for the unremarkable proposition that a court may scrutinize a responding party's search process when the resulting production proves deficient. *See Nat'l Day Laborer Org. Network v. ICE*, 877 F. Supp. 2d 87, 94 n.10 (S.D.N.Y. 2012) (production deficiencies documented through submitted documents and declarations); *Grullon v. Lewis*, 2025 WL 1693425, at \*1 (S.D.N.Y. June 17, 2025) (deposition revealed minimal counsel oversight); *Thomas v. City of New York*, 336 F.R.D. 1, 3 (E.D.N.Y. 2020) (defendants produced emails from one custodian and texts from another, revealing improper "splicing"); *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 561-62 (S.D.N.Y. 2013) (plaintiff alleged gaps in scope of complaints produced by defendant). Here, in contrast, Fanatics seeks to dictate Panini's methodology *before* receiving any documents and without any basis to question Panini's proposed approach. Moreover, these cases involved unsupervised searches or searches for large volumes of documents responsive to broad requests—far different from the counsel-directed search for a discrete set of documents from a limited time period at issue here. Fanatics cites no authority permitting a requesting party to dictate such a search on the front end.

---

[2] Fanatics served a third-party subpoena on Citigroup on January 12, 2026. ECF No. 281-1. Panini moved to quash, ECF No. 282; the Court granted in part and denied in part, directing Citigroup to produce certain documents while allowing redactions as appropriate. ECF No. 316 at 2-3. Fanatics initially demanded that Panini produce documents pursuant to the Citigroup subpoena, which Panini rejected. Ex. 3 at 1-2.

[3] *Nichols v. Noom Inc.*, 2021 WL 948646, at \*2 (S.D.N.Y. Mar. 11, 2021); *Kaye v. N.Y. City Health & Hosps. Corp.*, 2020 WL 7237901, at \*6 (S.D.N.Y. Dec. 9, 2020).



The remaining case cited by Fanatics—*Zhulinska v. Niyazov Law Group, P.C.*, 2021 WL 5281115 (E.D.N.Y. Nov. 12, 2021)—is inapposite because both sides jointly asked the court to resolve a pre-production impasse over search terms and production format after failing to agree on an ESI protocol. *Id.* at *1–2.[4] That bears no resemblance to Fanatics' unilateral demand that Panini redo its custodial collections to identify a discrete set of documents.

The Court should deny Fanatics' motion concerning the Citigroup documents and permit Panini to produce the Citigroup documents through the reasonable go-get search it has proposed.

## II.    Elisabetta Mussini Does Not Have Unique Relevant Documents.

Fanatics argues Panini must designate Elisabetta Mussini, Panini S.p.A.'s Group Licensing Director, as a custodian. Motion at 3. It previously has been determined in this litigation that this Court may compel additional custodians only if the party's selection "is manifestly unreasonable or the requesting party demonstrates that the resulting production is deficient," focusing on whether disputed custodians "are reasonably likely to have unique, relevant evidence that will not be captured by [the responding party's] proposed custodians." ECF No. 234 at 1,3 (quoting *Mortg. Resol. Serv., LLC v. JPMorgan Chase Bank, N.A.*, 2017 WL 2305398, at *2 (S.D.N.Y. May 18, 2017)). Fanatics has not met this standard. Panini designated 21 custodians through a deliberate, interview-driven process, and Fanatics cannot identify a gap in Panini's productions.

Nonetheless, Panini offered a path forward: it would collect and produce Mussini's responsive documents if Fanatics (1) added Cherian as a custodian, (2) produced Gordon's pre-Fanatics Zerocool documents, and (3) added appropriate reseller custodians. Panini stands by this proposal as a fair and balanced resolution of the parties' custodian disputes. Fanatics, however, declined, and it cannot demand expanded discovery from Panini while resisting its own obligations.[5]

Fanatics' exhibits do not show a gap in Panini's productions. Several involve Mussini-Fanatics correspondence over administrative matters—for example, tax withholding and trademarks—arising from the parties' failed transaction negotiations. *See* Exs. 13, 14, 15, 19. Even assuming marginal relevance, these emails are already in the files of other custodians, including Fanatics custodians. Other exhibits are plainly irrelevant. Exhibit 9, for instance, concerns Brazilian soccer players Panini signed to individual deals—a subject Fanatics makes no effort to connect to this case.

