**LATHAM&WATKINS**<sup>LLP</sup>            **quinn emanuel** trial lawyers | new york

June 12, 2026

**Via ECF**

The Honorable Valerie Figueredo
United States District Court Magistrate Judge

Re: *Panini America, Inc. v. Fanatics, Inc. et al.*, No. 1:23-cv-09714-LTS-VF (S.D.N.Y. 2023)

Dear Judge Figueredo:

In its latest Motion to Compel (the "Motion"), Panini attempts to resuscitate its twice-rejected request for additional custodians and demands that Fanatics produce the very same categories of documents that Panini is currently withholding. The Court should deny Panini's Motion in its entirety.

## I.      Panini's Demand For New Custodians Is Waived And Baseless.

Panini's Motion is its *third* attempt to secure court intervention concerning the same duplicative custodians. When Panini first raised this demand, both the Court and Fanatics pressed for a compromise that would have preserved Panini's right to request these custodians after Fanatics made its productions. Panini rejected that compromise and prematurely moved to compel *12 additional custodians*, including two of the same custodians it seeks today: Jeffrey Gordon and Saj Cherian. After extensive briefing and argument, the Court denied Panini's motion as to those two, and seven other custodians sought by Panini. Panini appealed the Court's denial of these custodians to Judge Swain, who affirmed after another round of comprehensive briefing. Now, after two unsuccessful bites at the apple, Panini tries for a third by recasting the same arguments this Court already rejected with citations to produced documents that only confirm what this Court already found—the additional custodians are unlikely to possess any unique relevant documents.

### A.      Background

Last fall, to avoid unnecessary motion practice, Fanatics proposed a "compromise offer of 15 custodians per side, with both parties reserving the right to propose up to three more custodians in the future based on a showing that the additional custodians are likely to possess unique, responsive documents." ECF No. 206-2 at 6. Panini rejected that compromise. *Id.* at 2–3. Instead, Panini moved to compel 12 more Fanatics custodians—including Gordon and Cherian—at the outset of document discovery. ECF No. 206.

During a court conference on Panini's motion to compel, the Court proposed a similar compromise: Panini could wait to receive productions from the custodians that Fanatics proposed, and then bring any gaps to the Court's attention that demonstrated the need for more custodians. Oct. 9, 2025 Tr. at 158:14–159:9. The Court explained that Fanatics would then bear the expense of supplementation, that Panini's demand for additional custodians was premature, and that an early ruling could have preclusive effect on the issue in the future. *See id.* at 164:16–165:11 ("I can't really make a ruling on [custodians] because I haven't seen what [has] been produced . . . And so what I thought was maybe ***to try not to close the door*** is that—and to sort of put the ball in Fanatics' court is that they would be responsible for either the cost or the time it would take to

do this on an expedited basis come January.") (emphasis added); *see also id.* at 170:13–15 (while suggesting compromise, "[a]nd I really don't want to chime in here, given the lack of information on this, and so ***I don't want to foreclose it for you***") (emphasis added).  Though the Court rightly observed that this wait-and-see approach would risk substantial costs for Fanatics, Fanatics agreed to that proposal because it was confident in its selection of custodians in the first place and in order to spare the costs of premature motion practice.  *Id.* at 158:23–159:23.  Panini refused, *id.* at 166:9–14, instead pressing forward with its motion to compel 12 more custodians, ignoring the Court's warnings that doing so could "close the door" on the issue, *id.* at 164:16–165:11.

The Court held a second conference on the issue on November 7, 2025.  There, again, Fanatics offered to assume the costs of a later demand for new custodians if Panini agreed to the Court's proposed compromise.  Nov. 7, 2025 Tr. at 22:20–22 ("Fanatics is happy to bear the cost of that down the line if they do identify gaps and need to come back to us with more custodians.").[1] The Court, again, questioned the "downside for Panini" of this compromise, given that "the burden, . . . the cost, the time of doing this on an expedited basis, come January/February, would be on Fanatics."  *Id.* at 21:8–14.  Panini, again, refused the compromise, arguing that a January/February motion to compel would be "too close to th[e] deadline" for substantial completion and would "inevitably extend and delay discovery."  *Id.* at 21:21–22:1.

