# Exhibit 1



June 9, 2026

**Via ECF**

The Honorable Valerie Figueredo
United States District Court Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

> Re: *Panini America, Inc. v. Fanatics, Inc. et al.*, Case No. 1:23-cv-09714-LTS-VF
> (S.D.N.Y. 2023) – Motion to Compel Production

Dear Judge Figueredo:

Panini renews its motion to compel Fanatics to add the following ESI custodians whose exclusion resulted in deficiencies to Fanatics' production on evidence central to Panini's claims: (1) Saj Cherian, (2) Jeff Gordon, and (3) appropriate reseller custodian(s) (the "Disputed Custodians").[1] *See Section I.* Panini separately seeks a Court order compelling Fanatics' compliance with the Court's November 20, 2025 order requiring it to produce summaries of certain athlete agreements. ECF No. 238. *See Section II.* Lastly, Panini requests an order compelling Fanatics to produce certain other documents relevant to the claims and defenses. *See Section III.*

Separately, the parties have been negotiating a deposition protocol, and Panini requests that the Court resolve any remaining disputes on the protocol at the hearing.

## I.    Missing Custodians

Panini previously moved to compel the addition of twelve individuals as custodians. ECF No. 207. Fanatics argued the disputed custodians were duplicative and the Court should wait to evaluate gaps after document discovery. ECF No. 242 ("Nov. 7, 2025 Tr.") at 5:3-11, 20:7-21. Finding it too early to assess Fanatics' custodian selections, the Court granted Panini's motion as to three custodians and denied the remainder without prejudice to renewal. ECF No. 234 at 3.

The parties substantially completed document productions by February 20, 2026. Panini's review confirmed that Gordon and Cherian—both listed on Fanatics' initial disclosures as having relevant knowledge—possess unique, non-duplicative documents critical to planning and negotiating the exclusive license agreements. The production also revealed that Fanatics provided misleading descriptions of the roles of existing custodians. Fanatics claimed it had designated four custodians "responsible for planning and negotiating the challenged license agreements" that are at the core of the case. ECF No. 213 at 2. In fact, only two custodians—Rubin and Gertzog—were involved in negotiating the license agreements during November 2020 to August 2021, when Fanatics formulated its trading card strategy and secured the exclusive licenses.[2] Neither one prepared the financial modeling, strategic documents, pitch decks, or market intelligence that

---

[1] *See* ECF No. 207 (original motion to compel); ECF No. 234 (order granting motion in part).

[2] Two other custodians, Kain and Schiffman, joined in the summer of 2021, after three of the six licenses had been signed. Neither played a substantive role in negotiating the two agreements executed in June and August 2021.



drove Fanatics' license acquisitions. That work was done by Gordon, Cherian, and Josh Luber[3]—none of whom are Fanatics custodians.

Making matters worse, Fanatics only recently disclosed that it possesses Gordon's unique Zerocool documents—information it should have provided during custodian negotiations. This belated disclosure contradicts Fanatics' claim that Gordon's documents are duplicative. Zerocool, co-founded by Luber and Gordon, partnered with Fanatics around November 2020 to form Fanatics Collectibles. Before that partnership, Zerocool had ████████████████████ ████████████████████████████████████—which Judge Swain found sufficiently alleged to have participated in "a conspiracy between the NFLPA, the MLBPA, and Fanatics to license both players associations' intellectual property on an exclusive basis for twenty years each." ECF No. 164 at 20. Gordon's unique Zerocool documents—which no other custodian possesses—are critical to understanding the origins of Fanatics' exclusive licensing strategy.

