LATHAM&WATKINS LLP quinn emanuel trial lawyers | new york

October 21, 2026

**Via ECF**

The Honorable Valerie Figueredo
United States District Court Magistrate Judge

Re: *Panini America, Inc. v. Fanatics, Inc. et al.*, Case No. 1:23-cv-09714-LTS-VF (S.D.N.Y. 2023)

Dear Judge Figueredo:

We write on behalf of Fanatics in the above-referenced matter to respectfully request that the Court compel Panini to produce documents in response to certain of Fanatics' Requests for Production ("RFPs"). Specifically, Fanatics seeks production of documents related to (1) the Better Business Bureau's (BBB) investigation of Panini in or around 2021, (2) Panini's customer service metric data, (3) specific statements made in the Confidential Information Presentation prepared by Lincoln International (the "CIP"), (4) [redacted] and (5) documents related to an Innate Motion research report. Fanatics respectfully requests that the Court hear argument on these RFPs at the December 7, 2026 conference. *See* ECF No. 646.

**I. Better Business Bureau's Investigation (RFP 122)**

Panini refuses to produce documents responsive to Fanatics' RFP 122, which seeks documents and communications related to the BBB investigation of Panini in or around 2021, including (1) the underlying customer complaints identified or reviewed by BBB, (2) Panini's communications with BBB, (3) BBB's proposed or requested changes to Panini's business practices, and (4) any actual or contemplated actions taken in response to BBB. Ex. 1, at 2 (Fanatics' Fifth Set of RFPs).

Panini objects that RFP 122 "has no plausible relevance to the claims or defenses in this action" because the BBB investigation began in October 2021, after Fanatics' announcement of the acquisition of certain league and player association licenses in August 2021. Ex. 2, at 2 (Panini Oct. 7 Letter). That argument fails for many reasons. First, Fanatics' agreement with NFL, one of the license agreements at issue in this case, was not signed until October 2022, one year after the BBB investigation began. Second, the underlying customer complaints and investigation may reveal poor performance that pre-dates Fanatics' announcement of the acquisition of certain licenses in August 2021. Third, Panini has already conceded that customer complaints post-dating Fanatics' acquisition of certain licenses in 2021 are relevant by agreeing to produce documents responsive to RFP 18—which seeks documents related to Panini's customer service problems—through July 31, 2025. Finally, Panini's ongoing customer service problems after Fanatics' announcement of its acquisition of certain licenses are plainly relevant to core issues in this case, including injury, damages, and mitigation. For example, Fanatics is entitled to seek discovery that demonstrates that Panini's claims of ongoing lost revenue are caused by Panini's own poor performance, rather than any anticompetitive action by Fanatics.

Fanatics' requested relief is narrow: Panini should be ordered to make two minor modifications to the search string for RFP 18 and produce incrementally responsive documents.

Because the search string for RFP 18 may not capture documents related to the BBB investigation, Fanatics requests that Panini add two words, "BBB" or "Better Business Bureau," to the agreed-upon search string for RFP 18. Ex. 3, at 2 (Fanatics Sept. 8 Letter). Fanatics has also agreed to limit the time period of this request to October 1, 2021 to July 31, 2025, based on Panini's representations about when the BBB investigation began. Ex. 4, at 1-2 (Fanatics Oct. 16 Letter). Given the minimal burden imposed on Panini to produce these plainly relevant documents, Panini should be compelled to make this production.

## II. Customer Service Metric Data (RFP 132)

Panini refuses to produce documents responsive to Fanatics' RFP 132, which seeks documents sufficient to show Panini's customer abandonment rates, response times, customer satisfaction scores and staffing levels for customer service operations. Ex. 1, at 5 (Fanatics' Fifth Set of RFPs). These metrics are directly relevant to Fanatics' defense that Panini lost the licenses due to its own poor performance, rather than any alleged anticompetitive action by Fanatics. They are also relevant to Fanatics' defenses that Panini's own business failures—not any alleged conduct by Fanatics—caused Panini's alleged injuries and that Panini failed to mitigate its damages.

During the meet-and-confer process, Panini suggested it would condition its production of documents responsive to this Request on Fanatics' willingness to produce corresponding customer service metric data in response to Panini's RFP 17 in its Fourth Set of RFPs. Ex. 2, at 3 (Panini Oct. 7 Letter). But the parties already extensively negotiated Fanatics' production of such data and reached an agreement regarding Fanatics' production more than a month ago, on September 17. Ex. 5 (Sept. 17 Email from J. Mugler). Panini cannot now back out of that agreement or attempt to modify it after the fact.[1] Further, Panini has failed to articulate why Fanatics' customer service metrics have any relevance to the antitrust case. Put simply, Panini's customer service metrics are relevant; Fanatics' are not; and, regardless, Fanatics has already agreed to produce certain such metrics. The Court should order Panini to produce documents responsive to RFP 132 without conditions.

