# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PANINI AMERICA, INC.

*Plaintiff,*

v.

FANATICS, INC., FANATICS, LLC, FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC., FANATICS SPV, LLC, and FANATICS HOLDINGS, INC.

*Defendants.*

FANATICS COLLECTIBLES TOPCO, INC.,

*Plaintiff,*

v.

PANINI S.P.A.,

*Defendant.*

Case No. 1:23-cv-09714-LTS-VF
[Rel. Case No. 1:23-cv-06895-LTS-VF]

**JURY TRIAL DEMANDED**

**NOTICE OF RULE 30(b)(6) DEPOSITION**

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the Local Rules of the Southern District of New York, and the Stipulation and Order Regarding Depositions (Dkt. 345) (the “Deposition Protocol”), Plaintiff Panini America, Inc. (“Panini”) will take the deposition of the corporate representative(s) of Defendants Fanatics, Inc., Fanatics, LLC, Fanatics Collectibles Intermediate Holdco, Inc., Fanatics SPV, LLC, and Fanatics Holdings, Inc. (collectively, “Fanatics”) regarding the subject matters identified in, and based on the definitions and instructions provided in, **Exhibit A** attached hereto, and the following terms:

1. **Date and Time.** The deposition will take place on [DATE] beginning at [TIME] EST. The date and time are subject to confirmation following the good-faith conferral between the Parties required by Paragraph 3 of the Deposition Protocol.

2. **Location.** The deposition will be held at the offices of Boies Schiller Flexner LLP, 55 Hudson Yards, 20th Floor, New York, NY 10001, or at another mutually agreed location, consistent with Paragraph 10 of the Deposition Protocol.

3. **Recording.** The deposition will be taken upon oral examination before an officer duly authorized to administer oaths. Testimony given during the deposition will be recorded stenographically and by audiovisual means by a certified court reporter and videographer.

4. **Governing Orders.** The deposition is subject to and governed by the Confidentiality Stipulation and Protective Order entered in this Action (Dkt. 160) and the Deposition Protocol (Dkt. 345). All documents and testimony produced or elicited at the deposition shall be treated in accordance with the terms of those orders.

5. **Designation of Corporate Representative(s).** Pursuant to Federal Rule of Civil Procedure 30(b)(6), Fanatics is required to designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf regarding the matters described in **Exhibit A** attached hereto. Each designated representative must testify about information known or reasonably available to Fanatics.

6. **Identification of Witnesses.** Pursuant to Paragraph 6 of the Deposition Protocol, no later than seven (7) days prior to the deposition, Fanatics shall provide the name(s) and title(s) of the witness(es) who will testify on its behalf, along with the specific topics on which each witness will testify.

7. **Duration.** Pursuant to Paragraph 23 of the Deposition Protocol, this Rule 30(b)(6) deposition shall last no more than seven (7) hours on the record, even if more than one individual is designated to provide testimony.

8. **Objections.** Pursuant to Paragraph 6 of the Deposition Protocol, any objections to the Rule 30(b)(6) topics set forth in **Exhibit A** shall be served within fourteen (14) days of service of this Notice. The Parties will meet and confer within seven (7) days thereafter to resolve any disputes regarding the noticed topics.

9. **Topics for Examination.** The topics on which Fanatics' designated corporate representative(s) are to be examined are set forth in Exhibit A attached hereto, which is incorporated herein by reference.

Dated: October 2, 2026

Respectfully submitted,

/s/*Stuart Singer*
David Boies
Eric Brenner
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
dboies@bsfllp.com
ebrenner@bsfllp.com

Stuart H. Singer*
Sabria A. McElroy*
Meredith Schultz*
Pascual Oliu*
Ana Carolina Varela*
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
smcelroy@bsfllp.com
mschultz@bsfllp.com
poliu@bsfllp.com
avarela@bsfllp.com

James P. Denvir*
Richard A. Feinstein*
William Harvey
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
jdenvir@bsfllp.com
rfeinstein@bsfllp.com
wharvey@bsfllp.com

*Counsel for Panini America, Inc.*

**pro hac vice*

cc: All Counsel of Record (by ECF)

**CERTIFICATE OF SERVICE**

A true and correct copy of the foregoing Notice of Deposition was served or delivered electronically via email to all counsel of record on October 2, 2026.