Fanatics also overstates Mussini's role in relevant licensing negotiations. Fanatics argues that Panini S.p.A. "maintain[s] a central role" in licensing and that licenses "are negotiated directly by Top Management." Motion at 3 (citing Exs. 5, 10, 30). But Panini has already designated numerous S.p.A. executives—Aldo Sallustro, Giorgio Aravecchia, Ivam Faria, Peter Warsop, and Peter Harris—as custodians. And Fanatics admits licenses are managed "with support from each country," here Panini America, from which Panini has also designated numerous custodians. *Id.* (citing Ex. 11). None of the licensor communications Fanatics cites suggests Mussini was independently involved in relevant negotiations outside Panini's existing production. *See* Ex. 6 (Mussini copies custodian Mark Warsop in communication with NFLPA concerning women's

---

[4] The defendants wanted to conduct unsupervised collections, which the court "strongly disfavored." *Id.* at *3 n.2.

[5] Panini is confident that it has demonstrated the need for these additional custodians. *See* Letter Motion to Compel, ECF No. 333 at 2-5.



soccer)[6]; Ex. 7 (Mussini sends draft term sheet to custodians Mark Warsop and Peter Warsop who were responsible for negotiating the NFLPI agreement); Ex. 8 (Mussini copies custodian Peter Warsop in email to WWE). Fanatics also relies on internal Panini correspondence to claim Mussini "developed pitches for WWE, met with WWE in person, and facilitated execution of Panini's WWE license agreement." Exs. 17, 18. But those emails show several custodians—Peter Warsop, Aldo Sallustro, and Mark Warsop—were also involved. Mussini's files do not contain uniquely relevant documents.

Nor can Fanatics rely on Mussini's job title alone. That Panini identified Peter Warsop as a custodian does not mean his successor must be added. Panini determined Warsop had unique, responsive documents concerning major league licenses dating to Panini America's formation in 2009 and the WWE license negotiations; Panini made no such determination for Mussini, and Fanatics cannot show that determination was manifestly unreasonable. Fanatics suggests (at 4) that documents concerning WWE's termination are missing because Warsop left in 2022, but its own exhibit shows the termination letter was addressed to custodian Aldo Sallustro—not solely to Mussini. *See* Ex. 16. Critically, Fanatics has not identified any actual gap—no missing communication, no absent negotiation document, no specific deficiency. It simply claims that "Panini's production contains *no documents* from the Group Licensing Director's files from mid-2022 to present." Motion at 4. That is not evidence of a gap; it is speculation that documents *might* be missing because someone holds a particular title. If that standard applied evenly, Fanatics would be required to designate Michener Chandlee, former Fanatics CFO, the predecessor to its current CFO, Glenn Schiffman, who did not join Fanatics until summer 2021—after negotiations for the key at-issue licenses were complete. Fanatics cannot adopt a job-title theory of custodian deficiency against Panini while refusing to apply it to itself. *Assured Guar. Mun. Corp. v. UBS Real Est. Sec. Inc.*, 2013 WL 1195545, at *3 (S.D.N.Y. Mar. 25, 2013) (speculation based on position titles not sufficient to justify designation as a custodian); *Mortg. Resol. Serv.*, 2017 WL 2305398, at *3 (same).