Thereafter, the Court ordered Fanatics to designate three more custodians—Omar Wilkes, Elizabeth Galviz, and Brian Bayne—while otherwise denying Panini's motion.  *See* ECF No. 234 at 1–3 (finding, *inter alia*, that it was "not readily apparent" that Gordon and Cherian "will have unique, relevant documents not captured by Fanatics' proposed custodians").  The Court did not rule that Panini could propose more custodians later, nor did Panini request such relief—despite the Court's indication that a ruling on that issue could "close the door" and "foreclose" that issue. *See* Oct. 9, 2025 Tr. 165:3–7, 170:13–15.  The Court's order granted no leave to renew, and Panini again requested none.[2]

Panini subsequently objected to the Court's ruling before Judge Swain.  *See* ECF No. 248. In the detailed opposition, Fanatics explained that Panini had "rejected" Fanatics' proposal "that Panini reserve the right to seek more custodians later."  ECF No. 265 at 5–6.  Panini did not dispute that characterization.  Ultimately, Judge Swain overruled Panini's objections in their entirety.  ECF No. 274.  Judge Swain's order granted no leave to renew, and Panini again requested none.

On April 9, after receiving Fanatics' productions, Panini demanded that Fanatics designate Gordon, Luber,[3] and Cherian as custodians, and that Fanatics propose one or more custodians for

---

[1]  In its Motion, Panini strips Fanatics' statements at the November 7, 2025 conference out of context to claim that these offers were not contingent on Panini's assent to the Court's proposed compromise.  Not so: Fanatics' agreement to bear the costs of later requests for custodians was clearly offered as part of that compromise, not as a freestanding gift to Panini.  *See* Nov. 7, 2025 Tr. at 22:20–23:8 (Fanatics responding to Panini's rejection of the proposed compromise, "Fanatics is happy to bear the cost of that down the line . . . which is why we are more than happy to proceed as you have suggested").

[2]  Panini misleadingly asserts that the Court's denial was "without prejudice to renewal."  Motion at 1 (citing ECF No. 234 at 3).  No reference to a possible renewal appears in the Court's order.

[3]  Panini misleadingly claims that Fanatics "deleted" Luber's data after his departure.  Motion at 2 n.3.  As Fanatics informed Panini, Luber's data was removed from Fanatics' systems following his November 2022 departure—years before this litigation, at which time Luber's data was not subject to any litigation hold or preservation obligation—consistent with applicable preservation policies and practices.  *See* Ex. 1 at 5 (April 30, 2026 Email from K. Bonacorsi).

reseller communications.  Motion Ex. 1 at 7–9.  Fanatics again offered a compromise that would have obviated the need for motion practice; Panini—once again—refused to accept a compromise that would avoid burdening this Court and wasting party resources.  *See* ECF No. 331-4 at 13–18.

**B.    Argument**

**i.    Panini Waived Its Right To Propose Additional Custodians At This Stage.**

The Motion is Panini's third attempt to litigate the same custodian dispute.  Panini arrived here through deliberate strategic choices: it rejected a compromise that would have reserved its right to propose additional custodians after productions; it demanded immediate adjudication of its initial motion to compel despite the Court's warnings that doing so would foreclose the issue; it failed to try to reserve any right to seek additional custodians after that motion was rejected by the Court and Judge Swain; and it waited after the close of document discovery to again raise the issue to the Court.  Having knowingly relinquished the wait-and-see path it now belatedly invokes, Panini has waived its right to propose additional custodians at this stage.