On April 9, 2026, Panini sent Fanatics a letter identifying these production gaps and requesting the Disputed Custodians. *See* Ex. 1. The parties met and conferred on April 17 and 24, but Fanatics refused to add the Disputed Custodians. It should be compelled to add them now.[4]

### A.     The Disputed Custodians Have Unique Relevant Documents

#### 1. Jeffrey Gordon, Fanatics Collectibles Co-Founder and Former Chief Strategy Officer

Gordon was central to Fanatics' trading card strategy and license acquisition campaign. Fanatics claimed Gordon's documents would be duplicative of existing custodians. ECF No. 213 at 5. The production proves otherwise. Gordon ████████████████████████████████ ████████████████████████, Ex. 2 (FAN-PAN-SDNY00708815), and ████████████████ ████████████████████ Ex. 3 (FAN-PAN-SDNY00932081); Ex. 18 (FAN-PAN-SDNY00432413) (Gordon was working on "████████████████████████████████ ████████"). Without Gordon as a custodian, Panini cannot access working files, drafts, or communications that may underlie these critical documents.

As Chief Strategy Officer, Gordon "████████████████████████████████ ████████████████████." Ex. 4 (FAN-PAN-SDNY00224948) at '949. The produced documents confirm Gordon was the primary recipient of market intelligence critical to Fanatics' trading card strategies—intelligence Panini can access only when Gordon happened to forward it to others. *See, e.g.*, Ex. 5 (FAN-PAN-SDNY00225761); Ex. 6 (FAN-PAN-SDNY00224359); Ex. 7 (FAN-PAN-SDNY00129032); Ex. 8 (FAN-PAN-SDNY00690899) at '901-'902. Gordon also communicated directly with ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████." Ex. 9 (FAN-PAN-SDNY00030577) at '582. Gordon further spoke regularly with resellers, *see* Ex. 10 (FAN-PAN-SDNY00690691) at '693 (meetings ████████ ████████████); Ex. 8 (FAN-PAN-SDNY00690899) at '900 (meeting with ████████████); Ex. 11 (FAN-PAN-SDNY00690683) at '684 (meeting with "████████████████████"), and engineered Fanatics' plan to ████████████████████████████████

---

[3] Panini is not moving to add Luber as a custodian because Fanatics disclosed on April 30, 2026, that it deleted Luber's Fanatics and Zerocool emails after his departure. Since Luber also used his Gmail account for Zerocool and Fanatics business, Panini intends to serve a document subpoena on Luber.

[4] The Court may compel additional custodians where a party's custodian selection "is manifestly unreasonable or ***the requesting party demonstrates that the resulting production is deficient***." ECF No. 234 at 1-2 (quoting *Mortgage Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.*, 2017 WL 2305398, at *2 (S.D.N.Y. May 18, 2017) (emphasis added)). This Motion demonstrates that Fanatics' resulting production is deficient.

**BSF**

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████, Ex. 14 (FAN-PAN-SDNY00731159). Any notes or communications from these meetings and strategy sessions reside solely in Gordon's files.

Finally, Gordon possesses uniquely responsive Zerocool documents. As discussed above, Fanatics only recently disclosed that it has Gordon's Zerocool files, directly contradicting its claim that Gordon's documents are duplicative. The pitch deck Zerocool ████████
████████████████████████████████████████████
██████████████████████████████." Ex. 15 (FAN-PAN-SDNY00434352) at slide 2. And Zerocool communicated with ████████████████
██████████████████████, but those communications do not exist in the current productions. *See* Ex. 16 (FAN-PAN-SDNY00935744) at '744. Gordon's Zerocool files are the only source for these missing communications.

### 2. Saj Cherian, Chief of Staff to Fanatics' CEO and Head of Fanatics Ventures

Cherian played a central role in Fanatics' license acquisition campaign. Fanatics previously argued Cherian's documents are duplicative because he reports to CEO Michael Rubin, who is a custodian. ECF No. 213 at 4. But that argument ignores how Cherian and Rubin worked together. Cherian ████████████████████████████████████████████
████████████████████. *See, e.g.*, Ex. 17 (FAN-PAN-SDNY00432810) at '812 (Cherian ████████████████████████████████████████████
████████████████████████"); Ex. 18 (FAN-PAN-SDNY00432413) (confirms Cherian was working on '██████████████████████████████████
████████████). Rubin routinely deflected discussions of these materials to oral channels.[5] As a result, Rubin's custodial files undercount the substantive discussions about topics relevant to this litigation. Cherian, as the conduit for setting up and participating in many of these conversations, holds unique documents reflecting the substance discussed outside of Rubin's email trail.