## III. Language Used in the Confidential Information Presentation Prepared by Lincoln International (RFPs 136, 138, 140, 141, 142)

Panini refuses to produce any documents in response to RFPs 136, 138, 140, 141, 142, which seek documents and communications concerning very specific statements made in the Confidential Information Presentation prepared by Lincoln International (the "CIP"). Ex. 1, at 5–6 (Fanatics' Fifth Set of RFPs). The CIP is a critical document in this case: [redacted] Panini did not produce the CIP until April 2026.

Panini argues that Fanatics' Requests are duplicative because they relate to "license negotiations, competition for licenses, sales of trading cards without league licenses, business growth, and Panini's response to Fanatics' acquisition of the league and player association licenses," which are covered by other Requests. Ex. 2, at 4 (Panini Oct. 7 Letter). Panini

[1] Despite Fanatics' repeated requests, Panini refused to provide Fanatics with a proposal for what it would consider a production "reciprocal" to Fanatics' agreed production.

misunderstands the nature of the Requests, which were served to ensure that the specific language Panini uses is included in search strings. Fanatics identified in the CIP precise language Panini employs to discuss critical issues in this case, such as [redacted] league and PA licenses with individual player licenses (RFP 136), [redacted] competitors with [redacted] (RFP 138), and making [redacted] collections or albums (RFP 140). When the parties negotiated the search terms for earlier requests, this language was unknown to Fanatics and thus not included in search strings. When Panini finally produced the CIP on April 16, 2026, Fanatics promptly served targeted discovery requests on May 6, 2026 using the specific language in the CIP.

Fanatics now asks Panini to make a handful of minor modifications to existing search strings to ensure that the language Panini actually uses is incorporated in the searches. Ex. 3, at 5–7 (Fanatics Sept. 8 Letter). Panini has not substantiated any burden argument: while it first claimed Fanatics' proposed search terms "would add approximately 56,000 hits, including families," Panini failed to state whether this is a de-duplicated figure, Ex. 2, at 4 (Panini Oct. 7 Letter), and later disclosed that there was an "error" in that figure anyway, Ex. 6 (Oct. 20 Email from W. Harvey). In any event, Fanatics has agreed to review similar volumes at Panini's request, *see, e.g.*, Ex. 7 (Jan. 7, 2026 Email from T. Ovrom accepting Panini's proposal to add a term that generated 80,000 hits, including families, for just two RFPs), and Panini's use of a GenAI tool to review and code documents substantially lessens any purported burden.

The Court should order Panini to produce documents responsive to RFPs 136, 138, 140, 141, and 142 using Fanatics' proposed modifications to the existing search strings.

**IV.** [redacted]

[redacted] *See, e.g.,* Ex. 8 at 279:1-300:6 (A. Nassar Dep. Tr.). Documents related to this meeting are plainly responsive to numerous Requests issued by Fanatics, including, for example, RFP 5 ("All Communications between You and any League, Association, Player, or Entertainment Licensor since 2015 concerning Fanatics or the production or sale of Collectibles."). *See* ECF 332-1. Panini has not produced any slide decks, meeting minutes, or other material generated in connection with this meeting, despite their obvious relevance and responsiveness. The Court should order Panini to produce documents related this meeting.

**V. Innate Motion Market Research Report**

Finally, discovery has shown that Panini commissioned, received, and heavily relied upon a market research report prepared by Innate Motion, a global consultancy. ECF 558-7. This research report describes Panini's competitors and consumer base in a way that directly undercuts Panini's alleged market definition. There are clear gaps, however, in Panini's productions related to this undeniably responsive report. For example, Fanatics has been unable to locate any communications preceding the report, documents related to Innate Motion's engagement (such as a scope of work), backup for the report, or discussion materials related to numerous internal Panini meetings that centered around the report. The Court should compel Panini to produce all documents related to this report.

Respectfully submitted,

*/s/ Michael B. Carlinsky*[2]
Michael B. Carlinsky
Quinn Emanuel Urquhart & Sullivan LLP
295 Fifth Avenue
New York, NY 10016
michaelcarlinsky@quinnemanuel.com
(212) 849-7000

*Counsel for Fanatics*

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
lawrence.buterman@lw.com
(212) 906-1200

*Counsel for Fanatics*

[2] Fanatics uses electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.