*/s/ Stuart Singer*
Stuart Singer

# **EXHIBIT A**

## **DEFINITIONS**

1. The Uniform Definitions in Discovery Requests set forth in Rule 26.3 of the Local Rules for the United States District Court for the Southern District of New York are hereby incorporated by reference.

2. The terms defined below and used in each of the topics should be construed broadly to the fullest extent of their meaning consistent with Southern District of New York Local Rule 26.3.

3. For the purposes of reading, interpreting, or construing the scope of this Notice, the terms used shall be given their most expansive and inclusive interpretation. This includes, without limitation, the following:

   a. The terms “all,” “any,” and “each” shall each be construed as encompassing any and all;

   b. The connectives “and” and “or” shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the deposition topics all responses that might otherwise be construed to be outside of its scope;

   c. The use of the singular form of any word includes the plural and vice versa;

   d. The masculine, feminine, or neutral pronoun shall not exclude other genders;

   e. The word “including” shall be read to mean including without limitation;

   f. The present tense shall be construed to include the past tense and vice versa;

   g. References to employees, officers, directors, or agents shall include both current and former employees, officers, directors, and agents.

4. “Action” or “Actions” refers to the above-captioned cases, including *Panini America, Inc. v. Fanatics, Inc. et al.*, Case No. 1:23-cv-09714-LTS-VF (S.D.N.Y.), and the related action, *Fanatics Collectibles Topco, Inc. v. Panini S.p.A.*, Case No. 1:23-cv-06895-LTS-VF (S.D.N.Y.).

5. “Amended Complaint” means the First Amended Complaint as amended by the Joint Stipulation for Plaintiff’s Leave to Amend First Amended Complaint. *See* Dkt. 69, 357.

6. “Athlete” means an athlete who participates in sports and includes athletes who participate in sports at any and all levels, including, but not limited to, the professional and collegiate levels.

7. “Autograph” refers to an Athlete’s wet signature.

8. “Case Breakers” refers to individuals or businesses who buy new packs of Trading Cards for the purpose of opening them live over the internet.

9. “Communication” means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

10. “Exclusive Athlete Agreements” means any agreements entered into by Fanatics for exclusive rights to Autographs, memorabilia, name, image, likeness, or endorsement rights of any current or future Athlete.

11. “Exclusive Licenses” refers to Fanatics’ exclusive license agreements with the NBA, NBPA, NFL, NFLPA, MLB, and MLBPA for Sports Trading Cards.

12. “Fanatics,” “You,” “Your,” or “Yours” mean Fanatics Holdings, Inc.; Fanatics Collectibles Topco, Inc.; Fanatics, Inc.; Fanatics, LLC; Fanatics Collectibles Intermediate HoldCo, Inc.; Fanatics SPV, LLC; and their lines of business, brands, affiliates, subsidiaries, and related parties, and includes each of their past and present officers, employees, agents and representatives,

parents and predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership of twenty-five percent or more or total or partial control between the company and any other Person or entity.

13. "GCP" means GC Packaging LLC and its affiliates, subsidiaries, and related parties and includes its past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership of twenty-five percent or more or total or partial control between the company and any other Person or entity.

14. "GCP Acquisition" refers to Fanatics' purchase and/or transfer(s) of interest in GCP from February 2022 through December 31, 2023.

15. "Licensors" means sports-related entities, including both sports leagues and players associations, who license rights related to Sports Trading Cards including, but not limited to, the NFL, NFLPA, NFL Properties, LLC, NFL Players, Inc., MLB, MLBPA, MLB Players, Inc., Major League Baseball Properties, Inc., NBA, NBPA, National Basketball Players, Inc., NBA Properties, Inc., or OneTeam.