### III.    Fanatics Is Not Entitled to Irrelevant Discovery Concerning Unproven Allegations in a Separate Proceeding.

Fanatics' Request Nos. 104–106 target allegations from *Wild Card, Inc. v. Panini Am., Inc.*, No. 3:26-cv-01485 (N.D. Tex.)—a separate proceeding to which Fanatics is not a party. Request No. 104 seeks documents about an "October 2021 distributor meeting" described in Wild Card's complaint; Request No. 105 concerns Wild Card's claim that Panini warned distributors of "consequences" for carrying Wild Card products; and Request No. 106 concerns Wild Card's allegation that Panini threatened a manufacturer. Ex. 28 at 4. These Requests seek information irrelevant to *this* action. Fanatics has imported Wild Card's unproven narrative as a vehicle for discovery the Court has already rejected.

The Court has already rejected this theory. On January 5, 2026, the Court denied Fanatics' motion to compel Request Nos. 77 and 79, which sought documents concerning allegations—"by any Person, including Wild Card, Inc."—of Panini misconduct. ECF No. 252-1 at 3-4; ECF No. 273 at 2. Fanatics argued then, as now, that Wild Card's allegations "mirror" Panini's allegations about Fanatics' conduct toward GCP. ECF No. 252 at 3. The Court squarely rejected that theory:

---

[6] Fanatics cites this document for its assertion that "Mussini acted as the primary liaison with the NFLPA." Motion at 3. But the document it cites shows Mussini connecting with an NFLPA official in his capacity representing women's soccer, not NFLPA, and, as noted above, custodian Warsop is copied. Ex. 6.



"Fanatics has not demonstrated that the requests seek information that is relevant to the claims in this case" and "there is no indication that any of the information sought by these requests bore on the licensors' decisions to leave Panini." ECF No. 273 at 2. That ruling is dispositive. Request Nos. 104–106 seek the same category of information. Fanatics' "narrowly tailored" argument misses the point—the Court's order was a *relevance* determination, not a *proportionality* one. Narrowing an irrelevant request does not make it relevant.

Fanatics invokes the Court's October 2025 observation that Panini's conduct "would allow Fanatics to make its argument that Panini engaged in the same conduct" or "that its own conduct was consistent with industry norms." ECF No. 228 at 3. But that observation addressed whether Panini's pre-2014 business practices might show industry norms when Fanatics entered the market. *See* ECF No. 209 at 1–2; ECF No. 216 at 2–3. The January 2026 order addressed the distinct question of whether Wild Card's specific allegations are relevant—and held they are not. The reason is straightforward: Panini's distribution practices do not bear on whether *Fanatics* violated the antitrust laws. Even if Wild Card's allegations were proven, that would not establish that Fanatics' conduct was lawful or constitutes an "industry norm" immunizing it from liability. Indeed, as Chief Judge Swain has already held in this case, there is no in pari delicto or unclean hands defense to antitrust claims. *See* ECF No. 164 at 18 n.11 (citing *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968)); *see also Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 604 (S.D.N.Y. 1989). Fanatics' claim that these documents are "critical" to showing its entry was "procompetitive" fares no better. Whether Fanatics' entry was procompetitive depends on *Fanatics'* conduct—not what Panini allegedly did to an unrelated third party in a dispute with no bearing on how Fanatics obtained its licenses.

Moreover, the documents Fanatics cites do not "corroborate" Wild Card's allegations. Fanatics points to eight documents, but its characterizations presuppose the truth of unproven allegations. Three emails are from February 2021—eight months before the October 2021 meeting that is the focus of Wild Card's complaint—and involve none of the distributors Wild Card claims stopped carrying its products. Exs. 20–22. The four November 2021 emails show only that distributors declined a sales solicitation from Wild Card; none mentions Panini or supports Fanatics' characterization of an "abrupt" cancellation. Exs. 23–26. The final email has nothing to do with Panini at all: it is a Wild Card produced email dated February 5, 2021 and involves a printer with whom Panini had no relationship at the time. Ex. 27.