"Waiver is the intentional relinquishment or abandonment of a known right."  *United States v. Olano*, 507 U.S. 725, 733 (1993) (citation omitted).  Panini's relinquishment was intentional and strategic: it repeatedly rejected the very right it now asserts in favor of pursuing its premature motion to compel.  *See United States v. Spruill*, 808 F.3d 585, 597 (2d Cir. 2015) ("[T]his court has recognized waiver where a party actively solicits or agrees to a course of action that he later claims was error."); *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) ("no difficulty" in finding waiver where a party was "attempting to evade the consequences of an unsuccessful tactical decision").  Panini's choices carried consequences for all involved.  By rejecting the sensible compromise that the Court proposed (twice), Panini forced Fanatics, the Court, and Judge Swain to expend substantial effort and resources—"two rounds of oral argument," "extensive briefing," and full objection practice before Judge Swain.  ECF No. 274 at 1 n.2, 5.  Having imposed such costs, Panini cannot now claim the benefits of the compromise it rejected.[4]

This waiver applies not only to Panini's requests concerning Jeffrey Gordon and Saj Cherian—who were specifically named in Panini's initial motion to compel, *see* ECF No. 207 at 2-3—but also to the reseller custodians sought in Panini's Motion.  At the November 7, 2025 conference, Panini raised this very same purported deficiency, putting it before the Court when it denied the addition of new custodians.  *See* Nov. 7, 2025 Tr. at 30:11–15 ("[T]hey have objected to Bell given his CEO role . . . But they have not proposed any custodians that would be involved with case breakers and have those communications."); *id.* at 33:3–6 ("And to the extent he is not the relevant custodian for case breaker communications, we would ask Fanatics identify

---

[4]  Panini's contention that "[t]he very standard Fanatics urged upon the Court" gives it this option is false.  Motion at 5.  As Fanatics has explained, that "standard provides multiple solutions" that are mutually exclusive: "(1) the requesting party can show that necessary custodians are missing by, for example, identifying specific requests that will go unanswered or organizational gaps that must be filled; or (2) the requesting party can wait and show that the 'resulting production is deficient.'"  ECF No. 265 at 14 (quoting *Mortg. Resol. Servicing, LLC v. JPMorgan Chase Bank, N.A.*, 2017 WL 2305398, at *2 (S.D.N.Y. May 18, 2017)).  Consistent with this standard, Fanatics (unlike Panini) has not attempted to avail itself of both options.  Indeed, Fanatics' motion to compel Panini's addition of Elisabetta Mussini as a custodian bears this out: it explains that "Fanatics has not previously moved to compel Mussini's designation and raises this issue now based on deficiencies that only became apparent upon review of Panini's production," including "[r]ecently produced documents."  ECF No. 332 at 3.  Moreover, those documents revealed true gaps in Panini's production—they showed Mussini was the key substantive decisionmaker on important issues.

appropriate custodians who are.  We do not think that they have done that.").  Panini therefore knowingly elected against a wait-and-see approach for this demand as well.

The Court should exercise its "broad discretion in resolving discovery disputes" to deny Panini a third bite at the apple and find that Panini has waived its right to request these same additional custodians.  ECF No. 274 at 2 (quoting *Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, 571 F. Supp. 3d 106, 112 (S.D.N.Y. 2021)).[5]

### ii.    Panini Has Still Not Carried Its Burden Of Justifying Additional Custodians.

Even if Panini had not waived its right to pursue additional custodians—and even if its Motion were not in fact a motion for reconsideration, for which the advancement of new facts is not permitted[6]—Panini's new citations to Fanatics documents would not carry the day.  The documents Panini cites merely confirm that each of its requested custodians would be duplicative, and it has certainly not identified any substantive gap that would justify adding any additional custodians.  *See, e.g.*, *Mortg. Resol. Servicing,* 2017 WL 2305398 at *3 ("[G]iven the information already produced, the marginal utility of that possessed by these custodians is low. . . .  The game is simply not worth the candle.").

*Jeffrey Gordon:*    Panini contends that Fanatics' production revealed that Gordon "was central to Fanatics' trading card strategy and license acquisition campaign," that he "was the primary recipient of market intelligence critical to Fanatics' trading card strategies," and that he had direct communications with ▮▮▮▮▮▮ and resellers.  Motion at 2.  These claims largely rehash Panini's earlier arguments for Gordon's designation: that he was "instrumental in planning, negotiating, and executing the exclusive license agreements at issues here" and that he "is likely to have played a unique role in the operational and strategic planning of Fanatics Collectibles." ECF No. 207 at 2.  And the documents cited by Panini show that Gordon was in extensive communication with Fanatics' existing custodians—like Fanatics Collectibles CEO Mike Mahan, Fanatics CEO Michael Rubin, Fanatics President of Business Affairs Gary Gertzog, and others— sending them ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  These documents confirm this Court's prior finding that "it is not readily apparent that [Gordon] will have unique, relevant documents not captured by Fanatics' proposed custodians."  ECF No. 234 at 2.