Moreover, Cherian was the primary author of strategic documents that drove Fanatics' license acquisition campaign. He authored the '████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████). On February 5, 2021, Cherian sent Rubin his "first pass" at a ████████
████████████████████████████████████████████
████████████████████████████████. Ex. 24 (FAN-PAN-SDNY00709144). Cherian's files would contain the drafts and prior versions of these materials.

Cherian also played a unique role in league negotiations that no other custodian can capture. On February 9, 2021, ████████████████████████████████████
████████████████████████████████████████████

---

[5] For example, when asked to share the ████████████████████
██████████████████████████." Ex. 18 (FAN-PAN-SDNY00432413). *See also* Ex. 45 (FAN-PAN-SDNY00434612); Ex. 46 (FAN-PAN-SDNY00431558) at '558.



Ex. 25 (NBA-Panini_00000996). The phrase "███████████████" suggests an earlier in-person meeting. And on May 4, 2021, Cherian conveyed instructions from the league to Gordon and Luber: "███████████████████████████████." Ex. 26 (FAN-PAN-SDNY00776998). This shows that Cherian may have received a prior communication from the league that does not appear in the production and also indicates that Cherian was spearheading negotiations ████████████. The same pattern appears with the ███████ ████████████████████████████." Ex. 27 (FAN-PAN-SDNY00434626) at '626. This shows Cherian had a prior email exchange with Clark that does not appear in Fanatics' production.

Finally, Cherian led market analysis and engaged in other communications bearing directly on the relevant market that are not in other custodians' files. He worked with ███████ ████████████████." Ex. 28 (FAN-PAN-SDNY00027718) at '719. When Rubin sought to "████████████████████████████," Cherian contacted various executives, but Fanatics did not produce the results—suggesting they exist only in Cherian's files. Ex. 29 (FAN-PAN-SDNY00225548). Cherian also communicated ████████████████████ ████████████████████, Ex. 30 (FAN-PAN-SDNY00707640), ████████████, Ex. 31 (FAN-PAN-SDNY00037611), without other custodians present. These market-definition documents are critical to Panini's antitrust claims, yet they appear in no other custodian's production unless Cherian happened to forward them to existing custodians.

### 3. Reseller Custodians

Fanatics also failed to designate custodians for communications responsive to Request Nos. 84 (case breakers), 87 (distributors), and 92 (hobby shops).[6] These communications are directly relevant to Panini's allegations that Fanatics threatened to cut off distributors who refused higher margins, imposed anticompetitive terms on hobby shops, and forced case breakers onto Fanatics Live. ECF No. 69 ("Am. Compl.") ¶¶ 194-206. After Panini raised this gap, Fanatics identified three individuals with relevant communications—Matthew Gepp (case breakers), John Rosenwinkel (distributors), and Scott Daniel (hobby shops)—but refused to add them as custodians.[7]

Fanatics previously argued that reseller communications "would be within the collectibles business, which is underneath David Leiner." Nov. 7, 2025 Tr. at 31:6-9. The production proves otherwise. Leiner does not communicate directly with resellers—he receives forwarded chains that reference or attach communications conducted by non-custodians. *See, e.g.*, Ex. 32 (FAN-PAN-SDNY00688104) (Leiner sent communications with hobby shops conducted by non-custodians Scott Daniel and Paul Todaro); Ex. 33 (FAN-PAN-SDNY00063638) at '641 (non-custodians ████████████████████"); Ex. 34 (FAN-PAN-SDNY00165660) at '660 (non-custodian ████████████ ████████████").[8] The day-to-day reseller communications reside only in these non-

---

[6] Panini raised this issue at the November 7 conference, stating it did not "have any custodians that would have the responsive communications concerning Fanatics' communications with case breakers." Nov. 7, 2025 Tr. at 30:5-19. In response, Fanatics stated that if there are gaps, Panini can "raise that with us at the appropriate juncture." *Id.* at 31:13-17.