16. "Local Card Shop" refers to a retail store that specializes in Trading Cards, and which sells Trading Cards directly to consumers either at a storefront or online.

17. "MLB" means Major League Baseball and its affiliates, subsidiaries, and related parties, including, but not limited to, Major League Baseball Properties, Inc., and includes each of their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. The terms "subsidiary,"

"affiliate," and "joint venture" refer to any firm in which there is total or partial ownership of twenty-five percent or more or total or partial control between the company and any other Person or entity.

18. "MLB Cards" means Sports Trading Cards featuring current or former MLB Players.

19. "MLB Players" refers to Athletes that play professional baseball for a team in MLB.

20. "MLBPA" means Major League Baseball Players Association and its affiliates, subsidiaries, and related parties, including, but not limited to, MLB Players, Inc., and includes each of their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership of twenty-five percent or more or total or partial control between the company and any other Person or entity.

21. "NBA" means National Basketball Association, Inc. and its affiliates, subsidiaries, and related parties, including, but not limited to, NBA Properties, Inc., and includes each of their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership of twenty-five percent or more or total or partial control between the company and any other Person or entity.

22. "NBA Cards" means Sports Trading Cards featuring current or former NBA Players.

23. "NBA Players" refers to Athletes that play professional basketball for a team in the NBA.

24. "NBPA" means the National Basketball Players Association and its affiliates, subsidiaries, and related parties, including, but not limited to, National Basketball Players, Inc. and THINK450, and includes each of their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership of twenty-five percent or more or total or partial control between the company and any other Person or entity.

25. "NFL" means the National Football League and its affiliates, subsidiaries, and related parties, including, but not limited to, NFL Properties, Inc., and includes each of their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership of twenty-five percent or more or total or partial control between the company and any other Person or entity.

26. "NFL Cards" means Sports Trading Cards featuring current or former NFL Players.

27. "NFL Players" means Athletes that play professional football for a team in the NFL.

28. "NFLPA" or "NFLPI" means the National Football League Players Association or National Football League Players Incorporated and its affiliates, subsidiaries, and related parties and includes each of their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial

ownership of twenty-five percent or more or total or partial control between the company and any other Person or entity.

29. "OneTeam" means OneTeam Partners, LLC, and its affiliates, subsidiaries, and related parties, and includes each of their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership of twenty-five percent or more or total or partial control between the company and any other Person or entity.

30. "Panini" means Panini America, Inc., and its parent, Panini S.p.A., along with its affiliates, subsidiaries, and related parties.

31. "Person" means any natural person or any legal entity, including, without limit, any business or governmental entity or association.

32. "Primary Market" means the initial sale or distribution of new, unopened Sports Trading Card products (including boxes, packs, and cases) by a manufacturer or licensee, such as Fanatics, Topps, Panini, Upper Deck, or Leaf, whether sold directly to consumers (including through the manufacturer's own websites, apps, or other direct-to-consumer channels) or through distributors, mass-market retailers, hobby shops, or other authorized resellers, and including the subsequent sale of such products by those distributors, retailers, hobby shops, or authorized resellers to consumers.

33. "Retailer" refers to a retail store that offers a wide variety of goods for sale directly to consumers through in person locations and online. Examples of Retailers include Walmart and Target.

34. "Rubin" refers to Michael Gary Rubin, the founder of Fanatics, individually, and any and all of his representatives, agents, consultants, assigns, trustees, administrators, and any other person acting on his behalf.

35. "Rubin Affiliated Company" means any entity, other than Fanatics, in which Rubin, directly or indirectly, individually or together with his family members, affiliates, or other related parties: (a) owns, controls, or holds a beneficial interest of the outstanding voting securities or ownership interests; (b) serves as an officer, director, manager, member of the board of directors or managers, general partner, or in any other management or controlling capacity; (c) has the power to direct or cause the direction of management and policies, whether through ownership of voting securities, by contract, or otherwise; or (d) otherwise controls or has the ability to control or significantly influence. This definition includes, without limitation, all subsidiaries, affiliates, predecessors, successors, assigns, parent companies, sister companies, joint ventures, partnerships, limited liability companies, trusts, and any other business entities or arrangements in which Rubin has any of the foregoing relationships or interests, regardless of the form of organization or the jurisdiction of organization.