This exemplifies the "case within a case" problem: Fanatics asks this Court to credit unproven allegations from a separate forum as a predicate for relevance. The theory is circular—it relies on the *existence* of allegations in another case rather than showing how the documents bear on claims and defenses *here*. That is the type of speculation-based discovery this Court should reject. *See Collens v. City of New York*, 222 F.R.D. 249, 253 (S.D.N.Y. 2004) ("[C]ourts should not grant discovery requests based on pure speculation that amount to nothing more than a 'fishing expedition' into actions or past wrongdoing unrelated to the alleged claims or defenses."). If parties can import allegations from other lawsuits to justify discovery, there is no limiting principle. Ordering production based on Wild Card's repackaged allegations would force Panini to litigate the same issues on two fronts—driven by a third party's unproven claims, not the issues before this Court.

Finally, even if marginally relevant, these Requests are grossly disproportionate. Each seeks "[a]ll Documents and Communications" from January 1, 2009. Ex. 28 at 4. Fanatics' assertion that Panini's burden is "minimal" because it will search these documents in the Wild



Card lawsuit is meritless—discovery obligations in one case cannot justify burdens in another. Moreover, there is a pending motion to dismiss in the Wild Card litigation, and discovery in that case may prove to be unnecessary.

### IV.    The Terms of Panini's Agreements with College, High School, and WNBA Players Are Irrelevant.

Fanatics seeks to compel Panini to produce summaries of 46 athlete agreements. But 21 of these agreements—with seven high school basketball and football players, thirteen college football and basketball players,[7] and one WNBA player (the "Out of Scope Agreements")—have no plausible relevance to the claims or defenses in this case. Fanatics' motion should be denied as to these agreements.

Fanatics' contention that it is entitled to the Out of Scope Agreements is wrong. Panini sought the terms of Fanatics' agreements with NFL and NBA rookies because those agreements are directly relevant to Panini's allegations "that Fanatics signed star NFL and NBA rookies to exclusive deals to prevent Panini from using their rights on fully licensed trading cards as one element of Fanatics' broader anticompetitive conduct." ECF No. 233 at 2 (citing Am. Compl. ¶¶ 163-169). Indeed, the complaint names specific athletes. Am. Compl. ¶ 232. Panini has been consistent on this point throughout discovery: when it offered a "parallel production," it made clear that offer was limited to NFL and NBA rookies. Panini Resp. Ex. 1 at 1-2. Fanatics understood this.

Fanatics, however, refused Panini's compromise offer, forcing Panini to move to compel twice. First, on September 30, 2025, Panini moved to compel Fanatics to produce athlete agreement information, ECF No. 210 at 5, and the Court ordered the parties to meet and confer on Panini's offer to limit its request to 50 athletes, ECF No. 226 at 3. Panini then identified 46 NFL and NBA rookies whose agreements were directly relevant to the claims.. But Fanatics insisted on providing only anonymized information, necessitating a second motion. ECF No. 233. On November 20, 2025, the Court granted Panini's motion to compel, holding that the athlete identities were relevant and Fanatics had not established burden. ECF No. 238 at 1-3. The Court emphasized that Panini's Amended Complaint alleges "that Fanatics signed several NFL and NBA rookie players to lucrative deals for their autographs" and "offered these players large sums of money in order to prevent Panini from having their autographs on trading cards during the early years in their careers." *Id.* at 1. The Court ordered Fanatics to produce non-anonymized summaries for all 46 athletes Panini identified.[8]

Importantly, the Court's order did not direct Panini to produce athlete agreements— Panini's offer was entirely voluntary. Nonetheless, Panini agreed to stand by its prior offer to produce a mutual scope of NFL and NBA athlete agreement summaries, matching the scope of what Fanatics was ordered to produce. Panini entered into good-faith negotiations to resolve related requests, and has been consistent throughout: its offer was always limited to NFL and NBA rookies, the only athletes relevant to the claims. Panini even offered to expand its production to include exclusive MLB rookies to accommodate Fanatics' Request No. 70. ECF No. 252-1 at 2.

---

[7] These classifications reflect player status during the relevant discovery period of 2021–2025. One player was drafted by the NFL in 2026 and three have declared for the 2026 NBA draft.