Panini strains to identify unique documents that Gordon might possess, such as "working files" and "notes" underlying documents that he admittedly shared with existing custodians. Motion at 2–3.  Panini makes no effort to explain why Gordon's potential "working files" and "notes" are relevant—let alone so relevant that they justify adding him as a custodian after the

---

[5]    Panini claims Fanatics "misle[d]" the Court by misrepresenting that Glenn Schiffman and Tucker Kain were involved in planning and negotiation of the licenses in spring 2021.  Motion at 1.  Not so.  Schiffman and Kain were both involved in planning for the licenses (which took effect in 2025 and early 2026), and the NFL license was not executed until late 2022.

[6]    Contrary to Panini's baseless assertion otherwise, neither this Court's nor Judge Swain's orders on Panini's initial motion to compel granted leave for renewal.  *See* ECF No. 234; ECF No. 274.  Accordingly, Panini cannot simply renew its prior motion—its latest Motion is instead a motion for reconsideration in disguise, one that improperly raises new factual contentions months after the deadline for such a motion has passed.  *See* Local Civil Rule 6.3 ("[A] notice of motion for reconsideration must be served within 14 days after the entry of the court's order being challenged."); *see also Polsby v. St. Martin's Press, Inc.*, 2000 WL 98057, at *1 (S.D.N.Y. Jan. 18, 2000) ("On such a motion [for reconsideration], a party may not 'advance new facts, issues or arguments not previously presented to the Court.'") (quoting *Morse/Diesel, Inc. v. Fidelity & Deposit Co. of Md.*, 768 F. Supp. 115, 116 (S.D.N.Y. 1991)).

close of document discovery.  Panini also argues that Gordon "possesses uniquely responsive Zerocool documents," referring to a company formed by Gordon and Luber prior to their affiliation with Fanatics, which Fanatics ultimately acquired.  Motion at 3.  These documents, from *before* Gordon joined Fanatics, have no relevance to this action against Fanatics, which arises from *Fanatics'* alleged conduct.  Panini has failed to articulate how activities that Gordon engaged in on his own, prior to any affiliation with Fanatics, are relevant to this case.

*Saj Cherian:*  Panini contends that Cherian: "███████████████████████ ██████████████████████████████████████████████████████████████████████████████" prepared talking points, meeting notes, and a deck for Rubin; "played a unique role in league negotiations[;]" and "led market analysis and engaged in other communications bearing directly on the relevant market[.]"  Motion at 3–4.  These allegations are not new.  In its initial motion to compel, Panini argued that Cherian "likely has detailed implementation documents, working-level analyses, and tactical communications necessary to execute Rubin's strategic decisions," had a "specific responsibility for 'cultivat[ing] partnerships with all major sports leagues[,]'" "likely possesses financial analyses of the equity stakes granted to licensors[,]" and "helped 'cultivate 10 long-term strategic partnerships (including [with] every major U.S. professional sports league).'"  ECF No. 207 at 3, 3 n.7.  This Court did not credit these arguments then and should not do so now.

Panini asserts Fanatics' "argu[ment that] Cherian's documents are duplicative because he reports to . . . Rubin . . . ignores how Cherian and Rubin worked together."  Motion at 3.  But Panini's cited documents only confirm that Cherian and Rubin worked hand in glove: ████ █████████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████████ █████████████████  Indeed, Panini concedes that Cherian "sent drafts and deliverables *to Rubin*." Motion at 4 (emphasis added).  These documents only reinforce the Court's finding that "it is not readily apparent that [Cherian] will have unique, relevant documents not captured by Fanatics' proposed custodians."  ECF No. 234 at 2.