[7] Fanatics offered to add them only if Panini added Elisabetta Mussini. Panini agreed to add Mussini only on the condition that Fanatics also add Cherian plus Gordon's Zerocool documents. Fanatics refused.

[8] *See also* Ex. 35 (FAN-PAN-SDNY00642668) (Leiner sent communications with distributors conducted by non-custodian Kevin O'Neil); Ex. 36 (FAN-PAN-SDNY00123074) (Leiner forwarded communication from reseller to non-custodian Scott Heard); Ex. 37 (FAN-PAN-SDNY00641158) (referencing agreements sent to resellers by non-



custodians' files.

The documents confirm the need for each custodian. Gepp uniquely possesses communications about forcing case breakers onto Fanatics Live. *See* Ex. 34 (FAN-PAN-SDNY00165660) at '660 (████████████████████████████████████"). Rosenwinkel uniquely possesses communications showing ████████████████ ████████████. *E.g.*, Ex. 39 (FAN-PAN-SDNY00664018); Ex. 40 (FAN-PAN-SDNY00153628); Ex. 41 (FAN-PAN-SDNY00126316). And Daniel uniquely possesses communications regarding Fanatics' anticompetitive terms imposed on hobby shops. *E.g.*, Ex. 32 (FAN-PAN-SDNY00688104) (direct communication with hobby shop by Scott Daniel). Fanatics should be compelled to add these custodians.

### B.    <u>Fanatics' Waiver Argument Is Baseless</u>

Rather than responding substantively to the deficiencies Panini identified as a result of Fanatics' failure to add Gordon and Cherian as custodians, Fanatics asserted waiver. This position is baseless. The very standard Fanatics urged upon the Court expressly preserves the requesting party's right to seek additional custodians where "the requesting party demonstrates that the resulting production is deficient." ECF No. 234 at 1-2. The Court's order likewise preserved Panini's right to renew its motion, noting that because only a "very limited number of documents [had been] exchanged," it could not fully assess Fanatics' custodian selections. *Id.* at 2. Fanatics also told the Court that Panini should "wait[] until they see the productions and then identify[] gaps on the back end," Nov. 7, 2025 Tr. at 20:19-21, and represented it would "bear the cost" if Panini needed "to come back to us with more custodians," *id.* at 22:18-23. Having obtained a denial predicated on the early stage of discovery, Fanatics cannot now claim Panini is barred from raising the issue when production has proven deficient.

Fanatics has also claimed Panini waived its rights by rejecting the Court's procedural proposals, but the Court never stated its ruling would prohibit Panini from renewing its motion after production.[9] In any event, Fanatics cannot credibly assert waiver when its opposition to Panini's earlier motion was predicated on misrepresentations to the Court concerning the Disputed Custodians' documents and roles. *See supra* at 1-2.

### II.    <u>Fanatics Is in Violation of this Court's November 20, 2025 Order</u>

This Court's November 20, 2025 order required Fanatics to produce non-anonymized summaries of its license agreements with 46 NFL and NBA players identified by Panini in response to Request Nos. 54 and 56. ECF No. 238. Fanatics has defied that order for over six months. It claims it need not comply until the parties resolve a separate dispute over Panini's athlete summaries so that the parties can each make a "parallel production."[10] That is not how court

---

custodian Emily Wanderer); Ex. 38 (FAN-PAN-SDNY00641841) at '841 (referencing ████████ ████████ created by non-custodian Avery Jessup).

[9] Fanatics is the only party who rejected a proposal by the Court. It rejected the Court's suggestion that the parties start with fifteen custodians each with the ability to seek five more. ECF No. 224 (Oct. 9, 2025 Tr.) at 162:14-163:15. At the November 7 conference, the Court proposed that the parties return after productions to resolve the custodian dispute. ECF No. 242 (Nov. 7, 2025 Tr.) at 20:24-21:17. Panini indicated it was "happy to proceed however your Honor thinks makes the most sense" while noting concerns about delays. *Id.* at 22:9-15. The Court then proceeded to decide Panini's motion on the evidence available at that time.