36. "Secondary Market" means any resale, trade, auction, or other transfer of Sports Trading Cards (including single cards, lots, collections, graded cards, and opened boxes, packs, or cases) after their initial sale in the Primary Market.

37. "Sports Trading Cards" refers to collectible cards featuring the NIL of Athletes that may also include Autographs and other Sports Trading Card attributes, including facsimile signatures, artwork, and tangible items (e.g., pieces of an Athlete's jersey).

38. "Topps" means The Topps Company, Inc. and its affiliates, subsidiaries, and related parties, and includes each of their past and present officers, employees, agents and representatives,

parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. The terms “subsidiary,” “affiliate,” and “joint venture” refer to any firm in which there is total or partial ownership of twenty-five percent or more or total or partial control between the company and any other Person or entity.

39. “Topps Acquisition” refers to Fanatics’ purchase of Topps in January 2022.

40. “Trading Cards” refers to collectible cards featuring images of real or fictional people, characters (e.g., Pokémon, Disney characters, Marvel characters), or things.

41. “WWE” refers to World Wrestling Entertainment, LLC.

42. Any reference to a Person that is a business entity and is not otherwise defined includes that Person’s predecessors (including any preexisting Person that at any time became part of that entity after merger or acquisition), successors, parents, divisions, subsidiaries, affiliates, franchisors and franchisees; each other Person directly or indirectly owned or controlled by any of them; each partnership or joint venture to which any of them is a party; all present and former directors, officers, employees, agents, consultants, controlling shareholders (and any entity owned by any such controlling shareholder), and attorneys of any of them; and any other Person acting for or on behalf of any of them.

43. Unless words or terms have been given a specific definition, each word or term used here shall be given its usual and customary dictionary definition except where such words have a usual custom and usage definition in Your trade or industry, in which case they shall be interpreted under such usual custom and usage definition of which You are aware.

## INSTRUCTIONS

1. Unless otherwise stated in a topic, the time period applicable to these topics is January 1, 2017, through the date of the deposition.

2. The definitions set forth above shall apply when the defined term is used regardless of whether the term is capitalized.

3. Notwithstanding any definition set forth above, each word, term, or phrase used in each topic is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure.

4. Each topic shall be construed independently, and no topic shall be viewed as limiting the scope of any other topic.

5. Pursuant to Rule 30(b)(6), Defendants are obligated to prepare each designated witness to testify fully regarding all information known or reasonably available to Defendants with respect to each topic, and not merely regarding information personally known to the individual designee. This preparation obligation includes, without limitation, reviewing documents, consulting with current and former employees, and making reasonable inquiry of all persons with knowledge of the subject matter of each topic.

6. If You object to any portion of a topic, state Your objection(s) with specificity and designate a qualified and knowledgeable witness to testify as to the portion(s) to which You do not object.

7. Where knowledge or information in Your possession is requested in a topic, the topic extends to knowledge or information in the possession of Your predecessors and/or successors, as well as information in the possession of Your officers, directors, agents, members, employees, servants, representatives, and, unless privileged, attorneys.

8. These topics are propounded for the purpose of discovery and are not to be taken as waiving any objections that may be made at trial to the introduction of evidence on subjects covered by these topics, or as an admission of the relevance or materiality at trial of any of the information requested by these topics.