[8] Fanatics has refused to comply with this court order, which is the subject of Panini's separate motion to compel. *See* ECF No. 334 at 5-6.



Fanatics has delayed production of court-ordered discovery, while pursuing agreements based on sensitivity rather than relevance. Rather than provide NFL and NBA rookie names for Panini's production, Fanatics submitted lists including golfers, NASCAR drivers, combat sports athletes, a WNBA player, high school students, and college athletes—none of whom have any connection to the claims in this case. Panini rejected these lists, reiterating the scope it had always proposed. Fanatics' assertion that Panini "reneged" on prior commitments is false. It is Fanatics that has shifted positions, demanding irrelevant agreements it never sought until this year while withholding court-ordered discovery for over six months.

Fanatics' relevance arguments lack merit. *First*, Fanatics argues the Out of Scope Agreements are "critical to undermining Panini's narrow market" because the terms "go directly to the value of (and demand for) non-NFL/NBA/MLB cards." Motion at 7. This argument conflates the market for trading cards with the market for athlete services. Neither party has contended that athlete services is a relevant market. Panini's Amended Complaint defines the relevant product market as "Major U.S. Professional Sports Leagues trading cards." Am. Compl. ¶¶ 42, 67. Even Fanatics' broader "collectibles" definition concerns products sold to consumers, not the market for acquiring athlete autograph rights. The terms of 21 Out of Scope Agreements do not bear on which products consumers view as substitutes for NFL, NBA, and MLB trading cards—and Panini has already agreed to produce documents regarding competition and market definition.[9]

*Second*, Fanatics argues the agreements are relevant to "testing Panini's claims of injury and damages." Motion at 7. This fails. The WNBA agreement is facially irrelevant: Panini is licensed by both the WNBA and its players association, so that agreement has nothing to do with unlicensed cards. As to the college and high school agreements, Fanatics offers no explanation for how these terms will "test" Panini's claims—particularly when Panini has already agreed to produce documents concerning its business plans and strategies for unlicensed products. The actual terms of these agreements are simply not relevant to Fanatics' purported defense. What Panini pays a high school or college athlete for autograph rights tells Fanatics nothing about Panini's claimed damages from being foreclosed from the relevant market. The broad scope of business planning documents Panini has agreed to produce will provide the information relevant to Panini's go-forward strategy.[10] Moreover, Fanatics' inclusion of high school athletes on its list is an improper attempt to obtain end-run discovery: the Court already denied Fanatics' Request No. 80, which sought "Autograph Deals between [Panini] and Athletes who were under 18 years of age at the time of the formation of the agreement." ECF No. 252-1 at 4; ECF No. 273 at 2. The Court should deny Fanatics' motion to compel.

---

[9] *E.g.*, Request Nos. 6 (competition between companies related to licenses); 9 (use or attempted use of exclusive licenses); 11 (competition for the sale of collectibles); 12 (analysis of the production or sale of collectibles); 21 (whether unlicensed sports trading cards compete with licensed sports trading cards); 22 (demand, competition, or the sale of unlicensed trading cards); 24 (consumer demand and value of trading cards); 28 (interchangeability between cards of players from different leagues); 31 (consumer demand for cards of NFL, NBA, or MLB athletes).

[10] *E.g.*, Requests Nos. 34 (projections of future revenues, expenses, profits, and margins for the next 20 years); 81 (efforts to grow and expand Panini's business or value proposition); 83 (actions taken in response to Fanatics' acquisition of exclusive licenses).



Respectfully submitted,

*/s/ Stuart Singer*

David Boies
Eric Brenner
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
dboies@bsfllp.com
ebrenner@bsfllp.com

Stuart H. Singer*
Sabria A. McElroy*
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
smcelroy@bsfllp.com

James P. Denvir*
Richard A. Feinstein*
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
jdenvir@bsfllp.com
rfeinstein@bsfllp.com

*Counsel for Panini America, Inc.*

**pro hac vice*

cc: All Counsel of Record (by ECF)