That finding makes sense: Cherian's documents all but entirely overlap with Rubin's, and any daylight between the two is filled by other custodians.  These documents show that it was Rubin, not Cherian, who "spearhead[ed]" the negotiations that Panini's letter highlights, Motion at 4, with Cherian providing support as Rubin's chief of staff for years, *see* ECF No. 206-10.  This dynamic is consistent with their respective backgrounds: Rubin has been immersed in the sports world for decades, was a co-owner of the Philadelphia 76ers for 11 years, and built deep relationships in that space; Cherian, on the other hand, is a former VC with a tech background.

Panini resorts to overstating Cherian's role because in reality, it has complete coverage from preexisting custodians across the timeline of Cherian's involvement: Cherian worked with Rubin and Gertzog around the launch of Collectibles when he "communicated directly with licensor counterparties" and (at Rubin's direction) prepared "strategic documents"; as the business developed, he worked alongside Tucker ██████████████████████████████████ who had years of experience as President of Business Enterprise for the Los Angeles Dodgers and Managing Director at Guggenheim Baseball Management, and Glenn Schiffman ████████ who had years of experience as IAC Inc.'s CFO and as an investment banker.  Motion at 3.

This is precisely why Panini struggles to identify any information they are lacking beyond one-off emails and conversations they *imagine* he had.  That is nowhere close to the sort of

5

substantive gap that constitutes a deficiency—and even as to those non-substantive quibbles, the documents cited by Panini prove overlap with present custodians. *See, e.g.*, *Mortg. Resol. Servicing,* 2017 WL 2305398 at *3 ("[G]iven the information already produced, the marginal utility of that possessed by these custodians is low. . . . The game is simply not worth the candle.").

*Reseller Custodians:*    Panini seeks to add three new custodians based on vague and conclusory allegations that Fanatics "coerced" distributors, hobby shops, and case breakers.  Am. Compl. ¶¶ 194–206, ECF No. 69.  By Panini's telling, these 13 paragraphs of a 298-paragraph complaint justify a 20% increase in the total number of Fanatics' custodians.  The significant burden imposed by this request is utterly disproportionate to any claimed basis for Panini's request.

Moreover, even if Panini's meager allegations could justify such a burdensome request, there is no "gap" in Fanatics' productions left to fill.  As Fanatics has explained, its production of David Leiner's documents provides Panini with adequate discovery into its reseller allegations given Leiner's function in Fanatics' collectibles business.  *See, e.g.*, Nov. 7, 2025 Tr. at 31:6–9. Panini establishes no deficiency in that existing production.

Panini contends that "Leiner did not communicate directly with resellers," Motion at 4— then cites a document that



Panini's other cited documents likewise reflect Leiner's close monitoring of Fanatics' reseller communications.

.  Panini argues that "[t]he day-to-day reseller communications reside only in these non-custodians' files[,]" Motion at 4–5—a statement clearly contradicted by the oversight of such communications reflected in Panini's own citations.  Moreover, if there were any supposed policy of coercion toward resellers, it would be reflected in documents of Leiner or Mahan.  Panini does not need every communication between Fanatics and three categories of resellers to investigate this vague, baseless allegation.

Panini's requests for additional custodians should be denied as waived and groundless.

## II.    Fanatics Has Complied With Its Athlete Agreement Obligations—Panini Has Not

***Athlete Agreement Summaries.***    Panini's argument regarding Fanatics' production of athlete agreement summaries ignores its own representations to the Court.  Fanatics complied with the Court's November 20, 2025 order: after satisfying relevant notice provisions, Fanatics prepared summary sheets for the 46 athletes Panini identified and transmitted them to Panini in a password-protected zip file.  Fanatics will provide Panini's counsel with the password upon Panini's promised "parallel production" of its own athlete agreement summaries—the production Panini represented to this Court it would make when seeking the order compelling Fanatics' production.  *See* ECF No. 233 at 4 n.2 (Panini represented it was "not seeking to impose burdens on Fanatics that go beyond what it is willing to itself assume" and that Panini "will need to make a parallel production").  Panini obtained a favorable order based on this representation; it cannot now refuse to honor its commitment while demanding Fanatics comply.  For the reasons explained in Fanatics' letter motion to compel, ECF No. 331, Panini should be compelled to make a "parallel production" of athlete agreement summaries for 46 athletes of Fanatics' choosing.