[10] As Panini will show in opposition to Fanatics' contemporaneous letter motion, Panini offered to make a "parallel production" of all NBA and NFL rookies with whom Panini has exclusive agreements—the only category of Panini agreements relevant here, and a scope matching what Fanatics was ordered to produce. Fanatics rejected this offer.



orders work. A separate discovery dispute does not give Fanatics license to ignore a direct order from this Court. Even if Fanatics had been justified in delaying production during negotiations—it was not—those negotiations have failed. Fanatics must comply immediately with the Court's November 20 order, and Panini respectfully requests such other relief as the Court deems proper in light of Fanatics' disregard of its order.[11]

### III.    Fanatics Should Be Compelled to Produce Relevant Documents

#### 1. Request Nos. 55 and 57, Second Set of Requests

In its Responses and Objections, Fanatics agreed to produce documents concerning its negotiations with NFL and NBA players "for the right to use their NIL or Autographs" on trading cards. *See* ECF No. 195-1 at 51-54. Fanatics then delayed production while the parties negotiated the scope of athlete productions. Those negotiations failed because Fanatics refused to produce any documents unless Panini agreed to produce certain agreements and related negotiations with athletes that are not NFL and NBA players and not properly within scope of discovery in this case. Fanatics should now be compelled to produce the documents it already agreed to produce.

These documents are directly relevant to Panini's rookie lock-up claims. The Amended Complaint alleges that Fanatics "began a targeted effort to execute exclusive deals with star, rookie players to deprive Panini of the ability to include those players' original, handwritten autographs" on fully licensed trading cards during the remaining term of Panini's licenses. Am. Compl. ¶ 164. Fanatics "offered these players large sums to keep their original, handwritten autographs *off* the most important trading cards for the critical, early years of their careers"—"effectively paying these players to prevent them from dealing with Panini since Fanatics cannot effectively use these rights in the interim." *Id.* ¶¶ 164-165. The Court has already ruled that the *terms* of these athlete agreements are relevant. *See* ECF No. 238. But the terms alone do not tell the full story. The *negotiations* are also relevant to Fanatics' anticompetitive intent—including evidence of what representations Fanatics made to induce athletes to sign and whether Fanatics threatened players that "if they did not immediately sign with Fanatics, they would never get an autograph deal in the future." Am. Compl. ¶ 166. These documents are also relevant to Panini's allegations that "Fanatics disseminated false, derogatory statements about Panini to players, player agents, and player representatives to induce players not to do business with Panini and, instead, to sign exclusive licensing agreements with Fanatics." *Id.* ¶¶ 170-172.

#### 2. Request No. 4, Third Set of Requests

Request No. 4 of the Third Set of Requests seeks documents sufficient to show payments Fanatics made to (i) NFL or NBA rookies for autograph rights and (ii) rookies from other leagues for exclusive autograph rights where Fanatics lacked a license with that league at the time. Ex. 44 at 3. Unlike Request Nos. 54-57 of the Second Set of Requests, which seek the negotiation communications and agreement terms, Request No. 4 targets the actual payments made under those agreements. This distinction matters because the agreement terms alone may not tell the full story. Many athlete agreements are structured to pay on a per-autograph basis, so the terms may show only the rate—not the volume. The payment records will reveal how many autographs Fanatics actually purchased from each player. If Fanatics contracted for exclusive rights but then purchased

---

[11]    At 4:02 p.m. on June 9, 2026—shortly before Panini's letter was due—Fanatics purported to provide a folder of the athlete agreement summaries but stated it was withholding the password until "Panini makes the parallel production [Fanatics] seek[s] in [its] letter motion." This is not a production and is improper for the reasons explained above. Fanatics is still in violation of the Court's order.



far fewer autographs than those rights would permit, that supports Panini's allegation that Fanatics entered these deals not to use the rights but to deprive Panini of access to these players. Am. Compl. ¶¶ 164-165.