## TOPICS

1. **Negotiation of Exclusive Licenses**. The negotiation of the Exclusive Licenses, including but not limited to:

   a. the process by which each Exclusive License was negotiated;

   b. the negotiation of the financial terms and durations of each Exclusive License;

   c. whether any competitive or open bidding process was conducted;

   d. the acquisition, possession and use of information concerning Panini's license agreements;

   e. the negotiation and provision of equity ownership interests in a Fanatics entity or options to acquire such interests provided to Licensors, OneTeam, and any persons related to Licensors;

   f. other monetary or non-monetary consideration provided to Licensors, OneTeam, and any persons related to Licensors

   g. analyses at or before the acquisition of such licenses concerning the competitive implications of acquiring such Exclusive Licenses.

2. **Length of Exclusive Licenses:** Any analysis, discussion, or consideration concerning the duration of the Exclusive Licenses that Fanatics obtained, including but not limited to:

   a. any studies or other materials that supported the need for the duration of the Exclusive Licenses that Fanatics obtained;

   b. any discussion with Licensors regarding the possibility and commercial viability of shorter durations; and

c. any consideration of whether Fanatics would have agreed to shorter durations of the Exclusive Licenses, including whether it would have agreed to Exclusive Licenses equivalent to the length of Panini's then-existing licenses with the Licensors.

3. **Market Definition:** Fanatics' understanding of the competition between itself and other companies which produce Sports Trading Cards, including Panini, Upper Deck, and Leaf, and the geographic areas in which it sells, markets, and distributes Sports Trading Cards, including but not limited to:

a. the preparation of any analysis by or for Fanatics, or relied upon by Fanatics, which describes the market for Sports Trading Cards;

b. the preparation of any analysis by or for Fanatics, or relied upon by Fanatics, which identifies whether Sports Trading Cards are substitutes for, or are reasonably interchangeable with, other Sports Trading Cards and/or other types of sports collectibles;

c. the preparation of any analysis by or for Fanatics, or relied upon by Fanatics of products, that You consider to be substitutes for, or reasonably interchangeable with, NFL Cards, MLB Cards, and NBA Cards;

d. statements made to third parties, including investors, lenders, ratings agencies, or licensors, concerning Your market position or the competitive landscape in Sports Trading Cards; and

e. the extent, if any, to which Fanatics views Sports Trading Cards sold in the Secondary Market as competing with or constraining sales of its Sports Trading Cards in the Primary Market.

4. **Market Share**. Fanatics' market share in the product and geographic markets for this case, including but not limited to:

a. Fanatics' share in the markets as defined by plaintiffs, at relevant times;

b. Fanatics' share in any product or geographical markets Fanatics contends are more appropriate in connection with this case;

c. any change in Fanatics' market share in the above markets since acquisition of the Exclusive Licenses; and

d. any change in Fanatics' market share in the above markets following any price increases Fanatics has initiated since obtaining the Exclusive Licenses.

5. **Investor materials**. Any presentations to or materials prepared for investors, board members, potential partners, lenders, or co-investors concerning Your Sports Trading Card business, including but not limited to:

a. Your market position, market share, competitive landscape, or growth strategy in Sports Trading Cards;

b. any representations, projections, or analyses concerning planned, anticipated, or implemented price increases for Sports Trading Cards;

c. valuations, financial models, or analyses of Topps, Panini, GCP, or any other Sports Trading Card business prepared for, presented to, or shared with investors, board members, potential partners, or lenders;

d. projections, reports, or analyses concerning Fanatics' revenues, costs, profit margins, EBITDA, or other measures of financial performance related to Sports Trading Cards; and

e. representations concerning the value or expected returns of equity interests in Fanatics or any Fanatics entity provided to Licensors, OneTeam, or any persons related to Licensors.

6. **OneTeam**. Your relationship with OneTeam, including but not limited to:

a. The role of Fanatics, zerocool and Rubin in connection with the creation and operation of OneTeam;

b. the role of OneTeam or any of its officers or employees in the negotiation, execution, or acquisition of any Exclusive License;

c. the role of OneTeam in the launch and creation of Fanatics Collectibles;

d. any agreements between Fanatics and OneTeam, whether or not committed to writing; and

e. any equity in OneTeam owned by Rubin, Gary Gertzog, any Rubin Affiliated Company, Fanatics, or any Licensor.