***Athlete Negotiation Documents and Payment Records.*** Panini's demands for *all* of Fanatics' NFL and NBA athlete negotiation documents (Request Nos. 55 and 57 from Set 2) and payment records (Request No. 4 from Set 3)—*i.e.*, well beyond the 46 athletes Panini selected— would defeat the purpose of the parties' agreement to share only summaries of athlete agreements and only for a limited number of athletes. The parties recognize that athlete agreements, negotiations, and payments are extremely sensitive. Indeed, Panini asked the Court to order only summary sheets for 46 athletes, ECF No. 211 at 5, and the Court agreed, ECF No. 226. This limitation—intended to minimize disclosure of some of the parties' most competitively sensitive information—is meaningless without a parallel limitation on athlete negotiation documents and payment records. Fanatics' negotiation documents hit by agreed search terms often have attached agreements or discuss terms for athletes *not* on Panini's list of 46. Producing those documents would effectively nullify the parties' agreement to produce only summary sheets and also greatly expand the number of athletes for whom Fanatics will produce summaries. That is contrary to the parties' discussions, Panini's request to the Court, and the Court's November 20, 2025 order. Fanatics is prepared to promptly provide a password for Panini to access its production of all athlete negotiation documents hit by agreed search terms for the 46 athletes Panini identified, as well as documents sufficient to show payments to those 46 athletes, provided Panini (a) makes a "parallel production" of athlete agreement summaries for 46 athletes of Fanatics' choosing and (b) agrees to produce related negotiation documents and payment terms.[7]

## III.    Supplemental Productions for Request Nos. 13, 96, 97, and 108

On August 28, 2025, the parties agreed to a mutual July 31, 2025 end date for document productions, with both parties reserving the right to request reasonable supplemental productions. *See* ECF Nos. 209-4 at 1, 214-2 at 1. On April 23, 2026, Panini demanded that Fanatics supplement certain data productions—specifically, data related to pricing, revenue, and market share, along with related go-get requests—to include documents dated August 1, 2025, through April 30, 2026. Motion Ex. 42 at 1. Fanatics did not "flatly refuse[] to consider Panini's supplementation requests[.]" Motion at 7. Rather, Fanatics stated it was improper for Panini to request that Fanatics expand or refresh its productions when Panini still had not satisfied its existing—and, in some cases, court-ordered—obligations. *Id.* Ex. 43 at 2. Subsequently, counsel for Panini and counsel for Fanatics discussed meeting and conferring about a mutual scope of data productions. Panini declined to engage in the meet and confer process and instead prematurely filed a letter motion on this issue. Indeed, Panini has not articulated why it actually needs Fanatics' highly sensitive, near-contemporaneous data—other than noting that "Fanatics' exclusive licenses for NBA and NFL cards took effect after July 31, 2025[.]" Motion at 7. Nor has Panini explained why the burden of a data refresh might be justified. Fanatics remains willing to meet and confer regarding a mutual scope of data productions, including the possibility of data refreshes, but there is simply no ripe dispute on this issue.

---

[7] Fanatics did not "retract" any agreement to produce documents sufficient to show payments made to the 46 athletes Panini identified. *See* ECF No. 331 at 7. Fanatics' agreement to produce athlete negotiation documents and payment records for the 46 athletes Panini identified has always been contingent on a global agreement regarding athlete agreements—including Panini's compliance with its representation to the Court that it will make a "parallel production." *See* ECF No. 331-29 at 12–13 (Panini's counterproposal requesting that Fanatics produce negotiations and payments only for the 46 athletes Panini identified).

Respectfully submitted,


*/s/ Michael B. Carlinsky*
Michael B. Carlinsky
Quinn Emanuel Urquhart & Sullivan LLP
295 Fifth Avenue
New York, NY 10016
michaelcarlinsky@quinnemanuel.com
(212) 849-7000

*Counsel for Fanatics*

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
lawrence.buterman@lw.com
(212) 906-1264

*Counsel for Fanatics*