Fanatics agreed to produce these documents on May 5, 2026, for the 46 athletes that are the subject of the Court's November 20, 2025 Order, but subsequently retracted this agreement.[12] These documents are relevant to Panini's allegations that Fanatics locked up rookie autograph rights, *id.* ¶¶ 163-169, as they will show whether Fanatics offered inflated deals it could not use before its exclusive licenses took effect.

### 3. Supplemental Productions for Request Nos. 13, 96, 97, and 108, Second Set of Requests

Panini requests that the Court order Fanatics to supplement its productions of pricing, revenue, market share, and competitive data for Request Nos. 13, 96, 97, and 108 to include documents dated August 1, 2025, through April 30, 2026. *See* ECF No. 195-1 at 19-20, 81-82, 89. The parties agreed to a mutual July 31, 2025 end date for initial productions, with both reserving the right to request reasonable supplemental productions.[13] Panini exercised that right on April 23, 2026, seeking information from August 1, 2025, through April 30, 2026. *See* Ex. 42 (Panini Apr. 23, 2026 Ltr.) at 1. This supplemental data is essential to market definition, competitive effects, and damages because Fanatics' exclusive licenses for NBA and NFL cards took effect ***after*** July 31, 2025—meaning the current production does not capture the period when Fanatics actually held exclusive rights.

Fanatics agreed to produce responsive data from January 1, 2017 through July 31, 2025 and to address the production gaps identified by Panini during this period. However, Fanatics flatly refused to consider Panini's supplementation requests for responsive data after July 31, 2025 because Panini supposedly has not complied with its own discovery obligations to produce "Lincoln International sales materials from after 2021 and…Citigroup materials." Ex. 43 (Fanatics May 18, 2026 Ltr.) at 2 n.2. This is wrong. Panini has produced the Lincoln International documents. Panini has also agreed to produce the Citigroup documents, all of which entirely post-date the July 31, 2025 cutoff and are themselves a supplemental request by Fanatics. *See* ECF No. 282 at 1.[14]

Regardless, Fanatics cannot condition compliance with Panini's proper requests on unrelated disputes. *See Stokes v. Wayne Cnty.*, 2023 WL 4144507, at *2 n.6 (W.D.N.Y. June 23, 2023) ("Plaintiff's withholding of production of the requested information and documents contingent upon the production of discovery by the opposing party in this case was clearly improper" (citation omitted)).[15] The Court should order Fanatics to supplement its productions accordingly.

---

[12] Fanatics has stated it will produce payments for the 46 athletes only if Panini makes a "parallel production" of athlete agreement documents. But, as explained above, *see supra* n.10, Panini offered to make a "parallel production," and Fanatics rejected it.

[13] *See* ECF No. 209-4 (Panini Aug. 19, 2025 Ltr.) at 1; ECF No. 214-2 (Fanatics Aug. 28, 2025 Ltr.) at 1.

[14] Production of these materials has been delayed due to Fanatics baselessly insisting on a full custodial collection for this discrete body of documents. As Panini will show in opposition to Fanatics' contemporaneous letter motion, Fanatics has no right to dictate Panini's search process, *see Hyles v. New York City*, 2016 WL 4077114, at *3 (S.D.N.Y. Aug. 1, 2016), and its attempt to do so is inconsistent with the party's agreement on supplemental requests.

[15] Panini seeks here only to compel Fanatics to supplement its productions; it does not seek to control how it conducts it searches for responsive documents. However, if supplemental custodial collections do occur, then they should be mutual.



Respectfully submitted,

*/s/ Stuart Singer*

David Boies
Eric Brenner
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
dboies@bsfllp.com
ebrenner@bsfllp.com

Stuart H. Singer*
Sabria A. McElroy*
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
smcelroy@bsfllp.com

James P. Denvir*
Richard A. Feinstein*
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
jdenvir@bsfllp.com
rfeinstein@bsfllp.com

*Counsel for Panini America, Inc.*

**pro hac vice*

cc:    All Counsel of Record (by ECF)