7. **Acquisition of GCP.** The circumstances surrounding Your initial partial acquisition and subsequent full ownership of GCP, including but not limited to:

a. Your knowledge of the change-of-control provision in the Panini S.p.A.–GCP contract; and

b. the structure of Fanatics' and/or Ames Watson's acquisition of GCP.

8. **Operation of GCP**. The day-to-day operations of GCP since Your acquisition of a minority interest in 2022 and later full ownership of GCP in 2023 thereafter, including but not limited to:

a. changes made to the number of machines dedicated to producing Sports Trading Cards for Panini;

b. Your involvement in discussions and considerations concerning scheduling, capacity, service, and manufacturing allocation decisions affecting Panini and other GCP customers;

c. discussions between Fanatics, GCP, Lids, and/or Ames Watson concerning scheduling, capacity, service, and manufacturing allocation decisions affecting Panini; and

d. discussions with representatives of Panini concerning Fanatics' ability to control GCP's manufacture of Sports Trading Cards for Panini.

9. **Hiring of Panini Employees**. Your efforts to recruit, solicit, hire, or otherwise engage current or former Panini employees beginning in or around March 2023, including but not limited to:

a. the business purpose and timing of these hiring efforts, including any analysis of the costs and benefits of hiring Panini employees in or around March 2023 rather than closer to when Fanatics could offer fully licensed basketball and/or football Sports Trading Cards;

b. how Fanatics determined the compensation and benefits offered to Panini employees, including any comparison to prevailing market rates or to Fanatics' own compensation practices for comparable positions;

c. whether Panini employees were recruited through the same hiring process applied to other candidates, including whether the positions were publicly posted, whether other candidates were considered, and whether Fanatics specifically targeted Panini employees;

d. the roles, responsibilities, and work assignments of each former Panini employee after joining Fanatics; and

e. Your knowledge of, and compliance with, any non-solicitation and confidentiality restrictions applicable to current or former Panini employees, and any use of confidential, proprietary, or trade secret information obtained from former Panini personnel.

10. **Statements and Communications Concerning Panini**. Statements made by You, Rubin, any Rubin Affiliated Company, or any of Your employees in 2023 to third parties concerning Panini's financial status, licenses, products, market position, or business prospects.

11. **Pricing Policies and Practices**. Fanatics' policies and practices for setting the prices of Sports Trading Cards, including but not limited to:

a. the prices Fanatics has set for Topps-branded and Fanatics-branded products following the Topps Acquisition, including any increases to box pricing, presale pricing, and per-card pricing, and the timing, amount, and reasons for each such increase;

b. internal analyses or projections of the effect of actual or contemplated price increases on consumer demand, revenue, and margins;

c. the factors Fanatics considers in setting prices, including the extent, if any, to which the prices of other Trading Cards or collectibles products constrain Fanatics' pricing, and the extent, if any, to which Fanatics monitors, analyzes, or relies upon Secondary Market prices for Sports Trading Cards (including prices on eBay, Whatnot, or other resale or auction marketplaces) in setting or adjusting its Primary Market prices; and

d. minimum price requirements or other pricing policies imposed on Retailers, Case Breakers, or Local Card Shops.

12. **Transaction Data**. The Fanatics and Topps transaction-level sales data for wholesale and direct-to-consumer sales from 2017 to 2026, including the data referred to in the Sept. 4, 2026, production letter from Kathryn D. Bonacorsi and Lawrence E. Buterman and any supplemental productions of similar transaction-level sales data, including but not limited to:

a. how that data is entered and maintained;

b. how that data is used by Fanatics and its employees;

c. how that data is interpreted by Fanatics and its employees;

d. the meaning of each "field" or "column" within that data set; and

e. the meaning of any codes within that data set.

13. **Product Quality and Control**. Information about the quality of your Sports Trading Card products, including but not limited to:

a. any known defects, collation errors, missing inserts, off-center cutting, delamination, or other manufacturing defects in Sports Trading Cards produced by or for Fanatics, and the frequency and severity of such defects;

b. any allegations, complaints, or investigations—whether internal or external—concerning the intentional pre-sorting, 'loading,' or preferential allocation of boxes or cases containing a disproportionate number of high-value, rare, or limited-edition cards to particular streamers, Case Breakers, influencers, or other preferred customers or partners; and

c. policies, procedures, or practices governing the allocation, distribution, or sequencing of high-value or limited-edition cards across boxes, cases, or product runs, including any practices designed to ensure or undermine randomization.

14. **Output Reductions**. Discussions or analyses in connection with any changes—whether contemplated or implemented—in Sports Trading Card output since You obtained the Exclusive Licenses, including but not limited to:

a. decisions to reduce the number of card counts per box, the number of Autographs or other relics per box, or other product content per box;

b. decisions to discontinue or modify product lines; and

c. the impact of those changes.

15. **Redemption Practices and Metrics**. Fanatics' practices and policies concerning the issuance, tracking, fulfillment, and retirement of redemption cards, including but not limited to:

a. Fanatics' policies and procedures for fulfilling redemption obligations;

b. the metrics Fanatics tracks, monitors, or reports regarding redemptions;

c. any changes to Fanatics' redemption practices, policies, or metrics over time, including but not limited to changes implemented following the Topps Acquisition;

d. the identity and responsibilities of each individual at Fanatics responsible for overseeing, managing, or reporting on redemptions or redemption-related metrics; and

e. any consumer complaints, litigation, or other third-party claims relating to Fanatics' redemption practices.

16. **Distribution Policies and Practices**. Your policies and practices for the distribution of Sports Trading Cards from the date You first executed an Exclusive License through the present, including but not limited to:

a. the termination of Your relationships with distributors, including but not limited to GTS Distribution;

b. Your relationships and agreements with Case Breakers, including the terms of any such agreements, any allocation of product to Case Breakers (including any Case Breaker-exclusive products), any requirements that Case Breakers use Fanatics Live or other Fanatics platforms, any rules or restrictions governing Case Breakers' conduct, and any preferential Case Breaker reseller programs (including the Direct Breaker program and the Medallion program);

c. Your negotiations or renegotiations of terms with Retailers or Local Card Shops concerning Sports Trading Cards;

d. the data that You collect from Retailers, Case Breakers, Local Card Shops, or distributors; and

e. any restrictions or limitations imposed by You on Retailers, Local Card Shops, or Case Breakers (*e.g.*, pricing margins, shelf space allocation, or brand exclusivity).

17. **Athlete Signing and Payment Practices**. Fanatics' signing of Athletes, including rookie Athletes, to Exclusive Athlete Agreements prior to the effective dates of the Exclusive Licenses, including during the remaining terms of Panini's licenses with the NBA, NBPA, NFL, and NFLPA, including but not limited to:

a. the financial and non-financial terms of such agreements, including how the compensation Fanatics offered compared to the market rate or to any competing

offers from Panini, and any internal guidelines, product plans, approval processes, or budgets governing such agreements;

b. the business rationale for entering into such agreements before the effective dates of the Exclusive Licenses, including Fanatics' plans or ability to use those Athletes' Autographs, names, images, and likenesses on Sports Trading Cards bearing league marks before those dates;

c. the number of Autographs Fanatics contracted for under each such agreement compared to the number it actually used in products, by year, including any "excess autographs" or "autos left on deals" tracked in Fanatics' Airtable system or elsewhere, *see* Wilkes Tr. 134:3-14;

d. products Fanatics manufactured, marketed, sold, or distributed using such Athletes' rights before the effective date of the relevant Exclusive License, and the revenues, costs, and profits or losses Fanatics realized on each such Exclusive Athlete Agreement, including any internal analyses of whether such agreements were profitable;

e. amounts paid and unpaid under such agreements, and the reasons for any payments below the guaranteed amounts; and

f. any threats, inducements, or representations made by Fanatics to Athletes, player agents, player representatives, or players associations concerning the execution or terms of Exclusive Athlete Agreements, including regarding future exclusivity or access to the Sports Trading Card market.

18. **Jersey Sales to Panini**. Any actual or potential efforts by You to terminate, decrease, or otherwise change the sale process of Your supply of jerseys to Panini, including

information about whether Panini currently purchases jerseys from You and whether Fanatics ceased selling jerseys to Panini directly.

19. **Early-Termination and Buyout Discussions with Panini.** Fanatics' efforts in 2022 and early 2023 to either purchase Panini outright or to acquire Panini's Licenses through early termination of such licenses and to acquire other assets of Panini, including but not limited to:

a. internal analysis of the value of such early termination;

b. due diligence performed by Fanatics in connection with such potential transaction;

c. demands by Fanatics that Panini assume certain risks regarding potential forfeiture and recapture of such licenses or alleged frustration of purpose of the transaction and the relationship of such requests to the perceived antitrust risks in the transaction;

d. structuring of the proposed transaction to avoid a Hart Scott Rodino filing by Fanatics; and

e. Fanatics' knowledge of any alleged "second set of books" or other undisclosed financial records kept by Panini, including when and how Fanatics learned of them and how they affected Fanatics' valuation of, or decision-making regarding, the proposed transaction.

20. **Document Preservation and Collection**. Fanatics' identification, preservation, and collection of documents and electronically stored information ("ESI") in connection with this Action, including but not limited to:

a. the date(s) on which Fanatics first anticipated litigation, and its litigation hold notices, including the date(s) of issuance, recipients, scope, and any updates;

b. the persons responsible for overseeing Fanatics' preservation and collection efforts;

c. the data identified, preserved, and collected from, including any sources excluded from preservation or collection and the reasons for such exclusions;

d. the process by which Fanatics collected documents and ESI, including the date(s) and method(s) of collection; and

e. Fanatics' document retention and destruction policies, any modifications to such policies after litigation was anticipated, and any loss, deletion, or destruction of documents or ESI after Fanatics' preservation obligations arose.

21. **Procompetitive Justifications**. For each act or course of conduct alleged against You in this Action to be anticompetitive, the factual basis for Your contention that such conduct was "lawful, reasonable, justified, procompetitive, and were undertaken in good faith to advance legitimate business interests and had the effect of promoting, encouraging, and increasing competition," Defs.' Answer and Affirmative Defenses, Dkt. 389, at 44-45, including but not limited to:

a. the "investments and innovations" that You allege caused the "industry to explode[] in growth and popularity," Defs.' Answer and Affirmative Defenses, Dkt. 389, at 3;

b. any benefits to consumers, including with respect to price, output, product quality, or consumer choice, that You contend resulted from such conduct; and

c. the facts supporting any contention that the exclusivity, duration, or aggregation of the Exclusive Licenses was necessary to achieve any claimed investment, innovation, or other procompetitive benefit.

22. **Affirmative Defenses**. The factual basis for the affirmative defenses asserted in this Action.

23. **Fanatics' Tortious Interference Claims**. The factual basis for Fanatics' allegation in Count 1 of the Second Amended Complaint that Panini interfered with Fanatics' prospective business relationship with current or former Panini employees, including but not limited to:

a. the identity of each current or former Panini employee with whom Fanatics claims it had a prospective business relationship that Panini interfered with;

b. any evidence that Panini threatened litigation or told any employee that Fanatics would be exposed to scrutiny by licensors or that Fanatics' contracts with licensors could be voided in order to prevent employee departures from Panini;

c. any evidence that Panini's alleged litigation threats or statements caused any current or former Panini employee not to pursue, or not to accept, employment with Fanatics;

d. efforts by Fanatics to employees for the positions it alleges current or former Panini employees would have applied for or filled in the absence of Panini's alleged tortious interference; and

e. any damages suffered by Fanatics arising from the alleged tortious interference.